```
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
```

United States of America,      ) Criminal Action
                               ) No. CR 15-23
                  Plaintiff,   )
                               ) Evidentiary Hearing
vs.                            )
                               ) Washington, DC
David Flowers,                 ) November 6, 2015
                               ) Time:  9:30 a.m.
                  Defendant.   )
_____

```
TRANSCRIPT OF EVIDENTIARY HEARING
HELD BEFORE
THE HONORABLE JUDGE BERYL A. HOWELL
UNITED STATES DISTRICT JUDGE
```
_____

```
A P P E A R A N C E S
```

For the Plaintiff:      **Darlene Michele Soltys**
                        U.S. ATTORNEY'S OFFICE
                        555 Fourth Street, NW
                        Room 4110
                        Washington, DC 20530
                        (202) 252-7685
                        Email:  Darlene.soltys@usdoj.gov

For the Defendant:      **Matthew J. Peed**
                        CLINTON BROOK & PEED
                        1455 Pennsylvania Avenue, NW
                        Suite 400
                        Washington, DC 20004
                        (202) 621-1828
                        Email:  Matt@clintonbrook.com

_____

Court Reporter:         Janice E. Dickman, RMR, CRR
                        Official Court Reporter
                        United States Courthouse, Room 6523
                        333 Constitution Avenue, NW
                        Washington, DC  20001
                        202-354-3267
                        JaniceDickmanDCD@gmail.com

```
 1
                              INDEX
 2
      JEFFREY JOHANNES
 3        Direct Examination By Ms. Soltys.................... 17
          Cross-Examination By Mr. Peed......................111
 4        Direct Examination By Mr. Peed.....................220

 5    CHAD HOWARD
          Direct Examination By Ms. Soltys...................120
 6        Cross-Examination By Mr. Peed......................153
          Redirect Examination By Ms. Soltys.................166
 7
      INVESTIGATOR TRIDICO
 8        Direct Examination By Ms. Soltys...................172
          Cross-Examination By Mr. Peed......................186
 9        Redirect Examination By Ms. Soltys.................190
          Rebuttal Direct Examination By Ms. Soltys..........248
10        Rebuttal Cross-Examination By Mr. Peed.............250

11    SHERILL COPELAND
          Direct Examination By Mr. Peed.....................194
12        Cross-Examination By Ms. Soltys....................199
          Redirect Examination By Mr. Peed...................202
13
      KEVIN BROWN
14        Direct Examination By Mr. Peed.....................204
          Cross-Examination By Ms. Soltys....................209
15        Redirect Examination By Mr. Peed...................218

16    DAVID FLOWERS
          Direct Examination By Mr. Peed.....................225
17        Cross-Examination By Ms. Soltys....................234
          Redirect Examination By Mr. Peed...................246
18
      Government Rests.......................................170
19    Defendant Rests.......................................251

20                          *   *   *

21

22

23

24

25
```

```
1                      P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Matter before the Court,

3    criminal case number 15-23, United States of America versus

4    David Flowers.  Counsel please come forward and identify

5    yourselves for the record.

6              MS. SOLTYS:  Good morning, Your Honor.  I'm

7    Darlene Soltys on behalf of the United States.  And with me,

8    sitting at counsel table, is my legal assistant Brendan

9    Coyne, who will operate my laptop.

10             THE COURT:  Good morning.  Welcome.

11             MR. PEED:  Good morning, Your Honor.  On behalf of

12   David Flowers, Matthew Peed.

13             THE COURT:  Good morning.  Good morning, Mr.

14   Flowers.

15             We're here for a number, four to be exact, motions

16   pending.  And I want to start with the defendant's motion to

17   suppress statements and physical evidence, and then I'll

18   turn to the other three motions.

19             I understand that the government has two witnesses

20   to put on for this suppression hearing, so why don't we

21   start with that, and then the law enforcement officers can

22   get back to work.

23             MS. SOLTYS:  That's fine.

24             THE COURT:  So they don't have to sit through my

25   rendering of rulings, to the extent I can today.  Let me
```

1    just say my plan today is to address all the pending motions

2    and then to set a schedule for a trial.

3              MS. SOLTYS:  Okay.  That's fine.

4              THE COURT:  So, are there any other agenda items

5    that we should include today?

6              MS. SOLTYS:  No, I don't think so.

7              THE COURT:  Okay.  Good.  All right.  So are you

8    ready to proceed?

9              MS. SOLTYS:  I think so.  If I could have the

10   court's indulgence for one moment.

11             (Pause.)

12             THE COURT:  Before I start hearing testimony, I

13   have some questions for Mr. Flowers' counsel.  That may

14   also, actually, help you in your presentation of evidence

15   because I want to make sure exactly what the challenge is

16   and what I need to be focusing on and so on.  So, once

17   you -- you can figure out the technology in just a minute,

18   if you don't mind.  And let me hear from Mr. Peed.

19             MS. SOLTYS:  That's fine, Your Honor.  I'll ask

20   the first witness to step out of the courtroom.

21             THE COURT:  Okay.  Thank you.

22             MR. PEED:  Good morning, Your Honor.

23             THE COURT:  Good morning.  So I've reviewed all

24   the papers and I just want to make sure that I'm on the same

25   track as the parties.  It's my understanding that -- to the

1    extent that your motion is seeking to suppress statements,

2    the only statement at issue here, and I've looked through

3    all the papers, is this very brief response that Mr. Flowers

4    made to an MPD officer when he was first stopped.  Something

5    along the lines of, you know, you're going to arrest me

6    anyway, and declining to give consent to search.  Do I have

7    that right?

8              MR. PEED:  That's correct, Your Honor.

9              THE COURT:  Okay.  And your basis for -- and the

10   only basis you have for seeking suppression of that

11   statement is because your assertion is that there was no

12   traffic violation?

13             MR. PEED:  That's correct, Your Honor.

14             THE COURT:  All right.  And then moving along to

15   the motion to suppress the search warrant, you're not

16   challenging the fact there's probable cause reflected in the

17   search warrants, right?  The nature of your challenge is

18   there are material misstatements; basically, the officer

19   lied in his affidavit.  Do I have that right?

20             MR. PEED:  That's correct, Your Honor.  And lied --

21   and since the lie included information that was illegally

22   obtained, that information also needs to be taken out of the

23   warrants for probable cause.  It's not just -- it's not just

24   a misstatement, but that the misstatement also includes

25   material information that was obtained for the initial legal

1    search.

2              THE COURT:  So that all turns on the credibility

3    of the officer, in terms of whether he saw stuff in plain

4    view, whether he saw the traffic violation or not.  Do I

5    have that right?

6              MR. PEED:  That's right, Your Honor.

7              THE COURT:  Okay.  So what are the material

8    misstatements?  I have to say, I am very confused about what

9    you say are the material misstatements.  One in the -- in

10   the affidavit.  So, one material misstatement that I think

11   you allude to is -- or, that you're challenging is the

12   description of the -- seeing the traffic violation and

13   seeing the material in plain view, that much I got.  Is that

14   one of the material misstatements?

15             MR. PEED:  Yes, Your Honor.  We contend that --

16             THE COURT:  So what are the other material

17   misstatements?

18             MR. PEED:  There was one other material

19   misstatement I cited -- that's the main thrust of our

20   motion, Your Honor.

21             THE COURT:  That's the main thrust.

22             MR. PEED:  We contend that nothing was in plain

23   view, that the officers performed a search of the vehicle

24   and then later asserted that what they found was in plain view.

25             THE COURT:  Then you have this peculiar footnote,

1    footnote in page 1 of your paper, which I think is your

2    suggestion of another material misstatement.  And I have to

3    say, I did not understand your footnote, particularly after

4    I read all the attachments.  So maybe the government understood

5    you, but I didn't.

6            So could you explain, other than the alleged

7    material misstatement due to the -- seeing the traffic

8    violation and evidence in plain view in the defendant's car,

9    what is the other material misstatement in the affidavit?

10           MR. PEED:  Would you mind reading me the footnote,

11   Your Honor?  I have everything except my motion in front of me.

12           THE COURT:  Yes, I'll be glad to.  Your footnote

13   says, "The affidavit for a search warrant submitted by MPD

14   Detective Chad Howard states that traffic camera footage

15   from December 26, 2014," quote, "revealed a vehicle that

16   appeared to be similar to a Buick LaCrosse," close quote, "a

17   sedan-type vehicle, Exhibit A."

18           I checked the affidavit, you quoted it correctly.

19   You go on to say in your footnote, "The government makes a

20   similar claim in its 404(b) motion, docket 2 at 8."  Then

21   you go on to say, "The defense is not currently aware of

22   what images these claims relate to or how they relate to

23   PGPD's conclusion, based on the same footage, to search for

24   a," quote, "small SUV-type vehicle," close quote, Exhibit B.

25           And Exhibit B is simply a report, not from PG

1    County, but from -- as I read it, an FBI 302 report

2    reflecting information from a D.C. Metropolitan Police

3    detective's review -- or, officer's review of traffic camera

4    footage from the route that the GPS-tagged package was

5    traveling.  And, for some reason, the person writing the

6    report said these are the -- these are the vehicles that

7    might be of interest, using the term small SUV-type

8    vehicles.  But they're basically just following along the

9    traffic footage, tracking the GPS footage.  And based on

10   this review by MPD officers, they gave a list of the

11   different cars.

12            MR. PEED:  I understand now, Your Honor.

13            THE COURT:  That might be associated with a GPS

14   tracking device and the camera footage, so I really don't

15   understand that.  And if you're trying to say that there's

16   some other report, perhaps, that I don't know about.  But

17   could you explain what material misstatement you're

18   referring to?

19            MR. PEED:  I believe I can explain, Your Honor.

20   So, the main vehicle that is involved in this case,

21   obviously, the gold Buick LaCrosse that Mr. Flowers was

22   arrested in, that car is correlated in terms of the Maryland

23   robberies, the government will contend, with the latest

24   robbery at KFC.  About a month earlier was the CVS robbery

25   with the GPS tracker.  And I believe the government just may

1    have -- and Mr. Howard, mistakenly asserted that the

2    surveillance footage from that route, from the traffic

3    cameras, which was reviewed by D.C., then given to PG

4    County, revealed a similar car to a LaCrosse.

5              It was an SUV.  I reviewed the testimony of the

6    FBI Agent Johannes from -- the grand jury testimony last

7    night, and it was -- he cleared it up, in my mind, that it

8    appears -- and you can ask the government about this,

9    basically there were two different cars, but the government

10   and Mr. Howard had conflated them and said they were both a

11   Buick LaCrosse.  So the video footage reviewed by MPD

12   revealed a SUV car, silver SUV car, and that's what PG

13   County went out and looked for that night in the area of the

14   GPS tracker.

15             So that's the misstatement.  The misstatement is

16   that this Buick LaCrosse is correlated with both robberies.

17   It's only correlated with one robbery through the footage of

18   the KFC escape vehicle.  There's nothing with regard to the

19   CVS robbery that has anything to do with a Buick LaCrosse,

20   and that's the misstatement.

21             THE COURT:  Okay.  Well, you've totally confused

22   me; even more, actually.  Because as I understand it, the

23   December 26 CVS robbery was the one that had the GPS

24   tracking device.

25             MR. PEED:  That's correct, Your Honor.

1          THE COURT:  And it was based on following that

2     through camera traffic, camera footage, that particular

3     tracking device, that they came upon the 2002 Buick

4     registered to the 57th Street address where the defendant --

5          MR. PEED:  So that's not correct, Your Honor.

6     They followed that tracking device --

7          THE COURT:  So you're saying that this report,

8     Exhibit B, which says the following SUV type vehicles were

9     observed in the area, along the traffic route following the

10    GPS device, and they cite to the 2002 Buick registered to

11    27th Street Southeast, Washington, D.C., you're saying that

12    actual report is wrong?

13         MR. PEED:  I'm not saying it's wrong, Your Honor,

14    but it was not correlated to the CVS robbery.  There was no

15    vehicle associated with -- there were several vehicles on

16    the street of 57th Street.  So they were cataloging every

17    vehicle, but there was nothing special about a Buick

18    LaCrosse at that point because there was nothing tying a

19    Buick LaCrosse to the CVS.

20         THE COURT:  Correct, except the fact that they

21    followed the GPS tracking device and I think they picked up,

22    from the camera footage following the GPS tracking device,

23    various cars that were in the same location as the camera

24    footage, so --

25         MR. PEED:  At the same time, at the same location

1    there was a SUV, not a Buick LaCrosse.  That's a misstatement.

2    And I think the government will agree with me that there was

3    no Buick LaCrosse in that camera footage.

4         THE COURT:  No Buick -- so, this Exhibit B is

5    wrong when it says that they observed, on the traffic camera

6    footage following the tracking device, a 2002 Buick?

7         MR. PEED:  I believe so, Your Honor.  That's my

8    understanding.  And after reviewing --

9         THE COURT:  Is that correct?  I just want to know,

10   what material misstatements in this affidavit should I be

11   focusing on?  And I really didn't understand this one and I

12   still don't understand it because the affidavit seems

13   entirely consistent with this backup report.

14        MR. PEED:  That is the misstatement that we're

15   asserting is a misstatement.

16        THE COURT:  Okay.  So is this Exhibit B to the

17   defendant's memo, this 302 from December 31, 2014 that

18   documents the SUV-type vehicles observed on the traffic

19   camera footage, is that list incorrect in referring to the

20   2002 Buick?

21        MS. SOLTYS:  No, Your Honor.  The attachment B is

22   not incorrect.  But, I think that the Court may -- may think

23   that the vehicles that are listed here were seen on the

24   traffic stop, and that is not the case.

25        THE COURT:  Oh, I thought they were seen on --

1    following the traffic camera footage.

2         MS. SOLTYS:  No.  These vehicles were -- if you

3    look at the very first sentence, "A physical surveillance

4    was conducted in the area of 57th Street and Foote Street

5    Southeast."

6         THE COURT:  Okay.  I see.  Okay.

7         MS. SOLTYS:  And these vehicles were in that

8    neighborhood.

9         THE COURT:  Oh, I see.  So these are not the list

10    of vehicles from the camera footage.

11         MS. SOLTYS:  Correct.  Now, if I could address the

12    court's confusion, I think --

13         THE COURT:  Okay.

14         MS. SOLTYS:  So for starters, this is a very --

15    this is a very minor point in the affidavit.  And I will

16    give the Court -- one of our exhibits is the footage from

17    that traffic camera that shows two vehicles.  It is listed

18    as being, in one of the reports, a small SUV-type vehicle.

19    I think that the Court can look at the photograph and the

20    Court can decide for itself whether it looks like it could

21    be a Buick LaCrosse or whether it could be a small SUV-type

22    vehicle.  But the bottom line is it is very insignificant

23    with respect to the affidavit itself.

24         So I think, as the evidence unfolds, where the

25    value of the Buick LaCrosse comes into play is on February

1   the 5th when the vehicle, the getaway vehicle is seen on

2   surveillance tape and Prince George's County is then able to

3   determine that it is a Buick LaCrosse.  So our evidence will

4   then show that they put out a look-out-for and submitted a

5   fusion report indicating that they were looking for a Buick

6   LaCrosse.  So it wasn't until February the 5th that all of a

7   sudden everyone became obsessed with locating a Buick LaCrosse.

8          THE COURT:  Okay.  Well, I know it's the

9   government's argument that it is a minor point.  Strikes me

10  as a minor point, too, but the defendant's brief said this

11  is a material misstatement.  That's how you frame it.  And I

12  didn't even understand it well enough to understand whether

13  it was a small point or a big point.  I didn't understand

14  your point.

15         MR. PEED:  I apologize for not being clearer, Your

16  Honor.  We would, of course, contend it's a major point

17  because the GPS device is with regard to CVS and that is the

18  only thing that brings it within the location of Mr. Flowers'

19  residence.  So when the magistrate's evaluating something,

20  he's saying his car is also correlated with that CVS

21  robbery, then you've got the GPS tracker in the car.  But if

22  you're getting the car from a different robbery that doesn't

23  have GPS and the GPS with a different car, it isn't a Buick

24  LaCrosse, that's a pretty major difference, versus

25  presenting the magistrate, Hey, we've got the tracker and

1   the car together.

2          So although it's one misstatement, in addition to

3   the mistake, whereas, I think the others were intentional,

4   it's a very significant mistake from our perspective.

5          THE COURT:  Okay.  All right.  I sort of have that

6   clear.  All right.  Let's start with the testimony.

7          MS. SOLTYS:  Thank you, Your Honor.

8          Your Honor, I have provided defense counsel with

9   copies of all of the exhibits that the government intends to

10  use at this hearing.  I've also provided the courtroom clerk

11  and the court reporter with a copy of the government's exhibit

12  list.

13         Our first witness would be Detective -- I'm sorry,

14  would be Special Agent Jeff Johannes.  And if I could tell

15  the Court, I intend to use a lot of different exhibits with

16  him, both back and forth between the video, as well as the

17  Elmo.

18         THE COURT:  How many robberies are you going to be

19  reviewing with all these exhibits?

20         MS. SOLTYS:  Eleven.

21         THE COURT:  Eleven.

22         MS. SOLTYS:  Yes.  So what we did --

23         THE COURT:  Because why -- I mean, let me just

24  say, based on my review of the papers, and when I heard that

25  there were going to be two witnesses, I was a little

1     surprised.  And when I got an exhibit list with 45 exhibits,

2     I was a little surprised.  Because as I see the issue, I

3     need to hear about the traffic stop.

4          MS. SOLTYS:  That's correct.  And what you need to

5     know about the traffic stop is what was in the mind of the

6     Detective Chad Howard when he executed the traffic stop and

7     when he walked up to the vehicle and he looked at the

8     vehicle and when he saw two items in this car that had

9     significance to him.  They would not have had significance

10    to you or me or anyone else in this courtroom at the time,

11    but these -- this detective, the FBI as well as PGPD police

12    officers and detective had formed a task force and they were

13    focusing on a person who they believed had committed a

14    series of armed robberies of commercial establishments on

15    this side of the border and on the Prince George's County

16    side of the boarder.

17         THE COURT:  Yes.  I've read from the papers, looks

18    like about 30 armed robberies in the course of a year and a

19    half.

20         MS. SOLTYS:  Numerous robberies, which there's

21    surveillance video.  What you'll learn then is the detective

22    and the agent looked at the surveillance video repeatedly,

23    over and over and over again, and what drew their attention

24    was the outfit that the person is wearing and how they're

25    able to surmise that it is the same person who's committing

1    these robberies.  So when Detective Chad Howard said, "I

2    looked in the car.  I could see in plain view there was a

3    sweatshirt and that sweatshirt had these white drawstrings,

4    then I looked in the back of the car and I saw behind the

5    driver's seat and there appeared to be these gloves.  I knew

6    immediately that that was the person we had been looking for."

7           And so what we did was -- we are trying to

8    streamline, so what we did was we took just the 30-second

9    clip from each robbery.  I don't intend to show you ten

10   minutes worth of videos from each robbery.  So we just

11   identified, this is the best clip, this is a 20-second clip

12   of the perpetrator walking into the store, you can see what

13   he's wearing.  This is a 20-second clip of the perpetrator

14   committing the robbery.  Then the detective and agent will

15   say this is what we were focusing on.  You can see here the

16   gloves, you can see the logo on the back of the gloves.  You

17   can see the drawstring, it looks like there's a logo here.

18   You can see this other jacket, looks like this is the jacket.

19          So these are all factors that they're looking at.

20   I think it's important, then, for the Court to know why, you

21   know, when Detective Chad Howard says, Well, I saw this and

22   immediately I knew, you know, what his knowledge is and how

23   it is developed based on his participation in what was a

24   very long-term investigation.

25          So I understand the Court's concern.  I intend to

1     move it along as quickly as possible and that's why we just

2     made very little clips.  And we have stills that we can show

3     the Court, they can emphasize some things for you.

4              THE COURT:  Fine.  Okay.  Let's bring on your

5     first witness.

6              MS. SOLTYS:  Okay.  Thank you.  Okay.  Thank you.

7     Can you --

8              THE COURT:  Now you need to get your technology

9     working.

10             MS. SOLTYS:  The computer is hooked up, so we have

11    to just be able to toggle back and forth.

12             THE COURT:  Mr. Peed, are you expecting to --

13    excuse me.  Mr. Peed, are you expecting to present any

14    witnesses today?  So I have a sense of timing here.

15             MR. PEED:  Yes, Your Honor.  At least two witnesses,

16    then we'll decide whether Mr. Flowers will testify as well.

17             THE COURT:  All right.  Please take the stand.

18                        JEFFREY JOHANNES,

19    was called as a witness and, having been first duly sworn,

20    was examined and testified as follows:

21             THE COURT:  Good morning.

22             THE WITNESS:  Good morning, Your Honor.

23                      DIRECT EXAMINATION

24    BY MS. SOLTYS:

25    Q.  Agent, would you please state your name?  Could you spell

1    your first name and last name for the benefit of the court

2    reporter?  Would you introduce yourself to the Court by

3    telling the Court how you're employed and in what capacity?

4    A.  My name is Jeffrey Johannes.  First name, J-E-F-F-R-E-Y.

5    Last Johannes, J-O-H-A-N-N-E-S.  I'm currently employed as a

6    special agent with the Federal Bureau of Investigation, the

7    Washington field office.  And my duties currently consist of

8    being assigned as an agent to our violent crime task force,

9    which includes -- we investigate violations of -- bank

10   robberies, home and car robberies, threats against government

11   employees.  We also assist and investigate armed commercial

12   robberies, as well as respond to active shooter threats within

13   the District of Columbia.

14   Q.  How long have you been a special agent?

15   A.  Twelve years.

16   Q.  And what other areas of expertise have you had within the

17   FBI?

18   A.  I was also employed as an agent with our crimes against

19   children task force, and also in organized crime.

20   Q.  I would like to direct your attention to events occurring

21   during the end of 2014 and the beginning of 2015.  And ask if

22   there was an FBI task force that was specifically focusing on

23   commercial robberies?

24   A.  Yes, there was.

25   Q.  And if you could just tell us, what are the other agencies

1    that worked with the FBI on this task force?

2    A.   Well, specifically for the District of Columbia, would be

3    the Metropolitan Police Department, but we're also in regular

4    contact with our sister office, for lack of a better term, FBI

5    Baltimore.   They have a task force in Prince George County

6    that consists of agencies from Prince George County police.

7    Q.   Would that include Prince George's County detectives,

8    robbery detectives?

9    A.   Yes, ma'am.

10   Q.   Would you call it a robbery task force?

11   A.   Yes.

12   Q.   Focuses on serial robbers?

13   A.   Correct.

14   Q.   Would you explain, just very briefly for the Court, how

15   does this task force work, in the sense of what is the

16   relationship with the other agencies and how much

17   communication is there, how much sharing of information is

18   there?

19   A.   We, I would say, communicate almost daily.   And a lot of

20   that -- and then there's sometimes several times a day,

21   depending on the type of investigation, where we identified --

22   where there's an identification of a serial armed robber or

23   violent criminal act between D.C. and Maryland, we will more

24   likely -- the lead agents and lead detectives who are

25   partnered up will contact our counterparts, again, daily, or

1    several times daily, if it's an active -- very active

2    investigation, or, if not, we definitely are in contact every

3    other day or weekly.

4    Q.   At some point then, I guess, in the midst of 2014, the

5    beginning of 2014 -- '15, did you participate in an

6    investigation that led to the arrest of an individual who

7    ultimately became known to you as David Flowers?

8    A.   Yes.

9    Q.   And do you see Mr. Flowers in the courtroom today?

10   A.   Yes, I do.

11   Q.   If you could point him out for the Court, please, by

12   telling us what he's wearing and where he's located?

13   A.   Mr. Flowers is currently wearing an orange jumpsuit.  He

14   is seated to my right at the defense counsel table, he's to

15   the left of defense counsel.

16            MS. SOLTYS:   I would like for the record to reflect

17   an in-court identification of the defendant.

18            THE COURT:   The record will so reflect.

19   BY MS. SOLTYS:

20   Q.   Could you give the Court a sense, when did this

21   investigation begin in earnest and how did the task force

22   begin to focus on a possible serial robber?

23   A.   For, specifically, for the District of Columbia, we took

24   notice around -- it was beginning with the October 13th

25   robbery of a Murry's grocery store within the Sixth District.

1    We noticed that an individual came in and committed a robbery

2    of the grocery store early in the morning, which, despite the

3    nature of the crime, is somewhat unique when compared to other

4    armed robberies based on -- within the region.

5          Now, after that robbery occurred, I noticed that

6    there was a -- an information poster came out from Prince

7    George County police in which they listed that there was an

8    individual who matched the description, and the method -- as

9    we would call, method of operation, that committed several

10   robberies in Prince George County; same clothing, same style,

11   same type of establishment being robbed.  This was October of

12   2014, is when we started, basically, beginning to look at a

13   pattern here, or a similar subject committing these armed

14   robberies.

15   Q.  If you could just tell the Court, initially what are these

16   observations that you're making, that you've described as same

17   MO, same pattern?  What are you looking at?

18   A.  Specifically for the pattern, we noticed that the

19   robberies were occurring, for the most part, after consulting

20   with PG County and FBI Baltimore, were beginning early in the

21   morning, right when or shortly before these establishments

22   were opening.  And several robberies occurred at the end of

23   the -- or, the closing of the establishments.

24         And we also noticed, besides the physical features

25   and the clothing, which I can discuss here shortly, we noticed

1    that the establishments that were being robbed were unique in

2    nature; namely, again, they're grocery stores, there's even

3    clothing shops, tire stores.  And Prince George County had

4    more robberies than we had at the time, but the uniqueness of

5    those establishments being robbed is another thing that drew

6    our attention to this individual.

7              THE COURT:  Is there something about those

8    establishments?  That they have cash on hand or something?

9    I mean, I don't know what ties together a clothing, tire,

10   and grocery store.

11             THE WITNESS:  That's exactly what we were trying

12   to put together too, Your Honor, is that for the most part

13   when you watch the news or media, most commercial robberies

14   occur at gas stations or convenience stores.  For small

15   grocery stores and dress shops, specifically women's dress

16   shops, and tire stores to be targeted for armed robbery was

17   very unique to us.  And that's why we were kind of focused

18   on that, as is there a reason why these establishments were

19   being targeted?  But as we determined, Your Honor, they do

20   have cash on hand.

21   BY MS. SOLTYS:

22   Q.  And were you determining, then, that the same

23   establishment was being robbed on both sides of the border?

24   A.  Yes.

25   Q.  So, now, did -- how did you guys begin this investigation?

1    When you start to think maybe there's a serial robber who's

2    committing -- all of these commercial establishments, what are

3    the steps that you take?  How did you begin compiling a list

4    of -- determining which could be committed by the same person?

5    A.   After conferring with my partners in Prince George County

6    and FBI Baltimore, as well as my partners in the Metropolitan

7    Police Department, MPD, we almost immediately began sharing

8    information and comparing the robberies that occurred in

9    Maryland with the robberies that occurred in D.C., then we --

10   this included physical meetings, telephone calls.  And most

11   information was gleaned from having meetings together, just

12   basically share information in person, and also looking back

13   at previous robberies that occurred both in the District of

14   Columbia and Prince George County that matched the MO, again,

15   to use that term.  Similar robberies.  Which for the D.C. we

16   determined that there were two previous robberies that

17   occurred before October matching the same MO and the same

18   geographic area, as well.

19   Q.   And they were?

20   A.   It was December -- I'm sorry, February 7, 2014, there was

21   the Ashley Stewart clothing store was robbed at the Good Hope

22   Marketplace.  It's located off the intersection of Alabama and

23   Naylor Avenue South -- Southeast.  And then on September 12th,

24   2014 there was the robbery of the Payless shoe store that

25   occurred in the same Good Hope Market shopping place.  And

1    they were both next to each other, the two establishments.

2              MS. SOLTYS:  Without objection, the government

3    moves into evidence Government Exhibit number 2.  And I have

4    this on the screen.

5    BY MS. SOLTYS:

6    Q.  And let me just show you, did this potential serial robber

7    get a name from the task force?

8    A.  Yes.  What's common with all investigations, whether it's

9    a bank robbery or other type of -- similar type of armed

10   robbery investigation, since we don't know who the suspect is

11   at the time, we determine -- we identify them with a moniker,

12   or a name, so we can easily identify them when we're

13   discussing.  In this case we designated the unknown subject at

14   the time, when we were comparing the case, to the Early Bird

15   Bandit, because most of the robberies, again, as I mentioned,

16   were occurring early in the morning, shortly before the

17   establishments were opening or shortly after they opened.

18   Q.  Government's Exhibit number 2, you've seen this before?

19   A.  Yes.

20   Q.  And how is this compiled?

21   A.  This is what we would -- this is our working -- this is

22   our chart that dictated -- or, indicated all the robberies, to

23   the best of our knowledge, that were committed by, as we had

24   determined at the time, the Early Bird Bandit.  Which it was a

25   chart initially started by Prince George County police and FBI

1    Baltimore, in which we shared back and forth inputting

2    information, which included my inputting and updating

3    information on this as well.

4    Q.  How did any particular robbery get designated on this list?

5    A.  Going back to the MO, as we mentioned there, we -- I

6    guess, scrub, for lack of a better term, we scrub or looked

7    through other robberies that occurred before October 2014.

8    And we determined, based on the MO, the type of robberies,

9    that was our first clue.  And then we also looked at the

10   clothing and the description and the type of weapon used,

11   which then narrowed down the type of robberies and the type of

12   suspect we were looking for, which then let it be placed on

13   the chart.

14   Q.  When you say description, for example, was it one

15   assailant versus two?

16   A.  One assailant.

17   Q.  Was there anything unique about the person's height?

18   A.  Yes.  For the most part, all the descriptions had him over

19   5-foot-8 or above, just on average, or 6-foot and over.

20   Q.  Slender?

21   A.  Slender, medium build.  Also there were several other

22   instances of light-skinned tone color.  And it was -- it was

23   identified as an African-American individual.  And if you

24   want, I can also go into the clothing that also narrowed it

25   down as well.

1    Q.  Male?

2    A.  Male.

3    Q.  And what about the clothing?

4    A.  The clothing was another -- probably one of our biggest

5    indicators that it was the same subject.  For the most part,

6    almost all the robberies occurred wearing the similar

7    clothing.  The clothing that we were noticed the most was a --

8    first of all, from top to bottom there was a ski mask or a

9    balaclava, which was -- is a black mask which only -- you

10   could only see the eyes.

11   Q.  A balaclava?

12   A.  Balaclava.

13   Q.  How do you say it?

14   A.  Balaclava.

15             THE COURT:  I thought that was a kind of dessert.

16             THE WITNESS:  I found, actually, how it was named

17   if you want me to go into that.

18   BY MS. SOLTYS:

19   Q.  Baklava is the dessert and the balaclava is the type of

20   ski mask?

21   A.  The official designation for that type of mask.  The

22   Crimean war of the 1850s.

23             So then, also -- we also had, the subject that we

24   were looking at almost exclusively wore a hooded sweatshirt.

25   In the majority the robberies wore a navy blue, dark blue

1    Champion-style sweatshirt which included gray interior lining

2    with the hood and light-colored drawstrings.

3          The other sweatshirt we identified was a light-

4    colored -- I take that back.  A dark gray, slate gray type --

5    colored hooded sweat jacket that had fluorescent green

6    drawstrings, as well as a -- zipper linings, as well.  And we

7    also noticed on several of the robberies there was a black

8    jacket that was worn over the hooded sweatshirt and the mask.

9    There was a plain black jacket that was nondescript that we

10   determined by the -- based on video footage, that it had --

11   the uniqueness of that was there were two zippers here on the

12   chest, that you can clearly see in the footage, that he wore

13   in several robberies.

14   Q.  Just so the record is clear, you just indicated just the

15   top of both -- both -- the top of your both nipples?

16   A.  The chest area.  The upper torso area of a male -- or,

17   chest area, I'm sorry, jacket, which -- where the zippers

18   were, like you would --

19   Q.  Sorry.  I didn't mean to interrupt you.  You were telling

20   us about the clothing.

21   A.  At times we would see a light-colored, hooded sweatshirt,

22   like a light gray.  Then usually the pants, then we would --

23   moving down on the subject description, it would usually

24   consist of blue jeans or some kind of dark-colored, black or

25   dark gray type pants.  And then we would go down further, we

1    would have the shoes, which at times varied between brown

2    boots or dark-colored, black type of shoes.  But the --

3            THE COURT:  Which of the sweatshirts that you

4    described, the navy blue, the dark gray, the fluorescent

5    green zippers, or the light gray, hooded sweatshirt had the

6    white strings?

7            THE WITNESS:  That would be the -- the white

8    drawstrings, the white drawstrings would have been the navy

9    blue Champion brand sweatshirt -- I'm sorry.  Dark blue.

10   I'm sorry.  Navy blue.

11   BY MS. SOLTYS:

12   Q.  I don't want to give away the end of the motions hearing,

13   but did you ultimately recover all four of those --

14   A.  Yes, we did.

15   Q.  -- jackets.

16           Then the last article of clothing, which you haven't

17   described yet, which I'll ask you, in your mind was this the

18   most significant article of clothing?

19   A.  Yes.  The most unique thing that identified our suspect as

20   committing all these robberies, based on witness testimony and

21   corroborated extensively by video footage, was the gloves.

22   The gloves were unique and they were described by the

23   witnesses as a two-toned type glove, where the bottom of the

24   gloves, along the hands and palms and finger were black, then

25   the tops would fade into a whitish, off-white color, and on

1    top of there was a logo, which we determined later on stand --

2    meant something, I forget the exact title, but Memphis.  But

3    the logo, you can see from the footage, you can see the unique

4    type of logo used on these gloves.  And these gloves were

5    almost exclusively at every armed robbery that we had

6    committed by -- at the time, the Early Bird Bandit.

7    Q.  So these are a number of factors that then allowed you to

8    put a number of potential -- I should say, put a number of

9    armed robberies with the potential serial robber in them?

10   A.  Yes.

11   Q.  Okay.  Then so this is Government's Exhibit number 2.

12   Just very quickly, the first page has an Ashley Stewart in

13   Washington D.C., a National Tire in Capitol Heights, another

14   National Tire in Capitol Heights, a Payless in Washington,

15   D.C., another National Tire in Capitol Heights, Rainbow

16   clothing in Forestville, Rainbow clothing in Suitland, Murry's

17   grocery store in Washington, D.C., CVS in Capitol Heights,

18   Pizza Hut in Capitol Hill, a Murry's in Washington, D.C., a

19   Popeyes in Landover, Save-A-Lot in Seat Pleasant, Taco Bell in

20   Oxon Hill, another Rainbow here in Washington, D.C., a Radio

21   Shack here in Washington, D.C., another CVS in District

22   Heights, another Taco Bell in Forestville, another Murry's in

23   Oxon Hill, another CVS here in Washington, Jiffy Lube in

24   Temple Hills, Save-A-Lot, Temple Hills, a KFC in Clinton, and

25   a Popeyes here in Washington, D.C.  Okay.

1          THE COURT:  How many total robberies are on that

2     list?

3          MS. SOLTYS:  So you know from this list that there

4     are eight --

5          THE WITNESS:  Eight in the District of Columbia.

6          MS. SOLTYS:  -- from the District of Columbia?

7          THE WITNESS:  Yes, ma'am.

8          THE COURT:  If you don't know, that's fine.  The

9     eight -- the eight from the District of Columbia are the

10    eight charged robberies in the case, is that right?

11         THE WITNESS:  Yes, ma'am.

12         THE COURT:  You don't know?

13         THE WITNESS:  Yes, Your Honor.  Yes, Your Honor.

14         MS. SOLTYS:  There's a total of 24.

15         If I could have the Court's indulgence.  Number 4,

16    number 5, any objection?

17         MR. PEED:  (Shakes head.)

18    BY MS. SOLTYS:

19    Q.  Government Exhibit 12, could you tell the Court what this

20    is?

21    A.  This is a map we created.  Same type of anything we would

22    do with any type of serial investigation, armed robbery, we

23    would create a map to track the physical, geographic locations

24    of the robberies that we, again, identified in the District of

25    Columbia to -- at the time, again, we nicknamed the Early Bird

1    Bandit.  And I alluded to earlier that a lot of the robberies

2    were -- it was another reason that we narrowed it down, was

3    based on the geographic locations in southeast D.C., where a

4    lot of the robberies were occurring.

5    Q.  So five of them, actually, are within the same, looks

6    like, one or two block strip mall?

7    A.  Correct.  The Good Hope Marketplace in southeast D.C.

8    Q.  And some of them are actually adjoining stores?

9    A.  Correct.

10   Q.  Then you also talked about the early bird -- the early

11   morning nature.  This is Government's Exhibit number 5, early

12   morning before the store opening or end of the day, when the

13   store is about to close.  This is Government's Exhibit number

14   5, and there are -- the first eight are the D.C. robberies,

15   the other three are Maryland robberies.  If you could just

16   tell the Court very succinctly what this chart represents?

17   A.  This chart is created to track the time of the robberies

18   and to also help us identify when the store opened, based on

19   the store website information.  We have open/close on the far

20   right, at 10 a.m., and then you look to the left, the middle

21   chart, and it has the time of the robbery.  For example, the

22   Ashley Stewart at 9:55 a.m.

23        And if you go down the chart, you'll see 9 a.m.

24   opening at Murry's grocery store, 9 a.m. -- I'm sorry, 9 a.m.

25   robbery, 9 a.m. opening, and so on and so forth.  As I

1    mentioned earlier, some of the robberies did take place at

2    store clothing time, clothing -- closing time, I'm sorry.  For

3    example, the Radio Shack, on December 22, closes at 8:49 --

4    I'm sorry, closes at 9 p.m., the robbery occurred at 8:49

5    p.m., shortly before closing.

6    Q.  As part of this investigation did you personally obtain

7    video surveillance of the eight robberies?

8    A.  Yes.

9    Q.  We have video surveillance from seven of the eight

10   robberies, is that correct?

11   A.  Correct.

12   Q.  The D.C. robberies, have you looked at that video?

13   A.  Yes.

14   Q.  Did you say that you looked at it just once and tossed did

15   aside, or did you spend any significant time with it?

16   A.  I would say above average, significant amount of time

17   examining the video, myself and the metropolitan police

18   detectives assigned to the investigation.

19   Q.  Who would that person have been?

20   A.  For the Sixth District the lead detective was Chad Howard.

21           THE COURT:  Can I slow you down for just a second,

22   make sure I'm understanding the Q and A.  So out of the 24

23   robberies on that list, you were able to recover video

24   surveillance tape from eight of the robberies, seven of them

25   were in D.C., one was in Maryland?

1          THE WITNESS:  Specifically for the D.C. robberies

2     we were able to recover seven of the eight video -- seven

3     foot -- video footage from seven of the eight robberies.

4     For the Maryland robberies, for the Prince George County

5     police, I can't 100 percent say that they recovered all of

6     their video from their robberies, but from the ones that we

7     were focused on, I would say a good number of them were

8     recovered, especially later on, once we identified we had a

9     serial armed robber that we were -- that we were looking for.

10          THE COURT:  Okay.  It's just I think one of your

11     questions and the answer was that you had video footage from

12     eight robberies, only seven of them were from D.C., so --

13     all right.  So, you have some video footage from one

14     Maryland robbery?

15          THE WITNESS:  Several, Your Honor.  Yes.

16          THE COURT:  You have more than one?

17          THE WITNESS:  Yes, Your Honor.

18     BY MS. SOLTYS:

19     Q.  In fact, Agent, as part of the exhibits that you've

20     reviewed in preparation for your testimony here today, are you

21     aware of the fact that we have a number of stills from the

22     surveillance videos from some of the Maryland robberies?

23     A.  Yes.

24     Q.  And you were -- you understand that I do not intend to

25     play all of the surveillance videos that the law enforcement

1    has for the Court at this moment.

2    A.  Yes.

3    Q.  I'm only asking you, we have -- for the D.C. robberies,

4    there are eight, we have surveillance video from seven?

5    A.  Correct.  Correct.

6    Q.  And you have reviewed that in preparation for your

7    testimony here today?

8    A.  Yes.

9    Q.  And, in addition, you know that there are three

10   surveillance videos from three of the Maryland robberies that

11   you have reviewed that, you know, that I intend to play here

12   today?

13   A.  Yes.

14          MS. SOLTYS:  So this is -- moving, Your Honor,

15   transitioning into what has been labeled as Government

16   Exhibit number 1, which is a disk.  I've provided defense

17   counsel with a copy and it has seven, plus three video clips.

18          THE COURT:  Okay.  Do you want to play that now,

19   or how do you want to do that?

20          MS. SOLTYS:  I would like to play it right now.

21   Is there any objection?

22          MR. PEED:  No objection.

23          MS. SOLTYS:  I've given defense counsel a copy.  I

24   explained to him, as I did to you, that it is simply just

25   some little snapshots of the various robberies.

1              (Pause.)

2              THE COURT:  Do you want to move on?  And then John

3      Cramer, our technical expert, will come and figure it out.

4      He's coming in just a minute.  Why don't you proceed and

5      he'll fix it when he gets here.

6              MS. SOLTYS:  I'm going to use Exhibits 1A through

7      1J.  Do you have any objection, Mr. Peed?

8              MR. PEED:  No objection.

9              MS. SOLTYS:  So we'll move into evidence 1A

10     through 1J.  I might not have moved in 2, 4, and 5, but I do

11     so at this time.

12             THE COURT:  They'll be admitted for purposes of

13     the hearing.

14     BY MS. SOLTYS:

15     Q.  Okay.  This is Exhibit 1A.  Do you recognize what this is

16     a still photo from?

17     A.  Yes.  This is a still photo from the video footage of the

18     Ashley Stewart clothing store and, specifically, for the

19     robbery that occurred on the morning of February 7th, 2014.

20     Q.  And that's depicted here on the videotape, is that correct?

21     A.  Yes.

22     Q.  Was there anything distinct or unusual about the

23     particular image of this -- the robber in this case?

24     A.  The suspect that was entering, as we later designated to

25     be the Early Bird Bandit, is wearing the -- the clothing that

1    we -- which was seen in several of the other robberies.  And

2    specifically, we have the dark blue, navy sweatshirt, hooded,

3    as well as a pair of jeans.  And he's also entering early in

4    the morning, as I mentioned before, the store clothing, and it

5    goes back to the geographic location of the Good Hope

6    Marketplace, where several of the other robberies occurred.

7    Q.  One-B, if you could tell the Court what this is?

8    A.  This is a still shot from the video surveillance footage

9    from the Murry's located just off of Pennsylvania Avenue in

10   the Sixth District of Maryland -- I'm sorry, the Sixth

11   District of Washington, D.C.  The robbery occurred on the

12   morning hours of October 13th, 2014.

13          And then, as I mentioned, as the store opened at

14   9 a.m., subject comes in, and in this case we identified the

15   subject being the same as the other gentleman who committed

16   the robberies; namely, by the type of sweatshirt that we have

17   here, which I described as a dark gray, slate gray in color,

18   hooded sweatshirt with fluorescent green drawstrings and

19   lining along the zipper.

20   Q.  Is that one of the sweatshirts that was recovered during

21   the search at Mr. Flowers' house?

22   A.  Yes.

23   Q.  Is there something unusual about his hand, what he's doing

24   with his hand?

25   A.  On this one, in the video, he -- in several of the

1    robberies he would come in to -- it appears to mask his face.

2              MS. SOLTYS:  Could you just pause that for one

3    second.

4              THE COURT:  We're multitasking here in the courtroom.

5              Thank you for coming, John.

6              (Pause.)

7              MS. SOLTYS:  If you don't mind, now, Your Honor,

8    we'll switch back to Government Exhibit 1.

9              THE COURT:  Would you just stick around?

10             MR. CRAMER:  I'll just sit right back here.

11             THE COURT:  Thank you so much.

12   BY MS. SOLTYS:

13   Q.  Just pause it for a second, please.  This is government's

14   Exhibit number 1.  Have you seen this -- have you seen this

15   exhibit before?

16   A.  Yes.

17   Q.  And do you know that this is seven clips of the D.C.

18   robberies and three clips of the Maryland robberies?

19   A.  Yes.

20   Q.  The first one that's on the screen right now, could you

21   tell the Court what this one is?

22   A.  This is, as I mentioned, the Ashley Stewart armed robbery

23   that occurred on February 7th, 2014.  What you're viewing is

24   the surveillance footage over near the -- the store entrance,

25   as shortly before the store is opened, which was supposed to

1    open at 10 a.m.

2    Q.   That's fine.  And could you just play it again, please.

3    And if you could just tell us what we see.  Is there anything

4    that you can tell about the hand?

5    A.   One thing that -- as you can see in the footage, as

6    opposed to the still, was that the subject -- and you'll see

7    in several other videos -- he keeps his hand up to his face in

8    the attempt to either mask his appearance or to make the --

9    give the illusion, or false illusion that he's making a cell

10   phone call as he enters the store.  Again, we suspect it was

11   for masking his physical features as he entered.

12   Q.   Do you believe that there's something distinct about the

13   hands in this case, that he's wearing something on the hand?

14   A.   Yes.  On this footage you can see there is a -- he appears

15   to be wearing light-colored type gloves.  But due to the type

16   of quality of this footage, we weren't able to enhance it any

17   further than this.  But we can see there is some type of

18   light-colored covering on his hands.

19   Q.   That's fine.  Let's go to the next clip, please.  That

20   would be -- let's -- hang on a second.  Let's play them in

21   chronological order.  So the next one we'll play -- what is

22   this one?

23   A.   This is, as I mentioned, the Murry's robbery, a grocery

24   store, that occurred on October 13th, 2014 at store opening.

25   Again, we have -- for our investigative purposes, narrowed it

1    down to the same suspect, based on, again, as I mentioned, the

2    physical features, but we also had that sweatshirt which was

3    seen in several other robberies within the region.  Again,

4    this dark gray, slate gray sweatshirt with the fluorescent

5    green drawstrings and the fluorescent green zipper lining.

6    And, again, also, he has his hand up to his face for what we

7    suspect to be masking purposes.

8    Q.  Okay.  Let's go to the next clip.  Inside the Murry's.

9    What do we see here?

10   A.  This is another camera view from the same store, at the

11   same time, at the same date of the robbery.

12   Q.  What about the gloves?

13   A.  The suspect comes in and we can see that he has the

14   gloves, which we hope narrow it down, black palms and white

15   tops.  And in the video he's -- there's another method that he

16   used that helped us narrow it down that it was the same

17   suspect; the suspect would come in asking for an employee or

18   random name, then once he had the employee's attention, he

19   would then force them or ask them to come in the back, or for

20   lack of a better term, force them in the back at gunpoint to

21   open the safe here, as you can see here in the video.  And Do

22   you want me to continue?

23   Q.  Gloves and bag?

24   A.  Yes.  Now we have some other unique things.  The gloves,

25   again, you can see a little bit clearer, we have the two-tone

1   and you can see the logo on top of the glove, the top of the

2   hand, black bottoms.  He also -- the other unique thing was

3   that he would sometimes use a white plastic bag which he would

4   withdraw from his person.  And then in this case he drew a

5   white plastic bag from here to put the money in that was from

6   the store safe.  The mask, again, matching the description, as

7   well as the physical feature.

8           And you can clearly see here, as well, another

9   visual indicator that helped us narrow it down as being the

10  same subject was the use of the weapon.  We saw the similar

11  weapon in several of the robberies, which was silver and

12  black, semi-automatic type pistol.  And as you see here, the

13  suspect is leaving.

14  Q.  Now -- it looped over.  He's -- now he's walking back in.

15          Does the Court wish to see any more of that one?

16          THE COURT:  No.  Thank you.

17  BY MS. SOLTYS:

18  Q.  Was there anything distinct about the fact that he went

19  straight to the safe?

20  A.  He -- back to the use of the word MO, he would always

21  ask -- when he would get the employee's attention, he would

22  always ask to be taken to the safe in certain stores.

23  Q.  Okay.

24  A.  I would say -- correction.  Most of the stores he would

25  ask to be taken to a safe by the -- directed by the employees,

1    usually at gunpoint.

2    Q.   Now let's play November 15th, the second Murry's robbery

3    in D.C.

4    A.   This is the November 15th robbery video.  This is camera

5    footage from the main entrance doorway.  Again, store opens at

6    9 a.m.  We have here a victim who was cleaning the window for

7    the store opening, who then confronted the subject.  But for

8    investigative purposes, we determined it to be the same suspect.

9         Again, we have the time, the geographic location.

10   We're not that far away from the other locations of the

11   robberies in D.C.  More namely, we have the clothing, we have

12   the dark-colored, dark navy blue sweatshirt with the light-

13   colored drawstrings, the mask.  And you can see here in this

14   video, on the right-hand you'll see the two-tone glove which

15   has the unique insignia on the top.  And as well, he has a

16   hand up to his face upon entering.  And in this case he has a

17   black backpack.

18   Q.   What do we see right now?  What just happened?

19   A.   He's again talking to the employee and forces them back to

20   the office area and -- to ask for the safe, which is what his

21   preferred target was for those robberies, was to have access

22   to the safes and then retrieve the cash from the store safes.

23   Q.   And then we see the gun?

24   A.   The gun will come out shortly before he enters the office.

25   The office is off to the left.  The other thing that we had, a

1   lot of times he would have the gun in his waistband.

2   Q.  And anything about this backpack?

3   A.  His backpack was a black backpack, which we saw on several

4   of the other robberies.

5   Q.  And?

6   A.  You can see here the other glove is on, he opens the door

7   with it, pulls the gun out of his person and then forces the

8   employee victim back to the office area.

9   Q.  Okay.  Let's go into the office.

10  A.  This is the footage of the interior of the office of the

11  Murry's down in the Seventh District.  We have the store

12  manager victim, he is observing what's going on outside his

13  window, office window, he comes to confront the suspect, at

14  which time the suspect enters and forces the manager to open

15  the safe.  Gives verbal instructions.

16  Q.  Do we have a really good image of the gloves here?

17  A.  Yes.  And you'll see, again, the gloves that were used

18  almost in all the robberies, the two-tone white on top with

19  the unique black-colored logo, and as well as you'll see the

20  black fingertips, the two-tone nature.  We also have the type

21  of firearm, again, that we've seen in several of the robberies.

22  Q.  Could you tell what jacket he was wearing in this case?

23  Did you see the logo?

24  A.  You'll see the logo.  In the video you'll see it's a --

25  you'll have a better view here.  It will be the dark or navy

1    blue Champion-style hooded sweatshirt.  Again, we have the

2    light-colored drawstrings that are hanging from the hood and

3    we also have the similar physical nature --

4    Q.  That's a great shot of the gloves right there, two-tone

5    with the logo on the back, drawstring?

6    A.  The drawstrings are hanging.

7    Q.  Logo over the left breast, small white logo over the left

8    breast.  You would agree with that characterization?

9    A.  Yes.  And a lot of times it would come in, he would force

10   the employees to turn around.  One other thing that was also

11   captured briefly on this video, when he first entered he would

12   ratchet or, for lack of a better term, slide the top slide of

13   the firearm.  We suspected that was a show of intimidation.

14   For a semi-automatic, that's when he pulls the top back to

15   chamber a round into the pistol.

16   Q.  Do you have any particular experience with firearms?

17   A.  Yes.

18   Q.  What is that?

19   A.  I have collateral duty as an FBI firearms instructor.

20   Q.  Could you show what you were just referring to on the

21   video?

22   A.  Yes.  As soon as you walk in -- as soon as he walks in,

23   the victim employee with the -- who was cleaning the windows --

24   I'm sorry, if you go to the interior view, and you'll see it

25   in other videos as well, when he comes in, you'll see him,

1    once the employee moves away from him, he directs them towards

2    the back corner, away from him.  You'll see the gun hand,

3    which is in his right, you'll see his left hand come over and

4    ratchet or slide back the top.  And you can see right there.

5              THE COURT:  Oh, I just saw that.  Okay.

6    BY MS. SOLTYS:

7    Q.  Okay.  Thank you.  You can stop.  And now let's look at

8    the Rainbow clothing, please.

9    A.  This is the footage of the early morning robbery of the

10   Rainbow clothing store.  And again, down in the Good Hope

11   Marketplace in southeast D.C.  Store opens at 10 a.m., subject

12   came in shortly before, as indicated on the video timestamp.

13   For investigative purposes, we helped narrow -- it helped

14   narrow us down once more based on the time, geographic

15   location, and also we have the same physical description.  But

16   namely, we have him coming in, as well, early in the morning,

17   with his hand up.  Again, we suspect to mask his identity

18   further as he's entering the establishment.

19   Q.  So the store hasn't even opened yet for business?

20   A.  Correct.

21   Q.  Go ahead and play.

22             THE COURT:  And are all the -- do all these stores

23   have the video camera fairly prominently focused on the

24   front door that would -- I mean, are -- so that somebody

25   coming in who wanted to mask his or her face would cover it?

1          THE WITNESS:  Yes, Your Honor.  For the most part,

2    for anybody who's an experienced criminal, for lack of a

3    better term, they would come in, do what we call pre-crime,

4    preoperational surveillance, similar to what we've seen in

5    bank robberies.  They would come in and look around for

6    video cameras, and look specifically where to place

7    themselves upon entering, or in this case, as an example, we

8    would have him coming -- he knows where the camera is at,

9    he's masking himself upon entering.  He might have known

10   where the camera was at already, as most establishments do

11   have cameras at entrances and exits, depending on the store.

12   But almost unilaterally they do have cameras covering front

13   doors --

14   BY MS. SOLTYS:

15   Q.  Now take us to the actual robbery.

16          THE WITNESS:  -- to the best of my knowledge.

17   BY MS. SOLTYS:

18   Q.  Now, what do we see here?

19   A.  This is the more -- this is still the main shopping area

20   of the store, towards the back of the store where the checkout

21   area is at.  We have two female victim employees that he

22   confronted in the -- between the entrance and the rear of the

23   store here where the cash register is at, where he directed

24   them to the safe, to open up and obtain U.S. currency.  In

25   this case he is over, behind, somewhat, kneeling down behind

1    one of the employees while the other employee opens up the

2    safe.

3            Once the safe is opened, he directs the employees,

4    as he's done in the other robberies, to move away from his

5    location.  He had a firearm displayed, which he then put in

6    his pocket.  He then began to retrieve a white -- or, a white

7    type of plastic bag with a logo on there, which -- from his

8    person, which is something we've seen in the other robberies.

9    And then another indication of his similar MO would be he

10   would then force the employees to the back of the store to

11   be -- to exit.  He would have them unlock the rear entrance of

12   certain stores, where it's not a public entrance, it's for

13   employees only or for deliveries.

14   Q.  Okay.  How about -- let's show the Radio Shack robbery,

15   please.  This is December 22nd, 2014.  What do we see in this

16   clip?

17   A.  This is the Radio Shack -- just, actually, a few stores

18   down from the Ashley Stewart and the Rainbow clothing store.

19   And again in the same shopping, the Good Hope shopping market.

20   This -- the store will be closing here -- before closing, at

21   9 p.m., we have subject coming in.  He -- same as -- the

22   similar MO, he would grab the attention of one of the

23   employees by either saying a false name or just saying, Hey,

24   I'm looking for -- he would just grab the employee's attention

25   in various ways, then he would direct them to the cash

1    register.

2             In this case we knew it was our suspect, for

3    investigative purposes, based on, namely, we have him in the

4    footage here, the gloves, the two-tone gloves, the navy, dark

5    blue hooded sweatshirt.  But also we have the black jacket,

6    the non-logo black jacket that we've seen in other robberies,

7    which we identified in other robberies being where we had the

8    two zippers up in the upper chest area.  He would wear that

9    sometimes over the hooded sweatshirts.  But, again, we have

10   the physical description, height, mask, blue jeans, and --

11   Q.  Looks like you can actually see the logo on the back of

12   the hand of the glove that he's taking the money from?

13   A.  Yes.

14   Q.  You could see the black palms of the glove?

15   A.  And similar to the Rainbow robbery which we've just seen,

16   he's forcing the employees to the rear of the store.

17   Q.  This jacket -- how did you describe this jacket that you

18   see right there in that --

19   A.  Yes, in this footage here you can see, based on the

20   lighting, you can see the shiny object in his chest, upper

21   chest area are the two zipper pockets of that non-logo jacket

22   that we've seen in several other robberies.  The zipper, two

23   upper zipper pockets you would see in other robberies and

24   other footage and that's how we identified that as being,

25   again, the same suspect.

1    Q.  Did we seize that jacket or a jacket that looks exactly

2    like that during the search at Mr. Flowers' house?

3    A.  Yes, we did.

4    Q.  Now let's show the office clip at the Radio Shack.  And

5    now tell the Court what you're looking at here, please.

6    A.  During the course of the robbery he demanded to be taken

7    to the save.  The employees told him several times that they

8    don't have a safe.  Now, when he wanted to exit the store, he

9    forced them into the back, and also, as a visual proof to --

10   from what we understand, to try and see if there was a safe

11   there.  As they're explaining to him right now, we don't have

12   a safe.

13          Also, you see when he entered the store, he did the

14   slide with the weapon, the top upper receiver, to, again,

15   firearms terms, what we would call chambering a round into

16   firing, for firing purposes.  Here he's demanding that they

17   unlock the rear of the store so he can be let out, which the

18   employees are complying.  And for investigative purposes, we

19   see the similar type of weapon, silver on top, black lower

20   receiver.  You can see the black jacket, in color, based on

21   the video camera footage, and the dark blue hooded sweatshirt

22   under it.

23          In this case he was asking to look for the safe.  He

24   wanted proof of the safe.  Later on he'll will come back out

25   and exit that way as well.  I'm sorry.  He would not exit that

1    way.  They were informing him that he couldn't open -- they

2    couldn't open the door, just like there was no safe back

3    there.

4            MS. SOLTYS:  Did the Court wish to see the

5    chambering of the round at the beginning of the clip?

6            THE COURT:  No.  Could I see that again?  And this

7    was coming into the store or --

8            THE WITNESS:  No, this is after he committed the

9    robbery at the cash register, he forced to the employees to

10   prove that there was not a safe in the store, and he chambers

11   the round.

12   BY MS. SOLTYS:

13   Q.  Are you satisfied with that clip?

14   A.  One thing I also want to notice on the clip, you can see

15   there, the glove, you can see a bit of the skin tone on the

16   glove, on the pistol hand on that footage, which, again, goes

17   to witness descriptions as being an African-American male,

18   lighter skin tone.

19   Q.  You can see the actual skin?

20   A.  Yes, you can see in the footage here.

21   Q.  Great.  Okay.  You can turn that one off, Brandon.

22            Now let's look at the still shot from the attempted

23   robbery at the CVS on January the 18th.  This is just an

24   attempted robbery?

25   A.  Yes.  On January 18, 2015 we have, which we later

1     determined to be the same subject, entering the CVS located

2     off of Alabama Avenue in the Sixth District of Washington,

3     D.C.  The subject came in before 8 p.m.  And, again, we have

4     several similar -- we have a similar method, the time, coming

5     in before store closing in the evening.  But namely for us,

6     which indicated it was the same subject, was the clothing, and

7     also his actions upon entering.

8              And as you can see in the footage, the still shot

9     here, you can clearly see the glove up to the subject's --

10    right hand up to his face.  Again, another similar tactic --

11    or, technique he used, I should say, where he would come in

12    and try and mask his appearance even further by bending down,

13    trying to avoid the store entrance camera.

14             But in this case, as well, he has one glove on, the

15    two-tone glove we've seen in several of the other robberies,

16    black bottoms, black bottom with the fingertips and palm,

17    upper top glove, as well as a black logo.  But we also have,

18    again, the dark blue, navy sweatshirt with the light-colored

19    drawstrings dangling down.  And also in his left hand that

20    is -- I'm sorry, his left hand that is ungloved, based on the

21    angle of the footage, we see a light skin tone of an African

22    male, based on other witness descriptions, as well.

23    Q.   And you see the logo over the top of the left breast?

24    A.   That is, we believe, to be a -- and later determined to be

25    a Champion style logo, Champion brand.

1    Q.  Do we ultimately recover a Champion jacket that looks like

2    this?

3    A.  Yes.

4    Q.  And that is recovered from what location?

5    A.  This was recovered from a vehicle utilized by Mr. Flowers

6    on February 6, 2015.

7    Q.  Okay.  Go ahead and play this.

8            THE COURT:  This sweatshirt was recovered from the

9    vehicle?

10           THE WITNESS:  Yes, Your Honor.

11           THE COURT:  Was it the vehicle he was arrested in

12   or was it a different vehicle?

13           THE WITNESS:  It was the vehicle he was arrested

14   in.  In this case, in this robbery, just to give background,

15   the subject did not receive any money.  The store manager

16   confronted him and said he, basically, was not going to

17   receive any money, in so many words, and then the subject left.

18   BY MS. SOLTYS:

19   Q.  So we see a really good shot of the two drawstrings that

20   you've mentioned several times.  Is that -- is it safe to say

21   that there's a lot of attention on the clothing and that those

22   drawstrings are significant?

23   A.  Yes.  As we mentioned, to help us narrow it down, the

24   similar subject, in various ways, the clothing was similar

25   clothing used in several of the robberies.  And in this case

1    one of the most predominant pieces of clothing was the

2    Champion brand, dark blue hooded -- or, dark blue, navy-

3    colored hooded sweatshirt, with the light-colored drawstrings

4    that we would see dangling a lot of times in most of the

5    robbery footage.

6    Q.  I don't want to belabor this point, but is it safe to

7    assume that you and Detective Chad Howard are having numerous

8    conversations about the defendant's appearance and the

9    articles of clothing that are being worn in these robberies

10   and you're talking about this particular sweatshirt and the

11   other jackets, as well?

12   A.  Yes, ma'am.

13   Q.  All right.  And then if we could now just go to the CVS

14   robbery -- I'm sorry, if we could go to the Popeyes, February

15   the 6th.  This is the last robbery for the District of

16   Columbia.  This is actually an attempt.  What happened here?

17   A.  What we have here is before the Popeyes opened, we have

18   a -- the subject entering.  Again, he would use the same type

19   of ruse where he was asking for somebody to gain entry.  And

20   the manager was actually standing in the door, letting a local

21   employee -- she usually lets a local employee who walks to

22   work in earlier in the morning, so he can start -- begin

23   cooking.  The subject also entered as well.

24        And at first he was starting to look around, ask

25   around.  The employees were trying to direct him back out.

1     And in this case they're asking him to leave.  And we have in

2     the still shot the footage where we see, from top to bottom,

3     we have a -- as we'll later determine, the dark blue.  And

4     you'll see in the other footage a better color version.  Dark

5     blue, navy blue hooded sweatshirt, a ski-type mask where only

6     the eyes were present, similar to the other robberies.

7          And then as you proceed further down you will see

8     two light-colored drawstrings hanging outside of a non-logo

9     black jacket, which in another footage you'll see.  But you

10    can see partly here the two zippers in the upper chest, breast

11    area.  And then as you proceed down on this subject

12    description you will see a -- the glove that was used, the

13    gloves that were used in the robberies, several of the

14    robberies, most of the robberies, the two-tone black bottoms

15    and white tops with a black logo on the top portion.  And then

16    we also have a black backpack.  And as you proceed further

17    down you have dark-colored pants, as well as dark or black-

18    colored shoes.

19    Q.  If you could just remind the Court, I believe we saw a

20    black backpack similar to that one in the second Murry's

21    robbery, is that correct?

22    A.  That is correct.

23    Q.  And then could you see -- you see the face here.  If you

24    can tell how much of the face is covered by this mask?

25    A.  Yes.  You can see only the eyes were visible in the --

1   based on the mask covering.

2   Q.  And then, also, you see these two white drawstrings hanging

3   down?

4   A.  Correct.

5   Q.  And again, this is important in your investigation.  And

6   then this jacket, does this jacket appear to be consistent

7   with one of the -- the jacket that was seized during the

8   execution of the search warrant that has the two zippers over

9   top of either breast?

10  A.  Yes.  We seized a jacket that matched -- that's the same

11  type of jacket that -- pursuant to the investigation.

12          Now, this is another footage.  The subject then

13  drew -- drew his weapon back in the main open area and

14  forces -- I'm sorry, when he first came in, again, as I

15  mentioned, he was attempting to look around the store by

16  looking -- by using a ruse of looking for -- using a name of

17  looking for somebody, which he just bypassed employees and

18  started to look around to the back.  And in this case we have

19  the first employee trying to confront him, to ask him to

20  leave, informed him that we're not open.

21          But, as you see in this color video footage, this

22  helped us narrow it down as being the same subject because we

23  have here, from the -- in the still shot, from the subject top

24  to bottom description, we have, as you can see from the camera

25  view here, the top, like a dark blue, navy blue hooded

1    sweatshirt.  Again, we have the mask, as well as we see the

2    two light-colored drawstrings hanging outside of the non-logo

3    jacket that has the same two-type zippers of the upper chest

4    area.  We also have a better view of the gloves where you can

5    see the logo, the unique logo that was worn by -- on these

6    gloves, as well as the two-toned white tops, black bottoms of

7    the gloves.  And we also have the black backpack, as well.

8            As you saw in the other footage, the subject was --

9    appeared to be leaving, he then turns around.

10   Q.  That is a really good shot of the gloves, is that safe to

11   say?

12   A.  Yes.  One of our better shots during the course of the

13   investigation of the gloves that we observed.

14   Q.  Do we ultimately find multiple pairs of gloves that are

15   identical to this glove that we see in this picture, too?

16   A.  Yes, we do.

17   Q.  Where do we find those gloves?

18   A.  We found them first in the vehicle -- well, actually, at

19   the same time we found them in a vehicle utilized by David

20   Flowers later that day, which was a gold, champagne-colored,

21   silver Buick LaCrosse with a Maryland tag of 9BP9073.  And

22   then we also see him at the residence of 611 57th Street

23   Northeast, which is where we executed the search warrant,

24   which is the location David flowers was residing at at the

25   time of his arrest.

1    Q.  The logo, so it says "Memphis," and it looks like it may

2    be three wolfs?

3    A.  Correct.  To the best description, it's a unique logo.

4    That's unique to that company, as we understand.

5    Q.  Okay.  Go ahead.  Now, I'm going to direct your attention

6    to three of the surveillance tapes from the Maryland robberies

7    and --

8            THE COURT:  The February 6, 2015 Popeyes was not

9    an attempted robbery?  That was a completed robbery?

10           THE WITNESS:  It was attempt.  The subject was not

11   able to obtain any currency from that robbery.

12           THE COURT:  That was just an attempt.  Got it.

13           THE WITNESS:  Yes, Your Honor.

14   BY MS. SOLTYS:

15   Q.  This is 12-26-2014.  If you could tell the Court what

16   we're seeing here?

17   A.  This is a robbery of the CVS in Prince George County,

18   Maryland.  What we have here again, this is footage obtained

19   by the Prince George County police pursuant to our joint

20   investigation.  What we have is, for investigative purposes,

21   where we identified it to be a similar subject where the

22   similar subject was -- subject enters before closing, before

23   10 p.m., and he confronts the employee, or manager at the

24   time, asked to be taken -- or, enters the store.

25           And as you see in the video, we have similar

1    clothing description, where in this case you'll see, from top

2    to bottom, a light-colored hooded sweatshirt -- I'm sorry, a

3    light gray-colored hooded sweatshirt, excuse me.  A mask that,

4    again, we only have the -- ski-type mask that only has the

5    eyes viewing.  And you also can clearly see in this video the

6    unique gloves that were used by the subject in these robberies.

7         We have the -- in this case, the still shot we have

8    the logo that you can see on a white background, which is the

9    top portion of the glove, and the black bottoms of the glove.

10   And then we see down to a dark-colored clothing, which appears

11   to be a black jacket, based on the enhancement -- the video, I

12   guess you could say that -- the quality of the video, that's

13   what we can determine from this.  Then we have blue jeans as

14   well.

15   Q.  Okay.  And now let's see the actual robbery, please.

16   A.  As he enters the store, we have, again, investigative

17   purposes to help narrow it down to the similar subject, we

18   have -- he asked to be taken to the rear office safe area of

19   the store to obtain money from the safe.  He has the similar

20   type of weapon, silver on top, back on bottom, semi-automatic

21   type pistol.  He directs the employee manager to the back, to

22   turn around, retrieves a white plastic bag from his person and

23   then places the U.S. currency that he obtained from the safe

24   into the plastic bag.  And then in this case, for video

25   footage, we see the white plastic bag taken from his person

1    and we also see the view of the gun and the gloves that we've

2    seen in similar -- several of the -- most of the other

3    robberies, I should say.

4    Q.   Here we see a light gray hooded sweatshirt underneath the

5    jacket.  Does that appear to be the case?

6    A.   That is correct.

7    Q.   And do we ultimately seize -- is that the fourth jacket

8    that we seize?  We seize a jacket that is light gray in color,

9    like this?

10   A.   Yes, ma'am.

11   Q.   And I will explore this in a moment, but is it safe to say

12   that this is probably the first big break that the task force

13   gets in identifying the serial robber?

14   A.   Yes, ma'am.

15   Q.   And just -- maybe in two sentences tell the Court.

16   A.   During this robbery, the CVS at this location, which is

17   located in District Heights, Maryland, they secreted a GPS

18   tracking pack inside a bundle of U.S. currency.  This is --

19   several businesses and establishments, mainly banks, use this

20   technology to track robberies.  Where they would put a GPS

21   tracking pack inside a stack of currency hidden within other

22   U.S. currency.

23        We've seen this several times in other bank

24   robberies and other types of investigations, where subjects

25   would take the currency and the tracking pack would be

1    activated upon exiting the store.  And in this case the

2    subject here did take a GPS tracking pack that was located

3    with the currency inside the safe and it was activated as he

4    departed the store.

5    Q.  All right.  Now, switch to, if you could show, please, the

6    January 14, 2015.  This is yet another Murry's that is robbed

7    in Maryland, is that correct?

8    A.  Yes.  We have a Murry's in Maryland, PG County, January

9    14th.  Upon store opening we have the subject, as you'll see

10   here, subject is -- has entered the store, but you can see his

11   legs on the top there and discussing, talking with the

12   employee.  He will enter the store shortly.  Again, early

13   morning hours.

14           And we also have a Murry's grocery store which was

15   targeted by two -- by the same subject in two D.C. robberies.

16   Q.  And so, now, this is a very good image?

17   A.  Yes.  One of the better quality video footages that we had

18   of the subject, where we can identify more specifically the

19   type of clothing that was used in the series of robberies.

20   Q.  I don't want to belabor this point, but in this image we

21   see what appears to be a light-skinned African-American male?

22   A.  Yes.

23   Q.  You can get a sense of his height?

24   A.  Correct.  That would be corroborated by witness testimony.

25   Q.  We see the face mask.  Only the eyes and the skin around

1    the eyes are visible, correct?

2    A.   Correct.

3    Q.   Looks like this is the same jacket that we've seen that

4    has the Champion logo over the left breast?

5    A.   Yes.  And in this video you can specifically see the logo

6    a little more clearly in the left area.

7    Q.   Two white drawstrings?

8    A.   Two white drawstrings.  And you can also see, as well,

9    another unique identifier of this dark blue, navy, Champion-

10   brand sweatshirt is that this -- the interior was lined with a

11   light gray material inside the hood.  And you can see, just

12   off to the right of the subject's face and towards his neck

13   area, the interior of that sweatshirt was light gray material.

14   Q.   That's consistent with the Champion jacket that was found

15   in Mr. Flowers' vehicle when he was ultimately stopped on

16   February the 6th, is that correct?

17   A.   Yes, ma'am.

18   Q.   Okay.  Go ahead and play the rest of that.

19        Are those the gloves here?

20   A.   We can clearly see, again, that the footage indicates the

21   same type of gloves used, where we have black bottoms, white

22   top, and a black logo on the top, white backing, top area of

23   the glove.  We also have a similar type of firearm, a

24   semi-automatic style where we have silver on top, black on

25   bottom.  And the same type of mask, and as well we have blue

1    jeans and brown-colored shoes.

2    Q.  Now we're going to see him flee the store after the

3    robbery is taking place?

4    A.  Correct.  After the robbery, he'll then exit shortly after.

5    Q.  So as you've been narrating these clips, you've just been

6    pointing out to the Court all of the similarities that allowed

7    you guys to compile these series of robberies as possibly

8    having been committed by the same perpetrator, is that correct?

9    A.  Yes, ma'am.

10   Q.  And here we see him go out?

11   A.  And in this case we see a white plastic bag, which is also

12   indicative of several other robberies we've seen on video

13   surveillance, as well.

14   Q.  And we have a clip from inside of the office?

15   A.  The -- what we have here is the subject again forcing the

16   employees to the rear, asking for currency, obtain --

17   retrieves a white plastic bag from his person, and then

18   places -- has the manager or employee put the money inside the

19   bag, and he also retreated himself.

20       We can see here the -- again from the footage, the

21   quality, that we can see it's a color of being dark blue or

22   navy blue type sweatshirt.  We also see the similar weapon.

23   Q.  Do you see this bag?

24   A.  Yes.

25   Q.  Anything significant about that white plastic bag?

1    A.   That appears to have a logo that could possibly be from --

2    has the name of -- from the store Save-A-Lot.

3    Q.   Save-A-Lot.  And did we ultimately recover a Save-A-Lot

4    white plastic bag that looked like that from Mr. Flowers'

5    house when we executed the search warrant?

6    A.   Correct.

7    Q.   Again, keeping both employees under his control, going to

8    the safe, all similar characteristics that we have seen

9    throughout?

10   A.   Correct.  And just to add on about the Save-A-Lot, there

11   was a Save-A-Lot robbery in Prince George County, as well,

12   committed by the same subject, according to PG County police.

13   Q.   That's on our chart, number 2.

14              Okay.  And then last one --

15              THE COURT:  That Save-A-Lot bank robbery is not

16   part of the 404(b) evidence?

17              MS. SOLTYS:  No.

18   BY MS. SOLTYS:

19   Q.   So this is the last one, February 5th, 2014, and this is

20   the -- this is an attempted robbery at a Kentucky Fried

21   Chicken restaurant in Prince George's County.  And would you

22   describe this robbery as another very significant break for

23   law enforcement?

24   A.   Yes.  In this robbery, which we have the -- in the early

25   morning hours, we have the attempted robbery of a KFC over in

1    Prince George County.  For MO purposes, what happened here was

2    the employee took the trash out, and as he exited, the

3    employee, he left the back door open, which was similar to the

4    robbery that occurred at the Payless shoe store on September

5    12th in Washington D.C., where the subject would enter the

6    back store as the employee is taking the trash out.

7          In this case we have the KFC, similar MO, where the

8    subject entered the store through the rear of the KFC in the

9    attempt to commit the robbery of the KFC.  And in the footage,

10   as you see here, we have again, due to the -- there was -- it

11   appears to be more of a black and white type nature, but we

12   can clearly see that we have -- from the top to the bottom of

13   the subject description, we have a hooded sweatshirt with

14   some -- dark-colored hooded sweatshirt with some type of

15   light-colored drawstrings dangling from it.

16         But what assisted us narrowing it down further is

17   not only the MO, we also have those gloves that we see in the

18   footage here, the two-tone gloves, which -- white on top,

19   black on bottom, with a black logo on the white backing on the

20   top of the glove.  And we also have here, as you can see over

21   the subject's left shoulder, a black backpack, which we have

22   seen in several of the other armed robberies.

23   Q.  Then, again, two white drawstrings?

24   A.  Correct.

25   Q.  Okay.  And then last clip that we will play, Your Honor,

1    is this.  If you could just tell us what this is.  This is --

2    A.  This is the actual exterior footage where, as I mentioned,

3    the subject -- the employee will come out, take the trash out,

4    the suspect is, top upper portion, waiting behind -- waiting

5    in the trees for the employee to exit, he then enters the

6    store through the back door that is left open.

7           In the footage that you can see, before -- he

8    appears to be observing, waiting for his moment to enter the

9    store, once the employee is out of sight, taking the trash

10   out.  But, for us to help narrow it down for investigative

11   purposes, we have the time, the geographic location, and, more

12   visually and physically, we have the physical description, as

13   well as the clothing.  And we have, in this case, the video

14   footage has -- matches the white gloves that we've seen in the

15   other robberies, white and black gloves with the black logo on

16   the top.  And we have the black backpack, as well.

17   Q.  Looks like you could see the logo on the back of the hand.

18   That's visible in this shot?

19   A.  We also have the subject wearing a similar type of mask,

20   as well.

21   Q.  So from this particular attempted robbery, there's

22   surveillance footage that shows the potential -- the getaway

23   vehicle, is that correct?

24   A.  Yes.  Subsequently Prince George County police and our FBI

25   counterpart task force obtained video footage from a nearby

1    McDonalds, which they determined to be a vehicle used as a

2    getaway vehicle used by the subject.

3    Q.  All right.  So, very quickly then, 1B is just a still

4    photo from the footage that we have now just seen from the

5    Murry's on October the 13th, with the fluorescent drawstrings;

6    1C is the second Murry's robbery -- second Murry's robbery; 1D

7    is just the perpetrator entering the Rainbow clothing store;

8    1E are some shots from Radio Shack; 1F is the attempted CVS;

9    1G the attempted Popeyes; 1H, the December 26 robbery at the

10   CVS in Maryland; 1I, January 14, 2015, Murry's robbery in

11   Maryland; and, finally 1J, attempted robbery in Prince

12   George's County at KFC.  Did I fairly summarize these -- the

13   stills that we just saw?

14   A.  Yes, ma'am.

15   Q.  And then last, very quickly, I also just want to go

16   through something, which is that you had said that Prince

17   George's County was sharing information with you that allowed

18   you to compile a number of robberies on the list as the Early

19   Morning Bandit, potential serial robber, is that correct?

20   A.  That is correct.

21        MS. SOLTYS:  This is Government's Exhibit number

22   3.  Any objection to this?  Mr. Peed?

23        MR. PEED:  Which robbery is this from?

24   BY MS. SOLTYS:

25   Q.  So, Prince George's County provided -- well, the task

1    force had access to a number of robberies that happened in

2    Prince George's County?

3    A.  Correct.

4    Q.  This one shows it is January 28th, it says the National

5    Tire and Battery in Prince George's County, correct?

6    A.  September.

7    Q.  What did I say?

8            THE COURT:  You said January.  Didn't look like a

9    "1."

10   BY MS. SOLTYS:

11   Q.  I'm sorry.  September 28th, 2014?

12   A.  Correct.

13   Q.  And then bottom right-hand photo, seems to show -- I'll

14   let you use your own words.

15   A.  The footage that, as we later obtained, during our joint

16   investigation, was that in this footage we see the suspect

17   wearing a dark gray, slate gray type sweatshirt, which we can

18   see to be the fluorescent-colored drawstrings and also

19   fluorescent-lined zipper, which we also see the gloves that

20   were seen in several of the -- almost all the other robberies

21   between D.C. and Maryland, and the similar type of weapon.

22           But for us specifically, the sweatshirt, that also

23   matched the sweatshirt worn by the suspect on the October

24   13th, Murry's robbery.

25   Q.  So this robbery makes the list of potential similar

1    committed by the same person?

2    A.  Correct.

3    Q.  You had access to this stuff, it says, "Early Morning

4    Bandit string, Prince George's County."  This is material you

5    had in your possession before Mr. Flowers is stopped on

6    February the 6th, 2015, correct?

7    A.  Correct.

8    Q.  So this is another robbery on October the 2nd, 2014, at

9    another Rainbow clothing store in Prince George's County,

10   correct?

11   A.  Correct.

12   Q.  Another CVS is robbed in November 1st of 2014, also in

13   Prince George's County?

14        THE COURT:  Excuse me just a second.  Yes, Mr.

15   Peed?

16        MR. PEED:  I would like to object to this exhibit

17   and, more generally, to exhibits for which the videos aren't

18   provided to the defense.  There were four Maryland robberies

19   for which videos were provided to the defense, and we asked

20   for all videos in the government's possession.  So, while I

21   understand we don't need to play full videos, I don't have

22   any information, other than the still.  So I have no with

23   way of knowing whether the witness has further

24   differentiating details, other images from the videos that

25   look like so-called similar MO.  So I would object where the

1     government has not produced any discovery at all.

2               THE COURT:  I think that some of these, for

3     example, the September 28, 2014, is not on my list of 404(b)

4     robberies, correct?

5               MS. SOLTYS:  That's correct, Your Honor.

6               THE COURT:  So is this exhibit talking about other

7     uncharged robberies that are also not related to 404(b)

8     evidence.

9               MS. SOLTYS:  That's correct.  These are still

10    shots from other robberies that are on Government Exhibit

11    number 2, which is just the list, and it's just to show to

12    the Court that there were a number of robberies that were

13    put on this list as potentially being committed by the same

14    serial robber.  And this is part of the basis why, that that

15    is -- that there was just the similar clothing, and that's

16    the only basis that the government is using these

17    photographs, is to explain how Exhibit 2 came to exist.

18              THE COURT:  Right.  And for some reason the

19    government is not seeking to admit evidence from these other

20    robberies as 404(b).

21              MS. SOLTYS:  That's correct.

22              THE COURT:  Is there any reason why, if you have

23    the videotapes related to these robberies, why can't give

24    them to the defense?

25              MS. SOLTYS:  If I have them, there's no reason why

1    I can't provide them to the defense.

2              THE COURT:  All right.  So, I mean, the government

3    is not seeking to introduce them as 404(b), so I think for

4    purposes of the hearing, I think the government is simply

5    helping to bolster some of the information that the agent

6    has about the series of 24 robberies of which the government

7    is intending, I guess, only to offer evidence in this, in

8    its case-in-chief at trial, about the charged ones and the

9    404(b) ones.  Do I have that correct?

10             MS. SOLTYS:  Yes, that's correct, Your Honor.  And

11   I would simply say that the Court may well know that there's

12   an ongoing investigation by the U.S. attorney's office in

13   Greenbelt and I would need to speak to the AUSA who's

14   handling Mr. Flowers' case there.  I would not want to

15   prematurely disclose information that would put any of their

16   witnesses in jeopardy.

17             THE COURT:  I understand.  Let me just ask you:

18   Are there pending charges against Mr. Flowers in Maryland?

19             MS. SOLTYS:  Yes.

20             THE COURT:  So he's already been indicted related

21   to certain bank robberies in Maryland?

22             MS. SOLTYS:  No, he hasn't been indicted, but

23   there is -- there's an arrest warrant that's lodged against

24   him at the state's attorney's office level, charging him

25   with at least one of the Prince George's County robberies.

1      There's an assistant United States attorney in Greenbelt

2      I've spoken with several times who would potentially bring

3      charges against Mr. Flowers on the federal side.  And then,

4      in addition, there's a pending rape case that's being

5      prosecuted by the state's attorney's office in Prince

6      George's County for which Mr. Flowers was indicted and is

7      pending trial, but then he was released while he was pending

8      trial right before these robberies occurred.

9              THE COURT:  All right.  Well, there was a

10     reference in some footnote to a rape case.  But it wasn't

11     clear to me what happened with that rape case, whether he

12     was, you know -- so, I take it from what you've just said,

13     that case never went to trial.

14             MS. SOLTYS:  Correct.  He was released pending trial.

15             THE COURT:  After being detained for some period

16     of time?

17             MS. SOLTYS:  Yes.

18             THE COURT:  Hum.  On a rape case?

19             MS. SOLTYS:  Yes.  Then these robberies all

20     occurred.  Mr. Flowers is then arrested here in Washington,

21     D.C., he's detained here federally.  At some point before I

22     became involved in the case I knew that the assistant

23     state's attorney Joe Ruddy, in Prince George's County, had

24     submitted a writ to take custody of Mr. Flowers.  They

25     actually had a trial date scheduled for the rape case.  And

1    unbeknownst to my office, I believe that the marshal service

2    just unilaterally refused to honor the writ, because I

3    believe it was -- coincided with a status hearing that this

4    court had.  So Mr. Flowers has been in federal custody here

5    under Washington, D.C.'s jurisdiction.

6              THE COURT:  Okay.  Well, I was curious about what

7    happened to that charge.  Thank you.

8              MS. SOLTYS:  Okay.  And then -- I don't know if

9    the Court is going to rule on this, on the objection to this.

10             THE COURT:  Well, the objection is overruled.

11   This is an evidentiary hearing.  I mean, you know, I

12   understand the nature of your objection.  It gave me an

13   opportunity to clarify exactly what these photographs relate

14   to.  But overruled.

15   BY MS. SOLTYS:

16   Q.  Agent, these are just examples of other photographs that

17   you had been provided as part of the task force investigation

18   into the Early Morning Bandit robbery?

19   A.  That is correct.

20   Q.  Bottom right-hand side we see another Taco Bell robbery in

21   Prince George's County and we see the drawstrings, is that

22   correct?

23   A.  That's correct.  And the one unique thing about that photo

24   is that the -- from our appearances, it appears that the

25   Champion brand, dark blue, navy sweatshirt that we've seen in

1    several of the robberies has been turned inside out.  The

2    reasons is that the logo is now on the opposite side, which

3    from the view would be on the right side of the body, upper

4    right, which is turned the other way, normal way out, for lack

5    of a better term, would be the left side.  We also have a good

6    visual here of the interior of the hooded sweatshirt lining,

7    which appears to be light gray.  So for some reason the

8    suspect at that time reversed the sweatshirt.

9    Q.  The Champion jacket we see, the interior of the hood is

10   this light gray?

11   A.  Correct.  And we also have, again, the light-colored

12   drawstrings are still visible there as well.

13   Q.  The last photo that is part of this exhibit is this

14   January 14, 2015, Murry's robbery that we've already seen the

15   video, is that correct?

16   A.  Yes, ma'am.

17   Q.  Now, I would like to focus on a couple of things, which

18   is -- all right.  You mentioned Detective Chad Howard was

19   involved in this investigation with you.  Is there a Prince

20   George's County counterpart that's also involved in this

21   investigation with you?

22   A.  Yes.  Detective Thomas Bunce, who is also designated as a

23   task force officer as part of the FBI Baltimore's robbery task

24   force.

25   Q.  I want to ask you this question, which is:  How focused

1    were you during this period of time on this particular

2    investigation?  Is this one of hundreds of cases that you're

3    handling, or is this more important in your workload?

4    A.  Due to the repeat and violent nature of the case, as well

5    as the -- I should say, the numerous robberies, this was my

6    priority case during this time period, myself and the -- those

7    who are the lead investigators on this case, as well.

8             THE COURT:  Could you spell the name of Detective

9    Thomas Bunce?

10            THE WITNESS:  Yes.  It's B-U-N-C-E.

11   BY MR. SOLTYS:

12   Q.  So is it fair to say that the first big break in this case

13   occurs on the day after Christmas, 12-26-2014, that CVS

14   robbery with the money pack?

15   A.  Yes, that is correct.

16   Q.  If I could have the Court's indulgence for a moment.

17            Six through 11.

18            This is Government's Exhibit number 6.  Tell the

19   Court, what is Government's Exhibit number 6, please?

20   A.  This is a map that we created that followed the track, GPS

21   track, as I mentioned, from the December 26 robbery of the CVS

22   in Capitol Heights, Maryland.  This is the data that we

23   received from the GPS; namely, longitude, latitude, that

24   allowed us to plot the track of the suspect who obtained that

25   money from -- or, the money and the -- well, specifically, the

 1    hollowed-out currency stack that contained the GPS following

 2    that robbery.

 3    Q.  If you could just remained the Court, we saw the clip of

 4    this.  We saw the perpetrator taking the money out of the safe

 5    and putting it in the bag, is that correct?

 6    A.  That is correct.

 7    Q.  This is Government's Exhibit number 8.

 8              And just for purposes of helping to clarify, what is

 9    Government's Exhibit number 7 (sic)?  If you can tell the

10    Court what this is?

11    A.  That is the -- that's the CVS pharmacy location.

12    Q.  Do you see this right here, the Southern Avenue Southeast?

13    A.  Yes.

14    Q.  Are you aware that this is the borderline between

15    Washington, D.C. here, and then Prince George's County on the

16    south side?

17    A.  That is correct.

18    Q.  Okay.  So -- so that would be depicted here at the bottom

19    of Government's Exhibit number 6, correct?

20    A.  Correct.

21    Q.  And then from -- what did you learn from this particular

22    12-26-2014 robbery?

23    A.  The data that was provided to us by the GPS tracking

24    indicated that the subject departed on foot initially, then

25    went into a vehicle.  Because the data that we received

1     indicated, at several times, the miles per hour that the

2     tracking device was going, and which would clearly indicate

3     that there was -- for example, 35 miles per hour to 45 miles

4     per hour, just as an example.  On several of what we would

5     call GPS pings -- which a ping is basically a ping from a

6     satellite to the GPS device that is hidden within the U.S.

7     currency.

8              To the best of our knowledge there is no human being

9     that can at least run at 35 miles per hour, so that would

10    indicate that the suspect had a vehicle that he facilitated as

11    a getaway from that robbery.

12    Q.  And this route is a road?

13    A.  Correct.  Each one of those blue dots represent a ping

14    that was send to the satellites and back down, between the

15    satellites and the GPS.

16    Q.  So this robbery occurred at approximately 9:55 p.m., the

17    GPS device is embedded in the stack of money and is activated

18    once it leaves the store.  And what happens to that GPS

19    tracking device?

20    A.  The GPS tracking device will stay active until it is

21    either, basically, reacquired from law enforcement or

22    discarded or disabled by the individual who took the GPS pack.

23    Q.  So what's represented up here?

24    A.  What we have here is we have a last ping around 10:03 p.m.,

25    in the vicinity of 524 57th Street Northeast.  What was later

1     determined is that it appeared, based on the pings, that there

2     was a zero miles per hour hit.  As you can see the cluster of

3     pings up there, the pings went to a zero miles per hour,

4     which, to the best of our knowledge, based on utilizing these

5     tracking devices used in other crimes before, is that the

6     subject stopped, because we were at zero miles per hour, where

7     other times we would have, obviously, speeds of 20 to 35 miles

8     per hour.

9            So we have a zero miles per hour, several pings were

10    going on here, then we have a ping that -- the last ping we

11    have is at this location, in the vicinity of 57th, which

12    basically, to our -- as we later determined, the subject who

13    had that GPS device deactivated it by breaking it and

14    discarding it.

15    Q.  Did you recover the device?

16    A.  Yes.  The device was recovered by Prince George County

17    police shortly afterwards.  And was recovered in the

18    cul-de-sac, just at the end of the 500 block of 57th Street.

19    It was in plain view, in the middle of the street, when the

20    Prince George County police arrived.  And this is the device

21    that we have here, that was recovered.

22    Q.  This is Government's Exhibit number 7.  And how big -- if

23    you could show the Court, what does it look like and where is

24    it embedded?

25    A.  If you want to use the reference of a single dollar bill,

1    it is embedded -- it is folded up, embedded inside a -- within

2    a dollar-bill-size stack of money.  So, it is -- the top of it

3    is somewhat hidden.  It's made to look like money on the top

4    and the bottom.  So it's hollowed out in the middle.

5    Q.  A hollow stack of money is created and this GPS device is

6    then embedded or hidden in the stack of money?

7    A.  Correct.  The company that makes these devices and sells

8    them to commercial establishments hollows out stacks of

9    currency, based on a contract with the U.S. Treasury

10   Department, and then sells them to establishments.

11   Q.  So this is how the device was -- how it appeared when it

12   was recovered by the Prince George's County police?

13   A.  As I was informed by the police officers, yes.

14   Q.  And who told you that he found it and when did he find it?

15   A.  One of the officers that responded to recover was, as I

16   mentioned, Detective Thomas Bunce, Prince George's police

17   department.

18   Q.  This is Government's Exhibit 10 --

19              THE COURT:  Excuse me just one second.  We're

20   going to take a ten-minute break.  My court reporter has

21   been working since 9:30 this morning and everybody talks, as

22   she says, very quickly.  We're going to take a ten-minute

23   break to give everybody a break.

24              (Recess.)

25              THE COURT:  Please proceed.

1              MS. SOLTYS:   Thank you.

2    BY MS. SOLTYS:

3    Q.   Agent, when we left off we were discussing the discovery

4    of the GPS tracking device on the evening of December the

5    26th, 2014.   And did you learn from Detective Bunce of the

6    Prince George's County police department, who was assigned to

7    your task force, where that device was actually located?

8    A.   Yes.   And it was in the cul-de-sac, again, as I mentioned,

9    on the 500 block of 57th, right near the intersection of Foote

10   Street and 57th Street Northeast.

11             And if you want to use the reference to the photo

12   which I have -- that you have, the cul-de-sac is -- if you're

13   looking at the photo, you see the Foote Street and the 57th,

14   it is going to be just to the left of the intersection, if

15   you're facing -- as you're facing east -- I'm sorry, westbound

16   on Foote Street.

17   Q.   How about if I put Government Exhibit number 9 on the

18   screen and ask if I'm pointing to the cul-de-sac right there?

19   A.   Correct.   That is the location.

20   Q.   And then 611 57th Street is highlighted.   Could you tell

21   the Court why, please?

22   A.   That is the location of Miss Terri Holman, which we later

23   executed a search warrant, after we determined Mr. David

24   Flowers was residing there.

25   Q.   And Miss Holman, is she in the courtroom today?

1    A.   Yes.

2    Q.   Could you point her out for the Court today?

3    A.   She is in the witness -- I'm sorry, the viewing area.  She

4    is wearing a tan-colored jacket, and is sitting in the middle,

5    third row back.

6    Q.   And she is Mr. Flowers' wife?

7    A.   Correct.

8    Q.   And so the distance between the location of the GPS

9    tracking device and the residence where Mr. Flowers lived is

10   five houses away, is that correct?

11   A.   Correct.

12   Q.   And so Government's Exhibit 9 shows the cul-de-sac.

13   Government Exhibit 10 just shows Eastern Avenue, is that

14   correct?  Foote Street and Eastern Avenue?

15   A.   Correct.

16   Q.   And then that's been consistent with -- here on

17   Government's Exhibit number 6, this is Eastern Avenue?

18   A.   Correct.

19   Q.   And then that's Foote Street?

20   A.   That is correct.

21   Q.   And then -- you learned from Detective Bunce that they

22   recovered the GPS tracking device at approximately 10:40 p.m.,

23   is that correct?

24   A.   Yes, ma'am.

25   Q.   So now what does that do for you, this location of the

1    tracking division?

2    A.  For investigative purposes we, based on our -- you know,

3    our -- the information that the tracking packet ended at that

4    location, that gave us an investigative lead, to focus on that

5    area because it was not on the main road, it was not on a main

6    thoroughfare.  It was in a subdivision or a neighborhood,

7    which would indicate for us whoever the suspect was that

8    committed the robbery and took the tracking pack is familiar

9    with that area.  Because if it was discarded off a main

10   highway, for example, then they would have -- basically we

11   would have stopped in that area, as opposed to this one where

12   it stopped and it was discarded at the same time.  And more

13   beneficially for us, it was in a neighborhood, which would

14   indicate that the suspect, more than likely, had knowledge of

15   that area.

16   Q.  So, fair to say this location became of interest to the

17   members of the task force?

18   A.  Correct.

19   Q.  Now, Government's Exhibit number 11, could you tell the

20   Court what that is, please?

21   A.  This is a D.C. camera footage that was forwarded to us

22   from the D.C. government, which, matching up the time of the

23   GPS pings and the miles per hour and the location, we were

24   able to determine that whoever committed the robbery was

25   stopped at the intersection of Southern Avenue at this time --

1    at this time of the evening, at the intersection.

2    Q.  So assuming that the GPS device is 100 percent accurate,

3    and assuming that the timing on the D.C. camera is 100 percent

4    accurate, these are the two vehicles that could potentially be

5    transporting the GPS tracking device, is that fair to say?

6    A.  Correct.

7    Q.  And so now you had access to this and you studied this?

8    A.  Correct.

9    Q.  Now, I would like to direct your attention, I would say --

10   ask if it would be fair to say or safe to characterize the

11   events of January 14th, 2015, the two robberies that occur on

12   that day as significant, as another significant break in this

13   particular investigation?

14   A.  Correct.

15   Q.  Okay.  So this is the still from January the 14th, 2015,

16   the robbery that takes place in Prince George's County, at the

17   Murry's.  It's already in evidence.  It's Government's

18   Exhibit 1I.  And after that robbery takes place, did Prince

19   George's County share with you information regarding the

20   actual -- this is Government's Exhibit number 12 -- the actual

21   vehicle that was -- the getaway vehicle, rather, from the

22   Murry's robbery on that date, January the 14th, 2015?

23   A.  Correct.  This is a -- what they would call a locale

24   poster that was developed following the robbery in which

25   Prince George County police obtained outside footage of the

1   business where the Murry's Steaks was located, which was

2   robbed on January 14th.  And the outside video footage that

3   they determined, again, Prince George's County determined that

4   the vehicle that is shown here was utilized by the suspect

5   in -- during the course of that robbery.

6   Q.  And then directing your attention to February the 5th,

7   2014, that attempted robbery that took place at the KFC that

8   we have seen --

9           THE COURT:  You mean February 5th, 2015, correct?

10          MS. SOLTYS:  Yes.  I'm sorry.

11          THE COURT:  There are enough robberies here and

12  dates, I want to make sure I'm following.

13  BY MS. SOLTYS:

14  Q.  This is Exhibit 1J, and we've already seen this.  This is

15  from February the 5th, 2015?

16  A.  Correct.

17  Q.  Okay.  And now as a result of this particular attempted

18  robbery at the KFC with the person that you believe is your

19  serial commercial store robber, does Prince George's County

20  gather information from that -- I think you had alluded to

21  this earlier during your testimony -- regarding the getaway

22  vehicle?

23  A.  Yes.  Following the attempted KFC robbery on February 5th,

24  the Prince George County police, during their subsequent

25  investigation, obtained video footage of the vehicle that was

 1    used by the suspect in the course of the KFC robbery.  They

 2    issued a BOLO, a lookout, which we have a silver or champagne-

 3    type colored vehicle.  Again, we can't be 100 percent positive

 4    on the determination of the color, but we have a silver or

 5    champagne-colored type vehicle, which they were able to

 6    determine that it was a Buick LaCrosse.

 7    Q.  This is Government's Exhibit number 13.  And this is a

 8    fusion center report form completed by Prince George's County

 9    after this robbery.  And they identify the suspect vehicle as

10    possibly a silver, newer Buick LaCrosse, is that correct?

11    A.  That is correct.

12    Q.  And they obviously -- well, shouldn't say obviously, but

13    did they share this information with you?

14    A.  Yes, they did.

15    Q.  And this is all part of what the task force is focusing on?

16    A.  Correct.

17    Q.  So, now that you have --

18              THE COURT:  So Exhibit 14, the suspected getaway

19    vehicle for the February 5th, 2015 KFC attempted robbery,

20    and Exhibit 12, reflecting the suspected getaway vehicle for

21    the January 14, 2015 robbery, two different vehicles?

22              THE WITNESS:  The --

23    BY MS. SOLTYS:

24    Q.  I'll show you.  This is 12.

25    A.  It's based on the footage.  I mean, we can't be 100 percent

1     sure it's the same vehicle, but we were able to determine the

2     color and shape of that being a sedan type vehicle.  Again,

3     silver or champagne type color used in those robberies.  If

4     that helps to answer your question, Your Honor.

5     BY MS. SOLTYS:

6     Q.  The one on the left described as the Buick LaCrosse by

7     Prince George's County police department, you would agree is a

8     much clearer image of the getaway vehicle from the one of

9     January the 14th?

10    A.  Correct.

11    Q.  All right.  So now we are up to, I guess, at some point on

12    the day of February the 5th, 2015.  And I would like to know

13    what steps the task force has taken, you, Detective Bunce,

14    Detective Howard.  What knowledge do you have at this point?

15    A.  Following that KFC robbery and then the issuance of the

16    BOLO, the alert poster, which we have a -- appears to be a

17    Buick vehicle, silver in color, newer model, that is passed on

18    to me the evening, early evening of February 5th, which, in

19    turn, I pass on to my partner, my partners in the Metropolitan

20    Police Department.  And specifically, that BOLO that was sent,

21    we pass that on to them as well.  They inform me that --

22               THE COURT:  BOLO stands for bulletin?

23               THE WITNESS:  Be on the lookout for.

24               THE COURT:  Be on the lookout.  Got it.  Okay.

25               THE WITNESS:  Sorry, Your Honor.  These terms come

1      out.

2              THE COURT:  Okay.

3      A.  So then I was also informed that Prince George County were

4      going to focus -- or, at least go to a check of the vicinity,

5      the 57th and Foote Street later that evening, Northeast,

6      based -- since that's the location where the GPS track was --

7      GPS pack was discarded.

8      BY MS. SOLTYS:

9      Q.  So do you learn from Prince George's County whether they

10     go to the area where the GPS tracking device was discarded and

11     look for a vehicle?

12     A.  Yes.  The next morning I received a phone call from

13     Detective Bunce and another agent and they inform me, it was

14     about 7 a.m., they inform me that that prior evening they

15     went -- detectives and law enforcement personnel from Prince

16     George County went to that neighborhood and they discovered

17     two Buick LaCrosse vehicles parked in front of 611 57th Street

18     Northeast.

19     Q.  And did they -- do you know what time it was that you had

20     this telephone conversation?

21     A.  Approximately 7:11 a.m. on the 6th of February.

22     Q.  Then what information do they tell you about these

23     particular two different Buick LaCrosses?

24     A.  They obtain the license plate information from the silver

25     one and the gold Buick LaCrosse.  Both of them were newer

1    model.  The silver was a D.C. tag of EP 4212, which was

2    registered back to Miss Terri Holman at that address of 611

3    57th Northeast.  Then the gold Buick LaCrosse in the same

4    vicinity was a rental vehicle, Enterprise rental vehicle,

5    which was subsequently determined to be rented by Miss Terri

6    Holman, utilizing the same address.

7    Q.  Let me make it a little easier for you, perhaps.  This is

8    Government's Exhibit 26, if you could just tell us if this is

9    the Buick LaCrosse with the D.C. tag?

10   A.  Correct.

11   Q.  And this is --

12            THE COURT:  You know, I don't know who the two

13   witnesses are that Mr. Peed plans to call, but if any of

14   those witnesses are sitting in the courtroom, does the

15   government have any wish to have them excluded?

16            MR. PEED:  They're not.  They're not, Your Honor.

17            THE COURT:  Okay.  Okay.

18   BY MS. SOLTYS:

19   Q.  So this is the silver Buick LaCrosse with the D.C. tag

20   that is registered to Terri Holman at 611 57th Street?

21   A.  Correct.

22   Q.  And this is Government's Exhibit number 19.  This is the

23   gold-colored Buick LaCrosse with the Maryland tag that you

24   just referenced that's leased by Terri Holman, it's actually

25   owned by Enterprise?

1    A.  Correct.

2    Q.  So now you learned from Prince George's County that both

3    of those vehicles are discovered outside of -- in front of 611

4    57th Street?

5    A.  Correct.

6    Q.  What information now do you learn, also from Prince

7    George's County, about Terri Holman and who she may be

8    associated with?

9    A.  They determined through their investigation in that time

10   period that she was associated with an individual identified --

11   as we subsequently identified as David Flowers, which was her

12   husband.  And David Flowers was a suspect -- I'm sorry, not a

13   suspect, correction, is a prior -- has a criminal history

14   involving robberies.

15   Q.  Let me take a step back and ask you, so at some point on

16   the morning of February the 6th, 2015, before Mr. Flowers is

17   stopped in his vehicle, what information did you know about

18   David Flowers?  And I care about his physical description and

19   his criminal history.

20   A.  Information that was relayed to me from Prince George

21   County, based on their investigation during that time period,

22   was that Mr. Flowers, to the best of their knowledge, was

23   residing at that location and he was associated with Miss

24   Terri Holman.  She, in fact, from my understanding, bonded him

25   out on the aforementioned rape charge that we just -- that was

1    mentioned earlier.

2    Q.  You knew that before he was stopped, that she bonded him

3    out on the rape charge?

4    A.  That was one of the -- that was -- I was informed of that.

5    And then they also described his criminal history of robbery,

6    as well as his physical description of being of -- matching

7    the physical description of the suspect in the armed robberies.

8    Q.  How so?

9    A.  The height, as well as the build, and also the skin tone,

10   as well, described by the witnesses as being a lighter-skinned

11   African-American man.

12   Q.  Is it safe to say then he becomes the prime suspect?

13   A.  Yes.

14   Q.  So now the morning of February the 6th, 2015, you just had

15   this phone conversation with your counterparts on the task

16   force, they shared this information about Mr. Flowers, you now

17   know the existence of at least two Buick LaCrosses which are

18   consistent with the getaway vehicle from the attempted robbery

19   the day before; where do you go, what do you look at?

20   A.  I proceed to that location myself, at approximately

21   7:35 a.m., and check that address as well.  And I discover

22   that only the gold Buick LaCrosse is present at that time,

23   which is the Maryland tag 9 Bravo Paul -- 9BP9073.  That's the

24   only vehicle that's parked that address at 7:35 a.m. that

25   morning.

1    Q.  When you say that address, you mean 611 57th Street

2    Northeast, Washington, D.C.?

3    A.  Yes, ma'am.

4    Q.  Now, then what happens next?

5    A.  We then -- we were then actually conducting another

6    operation that morning, in the vicinity, while we were -- also

7    accompanying us was Detective Howard for this operation, as

8    well, on a nonrelated investigation.  There was an alert that

9    came out through MPD radio channels, and also that there was a

10   commercial robbery, a robbery of establishment, at the Popeyes

11   located off Naylor Road, which is literally across the road

12   from the Good Hope Market.

13   Q.  Can I interrupt you for one second?  An attempted robbery?

14   A.  Attempted robbery.  So I proceed down there, since it was

15   a time of the day that our suspect usually strikes, as well as

16   the geographic location, again, across the street from the

17   Good Hope Market.  I naturally felt that this could be our

18   suspect.  So I proceeded down there.  And I was also shortly

19   followed by Detective Howard, as well, arrived to the Popeyes

20   location.

21   Q.  You keep saying across from the Good Hope Market.  If you

22   could just remind the court, are there four other robberies

23   that take place at that Good Hope Market?

24   A.  Correct.

25   Q.  This is the location of the Popeyes?

1    A.   Correct.  And again, the time of the day, early in the

2    morning, before the store opening.

3    Q.   So what happened when you arrived at the Popeyes?  What do

4    you do?

5    A.   I arrived and I initially talk to one -- or, interview one

6    of the employees who was present during the robbery.  And I

7    get an initial description which, based on his testimony,

8    sounds similar to our suspect.  I then show the employee two

9    what we would call, again, information sheets, BOLOs of recent

10   robberies in Prince George County, where the employee says,

11   yeah, that's the same guy or the same suspect that came in and

12   robbed the Popeyes.

13   Q.   Did you have an opportunity to look at the video

14   surveillance from the Popeyes robbery --

15   A.   Yes.

16   Q.   -- when you arrive?

17   A.   Shortly afterwards.

18   Q.   This is Government's Exhibit 1G, and if you could tell the

19   Court what that is?

20   A.   That is a still shot taken from the Popeyes that was --

21   that's video footage -- that's a still shot from the video

22   footage of the Popeyes during the course -- where we have the

23   suspect.

24   Q.   So you saw this video footage?

25   A.   Correct.

1    Q.  Did you draw any conclusions as to whether or not this

2    person might be your serial robber that you've been looking

3    for now for several months?

4    A.  Yes.

5    Q.  This is Government Exhibit number 15.  If you could tell

6    the Court what this is, these two pages are.  I think you just

7    referenced them.

8    A.  Yes.  These are the two information sheets, posters,

9    looking for information, BOLOs that we were -- that I showed

10   the employee that, and which she said that looks -- or,

11   matches the description of the suspect who attempted to rob

12   his Popeyes -- or, his establishment.

13   Q.  So these are two photos taken -- this is both January the

14   14th, 2015, this is the armed robbery at the Taco Bell in the

15   early morning hours, and then this is the armed robbery at the

16   Murry's in the early morning hours.  And she identifies this

17   image as the person that she believes came into the Popeyes

18   and tried to rob it that morning?

19   A.  Correct.

20   Q.  So, now, based on the fact that you have looked -- you've

21   talked to a victim, you showed this victim some photos of your

22   serial robber, as well as the fact that you yourself laid eyes

23   on this surveillance video, what information do you have and

24   who do you share it with?

25   A.  As I mentioned, Detective Howard arrived shortly

1    thereafter and he had knowledge of the information from the

2    attempted KFC and of the location of 57th Street himself

3    and -- or, he went to go to that address at 611 57th Street,

4    he proceeded from the Popeyes to that location.  I also asked

5    for assistance from additional FBI agents to proceed to that

6    location and set up on that location as well, the location

7    being 611 57th Street.

8    Q.  And you stayed at the Popeyes?

9    A.  Yes, I stayed at the Popeyes.

10   Q.  What are you doing it Popeyes?

11   A.  My main goal is to download the video and eventually get

12   that out to our other task force partners, to let them know

13   that the suspect did commit another robbery.

14   Q.  Attempted robbery?

15   A.  Attempted robbery.  I'm sorry.

16   Q.  This came at 8:55 in the morning, by 9 o'clock you hear

17   the information about the attempted robbery?

18   A.  Correct.

19   Q.  Do you know what time it is, then, that you've dispatched

20   two other special agents to go do surveillance in front of the

21   area at 611 57th Street?

22   A.  Somewhere between 9:30 and 10 a.m., approximately.

23   Q.  And then do you know whether or not -- what Detective

24   Howard does this morning?

25   A.  He proceeds down there as well, to 611 57th Street.

1   Q.  Do you learn from either the agents or from Detective

2   Howard, or from both, what observations they make in front of

3   Mr. Flowers' residence?

4   A.  They observe a -- the gold Buick LaCrosse, with the same

5   Maryland tag that we mentioned earlier, arrive at that

6   location.  And they observed, what we later determined to be

7   Mr. Flowers, entering the location at 611 57th Street Northeast.

8   Q.  What about Detective Howard, does he share with you what

9   he sees?

10  A.  Yes.

11  Q.  And that is?

12  A.  He also confirms that he sees Mr. Flowers exit that

13  vehicle and enter the residence, as well.

14  Q.  Does he tell you he sees Mr. Flowers eventually leave that

15  residence, go around to the back and park in the back?

16  A.  Yes.  Correct.  Mr. Flowers then comes back out shortly, a

17  short time after, enters the vehicle and proceeds to move the

18  vehicle of the rear of the address 611 57th Street Northeast,

19  as observed by Detective Howard.

20  Q.  You're still at the Popeye store at this time?

21  A.  That's correct.

22  Q.  Do you know where Detective Howard -- what happens with

23  Detective Howard?

24  A.  From approximately 50 minutes later, Mr. Flowers, as we

25  later identified, exited that residence and reentered the gold

1     Buick LaCrosse and then departed the residence, at which time

2     Detective Howard and the two other additional surveillance

3     agents ended their surveillance.  And Detective Howard

4     returned to the Popeyes after he stopped at his district

5     station to conduct some more investigative inquiries.  But

6     prior to that, prior to coming back to the Popeyes, he stopped

7     over at the Sixth District and then came back to Popeyes.

8     Q.  Does there come a point in time which Detective Howard and

9     anybody he's with comes back to the Popeyes where you are?

10    A.  Correct.  And he -- sometime before 12 noon he comes back

11    to the Popeyes.  At this time I had the video footage -- to

12    use the term, or lack of term -- cued up on the monitor inside

13    the Popeyes, which he can observe it himself, which I'm also

14    in the process of downloading, as well.

15    Q.  Are you talking to him?

16    A.  Yes.  We said it's more likely our same suspect.  Look at

17    the clothing here, look at the weapon, look at the gloves,

18    look at the -- again, we have the jacket, we have this hooded

19    sweatshirt, we have the mask, we have the same style, the same

20    MO, and, again, we have the location of where this robbery

21    occurred.  So we're discussing that and comparing what we see

22    and also what Detective Howard is -- you know, we're

23    discussing what we see in the footage and discussing the

24    footage.  We believe it's the same suspect.

25    Q.  Are you in contact with Detective Howard during this

1    investigation on a regular basis?

2    A.  Yes.

3    Q.  What happens when -- what's the next thing that happens

4    then, as far as -- from your point of view?

5    A.  As I stayed to finalize the video, Detective Howard then

6    exits the Popeyes.  From what I -- he then walks away from me

7    as I continue to download the video.  As I finish up

8    downloading the video, I receive a phone call from Detective

9    Howard stating that he observed the gold Buick LaCrosse in the

10   vicinity of the Popeyes and that he was following the Buick

11   LaCrosse, at which time I said, Okay, I will try and catch up

12   to you.  And eventually, he later called me back and tells me

13   he's in the vicinity of 16th and T Street Southeast.

14   Q.  And he tells you that he's actually stopped Mr. Flowers?

15   A.  Correct.

16   Q.  What do you do?

17   A.  I arrived at that location, sometime after noon or around

18   noon, and confer with Detective Howard and observed the scene,

19   which consists of several marked MPD police officers.  I also

20   observed Mr. Flowers behind the gold Buick LaCrosse, which was

21   then pulled over to the curb and near -- in the vicinity of

22   16th and T Street.  It's on the right-hand side.

23   Q.  This is Government's Exhibit number 17.  If you could tell

24   us what this is a photograph of, please, and also tell us --

25   slide that up so you can see that, 17.

1              Did you take that photograph?

2    A.  Yes.  I took this photo from the street in which Mr.

3    Flowers is located behind the Buick LaCrosse, sitting on the

4    curb.

5    Q.  That's the gold Buick LaCrosse?

6    A.  Correct.  That's the same one that was observed earlier

7    that he was utilizing, with the same Maryland tag.

8    Q.  I ask you to try to recollect, to the best of your

9    ability, what time it was that you actually arrived on the

10   scene and saw Mr. Flowers.

11   A.  Around noon, shortly thereafter.

12   Q.  This is a photograph that you took?

13   A.  Correct.  From the street.

14   Q.  So what happens then when you arrive?  What if anything

15   happens?  Do you have conversation with Detective Howard?

16   Does he say anything to you?

17   A.  Yes.  Detective Howard informs me that he observed, in

18   plain view, clothing that matched the clothing utilized in the

19   Popeyes robbery, which specifically included a dark navy blue

20   sweatshirt that was located in the front passenger seat of the

21   vehicle.  Then subsequently he also observed, in plain view,

22   gloves matching the description -- or, matching the same type

23   used in the other robberies, which were the two-tone black and

24   white in nature.

25   Q.  So did you want to see if you could see those things for

1    yourself?

2    A.   Yes.

3    Q.   And did you?

4    A.   Yes.

5    Q.   This is Government's Exhibit number 19, for starters.

6    That's a photograph of the gold Buick LaCrosse, is that

7    correct?

8    A.   Correct.

9    Q.   I just wanted to point out the windows.  Was there any,

10   you know, dark tint on the window that would have obstructed

11   your view to look into the car?

12   A.   No.  And it was -- it was somewhat of a sunny day, as well.

13   Q.   This is Government's Exhibit number 18.  Did you take this

14   photograph?

15   A.   Yes.

16   Q.   And if you could tell the Court what your -- what is

17   depicted in this photograph?

18   A.   This is a photograph from the outside of the passenger's

19   side of the vehicle.  Again, from the street in a public area.

20   I took a photo of the interior passenger side with the

21   clothing that Detective Howard's referring to.

22   Q.   Specifically?

23   A.   Specifically, as we see, a dark navy blue sweatshirt

24   located on the top of other clothing, which we later

25   determined to be a gray shirt.  We also -- there's a black

1    beanie-type cap located in the -- on the top of the -- or, in

2    the passenger's seat, as well.

3    Q.   What's that that I'm pointing to right there?

4    A.   That is drawstrings, light-colored drawstrings that was

5    part of the light -- the dark blue, navy blue sweatshirt that

6    was located in the front passenger's seat of the vehicle.

7    Q.   Okay.  When you saw that, do you recall whether this

8    passenger -- this front passenger door was opened or closed?

9    A.   It was open.

10   Q.   Okay.  And what did you personally think, once you saw

11   that sweatshirt with those two white drawstrings right there?

12   A.   I -- based on the robberies that occurred and the

13   information that we received in the past few days, I believe

14   that that was our suspect.

15   Q.   And then this is Government's Exhibit number 20.  This is

16   not a photo that you took, is that correct?

17   A.   Correct.

18   Q.   And if you could tell the Court what's depicted in this

19   photograph?

20   A.   This is the right -- that is the left rear passenger area,

21   right behind the driver's seat of the gold Buick LaCrosse.

22   And you -- and from there you can see the tops of the gloves,

23   the two-tone gloves that were visible also from the window, as

24   well.

25   Q.   This is Government's Exhibit number 21.  Is that a

1    close-up of the gloves that are depicted in the pocket behind

2    the driver's seat of the Buick Lacrosse?

3    A.  Yes.

4    Q.  Did you see those when you were standing outside of the

5    Buick LaCrosse?

6    A.  Yes, I saw those from the street.

7    Q.  Is that something Detective Howard had pointed out to you?

8    A.  Yes.

9    Q.  So what did you think when you saw those gloves behind --

10   A.  I strongly suspected that Mr. Flowers, who was the -- that

11   was the individual who committed the series of armed robberies

12   in the area.

13   Q.  Did those look like the gloves that you'd been seeing in

14   the videos?

15   A.  Yes.

16   Q.  How did you know that?  What could you tell about that?

17   A.  The uniqueness of those gloves.  Again, since we've seen

18   so much of the footage, that you can see the two-toneness

19   there.  And the two-toneness is pretty distinct, where you can

20   see the tops, the black bottoms and the white tops.  And,

21   plus, add that with the sweatshirt that was in the front

22   passenger seat with the white-colored -- or, the light-colored

23   drawstrings, led us to believe that this -- you know, that

24   this was the suspect that we had.

25   Q.  This is Government's Exhibit number 23.  Is that now what

1    the gloves looked like when they were ultimately seized from

2    the vehicle?

3    A.   Yes.

4    Q.   And if you could just point out for the Court, what are

5    you talking about when you're talking about the two-tone and

6    the color and the logo?

7    A.   The two-tone, it's really two colors.  We have the black

8    bottoms and the black fingers.  Black bottoms of the fingers

9    are black.

10   Q.   So it's like a rubber?

11   A.   Yes.  And the top of it is white.  Then we have a unique

12   type of logo that's -- a black logo that's patterned against

13   the back, the white of the glove, the top of the gloves.

14   Q.   So it says "Memphis Foam" and it looks like maybe it's

15   three wolfs howling?

16   A.   Correct.

17   Q.   Heads of three wolfs?

18   A.   Appears that way, yes.

19   Q.   Government's Exhibit number 22?

20   A.   This is the sweatshirt that was in the front passenger

21   seat of the Buick LaCrosse.  Again, for us, we are were

22   looking for a suspect utilizing a dark blue or navy blue

23   hooded sweatshirt with light-colored drawstrings of a Champion

24   brand, that also has the interior light gray, interior of the

25   hood.

1    Q.  Do you know that that's the Champion logo, that backwards

2    C with the bar?

3    A.  Yes.

4    Q.  Do you have any Champion paraphernalia yourself?

5    A.  Yes, I do.

6    Q.  And then those are the drawstrings that are visible in

7    Government's Exhibit number 18?

8    A.  Yes.

9    Q.  So after you saw what Detective Howard first told you that

10   he saw, in plain view, what did you think?

11   A.  I believed that we had our -- that Mr. Flowers was indeed

12   our suspect who committed these robberies.

13   Q.  What happened to Mr. Flowers at that point?

14   A.  He was taken into custody by the Metropolitan Police

15   Department.

16   Q.  And what happened next with respect to both the vehicle

17   and with respect to the Flowers residence?

18   A.  The Metropolitan Police Department then obtained a search

19   warrant for the residence and the vehicle, which we later

20   executed that evening.  The vehicle was -- search warrant was

21   executed at MPD's mobile crime unit and the search warrant was

22   executed at 611 57th Street Northeast.

23   Q.  Did you at all participate in the drafting and the seeking

24   of the judge's signature for the search warrant for the

25   affidavit that was the same affidavit used to support the

1    search warrant for the house and the vehicle?

2    A.   Correct.  As well as by the time -- later in the afternoon

3    the detectives and agents from our counterpart task force in

4    Prince George County in Maryland arrived at the Sixth District

5    where we all compared information that we had to help compile

6    the search warrant for the residence and the vehicle.

7    Q.   How long did it take everyone to compile this information

8    and draft this search warrant?

9    A.   A few hours.

10   Q.   Did there come a point in time which you actually sought a

11   judge's signature?

12   A.   Correct.

13   Q.   How did that come about?

14   A.   Myself, Detective Howard, and another investigator, later

15   that evening, proceeded to the judge's residence to obtain the

16   search warrant upon the residence.

17   Q.   You actually had to go to the judge's personal residence

18   that evening to get the search warrant?

19   A.   Yes.

20   Q.   Was it late at night?

21   A.   Yes.

22   Q.   Was there some reason why -- why didn't the FBI just

23   decide to wait until Monday?

24   A.   Well, based -- as we mentioned, the severity of the crimes

25   and the prolific nature of these crimes and the targeting of

1    businesses throughout D.C. and southern Maryland, we felt this

2    warranted an exigent circumstances, as well as the suspect

3    utilizing a firearm during these robberies.  We felt we needed

4    to obtain a search warrant as soon as possible and, hence,

5    that, in turn, we went to the judge's residence that evening.

6    Q.  Did Miss Holman show up on the scene when Mr. Flowers had

7    been arrested?

8    A.  From what I understand, yes, she did.

9    Q.  And the execution of the search warrant at the residence

10   occurs somewhere around midnight?

11   A.  Correct.

12   Q.  Okay.  So, very, very quickly then, Agent, this is

13   Government's Exhibit number 25.  Do you recognize this to be a

14   copy of the search warrant, and for both the house and the

15   car, and the affidavit as it was presented to the judge who, I

16   believe, appears to be Judge John McCabe of the Superior Court

17   of the District of Columbia?

18   A.  Yes.  Correct.

19   Q.  Okay.  Very -- do this very quickly.  You ultimately were

20   made aware of the search that took place of the Buick

21   LaCrosse, gold in color, pursuant to the search warrant, is

22   that correct?

23   A.  Correct.

24   Q.  And you learned that this Champion jacket was seized, is

25   that correct, Government's Exhibit 22?

1    A.   Correct.  Yes.

2    Q.   Gloves, 23?

3    A.   Yes.

4    Q.   This is 29.  Can you tell the Court what she's looking at

5    here, please?

6    A.   This is the interior of the gold Buick LaCrosse that was

7    seized and searched.  And this is, specifically, the gold

8    center console area of the Buick LaCrosse, which when you open

9    the center console, you'll see these two items here, which is

10   a rolled-up pair of Memphis style gloves, black, two-tone in

11   color, as well as a black ski mask, which only -- which you

12   can only see the eyes.

13   Q.   Let me just show you -- so this is Government's Exhibit

14   number 29?

15   A.   Yes.

16   Q.   This white scrunched-up item is Government's Exhibit 33,

17   which is also Government's Exhibit 34?

18   A.   Correct.

19   Q.   And that's another pair of the same gloves that are found

20   in the vehicle?

21   A.   Correct.  They were different from the ones from the rear

22   of the area.  And you could tell because the left side has the

23   blue lining.  The ones that were in the black seat had the

24   blue lining on the right-hand side.  On this case they were on

25   the left-hand side.  So the gloves from the interior had the

1    blue lining at the base on the left-hand side around the

2    wrist.

3    Q.  And this is Government's Exhibit number 29.  You pointed

4    us to that black item.  That's Government Exhibit 32.  Is that

5    what you're looking at?

6    A.  Yes.  That was the black ski mask that was rolled up or

7    folded up inside the center console.  Once mobile crime pulled

8    it out and flattened it out, this is the type -- this is the

9    mask that was there.

10   Q.  Does that mask appear to be consistent with the mask that

11   you've seen the serial robber wearing in several of the

12   robberies, including the Murry's that happened in Maryland and

13   the Popeyes attempted here in Washington, D.C.?

14   A.  Yes, it is.  Specifically where -- in this mask the only

15   visible part would have been the eyes.

16   Q.  Government Exhibit 30.  Do you recognize this to be a

17   photograph of the front seat of the Buick?

18   A.  Yes.

19   Q.  And this is Government's 30, that's 31, the hat.  Do you

20   see that?

21   A.  Yes.

22   Q.  Okay.  Then I wanted to just point out, because I notice

23   there's the piece -- there's a piece of paper from the dentist

24   that's here on the front seat of the car in this -- in this

25   photograph, that is in the front here.  Do you know how that

1    came about or what happened?

2    A.  Not 100 percent sure, but I know the piece of paper was

3    there.

4    Q.  Here, when you took the picture?

5    A.  Yes.

6    Q.  Did you move the piece of paper or anything?

7    A.  No.  But I suspect what happened is that when they opened

8    the doors, it might have blown off or blown to the floor

9    because the doors were open at the time I arrived.

10   Q.  And then you also participated -- so you said you

11   participated in the search at Mr. Flowers' residence, is that

12   correct?

13   A.  Correct.

14   Q.  Government's Exhibit number 31, if you could tell the

15   Court what we're looking at in this photograph?

16   A.  This is an interior photograph from -- pursuant to the

17   search warrant that was executed that evening, once you enter

18   the house, off to the right is an office area where we found

19   several pieces of evidence.  In this case we have a -- on the

20   top there we have a dark gray, slate-colored hooded sweatshirt

21   with fluorescent green, lime zipper and drawstrings.

22   Q.  Have you had occasion to look at that closer, take a

23   photograph of that?

24   A.  Yes.

25   Q.  This is Government's Exhibit No. 40.  Do you recognize

1   this photograph?

2   A.  Yes, this is the same sweatshirt that we seized that

3   evening from that residence.

4   Q.  And do you believe that this is the sweatshirt that the

5   perpetrator was wearing in the first Murry's, October 13,

6   robbery?

7   A.  Yes, I do.

8   Q.  This is another photograph of Government's Exhibit number

9   41.  And, you know, it appeared that, in one of the videos,

10   that the drawstrings appeared to be thicker than usual.  Do

11   you know why that could be?

12   A.  Those drawstrings actually were microphones, as we later

13   found out, are unique to the Old Navy brand, where you can see

14   the white cord, as well, you can hook into some kind of mobile

15   music device.  But the reason we suspect those are thicker

16   drawstrings is because those were actually, indeed, microphones

17   for that type of Old Navy brand sweatshirt.

18   Q.  You mean earphones?

19   A.  Earphones that you would put in your ear while listening

20   to music or phone calls.

21   Q.  So you can plug your -- so this jacket comes equipped so

22   you can plug it into a MP player?

23   A.  Correct.

24   Q.  Put the drawstrings in your ear and listen to music?

25   A.  Correct.

1    Q.  And then Government's Exhibit number 38, this is also one

2    of the jackets that was seized during the execution of the

3    search warrant?

4    A.  Yes.  In fact, this was specifically found right near the

5    main doorway of the residence, and on the bottom of the floor,

6    where, for us, we seized it based on matching description of

7    the jacket worn in several robberies.  And for us, we see the

8    two zippers on the top breast area, chest area, which we see

9    in the surveillance footage during several of the robberies,

10   that you can clearly see in the surveillance camera.  In this

11   case it matches the jacket -- matched the jacket we found at

12   the residence.

13   Q.  So you think that this appears to be the jacket that was

14   worn in the Radio Shack and the attempted Popeye robbery?

15   A.  Yes.

16   Q.  This photograph just shows how they sort of shimmer?

17   A.  Yes.  In the light you can definitely see the shimmering

18   of the light bouncing off of the zippers.

19   Q.  Government's Exhibit 42, this is a photograph of what?

20   A.  This is also -- if you refer back to that original pile of

21   clothing on the first photograph from the search warrant, this

22   is a light-colored gray hooded sweatshirt.  The reason we

23   seized that was based on that matching the description of the

24   light-colored hooded sweatshirt utilized in several of the

25   other robberies.

1    Q.   Including the December 26 robbery at the CVS?

2    A.   Correct.  Including -- and Prince George County police

3    detectives and FBI agents from the Maryland portion of our

4    task force were present for the search warrant, as well, to

5    corroborate that clothing, with respect to that clothing.

6    Q.   Government Exhibit 42, two plastic bags that were on the

7    ground?

8    A.   Yes.  We have a white plastic bag which we later found to

9    be Safeway and a black bag which we later found to be --

10   determined to be an Ashley Stewart.

11   Q.   Did you say Safeway?

12   A.   Save-A-Lot.

13   Q.   Government's Exhibit number 45, that's -- there was a

14   Save-A-Lot that was robbed, is that correct?

15   A.   Correct.

16   Q.   And does this appear to be one of the -- does this appear

17   to look like one of the plastic bags that was used in one of

18   these robberies that we showed to the Court?

19   A.   To the best of my knowledge, yes.

20   Q.   And then the last one, Government's Exhibit 44, this

21   plastic bag, Ashley Stewart, that was also a place that was

22   robbed, is that correct?

23   A.   That is correct.

24   Q.   And lastly, Government's Exhibit 36, if you could tell the

25   Court what that's a photograph of?

1    A.  That is a photo taken by Metropolitan Police Department

2    following the arrest of Mr. David Flowers.

3    Q.  Significance of the gloves that are seized from both --

4    from the car are that they appear to be consistent with gloves

5    worn in almost all of the D.C. robberies, is that correct?

6    A.  That is correct.

7    Q.  The face mask appears to be consistent with the face mask

8    worn in several of the robberies, is that correct?

9    A.  That is correct.

10   Q.  As well as the jackets that we've discussed?

11   A.  Correct.

12           MS. SOLTYS:  I have no further questions at this

13   time.

14           THE COURT:  Cross-examination.

15           MS. SOLTYS:  Can I move into evidence a number of

16   exhibits, please?

17           THE COURT:  Yes.  I think you've gone, basically,

18   1 through 45.

19           MS. SOLTYS:  I do want 1 through 45, Your Honor.

20   I have not used them all with Agent Johannes, but I will be

21   using them with Detective Howard.

22           THE COURT:  I don't see any reason why you can't

23   move them all in now.

24           MS. SOLTYS:  Fine.  I move them all in.

25           THE COURT:  Do you really have any objection to

1   any of these exhibits?

2          MR. PEED:  No, Your Honor.  My only objection was

3   to the one which was Exhibit 2, and then that compilation.

4          THE COURT:  All right.  Over objection, all the

5   exhibits will be introduced.  Specifically, the objections

6   to Exhibit 2 and -- when you say the compilation, what

7   you're talking about, Exhibit -- Exhibit 2 and what else?

8   Oh, the attachments?  Exhibit 3?

9          MS. SOLTYS:  Yes.

10          THE COURT:  Yes.  All right.  All right.  Mr. Peed.

11                    CROSS-EXAMINATION

12   BY MR. PEED:

13   Q.  Good afternoon.

14   A.  Afternoon, sir.

15   Q.  In the scope of your job investigating robberies, do you

16   get exposed to every robbery report in the District of

17   Columbia?

18   A.  I would say, since the beginning of 2014, when we were

19   informed of a -- the task force with Metropolitan Police

20   Department to identify commercial robberies, serial repeat

21   commercial robberies.  So late -- I would say the midsummer to

22   early fall 2014, I would be privy to most of the robberies, in

23   the District of Columbia.

24   Q.  Prior to that you didn't work on robberies in the District

25   of Columbia?

1    A.  I myself did not, but other agents in my task force and

2    squad did.

3    Q.  Do you know how many robberies are in the District of

4    Columbia on an annual basis?

5    A.  No, sir.

6    Q.  How about in southeast on an annual basis?

7    A.  Not an annual basis, sir.

8    Q.  You testified about several aspects of these robberies

9    that you were investigating for the bandit, early bandit?

10   A.  Yes.

11   Q.  And you talked --

12              THE COURT:  Early Bird Bandit.

13              MR. PEED:  Early Bird Bandit.

14   BY MR. PEED:

15   Q.  Now, within this collection of 30-some-odd robberies,

16   there were differences in the clothing, correct?

17   A.  Correct.

18   Q.  In some there was black hoodies, correct?

19   A.  Not for the D.C. robberies.

20   Q.  I'm talking about all the ones that were collected into

21   the Early Bird Bandit collection.

22   A.  I can't specifically attest to the robberies in Prince

23   George County, especially the ones that were before the -- we

24   formed this task force.

25   Q.  So those -- you can't attest to them, so those didn't go

1    into your conclusions about Mr. Flowers on the morning of

2    February 6; is that fair to say?

3    A.   I'm not sure, sir, I understand your question.

4              THE COURT:  Are you challenging probable cause for

5    arrest?  Because all they needed was reasonable suspicion

6    for the *Terry* stop.  So let's -- I mean, it's -- it's almost

7    lunch.  Let's focus in on the issues, that's what I'm trying

8    to do.

9              MR. PEED:  Yes, Your Honor.

10             THE COURT:  You don't have a probable cause

11   challenge for his arrest.  You're challenging whether or not

12   they had reasonable suspicion to stop him.

13             MR. PEED:  Well, Your Honor, the government has,

14   for the first time, in its opposition to our motion,

15   described a reasonable suspicion based on the robberies, not

16   based on the failure to use the turn.  So based on that, for

17   the first time raising that, that then raises other issues

18   of whether they had probable cause to conduct a search of

19   the car.  Because they claim there was not a search.

20             So I'm trying to defeat potential government

21   defenses that they will -- you know, that they may raise,

22   that's the problem here.  If they're claiming there was

23   reasonable suspicion for a *Terry* stop to investigate a

24   robbery, which there's strong evidence to support that

25   conclusion, that then takes you to the question of was the

1    arrest legal and was the search legal.

2          THE COURT:  Continue.

3          MR. PEED:  And again, Your Honor, this is raised

4    because of the nature of the government's opposition.

5          THE COURT:  Is the government withdrawing its

6    position that there was a traffic violation that gave them

7    reasonable suspicion to stop?

8          MS. SOLTYS:  No, not at all, Your Honor.

9          MR. PEED:  They haven't, Your Honor.  But for the

10   first time in their opposition they asserted that the reason

11   he was pulled over was not the traffic stop.  They actually

12   stated the reason Detective Howard --

13         THE COURT:  They have an alternative reason.  They

14   have -- they have two reasons.  Okay?  They stop -- they

15   conducted a reasonable *Terry* stop because of a left turn

16   signal.  I was expecting to hear about traffic violations

17   this morning.  Okay?  Sounds like it's more to bolster a

18   404(b) argument.  Okay?

19         So, I've got a reasonable suspicion.  I want to

20   hear about a traffic violation.  They have established

21   probable cause for the arrest of Mr. Flowers, but there's

22   been no challenge to the probable cause for his arrest.  No

23   statements were made after his arrest that are subject to

24   the challenge.  So it feels like we're going a little far

25   afield into probable cause.  Certainly -- and there's been

1   no probable cause challenge to the search warrants.  It's

2   really -- the whole basis for the challenge to the affidavit

3   is not based on probable cause, the lack of probable cause,

4   it's whether or not there was a misstatement about seeing

5   things in plain view.  So, an expansive -- you have been

6   given a lot of information.

7        MR. PEED:  Yes, we have, Your Honor.

8        THE COURT:  A lot of information to really educate

9   both you and your client about the nature of the evidence

10  that the government is going to go into in even much more

11  meticulous detail when this goes to trial.  You've been

12  educated.  But that doesn't mean that for purposes of the

13  motions pending in front of me I need to spend many more

14  hours on probable cause.

15       MR. PEED:  Here's how we see it, Your Honor, and I

16  appreciate --

17       THE COURT:  That's my perspective on what's going

18  on here.

19       MR. PEED:  Certainly.  We're working backwards.

20  We do not believe that the evidence was in plain view.  We

21  believe that is --

22       THE COURT:  Okay.  So ask him about that.

23       MR. PEED:  He wasn't there at the time, that's

24  questions for Detective Howard.

25       THE COURT:  So it should be a very short cross-

1    examination.

2              MR. PEED:  That's true, Your Honor.

3              THE COURT:  I'll allow you to do a little bit of

4    fishing, but not much.

5              MR. PEED:  Okay.  Let me be much more brief then,

6    Your Honor.

7              THE COURT:  Thank you.  It's been a long week.

8    BY MR. PEED:

9    Q.  Detective -- I'm sorry, Agent, when you arrived at the

10   scene, the doors of the car were already open, correct?

11   A.  Correct.

12   Q.  Okay.  And Detective Howard had already informed you that

13   he had seen certain items in plain view, correct?

14   A.  Correct.

15   Q.  So you don't know what the state of the car was at the

16   time that it was -- that Mr. Flowers exited the vehicle,

17   correct?

18   A.  No, sir.

19   Q.  You were also informed by Detective Howard that he made a

20   stop of the defendant based on a traffic violation, correct?

21   A.  Correct.

22   Q.  And the traffic violation he told you was at the corner of

23   16th and Good Hope Road, correct?

24   A.  Somewhere in that vicinity.

25   Q.  Mr. Flowers was arrested approximately three-tenths of a

 1   mile away from that location, correct?

 2   A.   I do not have that knowledge, sir.

 3   Q.   He was arrested on Ridge Place, correct?

 4   A.   You would have to ask MPD that, sir.  I'm sorry, I don't

 5   have the specifics of what they filed as the arresting

 6   location.

 7   Q.   Okay.  You stated on your direct that you helped draft the

 8   affidavit, where you reviewed the affidavit submitted to the

 9   magistrate, correct?

10   A.   Yes, sir.

11   Q.   I would like to give a -- do you have a copy?

12          MS. SOLTYS:  I think it's mine, number 25, and it

13   should be in the pile on the left.

14          MR. PEED:  Your Honor, I would like to show the

15   agent the --

16          THE COURT:  Go ahead.

17          MR. PEED:  -- the affidavit.

18   BY MR. PEED:

19   Q.   I've got some scribbles on here, but I would like you to

20   read, for the record, this statement to the magistrate -- I'm

21   reading from paragraph 16 on page 4.

22   A.   Where the circled part is at?

23   Q.   Yep.

24   A.   "Flowers was also wearing a black jacket and blue jeans

25   and brown boots.  Detective Howard immediately recognized

1    these clothing items as ones depicted in the video."

2    Q.  And when it says, "the video," that's in paragraph 16, did

3    you understand that to mean the video of the Popeyes?

4    A.  I would have to look at the context of the affidavit

5    again, sir, to get a complete answer.

6    Q.  Go ahead.  Read the whole paragraph, paragraph 16.

7    A.  I can't indicate what Detective Howard was referring to,

8    since we had several videos that he's also viewed as part of

9    this investigation.  So I can't specifically say what he was

10   referring to in this paragraph.

11   Q.  Do you recall what the suspect in the attempted robbery of

12   the Popeyes was wearing?

13   A.  Yes.

14   Q.  Was he wearing a black jacket?

15   A.  Yes.

16   Q.  And was that black jacket the black jacket that Mr.

17   Flowers was wearing when he was arrested?

18   A.  To the best of our knowledge, the jacket appeared to be

19   different.

20   Q.  Appeared to be different.  The jacket he was arrested was

21   a Ralph Lauren jacket, correct?

22   A.  I was not privy to the arrest procedures.

23   Q.  You took a picture of him when he was sitting on the curb,

24   correct?

25   A.  Correct.  But I could not tell what type of jacket that

1    was.

2    Q.  You can confirm it was not the black jacket used by the

3    suspect in the robbery of the Popeyes?

4    A.  From our appearance, yes, sir.

5    Q.  This affidavit says that Mr. Flowers was wearing blue

6    jeans and brown boots.  Was the suspect in the Popeyes video

7    wearing blue jeans or brown boots?

8    A.  No, sir.

9    Q.  So it's not true that these clothing items were the same

10   ones depicted in the Popeyes video?

11            MS. SOLTYS:  Objection.  It doesn't say the Popeyes

12   video, it just says, "in the video."  It's not a fair question.

13            MR. PEED:  I'm just asking him to confirm.

14            THE COURT:  He said, "in the Popeyes video."

15   Overruled.

16            Could you ask your question again, Mr. Peed?

17   BY MR. PEED:

18   Q.  It's not true that the -- that the clothing that was worn

19   by Mr. Flowers was the same ones depicted in the video of the

20   Popeyes attempted robbery, correct?

21   A.  Correct.  Yes, sir.

22            MR. PEED:  Your Honor, most of my other questions

23   would go to the probable cause inquiry that Your Honor wants

24   to expedite.  I can also reserve them for Detective Howard,

25   who made the arrest, and, therefore, is more relevant to him.

1          THE COURT:  Okay.  Well, that's really -- only we

2     need to get to reasonable suspicion, not probable cause.

3          All right.  Any redirect?  So are you done, Mr.

4     Peed?  Any redirect?

5          MS. SOLTYS:  No.  Now we'll -- at the Court's

6     pleasure, we can call Detective Chad Howard now.

7          THE COURT:  Yes, let's call him.

8                         CHAD HOWARD

9     was called as a witness and, having been first duly sworn,

10    was examined and testified as follows:

11         THE COURT:  Good afternoon, Detective.

12         THE WITNESS:  Good afternoon.

13                      DIRECT EXAMINATION

14    BY MS. SOLTYS:

15    Q.  Good afternoon, Detective.  Would you please state your

16    name for the record?  Would you spell both your first name and

17    last name for the benefit for the court reporter?  Would you

18    tell the Court how you're employed and in what capacity?

19    A.  I name is Detective Chad Howard.  First name is C-H-A-D,

20    last name is H-O-W-A-R-D.  I'm employed as a Metropolitan

21    Police Department Detective Grade 2, assigned to the criminal

22    investigations division.

23    Q.  How long have you been a member of the Metropolitan Police

24    Department?

25    A.  Eighteen years.

1    Q.   How long have you been a detective?

2    A.   Ten years.

3    Q.   And what do you investigate?

4    A.   Right now I investigate robberies of establishments and

5    all violent crimes that occur in the Sixth District.

6    Q.   I would like to direct your attention to the middle of

7    fall of 2014 and into the beginning of 2015 and ask if you

8    participated in a task force with Detective Tom Bunce from

9    Prince George's Counsel and Special Agent Jeff Johannes,

10   looking at violent robberies of commercial establishments both

11   in Washington, D.C. and Prince George's County?

12   A.   Yes.

13   Q.   Did you have other tasks to do at this time, or would you

14   say that your involvement with the task force was the most

15   important task that you had at the time?

16   A.   This was the most important task that I had at the time.

17   I had other assignments, but this was my primary.

18          THE COURT:  Detective, could you just move the

19   microphone a little bit closer to you --

20          THE WITNESS:  Yes, ma'am.

21          THE COURT:  -- so I don't have to stain to hear

22   you.  Thank you.

23   BY MS. SOLTYS:

24   Q.   I would like to ask, during that time of period that I

25   referenced, sometime in the fall of 2014 and into the early

1    part of 2015, did you participate in an investigation that led

2    to the arrest of an individual who ultimately came to be known

3    to you as David Flowers?

4    A.  Yes.

5    Q.  Do you see Mr. Flowers in the courtroom today?

6    A.  Yes.

7    Q.  If could point him out for us, please, by telling us what

8    he's wearing and where he's located?

9    A.  Sitting to the left of defense counsel in the orange

10   jumpsuit.

11          MS. SOLTYS:  I would like for the record to

12   reflect an in-court identification of Mr. Flowers.

13          THE COURT:  Let the record so reflect.

14          MS. SOLTYS:  Thank you.

15   BY MS. SOLTYS:

16   Q.  Detective, in preparation for your testimony here today,

17   did you meet with me and look at a video that contains

18   surveillance videos from seven different robberies that

19   occurred here in Washington, D.C., as well as three others

20   from Prince George's County?

21   A.  Yes.

22   Q.  Now, prior to December -- I'm sorry.  First question is

23   did you ultimately execute a traffic stop on David Flowers on

24   February the 6th, 2015?

25   A.  Yes.

1    Q.  I would like to talk about what you've done in the task

2    force and what you knew prior to the time that you executed

3    the traffic stop of Mr. Flowers on February the 6th.

4    A.  Okay.

5    Q.  Okay.  The videos that you looked at that make up

6    Government's Exhibit number 1, had you seen those videos

7    before you executed the traffic stop on Mr. Flowers?

8    A.  Yes.

9    Q.  Once, twice, or ad nauseam?

10   A.  Numerous times.

11   Q.  Why?

12   A.  There was a case -- those were the cases that I was

13   investigating and this was the suspect that I was

14   investigating.  So I watched those videos and seen still

15   photographs for months.

16   Q.  And did you have conversation with Detective Bunce and

17   with Agent Johannes about whether or not there was a serial

18   robber that was operating in the Prince George's County,

19   Washington, D.C. area?

20   A.  Almost daily.

21   Q.  And this person was referred to then as the Early Bird

22   Bandit?

23   A.  Yes.

24   Q.  Why is that?

25   A.  Because his times of striking was either early morning --

1     usually early morning or in the evening.

2     Q.  I don't intend to play the videos with Detective Howard

3     since we have already seen them.

4           But I would like to show you, Detective, a bunch of

5     still photos and just ask you some very specific questions.

6     A.  Okay.

7     Q.  Now, were there significant factors that law enforcement

8     was focusing on to determine whether or not this perpetrator

9     was the same throughout the series of the eight robberies or

10    attempted robberies that had occurred here in Washington, D.C.?

11    A.  Yes.

12    Q.  And if you could just very briefly sort of summarize for

13    the Court, before I show you some of the clips, what were some

14    of the factors that drew your attention, that allowed you and

15    the other members of the task force to surmise that there was

16    a serial robber of commercial establishments?

17    A.  When we looked at the videos, we noticed that the gloves

18    were the same, same white back, black front, two-tone gloves

19    with an emblem on the hand portion, the back of the hand.

20    There appeared to be a sweatshirt that I recognized in

21    particular with an emblem on the breast, the left breast of a

22    sweatshirt, that had like a C emblem on it.  I noticed that

23    because I own one of those sweatshirts myself.

24    Q.  What brand is that?

25    A.  It's a Champion.  And we noticed the jackets and the

1    handgun appeared to be the same, chrome-in-color handgun, the

2    times of the robberies, modus operandi, I guess you could say.

3    The way that he handled the employees of the stores, to me,

4    caught my eye.

5    Q.   What do you mean, how he handled the employees of the

6    store?  Could you elaborate?

7    A.   If there were more than one -- if there was at least one

8    or two employees in the store, he would never leave an

9    employee alone or lay an employee down, as I've seen in other

10   robberies.  He would keep them together with him and take them

11   to wherever, the cash register or safe or whatever it was that

12   he intended on getting the money from, he would take them with

13   him.  And that stood out to me.

14          As far as the clothing, even the way that he held

15   the weapon, to me, when he put the money in the bag, he would

16   always hold the weapon in his right hand, flat.  All of that

17   stood out to me because, like I said, I watched these videos

18   continuously, continuously.  I wanted to see something that

19   stood out in every case, and those things stood out to me.

20   Q.   So I want to just talk a little bit about articles of

21   clothing that you might have -- that you would have keyed in

22   on.  This is Government's Exhibit 1A.  These exhibits are

23   already into evidence.  I'm going to tell you this is from

24   February the 7th, 2014, which is the first robbery that

25   occurred, that was indicted here in Washington, D.C., the

1    Ashley Stewart robbery.  You've seen this before?

2    A.  Yes.

3    Q.  And you notice that there's potentially a white glove

4    that's depicted in this?

5    A.  Yes.

6    Q.  Okay.  And was there anything unusual about how the

7    perpetrator entered the establishments?  You know, right off

8    the bat.  Do you know what I mean by that question?

9    A.  Yes.  Well, he entered the establishments, he made a

10   conscious effort, in my opinion, to conceal his face; either

11   have his face covered by his hand, as if he was on a cell

12   phone, or conceal his face coming through the main door of a

13   lot of the establishments.

14   Q.  This is Government's Exhibit 1B and this is a series of

15   stills from the first Murry's robbery here in Washington,

16   D.C., October the 13th, 2014.  You've seen this still before

17   with the perpetrator?

18   A.  Yes.

19   Q.  And do you recognize this particular -- do you see this

20   jacket that's depicted in this photograph?

21   A.  Yes.

22   Q.  Are you aware of whether or not a jacket that has

23   fluorescent drawstrings was seized during the execution of a

24   search warrant at Mr. Flowers' residence?

25   A.  It was.

1    Q.  Can you tell -- I'll just point out to you, heading to the

2    safe, white plastic bag, appear to be the same, appear to be

3    gloves in this picture.  Did you look at these before?  Were

4    these things that you were focusing in on?

5    A.  Yes.

6    Q.  One-C, this is the second robbery of a Murry's here in

7    Washington, D.C., November the 15th, 2014.  You've seen this

8    video surveillance before, is that correct?

9    A.  Yes.

10   Q.  And you've seen stills from that video surveillance before?

11   A.  Yes.

12   Q.  Do you see -- recognize the gloves in this photograph?

13   A.  Yes.

14   Q.  And see the gloves in the second, and do you see the logo

15   that's depicted on the --

16   A.  Yes.

17   Q.  -- outside of the hand?

18   A.  Yes.

19   Q.  This is the January -- I'm sorry, this is the December 10,

20   2014 robbery that took place.

21           THE COURT:  I think you've established that he's

22   seen all these videos, he's watched these videos, he's

23   detailed a number of things that he's seen.

24           MS. SOLTYS:  I'll cut this short.  I'll cut this

25   very shot.

```
 1                THE COURT:  So I don't think we need to go through

 2     all the exhibits again.

 3                Why don't we break for lunch for one hour.

 4                Well, actually, can you get Mr. Flowers to and

 5     from in 45 minutes?

 6                THE DEPUTY:  I can, Your Honor.

 7                THE COURT:  Is that possible?  You tell me.

 8                THE DEPUTY:  We can, yes.

 9                THE COURT:  Why don't we resume in 45 minutes for

10     lunch.

11                MS. SOLTYS:  That's fine.

12                THE COURT:  Thank you.

13                (Recess.)

14                THE COURT:  Hope you had time for lunch.

15                THE WITNESS:  Yes.

16                THE COURT:  Okay.  Miss Soltys.

17                MS. SOLTYS:  Thank you, Your Honor.

18     BY MS. SOLTYS:

19     Q.  Detective, I want to just zero in on something, and that

20     is, were drawstrings, two drawstrings and a dark-colored

21     hoodie important in your investigation?

22     A.  Yes.

23     Q.  And were gloves that were two-tone, black on the palm and

24     white on the outside and a logo on the outside important in

25     your investigation?
```

```
1    A.  Yes.

2    Q.  There were other garments, as well, that played a role in

3    your investigation, is that fair to say?

4    A.  Yes.

5    Q.  Now, so specifically, I want to just ask you, this is

6    Government's Exhibit number 1E.  This is a still from the

7    robbery that took place at the Radio Shack.  Can you see the

8    gloves that are depicted here?

9    A.  Yes.

10   Q.  Are these -- were these significant in your investigation?

11   A.  Yes.

12   Q.  One-F, this is a still from the attempted robbery at the

13   CVS.  Do you see those two white drawstrings?

14   A.  Yes.

15   Q.  Had you seen this picture before?

16   A.  Yes.

17   Q.  Had you zeroed in on this before?

18   A.  Yes.

19   Q.  Do you see that logo on the top of the left breast?

20   A.  Yes, ma'am.

21   Q.  Do you have Champion paraphernalia at home?

22   A.  Not now, but I had, yes.

23   Q.  Do you see the gloves?

24   A.  Yes.

25   Q.  Do the gloves appear to be consistent with the gloves that
```

1    you've seen throughout the video surveillance and throughout

2    your investigation?

3    A.  Yes.

4    Q.  Government's Exhibit number 1G do you see that, the double

5    drawstrings, white drawstrings depicted in this?  And do you

6    see the gloves that are depicted here, with the logo on the

7    back?

8    A.  Yes.

9    Q.  And then lastly, Government's Exhibit number 1I, see the

10   double white drawstrings depicted in this still photo from the

11   Murry's robbery in Maryland?

12   A.  Yes.

13   Q.  And same with the white gloves, two-tone gloves, logo on

14   the back?

15   A.  Yes.

16   Q.  And these were all things that you had zeroed in on and

17   were concerning yourself with prior to the time that you

18   executed the traffic stop on Mr. Flowers, is that correct?

19   A.  Yes.

20   Q.  Now, during the course of the investigation did you come

21   to learn that there was this -- I call it big break the day

22   after Christmas, where there was a GPS device, a tracking

23   device that had been embedded in some cash and it came to be

24   discovered at a cul-de-sac at 524 57th Street Northeast, here

25   in Washington, D.C.?

1    A.  Yes.

2    Q.  And you knew that prior to February the 6th?

3    A.  Yes.

4    Q.  Did you come to learn about another significant break,

5    which was on February the 5th, 2015, an attempted robbery of a

6    KFC in Prince George's County in the morning, where the actual

7    getaway car was seen on surveillance tape?

8    A.  Yes.

9    Q.  And determined to be a Buick LaCrosse.  Did you know that?

10   A.  Yes.

11   Q.  So now on the morning of February the 6th, 2015, before

12   the time of the traffic stop of Mr. Flowers that midday, I

13   would like to ask you, did you have conversations with Agent

14   Johannes and did he relay information or did you learn

15   information about what Prince George's County had discovered

16   on the evening of the 5th and into the morning of the 6th

17   regarding the location of a Buick LaCrosse; who it was

18   associated with and what law enforcement knew about that

19   person?

20   A.  Yes.  I received a phone call from Agent Johannes and

21   Detective Bunce, both to inform me of the KFC incident, the

22   Buick LaCrosse, an investigation that they had that led them

23   back to what the -- the area of 57th Street and -- the vehicle

24   matching that description that they had discovered in that

25   block -- in the next block, actually; who owned that vehicle,

1    who was associated with that owner.

2    Q.   Who owned that vehicle?

3    A.   Terri Holman.

4    Q.   Who was associated with that vehicle?

5    A.   David Flowers.

6    Q.   What information did you come to learn of David Flowers

7    before the time of the traffic stop?

8    A.   That Mr. Flowers had been arrested for prior robberies,

9    other crimes of violence.

10   Q.   Did you know he had convictions for robberies?

11   A.   Yes.

12   Q.   Did you know he had convictions for weapons offenses?

13   A.   Yes.

14   Q.   Did you know he had done significant time?

15   A.   Yes.

16   Q.   Do you know Terri Holman bonded him out in the rape case?

17   A.   Yes.

18   Q.   What did you know about his physical appearance and how it

19   was consistent or not inconsistent with the description of the

20   assailant that you had as your serial Early Bird Bandit?

21   A.   Yes.  Once I found out his description, tall, slim, light

22   complexion, that actually we were leaning towards this could

23   be our guy.  He has a history, he has the physical build, we

24   have the vehicle, we have the GPS located in the next block.

25   It's starting to come together for us.

1          In fact, so that myself and the young man that was

2     riding with me that day -- actually, the day that we arrested

3     him we were doing surveillance at another location and then

4     the robbery at the Popeyes came out.  So we immediately went

5     to where the GPS device was located, thinking if this was Mr.

6     Flowers, he would come back home.

7          We sat there for a little while, we saw a vehicle

8     matching the description from the KFC incident come into the

9     block and we saw a gentleman exit out at the address that was

10    previously mentioned.  We could not tell it was Mr. Flowers

11    from the distance we were.  But we saw somebody get out, we

12    thought that they had a button-up shirt, white shirt.  So we

13    just paid attention to him, documented his movements.  He even

14    once moved the LaCrosse to the rear of the house.

15         But we didn't contact him.  We had other agents in

16    the area.  And I, in fact, said we're going to leave the area.

17    Q.  Now, do you think that that person saw you?

18    A.  Yes.  That's what I was about to get to.  Because

19    originally he had rolled past me.  Even though my vehicle was

20    tinted, you know, we were hiding in plain sight.  It was not

21    hard to see us.  So once he moved his vehicle, I moved mine,

22    and we kind of went to a direction where he was backing into

23    the space behind his house and he saw me.  So I said, Well,

24    I'm burnt.

25    Q.  How do you know he saw you?

1    A.  I just -- because in my experience, if we're dealing with

2    a gentleman with the history that Mr. Flowers has, they pay

3    attention to everything.  Not very much gets past them as far

4    as who's following them, because their senses are always up,

5    because they know they're doing wrong, in my opinion.  And

6    when I moved that vehicle, and then I moved it into the alley

7    where his house was, I said, Well, he had to have seen me.

8    Q.  You said, "I'm burnt."  What does that mean?

9    A.  That means I think he saw me.  I can no longer maintain my

10   cover.  Even if he didn't know it was law enforcement, he

11   thought it was somebody, because why would we move from that

12   corner to the rear of his house?  So I said, Well, we're gone.

13   Q.  You know now that person was Mr. Flowers?

14   A.  Yes.  I know that now, it's Mr. Flowers.  So I left.  I

15   said, Well, let's go up to Popeyes, let's go to the scene.

16   Because I spoke to Agent Johannes and he said, Well, this is

17   our guy.  You know, he matched the same lookout.  Well, sort

18   of the same lookout.  We have the gloves, black coat, coming

19   in and asking for an employee, because that had also been a

20   MO, asking for an employee or someone that he pretended to

21   knew -- to know, and that was used in the Popeyes event.  So,

22   I said, Let's go.

23          So I went up there and I spoke to the witnesses.  I

24   spoke to the manager, to a gentleman that was outside,

25   actually, that had followed who we now know as Mr. Flowers

1    behind the Popeyes, where they had a pallet laid on the fence

2    that exited into the McDonald's beyond.  I saw that pallet had

3    been laid there because it clearly was not there before, or

4    did not belong there.

5    Q.  You mean it was used as a ladder?

6    A.  Yes, over the barbed wire fence.  So, I'm sitting there

7    and I'm just thinking to myself, Well, it's happened again.

8    So I went to the front of the Popeyes, looking out of the

9    window.  It's a glass door.  I'm just wrapping it all up in my

10   mind, thinking about this vehicle.  Thinking is it this guy

11   that we saw?  It was a little bit of time, could it have been

12   him?  And I'm looking out the door and I see a gold LaCrosse

13   at the light.  And I'm looking at the car and I can see the

14   driver.  I did not know it was in Flowers.  I'm looking at the

15   driver, and the driver, he's looking in my direction.  And I

16   can clearly see him and I can clearly see the vehicle.

17          So I tap Investigator Tridico, I said, Let's go,

18   let's go.

19   Q.  What kind of a look was the person -- can you tell what

20   kind of a look this person was giving you?

21   A.  Well, in that direction you can either go down Good Hope

22   Road or you can take the right to go to Naylor Road or you can

23   make the left and come back in front of Popeyes.  But they

24   didn't take the left.  They were looking at me, and the only

25   thing I could do was a stooping down motion, maybe just to see

1    what's going on at the Popeyes.  Because we had it taped off

2    and there was clearly a police presence there, and they were

3    looking and they were hunching down, looking around.  What

4    drew my attention was that motion, that movement, and that

5    vehicle.

6    Q.  Just for the record, I would like the record to reflect

7    you have now just sort of moved up and down, and staring

8    intently.

9    A.  So I tapped my partner and said, Let's check go.  Let's

10   check this car out.

11   Q.  That's Investigator Joseph Tridico?

12   A.  Tridico.

13   Q.  Tridico.  T-R-I-D-I-C-O.

14   A.  Yes.  So, we jumped in my cruiser.

15   Q.  What were you thinking at that point?  What do you mean

16   you said, "Let's go"?  You tapped him and said, "Let's go"?

17   A.  What I'm thinking is, from my experience, what I know,

18   they always come back.

19   Q.  What do you mean, "they always come back"?

20   A.  They want to see what the police are doing.  They want to

21   see -- criminals, that is, people that have just committed a

22   crime want to see what we know, want to see if someone is

23   talking to the police, want to see if they left something

24   behind, want to see what we're doing.  That's the first thing

25   that I saw.  I said, What's the chances of my looking out this

1    door and seeing a gold LaCrosse sitting at that light?   I

2    said, He came back.   There's no doubt in my mind he came back.

3    I tapped Investigator Tridico and said, Let's go.   And he

4    didn't even know why I wanted to go.   I said, Just come on,

5    come on.

6          So we got in my car, we caught up to the LaCrosse.

7    And lo and behold, it's the same tag that I was given, that we

8    had documented earlier that was at the address where the GPS

9    was discarded.

10   Q.   The gold LaCrosse with the Maryland tags?

11   A.   The Maryland tag, the same tag.   And we're looking, I

12   said, This is -- that's too ironical.   You know, coincidence

13   only goes so far.   So we followed.   He changed lanes and then

14   he made a right, I believe that's on 16th Street.   We didn't

15   see any signals.   So when we pulled into 16th Street, I think

16   that's R or Riggs, he's pulling down the block and he just

17   pulls into a parking space.

18          So we stop in the middle of the street, activated

19   our equipment.   We didn't need sirens.   He pulled straight

20   over.   Even before we activated our emergency equipment, he

21   pulled over.

22   Q.   Met me stop you.   This is Government's Exhibit No. 16 that

23   I have on here.   Do you recognize this intersection?   Here

24   you've got Alabama Avenue, here we have Good Hope Road

25   Southeast, and here we have Naylor Road.   Do you see the

1    Popeyes is here?

2    A.  Yes.

3    Q.  Where was the light that you could see this person that's

4    staring at you?

5    A.  There's a light right at Good Hope Road and --

6         THE COURT:  You can come down and point it out on

7    the podium.

8    A.  There's a light right there.

9    BY MS. SOLTYS:

10   Q.  Keep your voice up.

11        THE COURT:  Or you can move the microphone over.

12   A.  There's a light right here, right under Good Hope Road,

13   between the two zeros.

14   BY MS. SOLTYS:

15   Q.  You can put a mark, or whatever you like.

16   A.  There's a light right here.

17   Q.  And then where the Popeyes?

18   A.  Popeyes is right here.  McDonald's.  And Popeyes is in the

19   front right there.  I'm sitting right here.  And if I may,

20   there's a direct line of sight.  There's no trees.  There's a

21   direct line of sight to that light.  I just happened to be

22   standing at the door because I'm putting everything together

23   and I see the LaCrosse at the light.

24   Q.  This is number 35, Government's Exhibit number 35, and

25   this just shows -- so, the Good Hope Market down here, and

1    then Good Hope Road up here, and then this is 16th Street.

2    Does this show -- I don't want to testify for you, but is this

3    the route on Good Hope?

4    A.  Yes.

5    Q.  To the right on 16th?

6    A.  Yes.

7    Q.  And then what was the traffic violation?

8    A.  When he changed lanes and he made a turn without using his

9    signal.  I can't remember if it was at 16th.  I would have to

10   see the ticket again.

11           THE COURT:  So he both changed lanes and made a

12   right, without a signal to change lanes and without a signal

13   to turn right?

14           THE WITNESS:  Yes, ma'am.

15   BY MS. SOLTYS:

16   Q.  Government's Exhibit number 24, 24, and I believe it's

17   completed by Tridico, 2293, but this is a warning, is that

18   correct?  This is what we call a notice of infraction, an NOI?

19   A.  Yes.

20   Q.  What is this?  Who is this for and --

21   A.  That was for Mr. Flowers.  That was his NOI for failure to

22   utilize turn signal, right turn from 16th and Good Hope Road

23   Southeast.

24   Q.  Okay.  So I don't want to interrupt you.  Please continue

25   with your narrative now.

1    A.  Once we stopped the vehicle, we approached the vehicle.  I

2    can't recall exactly if I approached the driver's side,

3    because I know Investigator Tridico got out of the vehicle

4    before I did because I was driving.  He exited the vehicle

5    before I did.  But I know I ended up eventually speaking to

6    Mr. Flowers.  And we asked him whose vehicle it was, what's

7    his name.  And he told us, he said his name was David Flowers.

8    He says his -- I can't remember wife or girlfriend, this is

9    her car, and then he gave us her name, Terri Holman.

10            And I said, Well, this is just -- you know, I knew

11   it came from her house.  I said, Well, there's no mystery

12   there.  He said it was Miss Holman, which was from the

13   information we had from PG County and from the FBI the day

14   before, the evening before.  And we asked him to step out of

15   the car.  He stepped out.  He cooperated.  We took him to the

16   rear of the vehicle, sat him down.  And Investigator Tridico

17   was talking to him.  I don't know what he said to him, but he

18   clearly wasn't under arrest.  But we were just trying to --

19   we're now putting the pieces together.

20            And I walked around the vehicle, I looked into

21   the -- when he got out the vehicle, the driver's side door was

22   open.

23   Q.  Can I interrupt you for a second?  Did you ask him for a

24   driver's license?

25   A.  Yes.

1    Q.  What did he say?

2    A.  He said he didn't have his driver's license, his wife had

3    his driver's license, or his girlfriend had his driver's

4    license.

5    Q.  He's driving without possession of a driver's license.  Is

6    that an arrestable offense in the District of Columbia?

7    A.  Yes.  Yes.

8    Q.  I know at some point you asked for consent.

9    A.  Yeah.

10   Q.  Is this before or after?  When is the -- what's the

11   sequence of events?  I'm sorry.  I interrupted you.  I should

12   just shut up and let you talk.

13   A.  That's all right.  We stepped him out of the vehicle.

14   Stepped him to the rear of the vehicle, sat him down on the

15   curb, asked him where he was coming from.  He said just from

16   home.  He said he left the dentist office, is what he said.

17   Then he said he had paperwork in the car to show he just left

18   the dentist office.  And he was going to see a buddy of his

19   that lived in the block, pointed back to this house.  We said,

20   Okay, fine.

21        I said, Well, you're not under arrest.  I said,

22   Where you coming from, other than the dentist office?  Where

23   you been before that?  He never really answered that question,

24   just small talk.  I walked around the passenger's side of the

25   vehicle while I was talking to him and I see on the front

1    passenger's seat a dark colored sweat-hood, and there's that

2    sweat-hood with the white --

3    Q.   Sweater?

4    A.   Sweat-hood.

5    Q.   Sweat-hood?

6    A.   Yeah sweat-hood with the white drawstrings.  And I can see

7    that emblem, that Champion emblem.  And I'm thinking to

8    myself, I said, Couldn't be, couldn't be.  And I see what

9    appears to be a black skull cap along with it, sitting on the

10   passenger seat, front passenger seat.  And I started thinking

11   to myself, This -- I think we have our guy.

12        But what cinched it for me is when I came back

13   around and I told Mr. Flowers, Can I look in your vehicle?

14   And he said, No, you're going to lock me up anyway.  I said,

15   Why would I lock you up?  You don't have your license, but

16   you're not under arrest.  You're not locked up now, you're not

17   in handcuffs.  You going to lock me up anyway.  At that point

18   Investigator Tridico was still talking to him.

19        I went to the rear driver's side of the vehicle.

20   There's -- in this picture that I'm looking at there's a seat,

21   driver's side seat, has a pouch on the back of it.  And on

22   that pouch you can see a glove sticking up out of that pouch.

23   You can see the front of it, the palm side is black and the

24   back side is white.  And I'm thinking to myself.  Now I look

25   up at Investigator Tridico, I said, This is just -- we're

1    beyond, you know, reasonable suspicion.

2         To me, this is probable cause because what's the

3    chances of someone being in the same area, the GPS being five

4    doors from his house, the same vehicle lookout?  I see that

5    Champion sweatshirt with the white tassels on the front seat,

6    I see the same kind of gloves that I've been looking at for

7    six months in a pouch behind this driver's side.  I been

8    looking at that sweat-hood for six months or more.  There's a

9    black hoodie, he has a history of robberies.  It's all coming

10   together.  And this, to me, is enough for me.

11   Q.  So, I have Government's Exhibit number 19 on the screen.

12   I put this one up because I just wanted you to be able to

13   comment on whether or not there were any obstructions looking

14   into the vehicle with respect to tint, or not?

15   A.  No.  This vehicle wasn't tinted at all.

16   Q.  Do you recall, were the car doors opened or closed?

17   A.  The driver side door was open, but the other doors were

18   shut.

19   Q.  This is Government's Exhibit number 20 that I have on the

20   screen in front of you.  I wanted you to just be able to

21   comment on what's depicted in that photograph.

22   A.  That's how I saw -- except for the door was closed, that's

23   how I saw the gloves that were coming out of that pouch on the

24   rear of the driver's side seat.  That is a better picture

25   because that's how I saw it.  The other picture makes them

1   appear to be gray.  But that's what I saw.

2   Q.  This is 21.  You can tell these are two different gloves?

3   A.  Yes.

4   Q.  You could tell that the gloves you saw on the video looked

5   like they have a rubber palm and a cloth on the outside?

6   A.  Yes.  So in my mind, those were the gloves I've been

7   looking at for months.  What's the chances?  What's -- that's

8   beyond coincidence, to me.  That's probable cause, to me.

9   Q.  And then what happens next?

10  A.  I called Jeff, Agent Johannes, he came down to the scene.

11  And I told him everything we had and he's just, like, this

12  is -- it's got to be him.

13  Q.  Did you show him -- did you walk around the car?

14  A.  Definitely.  Definitely.  I showed him everything.

15  Q.  What did he say?

16  A.  The same thing.  This is -- this is not coincidence; this

17  is the same area, the same lookout.  He lives a block -- the

18  same thing I just repeated to you.  I even called my

19  lieutenant.  My lieutenant came to the scene, we gave her the

20  rundown of what we had.  She agreed.  We called my division

21  captain at the time, Kevin Fitzgerald, came down to the scene

22  and we ran it past him.  And he said, Yeah, lock him up.  This

23  is -- this is -- you have more than enough, arrest him.

24  Q.  You know that Agent Johannes took two photos of the

25  vehicle and Mr. Flowers when he arrived?

1    A.   Yes.

2    Q.   This is Government's Exhibit number 17.  If you could just

3    tell us what is depicted here, please?

4    A.   That is Mr. Flowers.  Like I said, we sat him on the curb.

5    He wasn't under arrest.  Mr. Flowers, sitting on the curb at

6    the rear of his vehicle.

7    Q.   This is the Buick LaCrosse right here?

8    A.   Yes.

9    Q.   This is Government's Exhibit number 18; 18, if you could

10   just tell us what's depicted here?

11   A.   That's how, from the driver's side, is how I saw the

12   sweater, until I went around to the passenger side, and that's

13   how we found it.  That piece of paperwork is the paperwork he

14   had from the dentist's office.  I don't know if it's a

15   receipt, or it's for prescription from the dentist office.

16   But when the door was opened, that piece of paper flew on the

17   floor.  But that is the sweat -- that is the skull cap and

18   that is that sweatshirt that I spoke of earlier.

19   Q.   So you see those two white drawstrings right there?

20   A.   Yes.

21   Q.   That was one of the things that did it for you?

22   A.   Yes.

23   Q.   And then this is -- this black knit hat?

24   A.   Yep.

25   Q.   That got your attention?

1    A.  That definitely did because if you look in the video,

2    you'll see he has -- you'll see the mask, where he has the

3    skull cap on that comes down, or a mask and a skull cap in

4    some of the pictures, just to conceal his face down to his

5    eyes.

6    Q.  Government Exhibit 21, these are gloves that got your

7    attention?

8    A.  Yes.

9    Q.  There's a photograph when the car is ultimately searched,

10   this is Government's Exhibit number 30, which shows this piece

11   of paper that's -- it's from the dentist's office.  That had

12   been on the front floor, leaning up against the front

13   passenger seat, now it looks like it's on the seat.  Do you

14   know how that got -- how that got moved?

15   A.  Well, if this picture originally was seen like this, when

16   the doors open up to step out, that blew off; that piece of

17   paper went to the position it was when we showed it before.

18   Q.  And then did Miss Holman arrive on the scene?

19   A.  Yes.

20   Q.  And was -- she was cooperative?

21   A.  Yes.

22   Q.  She allowed you to search her vehicle?

23   A.  She did.

24   Q.  This is Government's Exhibit number 26.  This is a photo

25   of her Buick LaCrosse with the D.C. tag?

1    A.   Yes.

2    Q.   This is 27.  Do you know what this is a photograph of?

3    A.   That's the inside of her vehicle.

4    Q.   There's a driver's license right there.  Do you know whose

5    driver's license that was?

6    A.   That's Mr. Flowers' driver's license.

7    Q.   So he did not have his driver's license with him?

8    A.   He did not.

9    Q.   Now, then after he's placed under arrest, you know, some

10   could say you could have just searched the car right then and

11   there.  Did you do that?

12   A.   No.

13   Q.   Why not?

14   A.   Because we knew this was a high profile case, so we're

15   going to do everything we can to ensure that the trail of

16   evidence is upheld correctly.  So we're going to wait for a

17   search warrant.  We're going to impound the car and we'll wait

18   for a search warrant.

19   Q.   Did you then ultimately seek a search warrant that evening?

20   A.   Yes.

21   Q.   Did you seek -- let's just talk a little bit about the

22   drafting of the affidavit.  There's one affidavit that's used

23   for both search warrants, is that correct?

24   A.   Yes.

25   Q.   Obviously Miss Holman has arrived on the scene.  What, if

1    any, steps were taken to preserve the house at 611 57th Street

2    before the execution of the search warrant?

3    A.  We had an officer maintain on that, to go to that scene

4    and maintain the house until we drafted the search warrant and

5    had a chance to make entry.

6    Q.  And then what about the vehicle, what was done to preserve

7    the integrity of the vehicle?

8    A.  The vehicle was taken -- the vehicle that Mr. Flowers was

9    operating was taken down to our crime lab.  But Miss Holman

10   allowed us to look into her vehicle on scene.

11   Q.  And then she was free to go, she left?

12   A.  She was free to go.

13   Q.  Mr. Flowers, did he say anything as to why he was at that

14   location, that specific location?

15   A.  Where he stopped?

16   Q.  Yeah.

17   A.  He said he was going to visit a friend.

18   Q.  Who was that friend, do you know?

19   A.  I don't remember his name, but his address was directly

20   over my left shoulder where we were.  We went and spoke to

21   him.  Investigator Tridico went to speak to him and I followed

22   him shortly thereafter.  From the conversation, I can remember

23   we asked him, he agreed that he knew Mr. Flowers.  He said he

24   knew him.  Were you expecting him?  He's like, No, but he's a

25   friend of mine.  And I said, Okay.  I walked back down the

1    steps.  Investigator Tridico was still talking to him.  But

2    once I knew he wasn't expecting him, that kind of cinched it,

3    to me.

4    Q.  Did you see that gentleman outside?

5    A.  Yes.

6    Q.  During the execution -- I mean, like what point did he

7    come out, if you know?

8    A.  He came out onto his porch.  He never came out -- he never

9    came beyond the porch.  He came out onto his porch, looked

10   around for a little while.  When I looked up again, he was

11   back in the house -- or, at least he wasn't on the porch.

12   Q.  Had you already walked around the car, saw the items in

13   plain view?

14   A.  Yes.

15   Q.  Have you seen that person today?

16   A.  Yes.

17   Q.  He's here in the courthouse?

18   A.  He's in the courtroom, yes.

19   Q.  So, I would like to talk a little bit about the drafting

20   of the search warrant then.  How did that come about?  Where

21   did you go, who participated, and how did you get it signed on

22   a Friday evening?

23   A.  Well, we went back to the office, myself, Investigator

24   Tridico, Agent Johannes.  At that point it was a list of

25   officials, and Detective Bunce came around, couple of the task

1    force members came around.  We had a full office.  And

2    Detective Hanson, in my office, Curt Hanson, actually drafted

3    the search warrant.

4            So we put all our elements down, everything that

5    happened.  We listed the other robberies, everything that led

6    up to our probable cause.  And he put it down on the

7    affidavit, he wrote the affidavit.  And we contacted AUSA Mr.

8    Truscott.  And I believe we e-mailed him a copy of it.  We

9    made a copy of it available to him.  I believe he

10   telephonically approved it.  And then we went to the call

11   center -- command center, who -- we notified them that we had

12   an emergency search warrant that we want to execute.

13   Q.  Because this is after work hours?

14   A.  This is after work hours, yes.  We informed them of the

15   cases, the name -- the number of cases, the elements of the

16   cases.  And what they do is make a judge available to call you

17   back.  So I sat and I waited for a judge to call me back.

18   Judge called me back and we kind of ran down what we had, we

19   e-mailed him a copy of our affidavit, and he stated, Well, it

20   looks fine just bring it up to me to get it signed.  And he

21   lived up Connecticut Avenue.  So we actually jumped in two

22   different vehicles.  I drove one, Detective Hanson drove the

23   other, and we proceeded to the judge's house.

24   Q.  Search warrant was signed and then that evening --

25   A.  Yes.

1    Q.  And then early -- into the early morning hours of the next

2    day the execution occurred at 611 57th Street?

3    A.  Yes.

4    Q.  And there were several items that were seized that were of

5    significance?

6    A.  Yes.

7    Q.  There's Government's Exhibit number 43, which shows what

8    is a Save-A-Lot bag.  Why was that seized?  What was

9    significant about that?

10   A.  Because in a number of the robberies the defendant brought

11   his own bag.  And we noticed that one of the bags we believe

12   was a Save-A-Lot bag.  So as you see, it's red word

13   Save-A-Lot, it's kind of unique.  So we believe that when we

14   were in the house we saw this other Save-A-Lot bag, it's kind

15   of crumpled up, like you might have had it in your pocket.

16   And we were thinking this might have been the bag we saw on

17   one of the robberies.

18   Q.  This is Exhibit 39.  What's the significance of this

19   jacket?

20   A.  That jacket, if you look back at a number of the

21   robberies, he has on a black jacket that has -- if you see the

22   video, something is shimmering on both sides, something is

23   shivering -- shimmering, I'm sorry, on both sides of the

24   breasts.  And we assumed that it was zippers on both sides of

25   the chest.  And then when we went to the house, we saw the

1    jacket.  And that's the only thing on the front, those two

2    zippers on the side.  This might be our jacket, our other

3    jacket.

4    Q.  How about 41?

5    A.  Here we have a very unique sweatshirt.  We have the

6    drawstrings in neon, just like some of the other videos we

7    have from other robberies.  You see some -- the drawstrings

8    are neon on dark-colored sweatshirt.

9    Q.  Forty-two?

10   A.  We also have a robbery where -- I think numerous

11   robberies, at least two, where there's a gray sweat-hood worn

12   along with a dark-colored jacket.

13   Q.  Forty-four?

14   A.  An Ashley Stewart black bag was another bag from a

15   location that was robbed.

16   Q.  Now, I would like to just end with -- end with something,

17   which is this:  So, after you saw these items in plain view,

18   did you or anyone else look into the vehicle further?  Look

19   further into the vehicle for any reason?  To look for a weapon?

20   A.  Yes.

21   Q.  And who did that and what happened?

22   A.  Once the search warrant was signed, they looked at it, our

23   mobile crime lab, and they opened up the glove box.

24   Q.  Before.

25   A.  Oh, before.

1    Q.  Back on the scene.  I'm sorry.  I'm still back on -- I'm

2    back on 16th and T.

3    A.  Oh, from Mr. Flowers' vehicle?

4    Q.  Yeah.

5    A.  No.  Once we -- we waited until we got -- once we looked

6    inside and saw what we saw, we waited for the search warrant

7    for the vehicle to be processed.

8            MS. SOLTYS:  Okay.  Thank you very much.  I have

9    no further questions at this time.

10           THE COURT:  Mr. Peed, cross-examination.

11                    CROSS-EXAMINATION

12   BY MR. PEED:

13   Q.  Good afternoon, Mr. Howard.

14   A.  Good afternoon.

15   Q.  When you saw the vehicle passing you, the gold Buick

16   LaCrosse passing you, you immediately started following it,

17   right?

18   A.  No, he didn't pass me.

19   Q.  You saw him stopped at the traffic light.  I'm sorry.

20   When you were standing there, you saw him stopped at the

21   traffic light?

22   A.  Right.  He didn't pass me.  I was in the doorway, inside

23   the Popeyes.  He was sitting at the light.  The gold LaCrosse

24   was sitting at the light.  The LaCrosse left the light before

25   I had a chance to get out the Popeyes and get to the car, so

1    he never passed me.

2    Q.  Then you got in your car?

3    A.  Yes.

4    Q.  Again, to follow it?

5    A.  Yes.

6    Q.  Were there any cars between you and the gold Buick?

7    A.  Several.  Several.  But as I stated before, Mr. Flowers

8    changed lanes.  He changed lanes and at one point he ended up

9    in front of us and that's how we got the tag.

10   Q.  What was the location of the lane he changed?

11   A.  It was on Good Hope Road.  I can't remember what exactly --

12   which --

13   Q.  Was it close to 16th Street where he turned right?

14   A.  It was definitely between Alabama Avenue and 16th Street.

15   Q.  So, you were directly behind him when he turned right on

16   16th Street, is that correct?

17   A.  I can't remember if we were directly behind him when he

18   made the right on 16th Street, but we could see him.  But I

19   don't remember if I was directly behind him.

20   Q.  What was the oncoming traffic like at 16th and Good Hope?

21   A.  Oncoming traffic?  I can't recall what the oncoming

22   traffic was.

23   Q.  Did you have -- you had emergency equipment.  Why didn't

24   you turn it on when he turned, when he failed to use his

25   signal?

1    A.  When he failed to use his signal and turn on 16th Street,

2    I was really trying to figure out where he was going.  I was,

3    like, is he trying to run from us?  Has he seen us?  He's made

4    this turn, but then he made that immediate left and pulled

5    into the parking space.  There was no reason for us to have to

6    pull him over because he pulled himself over.

7    Q.  You didn't actually do a traffic stop, he stopped himself?

8    A.  He stopped himself.  I did activate the emergency

9    equipment when we pulled up in the street because at that

10   point my partner was exiting the vehicle and I wanted to let

11   him know that we are law enforcement.

12   Q.  He exited the vehicle and you approached him, right?

13   A.  Investigator Tridico exited the vehicle.  And I don't

14   believe we stepped him out.  I think -- I mean, I believe we

15   stepped him out.  I don't think he just jumped out of the car.

16   Q.  Well, are you sure?  You testified on direct that you --

17   that he was in the car and you're asking him questions.

18   A.  Right.

19   Q.  Now you're saying you're not sure if he'd gotten out yet?

20   A.  At that point I wasn't.  But as I rethink now, he was in

21   the vehicle or near the vehicle when I got out of the vehicle,

22   because I said Investigator Tridico approached him first.  I

23   was still in the vehicle.  I wasn't too far behind him, but he

24   did contact him first.

25   Q.  Did you tell Special Agent Johannes that you -- that Mr.

1    Flowers had exited the vehicle when you approached him?

2    A.  I can't remember what I told him.

3    Q.  Did you review the grand jury testimony of Special Agent

4    Johannes in this case?

5    A.  I have not.

6    Q.  So, did you -- did you observe the filling out of the

7    warning for failure to use a turn signal?

8    A.  I did not.

9    Q.  You did not.

10               Could I have a moment, Your Honor?

11               (Pause.)

12   BY MR. PEED:

13   Q.  For you, you testified on direct examination that when you

14   saw those gloves, that's what turned it from reasonable

15   suspicion to probable cause, correct?

16   A.  Yes.

17   Q.  Did you search the vehicle prior to seeing those gloves?

18   A.  No.

19   Q.  Did you search the vehicle after seeing those gloves?

20   A.  Did I?  No.

21   Q.  Did investigator Tridico search the vehicle?

22   A.  I don't believe, no.  He wouldn't have.  We were waiting

23   for a search warrant.  Like I said before, this is -- this is

24   kind of important, so we want to maintain everything.

25   Q.  How many officers were on the scene?

A.   I remember --

          MS. SOLTYS:   Could I just object to the question

and ask for clarification, what he means, "on the scene"?

There are -- it's a large scene and I would just like some

clarification.

          MR. PEED:   Immediately prior to --

          THE COURT:   Are you trying to find out how many

officers were on the scene to see if a statement and

response -- the one statement that's at issue in response to

some question by the cops was coerced?  Is that why you want

to know the number of people on the scene?

          MR. PEED:   It's relevant to whether there was any

reasonable fear by any of the officers, Your Honor.

          THE COURT:   So you're trying to establish that the

one statement that's at issue in this hearing was blurted

out, volunteered, through fear?

          MR. PEED:   No, Your Honor.  I'm not --

          THE COURT:   I'm sorry.  I'm not following the

relevance.

          MR. PEED:   The relevance would be, Your Honor, if

there was a search of the car, which has been denied.  But

if there were a search of the car, whether that search was a

legal search or not.  But also, would be affected by how

many officers were on the scene, whether those officers had

reasonable fear of Mr. Flowers obtaining a weapon.

```
 1              THE COURT:  Okay.  All right.

 2    BY MR. PEED:

 3    Q.  At the time of the arrest of Mr. Flowers, do you recall

 4    how many officers were present?

 5    A.  At the time Mr. Flowers was arrested there were numerous

 6    officers at the scene.  But at the time Mr. Flowers was

 7    contacted, there was only two.

 8    Q.  And how long after you arrived did other officers arrive?

 9    A.  Shortly.  Within minutes.

10    Q.  Ten minutes?

11    A.  Yes.

12    Q.  And did you arrest Mr. Flowers immediately upon seeing the

13    gloves?

14    A.  Not immediately upon.  Like I said, I conferred with my

15    lieutenant.  I conferred with my district captain.  And

16    that -- that took a little bit of time.  Not a long time, but

17    it took a while to figure out exactly what we were going to

18    do.  So before I made a move, I checked with them.

19    Q.  And what was the nature of your deliberations, if, in your

20    mind, you had already crossed the threshold of probable cause?

21    A.  Certainly in my mind I did, but I wanted to check with

22    them, as well.

23    Q.  Did you review the affidavit that you provided to the

24    magistrate to get the search warrant?

25    A.  To the magistrate?
```

1    Q.  The one that you signed.

2    A.  Yes.

3          THE COURT:  It was to a Superior Court judge.

4          MR. PEED:  I'm sorry, Superior Court judge.

5          Your Honor, may I approach.

6          THE COURT:  Um-hum.  You're approaching with?

7          MR. PEED:  Showing him Government Exhibit 25.

8          THE COURT:  Okay.

9    BY MR. PEED:

10   Q.  If you could just flip through that.  This is the

11   application for a search warrant.

12         THE COURT:  Do you want to direct his attention to

13   anything in particular?

14   BY MR. PEED:

15   Q.  If you'll turn to page 5 of 5 of your affidavit, Mr.

16   Howard.  Is that your signature?

17   A.  It is.

18   Q.  And you are attesting that these facts are true and

19   correct, right?

20   A.  Yes.

21   Q.  If you turn to page 4, the immediately preceding page.  On

22   paragraph 16.  Just read along, starting with the second

23   sentence.  I'm sorry, the third sentence.  "The Buick made a

24   right turn from Good Hope Road on 16th Street Southeast

25   without using his turn signal, and Detective Howard conducted

1    a traffic stop.  The driver stated he didn't have his license

2    on him, that he was on the phone with his girlfriend Terri

3    Holman."  You didn't include in this any information about Mr.

4    Flowers stopping on his own, correct?

5    A.  Correct.

6    Q.  So the way it's written, it reads as if you conducted a

7    stop yourself, correct?

8    A.  Correct.

9    Q.  Now, going down --

10                THE COURT:  Did you view what you did when you

11    approached his car as a traffic stop?

12                THE WITNESS:  I did not.  I approached it as a

13    contact after a traffic incident -- after a traffic

14    violation, that is.

15    BY MR. PEED:

16    Q.  All right.  If you look at paragraph 14.  Do you see the

17    sentence that says, "The store video depicted the suspect as a

18    black male wearing a black mask with his eyes uncovered, a

19    dark-colored jacket, a dark-colored hoodie with white strings

20    hanging from the neck, dark pants and dark shoes and two-tone

21    colored gloves."

22    A.  Yes.

23    Q.  The video that sentence refers to is from the Popeyes

24    attempted robbery on 2721 Naylor Road Southeast, right?

25    A.  Yes.

1    Q.  The last sentence in paragraph 16 says, "Flowers was also

2    wearing a black jacket, blue jeans, and brown boots.

3    Detective Howard immediately recognized these clothing items

4    as the same ones depicted in the video," right?

5    A.  Correct.

6    Q.  Now, the video, that's referring to the Popeyes video from

7    paragraph 14, correct?

8    A.  It doesn't say that.

9    Q.  This is your affidavit.  I'm asking.

10   A.  It does.  It is my affidavit.  But as I said, I didn't

11   draft it.  I've read the statement of facts, and everybody had

12   the input.  Detective Hanson drafted it and, of course, I read

13   over it.  I don't know how he took the things that we talked

14   about or the things that we brought up.  But, some of this is

15   the way he saw it.

16   Q.  It's your affidavit.  You signed it and said it was true,

17   correct?

18   A.  Yes.

19   Q.  Is it true that the video in that sentence is referring to

20   paragraph -- to the Popeyes video discussed in paragraph 14?

21        MS. SOLTYS:  Objection.  I would like to know what

22   the scope of his knowledge would be.

23        THE COURT:  Overruled.

24   A.  May I read the entire paragraph, please?

25        (Pause.)

```
 1              Yes.  Again, yes.
 2     BY MR. PEED:
 3     Q.  Now, when it said Detective Howard immediately recognized
 4     these clothing items as the same ones depicted in the Popeyes
 5     video, that includes the black jacket?
 6     A.  Yes.
 7     Q.  But, in fact, the black jacket Mr. Flowers was wearing
 8     when you arrested him was not the black jacket Mr. Flowers was
 9     wearing in the video?
10     A.  It was not.
11     Q.  When you arrested Mr. Flowers he was wearing blue jeans,
12     correct?
13     A.  Correct.
14     Q.  But the suspect in the video of the Popeyes was wearing
15     black pants, correct?
16     A.  Correct.
17     Q.  So it's not true -- I'm sorry, the brown boots that
18     paragraph 16 says that Mr. Flowers was wearing do not match
19     the ones of the suspect in the Popeyes video, correct?
20     A.  Correct.
21              THE COURT:  But they may not have matched the ones
22     from Popeyes, but they matched other ones that you've seen
23     in videos in connection with this case?
24              THE WITNESS:  Yes.  And I believe, if I may, that
25     that was the confusion in translation.  We were talking
```

1    about all of the cases.  Detective Hanson might have gotten

2    a little confused, but --

3    BY MR. PEED:

4    Q.  Is it true, Detective Howard, that you immediately

5    recognized the black jacket worn by Mr. Flowers as used in any

6    robbery in this case?

7    A.  In reference to his traffic stop?

8    Q.  The one he was wearing at the traffic stop.

9    A.  Oh, no.  No.

10   Q.  This is a false statement, that you immediately recognized

11   that black jacket?

12   A.  I wouldn't go as far as saying false, but I would say

13   there was some confusion in it, yes.

14   Q.  You did not immediately recognize the black jacket he was

15   wearing as involved in any robbery?

16   A.  I did not.

17   Q.  Turn to page 3, please, of your affidavit.  Paragraph 11

18   follows paragraph 10 and includes facts related to the CVS

19   robbery on December 26, 2014, correct?

20   A.  Yes.

21   Q.  And paragraph 11 says, "A review of images by law

22   enforcement revealed a vehicle that appeared to be similar to

23   a Buick LaCrosse," correct?

24   A.  Yes.

25   Q.  And referring to images captured by traffic camera at the

1    intersection of Southern Avenue and East Capitol Street, right?

2    A.  Yes.

3    Q.  The images captured there were of a silver SUV, isn't that

4    correct?

5    A.  There was a silver SUV in the shot, yes.  We had another

6    shot that had a silver vehicle in it, as well.

7    Q.  Of an SUV, correct?

8    A.  That was one of the vehicles, yes.

9    Q.  And PG County, after seeing those images, put out a BOLO,

10   a be on the lookout for an SUV, correct?

11   A.  Yes.

12   Q.  Not a Buick LaCrosse, as this paragraph 11 states, correct?

13   A.  Correct.

14   Q.  Detective Howard, when you had already arrested Mr.

15   Flowers for armed robbery, did you make the decision to issue

16   him a warning for failure to use a turn signal?

17   A.  That was a decision that was made -- I don't know if it

18   was by me or it was by officers when we got on the scene.

19   That I cannot recall.

20   Q.  Was that citation ever delivered -- or, warning ever

21   delivered to Mr. Flowers?

22   A.  I don't know if he ever received it on his person or not.

23   That's beyond my knowledge.  I didn't write the ticket, so I

24   don't know -- I didn't write the warning, that is.

25   Q.  And you are adamant -- did you see anyone at the scene

1    search Mr. Flowers' car?

2    A.  No.

3    Q.  And you were there all the way until the point he was

4    taken away?

5    A.  Yes, I was on the scene.  I was moving around, but I was

6    there.

7    Q.  Did you see anyone at the scene open Mr. Flowers' trunk?

8    A.  His trunk, no.

9          MR. PEED:  Thank you, Your Honor.  No further

10   questions.

11         THE COURT:  Any redirect?

12         MS. SOLTYS:  Just a few questions to follow up a

13   couple things.  The -- may I -- you haven't taken mine, have

14   you?

15         MR. PEED:  No.

16         MS. SOLTYS:  Mine are all --

17         THE COURT:  Wasn't there some BOLO with a Buick

18   LaCrosse in it?

19         THE WITNESS:  Yes.

20         THE COURT:  But that was not in connection with

21   the December 26, 2014 CVS robbery?

22         THE WITNESS:  It might have been.  I know I was

23   given information that there was a BOLO.  But the

24   information I received was world of mouth from Detective

25   Bunce and Agent Johannes.  I was told that there was a BOLO,

1    but it was only told to me.

2                    REDIRECT EXAMINATION

3    BY MS. SOLTYS:

4    Q.  You recognize this to be Government's Exhibit number 13,

5    and this is for the February the 5th, 2015 attempted robbery

6    at the KFC, and this is for the silver Buick LaCrosse.  Do you

7    see it right there?

8    A.  Yes.

9    Q.  And then do you see that this lookout for actual vehicle

10   was for the January 14, 2015 Murry's?  Do you see that?

11   A.  Yes.

12   Q.  And I don't know, does that look like a -- do you know

13   what that -- what kind of a car that could be?

14   A.  Looks like an SUV.

15   Q.  And then this one -- there's two vehicles here.  Are you

16   aware that this is the shot that came from the -- I guess, the

17   red light camera from December 26th, 2014; from the red light

18   camera from the CVS with the GPS package embedded?

19   A.  Yes.

20   Q.  And, I don't know, do you think that either one of those

21   could be a sedan?

22   A.  Yes.  The one on the rear of the picture looks like --

23   looks like it's two sedans in that photo, actually.  But the

24   one coming towards you, one looks like a SUV and one a sedan.

25   Q.  Which one do you think is the sedan?

1    A.   The one in the back.

2    Q.   The second one?

3    A.   Second vehicle.

4    Q.   We don't know, we don't know which one of these clearly is

5    the car that has the GPS in it, correct?

6    A.   We do not know.

7    Q.   The first one, SUV, sedan, can you say for certain?

8    A.   Looks like an SUV to me.

9    Q.   And then -- okay.  And then I wanted to just talk to you

10   at bit about the drafting of the affidavit.  Did six -- did

11   PGPD police officers also show up?

12   A.   Yes.

13   Q.   And if you could, just sort of describe, you know, for the

14   Court what it's like to have a lot of different people

15   inputting information to an affidavit?

16   A.   Where we were was inside of my office.  And my office is

17   maybe the size -- where we were is half the size of the jury

18   box.  And we were all crowded in.  It was in excess of 20-

19   something people in that area.  And we were all talking and we

20   were trying to list the facts.  PG County is trying to get

21   their facts out, we're trying to get our facts out, because we

22   all wanted in on the warrant.  So everyone is talking.

23           So we said, okay, this is what happened, this is

24   what happened, this is what happened.  And we said, Curt, did

25   you get that?  Curt, did you get that?  And he's typing

1    everything as he's hearing it.  And, of course, you have 20

2    different detectives in a room, different opinions are going

3    to come out of the things that we saw on the video, things

4    that we saw on different videos, of things that we think need

5    to be added, and that is -- it is -- it's confusing.  I even,

6    myself, was trying to get everything in line because it was --

7    once you added the PG County robberies, we were, like, this is

8    a lot of stuff.  So we're trying to keep it in line as best we

9    could.

10   Q.  If we go to paragraph 16 -- do you have that in front of

11   you?

12   A.  Yes.

13   Q.  Paragraph 16, about six lines down, it says, "Detective

14   Howard conducted a traffic stop."  You've said earlier that

15   you thought it was a contact after a traffic violation.  Do

16   you view what was written in here as being a material

17   misstatement of fact?

18   A.  I believe it was Detective Hanson using his own verbiage.

19   Q.  And then this -- at the end of this paragraph here it says

20   you are the primary detective assigned to the robbery task

21   force and you have viewed video footage from each of the

22   robberies.  "Flowers was also wearing a black jacket, blue

23   jeans, and brown boots.  Detective Howard immediately

24   recognized these clothing items as the same ones depicted in

25   the video."  Do you know what he meant by, "the video"?

1    A.  I was speaking of another video that we were watching,

2    because we watched all of the videos.  And I was like, There's

3    those boats, there's the jeans.  And I guess Detective Hanson

4    placed it in here.  But I did speak of those boots and jeans.

5    Well, boots and jeans.

6    Q.  Just so that we're clear, we would concede that the black

7    jacket Mr. Flowers was wearing at the time of his arrest is

8    not a black jacket that was depicted in any of the videos.

9    You agree with that?

10   A.  That's correct, it was not.

11   Q.  Do you view the fact that it says he was also wearing a

12   black jacket, that -- and then that you recognize these

13   clothing items, do you view that as a misstatement, or an

14   intentional statement to mislead the judge?

15   A.  No.  No, it was not.  It was not.  It was Detective Hanson

16   using his own verbiage.  He was trying to keep everything in

17   line because these cases are new to him.  We're just trying to

18   explain to him what we want in the affidavit.  And it was an

19   honest mistake.

20   Q.  Lastly then, I want to ask about the search.  The search

21   was conducted, the full-blown search was conducted after the

22   warrant was obtained and after the car had been taken back to

23   the evidence bay?

24   A.  Yes.

25   Q.  Law enforcement could have looked in that vehicle just to

1   make sure that there were no weapons or anything else.  Do you

2   know whether or not anybody looked in the vehicle?

3   A.  From my memory, no one looked in the vehicle.  But as I

4   stated, I had walked away.  When I conferred with Captain

5   Fitzgerald and Lieutenant wanted to ask, we had walked to the

6   end of the block because at that time Mrs. Holman pulled into

7   the block and we wanted to be away from her.  So I walked down

8   and I left everyone else at the scene.  So that's one time I

9   left and went to the far end of the block.

10  Q.  If someone looked in the vehicle for a weapon, would you

11  consider that to be a search?

12  A.  No.  No.

13  Q.  When defense asked you if you were certain no searches

14  took place --

15  A.  Well, I was certain that no searches took place, yes.

16          MS. SOLTYS:  Okay.  Thank you very much.

17          THE COURT:  You're excused.

18          MS. SOLTYS:  Your Honor, we have no further

19  witnesses.

20          THE COURT:  All right.  Any defense witnesses you

21  would like to call now, Mr. Peed?

22          MR. PEED:  Yes, Your Honor.  I'll need to go get

23  them.

24          THE COURT:  From where?

25          MR. PEED:  They're in the cafeteria.

```
 1              THE COURT:  Well --
 2              MR. PEED:  I'd ask for a brief recess and I'll get
 3    them.
 4              THE COURT:  Okay.
 5              MR. PEED:  And I wanted to raise an issue of --
 6              THE COURT:  Don't -- have all your -- have all
 7    your witnesses lined up, sitting right outside, if you
 8    would.
 9              MR. PEED:  I will.
10              THE COURT:  What is it?
11              MR. PEED:  I would like to call Officer Tridico
12    that wrote the citation.  The government initially said he
13    would be available.
14              MS. SOLTYS:  He's here.
15              THE COURT:  Why don't we start with him.  Is he
16    right outside?
17              MS. SOTLYS:  Yes.
18              THE COURT:  Do you have a cell phone for the
19    witnesses that you have that are down in the cafeteria?
20    Could you make a call right now and have them ready?
21              (Pause.)
22              THE COURT:  Investigator Tridico, could you come
23    up to the stand.  Did I just totally butcher your name?
24              THE WITNESS:  No, you did, actually, well.
25              THE COURT:  What is your title.
```

```
 1              THE WITNESS:  Investigator Tridico.

 2              THE COURT:  Investigator.  I got that right.

 3                     INVESTIGATOR TRIDIOCO,

 4     was called as a witness and, having been first duly sworn,

 5     was examined and testified as follows:

 6              THE COURT:  Good afternoon.

 7              THE WITNESS:  Good afternoon, ma'am.

 8              THE COURT:  We're just waiting for one second, for

 9     Mr. Peed to contact his other witnesses.

10              (Pause.)

11              THE COURT:  Good afternoon.

12                     DIRECT EXAMINATION

13     BY MR. PEED:

14     Q.  Good afternoon, Mr. Tridico.

15     A.  Good afternoon, sir.

16     Q.  You were riding in the car with Detective Howard on

17     February 6, 2015?

18     A.  That's correct.

19     Q.  In pursuit of David Flowers?

20     A.  We didn't realize that until we stopped him.  But we were

21     looking for the Popeyes robbers that morning.

22              THE COURT:  How long have you been with the

23     Metropolitan Police Department?

24              THE WITNESS:  Since January 2006.

25     BY MR. PEED:
```

1   Q.  Once you got onto Good Hope Road, how many cars were

2   between you and the gold Buick LaCrosse?

3   A.  If I can recall, there was probably a few.  I would say a

4   few, meaning three to four when we initially got onto Good

5   Hope Road.  But, by the time we made it down to the

6   intersection of Good Hope and 16th, I think we were right

7   behind the car, or maybe one was in front of us, to the best

8   of my recollection.

9   Q.  Okay.  What was the traffic conditions like that day?

10  A.  Medium.  It's Good Hope Road, it's a steady stream.

11  Q.  Did you see any oncoming traffic when Mr. Flowers --

12          MS. SOLTYS:  If I could interrupt you one second.

13  Is that your witness?

14          MR. PEED:  No.

15          MS. SOLTYS:  I'm sorry.

16  A.  I'm sorry, could you say it again?

17  BY MR. PEED:

18  Q.  Was there any oncoming traffic when Mr. Flowers made the

19  right turn to 16th Street?

20  A.  I don't think I was paying too much attention to traffic

21  going in the other direction.  I was pretty focused on the

22  Buick in front of me.

23  Q.  Any other traffic infractions prior to that right turn?

24  A.  No.  It's a straight -- straight shot.  We watched.  I was

25  watching, just to make sure the car was in our sight, and then

1    I looked at Chad when he made the turn onto 16th Street and I

2    said, He didn't use his turn signal, and I kind of nudged

3    Chad.

4    Q.  That was the first time there was anything that gave you a

5    direct reason to pull him over?

6    A.  That was the reason -- that was the first infraction that

7    I saw.  From what -- my recollection, that was the first

8    traffic violation I saw.

9    Q.  Do you carry a camera of any kind --

10   A.  No.

11   Q.  -- when you're on duty?

12   A.  No.  At that point I don't think the Metropolitan Police

13   Department had cameras for their -- I know now they have the

14   different types of cameras, but I don't think we had those

15   deployed in the field at that time.

16   Q.  What about handheld cameras?  Detective Howard have a

17   handheld camera?

18   A.  I don't know if he has one on his phone.  I don't know.  I

19   mean, a cell phone is a handheld camera.  I probably had a

20   phone on me, but I didn't use it.

21   Q.  So you pursued him through the right turn on 16th Street,

22   correct?

23   A.  That's correct.

24   Q.  And you --

25   A.  I was in the passenger seat.

1    Q.  You crossed Minnesota Avenue, correct?

2    A.  Is that Minnesota -- no, it's -- it's Good Hope, isn't it?

3    All the way down and then you make a right on 16th.  Minnesota

4    is way --

5    Q.  After the right turn.  I'm sorry.

6    A.  After the right turn on 16th Street?  I think he just

7    turned on T Street right there, isn't it?  He makes a left on

8    T, coming down Good Hope.  We're behind the car, there's a

9    couple cars in front of us.  We get to about the intersection

10   of 16th and Good Hope, he makes the right, he fails to utilize

11   a right turn signal.  That's what I wrote the infraction for.

12   That's what I observed.

13          He goes a little bit, I'm nudging Chad and I'm

14   saying, Hey, let's stop it.  Let's go.  We got it.  And then

15   he turns onto T Street, he makes a left.  We activate our

16   equipment, he waits about three or four car lengths before he

17   stops his vehicle.

18   Q.  So the stop happened on T Street?

19   A.  I think the stop is on T Street, if I can recall, yes.

20   Q.  It's on Ridge Place?

21   A.  It could be.  It could be.  It's the first left or second

22   left right there.  I don't know if it's T or Ridge.

23   Q.  Mr. Flowers' parked his car in an open spot on that --

24   whatever road it was that he was ultimately stopped on,

25   correct?

1   A.   It was -- it was an open spot, yes.

2   Q.   And then you got out of the car?

3   A.   Yeah, I approached the driver's side.  And I -- the

4   defendant was on the phone and I asked him, I said, Who are

5   you talking to?

6   Q.   He was standing outside his car with the phone in one hand

7   and keys in the other hand, correct?

8   A.   No.  No, not at that point.  He was in the car still.  He

9   was in the car still.  He was on the phone and I asked him,

10  Who are you on the phone with?  And if I can recall correctly,

11  he either said my girl or my wife.  And I asked, Who is that?

12  And he responded back, Terri Holman.

13  Q.   Defendant standing up when you had this conversation?

14  A.   He's getting out of the car.  He's not completely out of

15  the car because I told him, I said, Go ahead, get out of the

16  car.  But, he began the conversation.  And as we're -- as he's

17  talking, then he's getting out of the car.  And he did have

18  the phone in his hand and he had -- I don't know if he had the

19  keys in his other hand, I can't recall at this point.

20         But I asked him immediately, I asked him to turn

21  around.  And I patted him down for a weapon and I asked him if

22  he had any weapons on him.  And once that I felt that he was

23  safe, I passed him off to Chad.

24  Q.   And you asked him -- or, when I say "you," you or

25  Detective Howard, one of you asked him to sit on the curb?

1    A.   Yeah.   I might have asked him to sit on the curb, yeah.

2    Q.   Did you inform him that he failed to make a right turn?

3    A.   Not at that point.   Not until later on did I tell him that.

4    Q.   Okay.   So, when Mr. Flowers was sitting on the curb, his

5    hands behind his back, where did you go from that point?

6    A.   I stayed --

7              MS. SOLTYS:   I'd just object to assuming facts not

8    in evidence.

9              THE COURT:   Investigator, listen really carefully

10   to the questions.

11             THE WITNESS:   Sure.

12             THE COURT:   Because when you say "Yeah," you may

13   be answering one part of the question, there may be facts

14   embedded in it.   So when Mr. Flowers was sitting on the

15   curb, were his hands in front of him or in back of him?   If

16   you remember.   And if you don't, you don't.

17             THE WITNESS:   At certain points.   It was both.   At

18   certain points.   I don't think he was handcuffed

19   immediately.   He was sitting on the curb, so his hands were

20   probably on the front of him.   But after he was placed under

21   arrest, then his hands were behind his back.

22             THE COURT:   All interaction with Mr. Flowers

23   occurred outside his vehicle?

24             THE WITNESS:   Other than the conversation I just

25   explained to you.

1           THE COURT:  When he was getting out of his

2      vehicle?

3           THE WITNESS:  Yeah, he was on his way getting out,

4      that's when we had the conversation about the phone and who

5      he was talking to.

6           THE COURT:  Is that one of the statements at

7      issue?  Because the government is not planning on using that.

8           MS. SOLTYS:  (Shakes head.)

9           THE COURT:  Okay.

10          MR. PEED:  Credibility differences, ferreting out

11     differences between Mr. Howard's account.

12     BY MR. PEED:

13     Q.  So after Mr. Flowers was sitting there, you went and spoke

14     with Mr. Kevin Brown, correct?

15          MS. SOLTYS:  I would just object.  Does he mean

16     immediately after that?  If we could have some frame of

17     reference.

18          THE COURT:  At some point did you talk to anybody

19     named Kevin Brown?  If you recall.

20          THE WITNESS:  I don't recall.  Is that an officer?

21     BY MR. PEED:

22     Q.  Did you talk to a neighbor?

23     A.  Oh, on the porch, yes, you're right.  I knocked on the

24     door.

25          THE COURT:  Do you know if that person's name is

1    Kevin Brown?

2              THE WITNESS:  No.

3              THE COURT:  All right.

4    BY MR. PEED:

5    Q.  About how long would you estimate that transpired, between

6    when you first arrived and Mr. Flowers was getting out of his

7    car and when he was arrested and taken away?

8    A.  Oh, that's a tough question because we were there for a

9    while.  I can't even give you a rough estimate.  It was a

10   while.

11   Q.  More than an hour?

12   A.  Could have been.  Could have been less, could have been

13   more.  It was a while.  That's all I really can say about

14   that.

15   Q.  Was Mr. Flowers arrested -- I'm sorry.  Strike that.  How

16   long would you estimate was the period of time between the

17   formal arrest of Mr. Flowers and the end of the -- when you

18   left the scene?

19   A.  I stayed on the scene for a while after the defendant

20   left.  You know, the defendant had already been taken back to

21   the District and I stayed on the scene.  I stayed there

22   because the vehicles were there.

23   Q.  So could have been an hour?  It could have been an hour,

24   you're not sure?  It's possible it was an hour between your

25   arrival and his arrest, and then you stayed on after the

1    arrest?

2    A.  I -- like I said, I can't even estimate.  It all came

3    together.  You know, the time there, when we made the stop to

4    the time other people started showing up, and then, also,

5    another vehicle came and we talked to that person and we

6    waited for the vehicles be moved along.  So it was a while.

7    I couldn't tell you and give you an estimate of time.

8    Q.  Did you have any cameras on you at the stop?

9    A.  No.  I just -- like I said, I just had a cell phone, but I

10   didn't use it.

11              MS. SOLTYS:  Objection.  I think that the question

12   cut off the witness and the witness was explaining about

13   having a cell phone, and then the question was no cameras at

14   all.  So I would just object to cutting off the witness

15   before the witness has completed his answer.

16              THE COURT:  The only device you had on you to take

17   any pictures was your cell phone?

18              THE WITNESS:  That was the only thing.

19              THE COURT:  Did you take any pictures at the scene?

20              THE WITNESS:  No.  No, not at all.

21              THE COURT:  All right.

22   BY MR. PEED:

23   Q.  Mr. Tridico, you wrote the citation to Mr. Flowers,

24   correct?

25   A.  That is correct.

1    Q.  When did you write that?

2    A.  I believe when we were on the scene.  I believe -- I got

3    the ticket book from another officer because I didn't have

4    one.  And I think I wrote it on the scene.

5    Q.  And you wrote the day and date and time on the ticket,

6    correct?

7    A.  I wrote -- I completed the ticket, yes.

8                THE COURT:  Are you going to show him Government

9    24, the notice of infraction?

10               MR. PEED:  Yes, Your Honor.  I just didn't have

11   the stamped copy.

12               THE COURT:  You have a what?

13               MR. PEED:  I didn't have the government's stamped

14   copy.

15               THE COURT:  It's G24.

16   BY MR. PEED:

17   Q.  Do you recognize this document?

18   A.  Yeah, that's the notice of infraction, NOF.

19   Q.  You wrote this?

20   A.  Yes.

21   Q.  This is your signature?

22   A.  That is.

23   Q.  Did you write this date and time on the scene?

24   A.  That I can -- from what I can recall, yes.

25   Q.  But did you give this ticket to Mr. Flowers?

1   A.   No.   It went into his property.

2   Q.   Mr. Flowers was already removed from the scene by this

3   point, correct?

4   A.   Probably.   He was probably either about to be moved or he

5   was already moved.

6   Q.   Where did you get this address that you have for his

7   address?

8   A.   I couldn't recall at this point.

9   Q.   Did you have a driver's license that you were copying?

10   A.   The only identification that I saw that day was the warrant

11   in the other vehicle earlier -- or, later on, on the scene.

12   Q.   Okay.   You have no recollection of where you got that

13   address?

14   A.   Not at the time, no.

15   Q.   But you do recall writing the day and date when you were

16   on the scene, on this ticket?

17   A.   I believe I did.   I believe I wrote the ticket on the

18   scene.   But I did not present the ticket to him.

19   Q.   February 6th was a Friday, correct?

20          MS. SOLTYS:   I'll stipulate.

21          THE COURT:   Okay.   So now we know February 6th was

22   a Friday.

23   BY MR. PEED:

24   Q.   Did you know it was a Friday when you wrote the ticket?

25   A.   Probably not.   Probably all the days were running together.

1    Q.  When you were on the scene, Mr. Tridico, did you search

2    through the Buick LaCrosse?  Did you conduct a search of the

3    Buick LaCrosse?

4    A.  Yes.

5    Q.  What areas did you search?

6    A.  I looked at the --

7         THE COURT:  Aren't there two Buick LaCrosses

8    involved in the case?  So which one did you search?  Or did

9    you search both of them?

10         THE WITNESS:  I didn't search the second one.  I

11   looked in the second one, but I didn't search it.  The first

12   one is what we're talking about, is the one the defendant

13   was driving, the gold.

14         THE COURT:  After the traffic stop?

15         THE WITNESS:  After the traffic stop.

16         THE COURT:  Okay.

17   BY MR. PEED:

18   Q.  You conducted a search of the vehicle after, at the

19   traffic stop?

20   A.  That's correct.  It was a cursory search for weapons.

21   Q.  What areas did you cursory search?

22   A.  Pretty much the driver's side underneath the seat, center

23   console, passenger side underneath the seat, back seat.  I

24   probably tried to lift up the seats in the back seat, but I

25   don't know if they went up or not.  I will search a vehicle --

1    I worked narcotics for a long time, and I'll search.

2    Q.   At what time -- I'm sorry.  Let me take you to the

3    sequence of what you've already testified to.  You say Mr.

4    Flowers got out of the car and you did a pat-down?

5    A.   Correct.

6    Q.   And then you asked him to sit on the curb and answer some

7    questions, correct?

8    A.   I didn't ask him any questions.  He spoke a few words, but

9    I think Chad directed most of the questions to him.  He had

10   much more knowledge of this case.

11   Q.   I'm sorry, who is Chad?

12   A.   Chad is Detective Howard.  I'm sorry.  But Detective

13   Howard asked him questions.  I really didn't speak to him too

14   much because, like you said, I went to the porch.  And I don't

15   remember that guy's name, but I did go to the porch, and then

16   I came back and I stood next to the defendant.

17   Q.   And did the search that you did of the car happen after

18   you came back from Mr. Brown's -- or, the neighbor's house?

19   A.   I believe Chad went -- when I pulled him out of the car

20   and we talked, you know, I did the pat-down, I believe Chad

21   walked around the vehicle.  I didn't do that until Chad said

22   go ahead and look at the car.

23   Q.   Chad told you to go and look at the car?

24   A.   Yes.  Yeah.

25   Q.   Detective Howard?

1   A.  Detective Howard was, like, Go ahead now, take a look.

2   Yeah, I believe.  I believe him saying that to me, Go ahead

3   now, check for guns, check for weapons.

4   Q.  And --

5   A.  From what I can recall, that's the way it went.

6   Q.  Do you recall if that was before you went to talk to the

7   person on the porch?

8   A.  That I can't remember.  I think I might have done the

9   speaking to the gentleman first, and then came back to that.

10  But I know there had to be -- there had to be other people

11  there because I couldn't leave him by himself.

12  Q.  Okay.  So after other people arrived, other officers

13  arrived is when you did the search for weapons?

14  A.  I think it was around the same time when Chad -- Chad did

15  a cursory search, like walked around -- not a cursory search,

16  but walked around, and he said he observed some things.  He

17  didn't tell me what they were.  Then he was, like, Go ahead

18  and check and make sure there's no guns or any weapons.

19  Q.  But other officers had arrived when you did that search

20  because other -- you said that you couldn't leave him alone?

21  A.  Yeah.  I think it was around that same time.  Around the

22  same time I was doing that the officers showed up.  It was

23  pretty close to the same time.

24  Q.  Did you open the trunk of the car?

25  A.  I can't remember if I did that.

1    Q.  After you did your search of the vehicle, did you talk to

2    the Detective Howard about your search?

3    A.  Yeah.  I told him no weapon.

4              MR. PEED:  No further questions, Your Honor.

5                        CROSS-EXAMINATION

6    BY MS. SOLTYS:

7    Q.  It's really important, the sequence of events.  I want to

8    ask you some questions about the traffic stop.  So, how much

9    knowledge did you have about the robberies that Detective

10   Howard and Detective Bunce and Special Agent Jeff Johannes

11   were investigating?

12   A.  Miniscule compared to them.

13   Q.  And now you said that once the stop occurred, you said

14   that Detective Howard walked around the car?

15   A.  Correct.

16   Q.  What did he do when he walked around the car?

17   A.  I think he just looked into the windows, the windows of

18   the car.

19   Q.  And what did he say after he looked in the windows of the

20   car?

21   A.  He told me to come over and look, that there was -- in the

22   map -- after the driver's seat there was a map holder or

23   pocket.  And he goes, I think those are the gloves.  And then

24   he walked around the front -- we walked around the front and

25   he goes, Looks there's the sweatshirt.  I was, like, okay.

1    But I really didn't have all the knowledge of what the gloves

2    were and what the sweatshirt was.

3    Q.  You know now?

4    A.  I know now.

5    Q.  And so it's clear that when -- is it clear to you, is it

6    clear from your testimony that Detective Howard walked around

7    and saw -- said, Look, look at those gloves, look?

8    A.  Correct.

9    Q.  Look at that sweatshirt?

10   A.  Correct.

11   Q.  Did he point out to you what it was that caught his

12   attention?

13   A.  I think it was just -- he just observed it from previous

14   things in his knowledge and it rang a bell to him.

15   Q.  Now, you know that ultimately this car was searched

16   pursuant to a search warrant, correct?

17   A.  Correct.

18   Q.  Defense counsel asked you about searching the car.  And

19   you've described it, your words were "cursory search for

20   weapons"?

21   A.  Correct.

22   Q.  Is there a difference, in your mind, between a search and

23   a cursory search for weapons?

24   A.  Correct.

25   Q.  Are you familiar with a *Terry* stop and a *Terry* pat-down on

1   a car for weapons?

2   A.   Correct.

3   Q.   And in your mind is that what you were doing?

4   A.   Correct.

5   Q.   Now, if you could explain for the Court, did you have a

6   reason to think that the defendant could potentially be armed?

7   A.   Correct.  The robbery that morning, he was -- he was

8   armed.  The defendant was armed.  So we had assumed, just to

9   be safe, that we would check for weapons.  Defendant may very

10  possibly be holding a weapon.

11  Q.   And I want to show you two pictures real quick.

12  Government Exhibit number 18, do you see the white drawstring

13  that's attached to a dark-colored hooded sweatshirt in this

14  picture?

15  A.   Yes, I do.

16  Q.   Was that one of the items that Detective Howard pointed

17  out to you?

18  A.   That's correct.

19  Q.   Do you recall what it was that he said when he pointed

20  that out to you?

21  A.   I believe he just said this is the sweatshirt that we're

22  looking for, but I can't recall exactly.

23  Q.   Government's Exhibit number 20, do you know what's

24  depicted in this photograph?

25  A.   Say that again.

1    Q.  Do you know --

2    A.  Oh, yeah.  That's the gloves that he pointed out.  He was,

3    like, Hey, look at that, those are the gloves.  And they're

4    are two-toned gloves.

5    Q.  And then this is Government's Exhibit number 19.  I just

6    wanted you to comment on the fact of the windows, whether or

7    not there was any tint that was obstructing anyone's view in

8    looking in?

9    A.  No.  No, they're clear.

10   Q.  Now, did you participate in the drafting of the affidavit?

11   A.  I assisted, just saying what happened, yeah.

12   Q.  If I were to tell you that Detective Howard characterized

13   that he walked around and he saw the items in plain view,

14   would that be consistent with what you observed?

15   A.  That's correct.

16   Q.  Any search that took place after that, as you said, that

17   was a cursory search for weapons.  Is that different than a

18   search?

19   A.  It's completely different than a search.  The cursory

20   search, the *Terry* search is just above -- you know, not in

21   depth, not digging things, not looking very, very hard, but

22   just in reach, and that's what I did.  Things that were in

23   reach, things that were readily available, right in front of me.

24        MS. SOLTYS:  Thank you.  I have nothing further,

25   Your Honor.

1          THE COURT:  All right.  You're excused.

2          MR. PEED:  Redirect?

3          THE COURT:  I'm sorry.  What?

4          MR. PEED:  Redirect.

5          THE COURT:  Oh, sorry.  Yes.  It's your witness.

6     Sorry.  It was too quick.

7          THE WITNESS:  Oh, no, no problems.

8                    REDIRECT EXAMINATION

9     BY MR. PEED:

10    Q.  Mr. Tridico, do you remember precisely when you -- do you

11    remember the precise time that Detective Howard pointed out

12    those gloves to you?

13    A.  The actual time?

14    Q.  Um-hum.

15    A.  No.

16          THE COURT:  Are you looking for, like, 11:35?  Or

17    what are you asking?

18          MR. PEED:  I meant, like, 10:30 or 11:35, but I'll

19    follow up, assuming he couldn't recall.

20    A.  Not a chance.  I'm sorry.  Not a chance.

21    BY MR. PEED:

22    Q.  You indicated the whole stop could have been an hour.

23    Relative to the length of the stop, was it the middle, the

24    beginning, the end?

25    A.  When Detective Howard walked around the car?

1    Q.  When he pointed out the gloves.

2    A.  It was closer to the beginning.

3    Q.  The beginning?

4    A.  Yeah.

5    Q.  Was it before or after your protective search of the car?

6    A.  That he pointed out the gloves?  Oh, he did that way

7    before I did that.

8    Q.  Before your search.  When you did your search of the car,

9    did you uncover any evidence?

10            MS. SOLTYS:  Objection.  So, first object to the

11   term "search," he's not using the witness's --

12            THE COURT:  This is not a jury.  I understand

13   exactly what was going on.

14            So, when you were doing your security sweep of the

15   car.

16            THE WITNESS:  Yes.

17            MR. PEED:  I think I'm being generous in calling

18   it a protective search.

19            THE COURT:  Really, it's a security sweep, right?

20            THE WITNESS:  Correct.

21            THE COURT:  All right.  So what's your question?

22   BY MR. PEED:

23   Q.  Did you uncover any items of evidence when you did that?

24   A.  I didn't recover any items at all.

25            THE COURT:  Because it was a security sweep and

1    you were not actually seizing any items, is that correct?

2         THE WITNESS:  That's correct.  I wasn't the

3    seizing officer.  I didn't do that.  I didn't do the search.

4    I just made a cursory search for weapons and that was it,

5    period.

6    BY MR. PEED:

7    Q.  Did you talk to Detective Howard about whether to write

8    this warning, or did you do that on your own?

9    A.  No, I don't like going to PTA, so I don't really write

10   tickets, so the warning.

11        THE COURT:  Sure.  What is PTA?

12        THE WITNESS:  PTA is traffic court.  So I don't

13   want to go to traffic court.

14        THE COURT:  Is that why you don't carry your book

15   with you?

16        THE WITNESS:  Well, that -- I was in plain clothes

17   that day.  I was detailed with the detective squad.  But I

18   don't usually carry a ticket book with me.

19        MR. PEED:  No further questions.

20        THE COURT:  Now you're excused.

21        THE WITNESS:  Thank you, Your Honor.

22        THE COURT:  Next witness.  Are they up from the

23   cafeteria?

24        MR. PEED:  I sent them both texts and I haven't

25   gotten responses.

```
1              THE COURT:  You can check outside.

2              (Pause.)

3              THE COURT:  Are they here, Mr. Peed?

4              MR. PEED:  They're not outside, Your Honor, but

5     someone is going to get them.  If we could have five minutes?

6              THE COURT:  All right.  We'll just wait for them.

7     How will you know when they have arrived?

8              MR. PEED:  Somebody will bring them to the

9     courtroom.

10             MS. SOLTYS:  Could I speak with Mr. Peed for a

11    moment?

12             THE COURT:  Yes.

13             (Off-the-record.)

14             THE COURT:  Shall we take up one of the other

15    motions while we're waiting, Mr. Peed?

16             MR. PEED:  That's fine, Your Honor.  If I could

17    have a minute to disclose some information to the government,

18    then I'll be prepared.

19             THE COURT:  Okay.  I was hoping to resolve all

20    four motions today.

21             MS. SOLTYS:  It's still early.

22             THE COURT:  Who are your witnesses going to be,

23    Mr. Peed?

24             MR. PEED:  Kevin Brown and Shirell Copeland.

25             THE COURT:  Kevin Brown.  And who is the other
```

1    person?

2              MR. PEED:  Shirell Copeland.

3              THE COURT:  Do you know how to spell that?

4              MR. PEED:  S-H-I-R-E-L-L, C-O-P-E-L-A-N-D.

5              THE COURT:  Do you want to check outside to see if

6    they've arrived?

7              (Pause.)

8              THE COURT:  Are you Miss Copeland?

9              THE WITNESS:  Yes.

10             THE COURT:  Please come forward to the witness

11   stand.

12             THE COURTROOM DEPUTY:  Good afternoon, ma'am.

13   Take the witness stand and raise your right hand.

14                        SHIRELL COPELAND,

15   was called as a witness and, having been first duly sworn,

16   was examined and testified as follows:

17             THE COURT:  Good afternoon, Miss Copeland.

18             THE WITNESS:  Good afternoon, Your Honor.

19             THE COURT:  And, Mr. Peed.

20                        DIRECT EXAMINATION

21   BY MR. PEED:

22   Q.  Good afternoon, Miss Copeland.

23   A.  Good afternoon.

24             MS. SOLTYS:  Could I just put on the record that

25   I've asked for their names and date of birth, their

1   addresses, because I'm learning of these witnesses today.  I

2   would like to know whether or not there's impeachable

3   convictions.

4          THE COURT:  You can also ask.

5          MS. SOLTYS:  Okay.  That's fine.

6   BY MR. PEED:

7   Q.  Could you state your name for the record?

8   A.  Shirell Copeland.

9   Q.  How do you spell your name?

10  A.  My first name is spelled S-H-I-R-E-L-L.  My last name is

11  spelled C-O-P-E-L-A-N-D.

12  Q.  And where do you live?

13  A.  I reside at 443 Ridge Place Southeast, Washington, D.C.

14  20020.

15  Q.  And if you wouldn't mind giving your date of birth?

16  A.  I do.

17  Q.  Take --

18          THE COURT:  How old are you, Miss Copeland?

19          THE WITNESS:  I'm 58.

20          THE COURT:  Okay.

21  BY MR. PEED:

22  Q.  I would like to draw your attention to February 6th of

23  this year.  Do you recall a disturbance outside of your house

24  on Ridge Street -- Ridge Place?

25  A.  Yes.

1    Q.  Did there come a time when you came out of your house to

2    observe this disturbance?

3    A.  I did.

4    Q.  Tell the Court what you saw.

5    A.  When I came outside, I saw several police cars between

6    14th and 16th and Ridge Place Southeast.  So, there were cars

7    in the rear, coming from 16th, there were cars blocking a car

8    from 14th.  And there was a black male handcuffed with his

9    hands behind his back, sitting on the curb.

10   Q.  How long did you observe the scene?

11   A.  I was out there for -- I went in and out of the house, but

12   I was -- it went on for -- I would say a while.  It went on

13   for a while.  And the officers were check -- some of the

14   officers were checking the vehicle.

15   Q.  How many officers did you see?

16   A.  There were at least six officers.

17   Q.  Did you recognize any of the officers?

18   A.  One of the officers looked familiar because he comes in

19   the neighborhood often.  He's a heavyset Metropolitan Police

20   Department officer.  I don't know what substation he is out

21   of.  But he -- he normally sits in his vehicle and drives

22   through the neighborhood.  When my bike was stolen, I think

23   he's one of the officers that responded.

24   Q.  How long have you lived in the neighborhood?

25   A.  I've lived on Ridge Place for five years.

1    Q.   How long have you lived in the District of Columbia?

2    A.   I was born and raised in the District.

3    Q.   What is your education like?

4    A.   I have an undergraduate degree and master's degree and

5    some law school.

6    Q.   When you first came out of your home on Ridge Place, were

7    there officers around the gentleman who was sitting on the

8    curb?

9    A.   There was, I know, an officer speaking with him.  But

10   there was some other officers going through the vehicle.  The

11   trunk was open, several of the doors were opened and they were

12   checking the vehicle.  And there was an officer also speaking

13   with him as he sat handcuffed on the side of the curb.

14   Q.   The curb you're referring to is the curb opposite your

15   place, is that right?

16   A.   It's across the street, yes.

17   Q.   So the person you saw was facing you, is that --

18   A.   My house sits -- well, I would say across the street and

19   several houses over, approximately two houses over to the

20   left.  If I'm coming out my front door, there's a brick house,

21   which is 1500.  There's a beige house across from me, to

22   the -- coming out of my door, facing -- coming down the steps

23   there's 1500, which is Robin's house, and to the left of that

24   is a yellow and white house, that's empty now.  He was sitting

25   on the curb there and approximately in front of that house.

1    Q.  As best you can recall, how many of the car doors were

2    open?

3    A.  I know there was a female officer, at the time, looking in

4    the trunk.  And the doors of the passenger's side were open at

5    this time.  The front and the rear of the passenger's side

6    were open.

7    Q.  How many officers were going through the car, as you say?

8    A.  There was a female officer checking at this time, checking

9    the trunk, and there was a male officer checking the inside of

10   the car at this time, and there was also an officer kind of

11   with him, standing next to the officer, a female, another

12   female officer, standing there.

13   Q.  What were they doing with their bodies, if you could

14   explain?

15   A.  Leaning into the vehicle, examining the contents.

16   Checking the interior of the car.  I couldn't see them

17   necessarily going into the -- anything in the interior, but

18   they were certainly inside of the vehicle, going through the

19   vehicle.

20   Q.  Did you see anyone going into the driver's rear door?

21   A.  No.

22   Q.  How about the passenger rear door?

23   A.  The passenger, yes.

24   Q.  Did you observe the scene long enough to see them -- the

25   police take away the person sitting on the curb?

1    A.  I don't recall.  I was -- I know it was late morning, and

2    I normally let my dog out to -- so that he could use the

3    bathroom.  And the activity was still pretty heavy, you know,

4    up to noon.  So, but I don't recall seeing him being taken

5    away.  But he sat on the curb for at least 30 minutes.

6    Q.  So he was there the whole time the search activity that

7    you saw --

8    A.  Yes.

9    Q.  -- was happening?

10              MR. PEED:  No further questions, Your Honor.

11              THE COURT:  Cross?

12              MS. SOLTYS:  Thank you.

13                        CROSS-EXAMINATION

14   BY MS. SOLTYS:

15   Q.  I just have a few questions for you.

16              So you made it clear that the first thing that

17   happened when you came out, what you observed was there were

18   already lots of police cars around, is that correct?

19   A.  Yes.

20   Q.  And there were lots of police officers around, is that

21   correct?

22   A.  Yes.

23   Q.  Did you see police officers that were -- I don't know

24   whether you would know or not, that the -- a captain or

25   lieutenant or other high-ranking officials were on the scene?

1    A.   I couldn't tell their rank.

2    Q.   And did you see plain clothes police officers?

3    A.   I saw an officer go to my neighbor's house.

4              THE COURT:  Was that person in plain clothes?

5              THE WITNESS:  Yeah.

6              THE COURT:  How did you know that person was an

7    officer?

8              THE WITNESS:  I didn't, but, you know, he looked --

9              THE COURT:  Official?

10             THE WITNESS:  Official.

11   BY MS. SOLTYS:

12   Q.   And that's Mr. Brown?

13   A.   Pardon?

14   Q.   That was Mr. Brown's house?

15   A.   I don't know the neighbor's last name.

16   Q.   Is it Kevin?

17   A.   Yes.

18   Q.   So that's -- he went to Kevin's house?

19   A.   Yes.

20   Q.   And -- okay.  And it was also clear, I think, from your

21   testimony, you said that when you first looked out, you saw

22   the person who was handcuffed?

23   A.   Yes.

24   Q.   And that person was seated on the curb, correct?

25   A.   Yes.

1    Q.  And that person, do you know that person?

2    A.  No.

3    Q.  Do you see him in the courtroom today?

4    A.  I couldn't tell you what he looked like specifically.

5    Just that he was a black male.  I thought initially that it

6    was my neighbor's son, but he was older.  And so, it wasn't my

7    neighbor's son.  But initially I thought it was my neighbor's

8    son.

9    Q.  Is it safe to say that it was clear to you when you came

10   out that things had already happened that you had not seen?

11   A.  Yes.

12   Q.  Now, this is a Government's Exhibit number 26.  Do you

13   recognize what this is?

14   A.  It's a four-door sedan of some type.

15   Q.  Now, did you see the police officers when they searched

16   this vehicle?

17   A.  I can't tell you specifically if it was that vehicle, but

18   it was a four-door sedan.

19   Q.  And you saw -- so you saw several police officers

20   searching a Buick LaCrosse, or Buick sedan?

21   A.  Ma'am, I can't tell you the make or model of the vehicle.

22   It was a four-door sedan.

23   Q.  Can you tell us the tag number?

24   A.  No.

25   Q.  Do you know whether it was a D.C. tag or Maryland tag?

1    A.  I don't recall.

2    Q.  The color of the car?

3    A.  It was a sedan, four-door sedan.

4    Q.  You don't know whether or not you saw police officers

5    searching this car?

6    A.  Not particularly, no.

7              MS. SOLTYS:  All right.  I have no further questions.

8              THE COURT:  Redirect?

9              MR. PEED:  Yes, Your Honor.

10                     REDIRECT EXAMINATION

11   BY MR. PEED:

12   Q.  I'm going to show you Government Exhibit 17.  Do you

13   recognize the individual in this photo?

14   A.  I don't personally recognize him, no.  But, he looks to be

15   about the same age and body type of the person who was

16   arrested.

17   Q.  Is he sitting -- can you tell from the neighborhood, from

18   the homes and the sidewalk, whether this is your neighborhood?

19   A.  That's my neighborhood.  And that is -- I can tell you

20   that the -- that the house with the little spike bushes in the

21   back, that is Stacy's house.  And to -- looking at the picture

22   from this vantage point, to the right would be the house that

23   I described, the yellow and white abandoned house.  He's

24   approximately in -- he looks to be in between the yellow and

25   white house and close to Robin's house, her property line.

1    Q.  Relative to where this individual is, is this about where

2    the car that you saw being searched would be?

3            MS. SOLTYS:  Objection.  Leading.

4            THE WITNESS:  No.  The car was --

5            MS. SOLTYS:  Withdrawn.

6            THE COURT:  You can answer, if you can.

7    BY MR. PEED:

8    Q.  Where was the car that you saw being searched relative to

9    the person sitting on the curb?

10   A.  Repeat your question.

11   Q.  When you saw the person on the curb, where was the car

12   that you saw being searched relative to that person?

13   A.  When I first came out the street, the car was in the

14   street, and then it's been pulled over.  But it was in the

15   middle of the street when the back of the car was being

16   searched.

17   Q.  Okay.

18   A.  It hadn't been pulled over to the side of the road.

19   Q.  It was in the middle of the street?

20   A.  It was in the middle of the street and it was being

21   blocked off by police at each end.  There were police cars at

22   16th blocking the vehicle, there were police cars in front of

23   the vehicle blocking the street, where nothing could get by

24   initially.  Traffic couldn't get by either way.

25   Q.  You don't recall the color of the vehicle?

```
 1    A.  Not specifically.  I just know it was a four-door sedan.

 2            MR. PEED:  Okay.  No further questions.

 3            THE COURT:  No further questions.  You're excused.

 4    Thank you, Miss Copeland.

 5            THE WITNESS:  Thank you.

 6            THE COURT:  And your next witness, Mr. Peed?

 7            MR. PEED:  I'll step outside.

 8            (Pause.)

 9            THE COURT:  Are you Mr. Brown?

10            THE WITNESS:  Yes, ma'am.

11            THE COURT:  Okay.  Please step forward to the

12    witness stand.

13                            KEVIN BROWN,

14    was called as a witness and, having been first duly sworn,

15    was examined and testified as follows:

16            THE COURT:  Good afternoon, Mr. Brown.

17            Mr. Peed.

18                        DIRECT EXAMINATION

19    BY MR. PEED:

20    Q.  Mr. Brown, could you please state your name for the record?

21    A.  Kevin Leroy Brown.

22    Q.  What's your address?

23    A.  12 -- 1502 Ridge Road -- Ridge Place Southeast.

24    Q.  Were you on Ridge Place on February 6th, 2014?

25    A.  Yes.
```

1    Q.   What's your education level?

2    A.   Eleventh.

3    Q.   How long have you lived on Ridge Place?

4    A.   Actually, I live on 1242 Barnaby, but my girlfriend stays

5    at 1502.  So, I mean, you know, back and forth.

6    Q.   Did you get a call from Mr. Flowers on -- I'm sorry.  Let

7    me step back.

8              Do you know Mr. Flowers?

9    A.   Yes, sir.

10   Q.   How do you know him?

11   A.   We come up together in the same neighborhood.

12   Q.   Which neighborhood was that?

13   A.   Woodland.

14   Q.   I'm sorry?

15   A.   Woodland.

16   Q.   And how long have you known him?

17   A.   About 30 years.

18   Q.   Do you ever hang out with him socially?

19   A.   From time to time.

20   Q.   On February 6th, 2014, did you receive a call from Mr.

21   Flowers?

22   A.   That morning, yes.

23   Q.   And what did he say?

24   A.   He asked me what was I doing, and I told him I was just

25   leaving the clinic.  And he said he was going to come past

1   because he was going to the dentist.  He said and he was going

2   to stop past.

3   Q.  Later that morning did you get a knock on your door?

4   A.  Yes.

5   Q.  And describe what happened afterwards.

6   A.  Well, the officer asked me to step out and he asked me did

7   I know the person that was on -- sitting on the ground.  And I

8   said, Yes.  And then he asked me how did I know him?  And I

9   told him where we grew up at.  And then he asked the plain

10  clothes -- I mean, the police officer in uniform to run my

11  name through.  So I asked him why, why was he running my name

12  through.  He wouldn't tell me.

13  Q.  Did you tell any officers that you were not expecting Mr.

14  Flowers?

15  A.  No.

16  Q.  Were you expecting Mr. Flowers that morning?  Were you

17  expecting Mr. Flowers that morning?

18  A.  Yeah.

19  Q.  While -- while they were running your ID, did you observe

20  anything on the street in front of your house?

21  A.  It was just the police, that was all, out front, in the

22  middle of the street.

23  Q.  About how many officers did you observe?

24  A.  I think it was -- might have been over five, or might have

25  been five, six.

1    Q.  Did you see a gold Buick in front of your house?

2    A.  In front of my house?

3    Q.  On the street in front of your house.

4    A.  Yes.

5    Q.  What was happening to that Buick?

6    A.  The police, they was just going in and out, talking with

7    one another.  Talking to David, asking him questions, I guess.

8    And the door was open and he just kept going -- looking in,

9    looking in.

10   Q.  How many officers did you see look in the car?

11   A.  One.  And he might have been talking to the other police

12   as they was coming by.

13   Q.  What were the other officers doing?  You said there were

14   around five?

15   A.  Like pointing -- yeah, the officers, they was over there

16   talking to each other.  You know, some that was maybe on the

17   other side of the car, in the middle of the street, then you

18   had the one who kept going around the car; he was in and out

19   of the car, and he might be talking to one of the other police.

20   Q.  How long did you observe that scene?

21   A.  They had me outside for about 15, 20 minutes.  Time, I

22   can't really --

23            THE COURT:  If you know.

24            THE WITNESS:  The whole time I was out there,

25   that's when they was doing it.

1    BY MR. PEED:

2    Q.  So, if you know, how long were you out on your porch?

3    A.  Probably about 15, 20 minutes.

4    Q.  Did you watch it at all after you went inside?

5    A.  Yeah.  I was looking out the whole time.  My front door, I

6    have a window, I was just peeping out.

7    Q.  Do you know how long you watched through your window?

8    A.  It was -- I really didn't keep up with the time, but it

9    was -- I want to say maybe 20.  I know it was about 12

10   because, like, when I get home, this is like 11, from the

11   clinic.  I think they got out of there almost 12.

12   Q.  So about an hour after you got home?

13   A.  Yeah, I think all this took place.

14   Q.  Did you see them take Mr. Flowers away?

15   A.  Yes.

16   Q.  After you went inside, did you see anyone else open any of

17   the doors to the Buick?

18   A.  When I was inside?

19   Q.  Yeah.

20   A.  No, it was just that same one cop.

21   Q.  When he was doing it, how many other officers were around

22   Mr. Flowers?

23   A.  I think a lady or something came over and -- I'm thinking

24   it was a lady, if I can remember.

25   Q.  Do you think a female officer came over?

1   A.   I think it was a female officer.

2   Q.   To Mr. Flowers or the vehicle?

3   A.   The vehicle.

4   Q.   And what did she do?

5   A.   Well, they just talked, still just talking about what was

6   going on with the car.

7   Q.   Could you describe what physically the officers were doing

8   with regard to the car?

9   A.   I told you, they was pointing and looking in and then they

10  say something.

11  Q.   How much of their bodies were going into the car?

12            THE COURT:  If any.

13  BY MR. PEED:

14  Q.   Did you see any parts of the their body going into the car?

15  A.   Can't remember.

16            THE COURT:  If you know and can recall, Mr. Brown.

17  A.   I just know they kept going in and out of, opening the

18  door and pointing, talking to David; he was on the ground.

19            MR. PEED:  Okay.  No further questions, Your

20  Honor.

21                      CROSS-EXAMINATION

22  BY MS. SOLTYS:

23  Q.   So -- good afternoon.  How are you?

24  A.   I'm okay.  And yourself?

25  Q.   Thank you.  Fine, thank you.  Thank you for asking.

```
 1              I have to just ask if you have any convictions?

 2   A.   Yeah, I have two.

 3   Q.   Do you -- could you tell us what they are, please?

 4   A.   Attempt to distribute, both.

 5   Q.   What drug?

 6   A.   Cocaine.  Cocaine.

 7   Q.   Both?

 8   A.   Yes.

 9   Q.   Are they -- okay.  Now, do you also know Miss Holman?

10   A.   Excuse me?

11   Q.   Do you also know Miss Holman?

12   A.   Miss Holman?

13   Q.   Holman.  Terri.

14   A.   Oh.  Yeah.

15   Q.   Do you not know her last name?

16   A.   Well, I mean, I could never -- you know, I never called

17   her by last name.

18   Q.   You know that she's Mr. Flowers' spouse?

19   A.   Yes.

20   Q.   So, from your testimony now, I just wanted to ask, that

21   you were in the house, and you didn't -- you were in the

22   house, the first thing that happened, that got your attention,

23   was there was a knock on the door?

24   A.   Yes.

25   Q.   And when you answered the door there was a police officer
```

1    that was standing there that wanted to talk to you?

2    A.  Um-hum.

3    Q.  That police officer, he wasn't in uniform, was he?

4    A.  No.

5    Q.  In fact, he was just wearing regular clothing, correct?

6    A.  Yes.

7    Q.  Have you seen him here today?

8    A.  No.  I didn't, no.

9    Q.  Do you happen to recall that he was a bald-headed guy?

10   A.  Yeah.

11   Q.  And he asked you some questions about Mr. Flowers, right?

12   And you could see that Mr. Flowers was already sitting down on

13   the curb?

14   A.  Um-hum.

15   Q.  You could see Mr. Flowers was already handcuffed, right?

16           THE COURT:  You have to answer yes or no so we can

17   all understand you.  But for the court reporter, she needs

18   to take it down.

19   A.  Was he handcuffed?  I don't know.  I don't know.

20   BY MS. SOLTYS:

21   Q.  Do you recall, was there a time -- did you ever see Mr.

22   Flowers handcuffed?

23   A.  I don't know.  I don't know.

24   Q.  Okay.  Now, when you looked outside, you were surprised

25   because you saw a lot of other police officers, right?

1    A.   Yes.

2    Q.   There were multiple police cars and they had -- they were

3    at one end of your block, right?

4    A.   Yes.

5    Q.   And they were at the other end of the block, right?

6    A.   In the middle.

7    Q.   In the middle.

8    A.   In the middle.  I don't know about down the block.  Where

9    my house is, that's where the police was at.

10   Q.   There were quite a few of them?

11   A.   Right.

12   Q.   Uniformed police officers?

13   A.   Uniform and regular.

14   Q.   And marked police cars, right?  Marked cruisers, I mean to

15   say.  You know, an MPD cruiser.

16   A.   Yeah.

17   Q.   You saw at least three?

18   A.   I didn't count the cars.  I just --

19   Q.   How many -- do you know how many there were, approximately?

20   No?  I'm sorry.  I'm not sure if you're answering my question

21   or not.

22   A.   It was some cars out there, but I did not count them.

23   Q.   Okay.  So can you estimate?  Were there less than three or

24   more than three?

25   A.   Probably was three; might have been, but I didn't count

1    them.

2    Q.   Okay.   That's fair.   That's fair enough.   And then you

3    said that police officer, the non-uniform, the guy that was in

4    plain clothes, bald guy talked to you, asked you some

5    questions, right?

6    A.   Yes.

7    Q.   Asked you about your friend, correct?

8    A.   Yes.

9    Q.   And you told him that, oh, that Mr. Flowers was -- you

10   were expecting Mr. Flowers?

11   A.   Yes.

12   Q.   And you told him that Mr. Flowers told you that he was

13   going to stop by after his visiting the dentist?

14   A.   Right.   He said his mouth was hurting.

15   Q.   You told that to the bald guy?

16   A.   I don't know if he asked me that, or not.

17   Q.   But you told him?

18   A.   I think he might have.   He might have.

19   Q.   But you're absolutely certain that you told him that you

20   were absolutely expecting Mr. Flowers?

21   A.   Um-hum.   Yes.

22   Q.   And that Mr. Flowers had contacted you ahead of time and

23   said he was on his way over?

24   A.   Yes.

25   Q.   And then after that, then you did continue to pay

1    attention to see what happened to Mr. Flowers?

2    A.  I continue, you said?

3    Q.  (Nods head.)

4    A.  It was -- I mean, yeah.  I mean, when he was just

5    sitting -- he was just sitting on the ground.

6    Q.  Yeah.  He's your friend, right?

7    A.  Right.

8    Q.  You cared about him, right?

9    A.  (Nods head.)

10              THE COURT:  You have to answer.

11    A.  Yes.

12    BY MS. SOLTYS:

13    Q.  So you were obviously concerned enough to pay attention,

14    to see what, if anything, what were the police doing to your

15    friend, right?

16    A.  Right.

17    Q.  And -- but you're still -- you're not sure at what point,

18    if he even was placed in handcuffs, right?

19    A.  They placed him in handcuffs and took him away.

20    Q.  You're not sure when that happened, when you saw the

21    placing of the handcuffs?

22    A.  No.  I mean, I came back because I couldn't -- the way my

23    window is in my -- on my door, is like I got to be on my tippi

24    toes.  So I came back and forth, came back and forth.

25    Q.  You mean in and out, in and out?

1    A.  Back and forth to the door.

2    Q.  From where?

3    A.  My living room.

4    Q.  So looking out the living room window?

5    A.  No, the door.

6    Q.  I see.  So you did not look out your living room window?

7    A.  My door.  My door.  That's the window over the top of my

8    door.

9    Q.  So you did not look out a living room window?

10   A.  From my door, my door.

11          THE COURT:  Why didn't you look out your living

12   room window?

13          THE WITNESS:  I don't know.  I was just looking

14   out the door.  My couch is in front of my living room

15   window.  I have a couch right there, and a radiator.  So, I

16   don't get all on my couch.  So I looked outside my door

17   because I got my door.

18   BY MS. SOLTYS:

19   Q.  Everything that you saw then, after they closed the door,

20   you saw from your window outside of your front door?

21   A.  Yes.

22   Q.  And your -- the window on your door, how big is this

23   window?

24   A.  It's (indicating), like that.

25   Q.  So it's a fancy glass window on the top part of your --

1      A.   Yeah.

2      Q.   -- door?

3      A.   Yeah.

4      Q.   And you just motioned, you had to sort of stand on your

5      tiptoes?

6      A.   Yeah, just looking.

7              THE COURT:   Do you have to stand on your tiptoes

8      to see out of it?

9              THE WITNESS:   Yes.

10     BY MS. SOLTYS:

11     Q.   So that's what you did every time?

12     A.   I just did that every time.

13     Q.   When you're testifying here today about what you saw,

14     these are all instances when you went to the window, stood on

15     your tiptoes and looked out the window?

16     A.   That's right.

17     Q.   Now, did you see Miss Holman arrive?

18     A.   Yeah, I think I did see her walk down.

19     Q.   And did you see her -- did you see her come in her

20     vehicle?   No?

21     A.   No.

22     Q.   Did you see her vehicle?

23     A.   No.

24     Q.   Do you know what vehicle she drives?

25     A.   Yes.

1    Q.  What is that?

2    A.  Is it LeSabre?  What's the name of that car?  What is the

3    name?  It's -- let's just -- it's something like a LeSabre.

4    Buick, I think.  Yeah.

5    Q.  And did you know what type of a vehicle Mr. Flowers drove?

6    A.  He drove her car.

7    Q.  Had you seen him driving her car previously?

8    A.  Yeah.

9    Q.  Regularly?

10   A.  But I don't pay attention to, you know, what he drive.

11   You talking about that day?

12   Q.  No, just in general, in the past.

13   A.  No.  I might see him in -- I don't know, it looked like

14   her car.

15   Q.  Now, you were talking about you saw police officers that

16   were pointing at -- well, let me ask you this:  Do you know

17   what this is?

18   A.  Do I know what that is?

19   Q.  Yeah.  Do you know what this is?

20   A.  This is a Buick.

21   Q.  Do you know who it belongs to?

22   A.  I don't see the tag number, so I don't know if that's her.

23   I don't want to say if that's her car or not because I don't

24   know the tag.

25            THE COURT:  For the record, the witness is looking

1    at Government Exhibit number 26.

2    BY MS. SOLTYS:

3    Q.  You don't recognize this car?

4    A.  Well, that might -- is this the car that day, that

5    morning?

6            THE COURT:  Well, just if you recognize it.

7    BY MS. SOLTYS:

8    Q.  You tell me.

9    A.  Yeah, I guess that's the car that morning, I guess.

10   Q.  So you saw police searching this car?

11   A.  Yeah, probably.  That probably was it.  Probably, yes.

12           THE COURT:  Do you think this was the car that was

13   being -- that you saw cops looking into?

14           THE WITNESS:  Yeah.  It was a Buick.

15           MS. SOLTYS:  Thank you.

16           THE COURT:  Redirect?

17                    REDIRECT EXAMINATION

18   BY MR. PEED:

19   Q.  Mr. Brown, do you remember the color of the car that you

20   saw being searched?

21   A.  I'm trying to think.  Was it -- if that was it, it had to

22   be silver.

23   Q.  I'm not asking if you can deduce it.  Just do you remember

24   the color?

25   A.  I can't.

```
1    Q.  Do you remember where the car was parked?

2    A.  It was parked down by the fire hydrant.  So if I come out

3    my door, out my gate, and I walk down one house, almost two

4    houses, that was the fire hydrant and David was right next to

5    that, sitting on the ground.

6    Q.  I'm going to show you Government Exhibit 17.  Does this

7    car match what you just described?

8    A.  Yes.

9    Q.  So this --

10   A.  So the fire hydrant is like right there, where that cop

11   is, that's where his back is turned.

12   Q.  Right here (indicating).

13   A.  No, not him, the other one.

14   Q.  Here?

15   A.  It's like right -- the fire -- right up in there, in front

16   of him or right beside.  There's a fire hydrant right there.

17   Q.  So is this the car that you saw being searched?

18   A.  Yes.

19              MR. PEED:  No further questions.

20              THE COURT:  And that was Government Exhibit 17?

21              MR. PEED:  Yes, Your Honor.

22              THE COURT:  All right.  Mr. Brown, you're excused.

23              We're going to take -- do you have any other

24   witnesses?

25              MR. PEED:  Yes, Your Honor.  Mr. Flowers would
```

1   like to testify.

2          THE COURT:  All right.  We're going to take a ten-

3   minute break.

4          (Recess.)

5          THE COURT:  All right.  Mr. Flowers is going to be

6   your next witness?

7          MR. PEED:  I would like to briefly recall Special

8   Agent Johannes.

9          THE COURT:  Is he still here?  Because I had excused

10  him.

11         MR. COYNE:  He's still here.

12         THE COURT:  Good for him.  All right.

13         (Pause.)

14         THE COURT:  Welcome back, Agent.  All right.

15  You're now being called by the defense.  Have a seat.  You

16  remain under oath.

17         Please proceed, Mr. Peed.

18                    DIRECT EXAMINATION

19  BY MR. PEED:

20  Q.  Good afternoon.

21  A.  Sir.

22  Q.  Mr. Johannes, you were described the events of the arrest

23  of Mr. Flowers by Mr. Howard, correct, Detective Howard?

24  A.  I'm sorry?  What's the question?

25  Q.  Did Detective Howard describe to you the events of the

1    arrest of Mr. Flowers?

2              THE COURT:  And when?  What -- when precisely are

3    you talking about?

4              MR. PEED:  On February 6, 2015.

5    A.  You have to be a little more specific.  The arrest?  He

6    was arrested after -- later on that day.  If you're referring

7    to the traffic altercation or the traffic stop, yes, he

8    described that.

9    BY MR. PEED:

10   Q.  And did he describe to you that the traffic stop began --

11   I'm sorry.  Did he describe Mr. Flowers getting out of his

12   vehicle and then being approached by Detective Howard?

13   A.  I can't recall 100 percent, but he possibly did.

14   Q.  Did you recall at the time of your grand jury testimony?

15   A.  I might have.

16   Q.  Do you recall testifying that Mr. Flowers had exited his

17   vehicle?

18   A.  Possibly.

19             MR. PEED:  Your Honor, may I approach to see if

20   this refreshes his recollection?

21             THE COURT:  Sure.

22             MR. PEED:  Just one second.

23             (Pause.)

24             THE COURT:  What was the date of the grand jury

25   testimony?

1    BY MR. PEED:

2    Q.  Could you describe -- say the date here on the front of

3    the grand jury testimony?

4    A.  Tuesday, February 24th, 2015.

5    Q.  Do you recall giving testimony in front of the grand jury

6    on that date?

7    A.  Yes.

8    Q.  Court's indulgence.  I believe I had it.

9         Just read this question to here (indicating) and

10   then I'll ask you if that refreshes your recollection.

11   A.  Okay.  "Question:  After they proceeded to follow" --

12   Q.  Read to yourself.  Sorry.

13        THE COURT:  Yes.  This is just to see if it

14   refreshes your recollection of what Detective Howard told

15   you.

16        THE WITNESS:  Okay.

17   A.  Okay.

18   BY MR. PEED:

19   Q.  Does that refresh your recollection?

20   A.  Yes.

21   Q.  Did Detective Howard tell you that Mr. Flowers had exited

22   his vehicle before they had approached him?

23   A.  He told me -- I was summarizing what Detective Howard told

24   me.  But for the specifics, you have to ask Detective Howard

25   again, since I was not there.  The -- as for the grand jury

1    testimony and that statement, that was at that time, to the

2    best of my knowledge, what Detective Howard told me from that

3    day.  I did not -- to the best of my recollection, I did not

4    refresh my memory or the reports for that grand jury.  We were

5    focused on the other parts of the investigation.

6    Q.  Your recollection on that day was that Mr. Flowers had

7    exited his vehicle and then was approached by Detective Howard?

8    A.  That was my initial information from Detective Howard, to

9    the best of my knowledge at that time.  Again, specifically,

10   Detective Howard was there, I was not.

11   Q.  This was about -- this was February 15th -- I'm sorry,

12   February 24th.  So approximately three weeks after the events,

13   is that correct?

14   A.  Yes, sir.

15          THE COURT:  To the best of your recollection, what

16   Detective Howard told you was when he first talked to Mr.

17   Flowers, he was already out of the car?

18          THE WITNESS:  Yes.  Yes, Your Honor.

19   BY MR. PEED:

20   Q.  Is your recollection fresher in February of this year than

21   it is right now?

22   A.  I'm not sure I understand the question.

23   Q.  Was your memory fresher when you made that statement to

24   the grand jury than it is today?

25   A.  I can't answer that.  I'm not sure.  I mean, that's

1    something that -- I don't know if I can answer that.  I'm

2    sorry.

3              MR. PEED:  No further questions.

4    A.  If my memory is fresher now or then?

5    BY MR. PEED:

6    Q.  Yes.  If your recollection of the event was fresher three

7    weeks after the event than it is now, several months after the

8    events?

9    A.  It really depends on the amount of information I have to

10   review prior to testimony; court proceedings, investigative

11   review.

12   Q.  You don't know right now whether or not it's fresher?

13             THE COURT:  Okay.  That's enough.  Any cross?

14             MS. SOLTYS:  No, Your Honor.

15             THE COURT:  You're excused.

16             MS. SOLTYS:  If I could just have my grand jury

17   testimony back, please.

18             THE COURT:  All right.  Mr. Peed.

19             MR. PEED:  Defense calls Mr. Flowers.

20             THE COURT:  Mr. Flowers, please step forward to

21   the witness stand.

22                       DAVID FLOWERS,

23   was called as a witness and, having been first duly sworn,

24   was examined and testified as follows:

25             THE COURT:  Good afternoon, Mr. Flowers.

1           THE WITNESS:  Good afternoon.

2                   DIRECT EXAMINATION

3     BY MR. PEED:

4     Q.  Mr. Flowers, could you state your name for the record?

5     A.  David Flowers.

6     Q.  Mr. Flowers, on February 6, 2015, between 11 a.m. and

7     noon, do you recall traveling along Good Hope Road?

8     A.  Yes, I do.

9     Q.  Where were you coming from?

10    A.  The dentist office, on Della Road, I believe it is.

11    Q.  And where were you headed towards?

12    A.  Ridge Road.  Kevin's house.

13    Q.  That's Mr. Brown?

14    A.  Yeah, Mr. Brown.  I'm sorry.

15    Q.  And did you make a turn off of Good Hope Road?

16    A.  Yes, I did.

17    Q.  What turn did you make?

18    A.  On 16th Street.

19    Q.  Did you use your turn signal?

20    A.  Yes, I did.

21    Q.  How do you know that you used your turn signal?

22    A.  Always I drive cautious.

23    Q.  After you made the right turn, what -- where did you go?

24    A.  Went down 16th Street, stopped at the light, crossed over

25    Minnesota Avenue, went down to a stop sign, went through the

1    stop sign, made the left-hand turn on Ridge Road.  Went down

2    to probably the middle of the block, I parked the car, got out

3    the car, locked the car, walked off to the back and the

4    officer approached me.

5    Q.  Which officer approached you?

6    A.  I don't know the -- I don't know his name.  The bald-headed

7    guy.

8    Q.  The white officer?

9    A.  The white officer, yeah.

10   Q.  What did the officer do?

11   A.  They approached me, he patted me down.  He said he wanted

12   to ask me a question.  He took my phone, took the keys out of

13   my hand, and asked me, could I stand on the curb.

14   Q.  Did you comply?

15   A.  Yes, I did.

16   Q.  What happened next?

17   A.  The other officer, Detective Howard, he came up and said,

18   We want to talk to you about something.  We want to ask you

19   some questions.  And he said, Do you have a gun in the car?

20   And I said, No, sir.  He asked me again, Do you got a gun in

21   the car?  I said, No.  And so he start walking around the car,

22   looking in the car.  By this time more officers come, more

23   officers came.  And so they said, Can you put your hands

24   behind your back, sit on the ground, cross your feet.  He tell

25   me, You still not under arrest.  I just want to ask you some

1    questions.

2          By this time they started asking me where I was

3    going, where I came from.  I told Detective Howard, I'm coming

4    from the dentist, I'm going to my buddy's house; he lives

5    right here.  He said, Where?  And I pointed to the house.  The

6    white officer proceeded to the house.  So it was more officers

7    standing around me, to, I guess, keep me secured.

8          Detective Howard goes back to the car, passenger

9    side, opens the door, leans in the car, comes back to me,

10   asked me again, Do I have a gun in the car?  Once again I

11   said, No, I don't.  And then he said, Well, let me search the

12   car.  And I said, No, you can't search the car.  So they

13   started going -- I guess, walking the car.  He goes on the

14   other side of the car, on the driver's side, back side, opened

15   that door, he leans in, body inside the car.  Comes back out.

16   The other white guy, he's still talking to Kevin.  Later,

17   like, I heard him say, he was writing his name.  Detective

18   Howard tell everybody to move away from me.  So everybody

19   watch out, move back, they have a -- to have a personal

20   conversation with me, just me and him.

21         So he said, he lean down to me and whispered to me,

22   Look, if you got a gun in the car, tell me now.  I said, I

23   don't have a gun in the car.  So, they come, all the officers

24   come back around in listening view.  He goes back in the car,

25   picks up the paper.  Leans in the car again, picks the dentist

1    paper up off the front seat, look at it --

2    Q.  Just a minute.  Let me stop you.  You mentioned a sheet of

3    paper from the dentist.  Have you seen that paper today

4    presented?

5    A.  Yes.  Yes, I seen the paper.

6    Q.  When you got that sheet of paper from the dentist, where

7    did you put it?

8    A.  When I left the dentist, I got the prescription, I set it

9    on the passenger's seat.

10   Q.  Did it lay flat on the passenger's seat?

11   A.  Yes, it did.

12   Q.  I'm going to show you Government Exhibit 18.

13             This isn't on.

14             Thanks.

15             Do you recognize this sheet of paper?

16   A.  Yes, that's the sheet of paper.

17   Q.  When you got in the car after the dentist, where did you

18   place it?

19   A.  I placed it on the seat.  It wasn't -- it wasn't -- the

20   sweatshirt wasn't there, the hat wasn't there; they was in the

21   back of the car.

22   Q.  Did it lay flat?

23   A.  The paper lay flat.

24   Q.  On the seat?

25   A.  On the seat.

1    Q.   Do you see the surface here of these bundled up clothes?

2    A.   Yeah.

3    Q.   Would the paper be able to lay on that?

4    A.   It wouldn't be able lay on it, no.  Of course it wouldn't

5    on the bundle.  If you put it on the bundled up clothes, it's

6    automatic slide right off.  The clothes, they put them in a

7    heap.

8    Q.   So you were describing what Detective Howard was doing --

9    continue describing what he was doing after he looked at this

10   paper.

11   A.   Okay.  Each time he opened the door he lift the paper up,

12   but he leaned his body inside the car.  He put it back, he

13   would close, he'll walk around the car again.  He'll go to the

14   other side, he'll open up the driver side door, he'll lean in.

15   He'll go to the back side of the car, to behind the driver's

16   side door.

17        He open that up, he's leaning all the way in and

18   he's looking in, peering in the car.  And as he did that, he

19   comes around, then he going to talk to me again, he asked me,

20   I don't know how many times, do I have a gun in the car?  So

21   each time I tell him no.  I believe probably the fifth or

22   sixth time, Don't worry about it, we will call the gun dog.

23   Q.   Say that again?

24   A.   Don't worry about it, we'll call the gun dog.  I'm sitting

25   on the curb, I say, Okay.  And like he said, more detectives

1     came.  Somebody else pulled up.  They huddled up, they

2     talking.  Eventually Detective Howard asked me, where's your

3     driver's license?  And I said, It's in the sun visor in the

4     car.  He said, Why don't you got it?  I said, That's where I

5     keep it, because I lose it.  It's in the car, it's in the sun

6     visor.  But he don't go get it, he just asked me where is it at.

7     Q.  What was the address on that driver's license?

8     A.  That address on that driver's license is 4019 E Street.

9     The same address he wrote on the ticket.

10    Q.  We'll get to the ticket.  Did you have any other driver's

11    licenses?

12    A.  Yes, I do.

13    Q.  Why do you have two driver's licenses?

14    A.  Because when I got the last -- the one that -- my current

15    driver's license, 4019 E Street, when I was staying with my

16    sister, I got that because I was going to school to get my

17    CDL.  So once I passed the learner's test for CDL, I had to

18    get a new address, and that was the one that was current.

19    Q.  What was that address?

20    A.  4019 E Street, Washington, D.C., Southeast.

21    Q.  So the address of the license in your car was?

22    A.  4019 E Street.

23    Q.  And the address on the other license was what?

24    A.  2733 Langston Place.  That's the old address, my old -- my

25    old driver's license.

1    Q.  You didn't have that one on you?

2    A.  No.  I left it in the car, Miss Holman's car.

3    Q.  So Mr. Howard had asked you for your license and you said

4    it was in the visor?

5    A.  Right.

6    Q.  What do you recall next?

7    A.  If it's the same thing, when all -- you know, he kept

8    walking around the car, they kept huddling up, talking.  And

9    he just -- he just -- he repeated the same thing.  He kept

10   going, looking in the car, opening doors up, leaning in,

11   looking.

12   Q.  Did there come a point when you were told that you were

13   under arrest?

14   A.  Yes, there did.

15   Q.  Did anything significant happen right before you were told

16   you were under arrest?

17   A.  Not really.  They looked, you know, he looked in -- I

18   believe he -- somebody came up, I believe it was a lady, she

19   came up, they stood and talked.  I believe they came and

20   looked in the car and then they came back and said, you know,

21   place him under arrest.

22   Q.  Were the doors open to the car when you're saying they're

23   looking in the car?

24   A.  Yeah, the passenger's side door is still open.  As you

25   see, I'm sitting on the curb, it's open.

1   Q.  How many officers did you see stick their torsos into the

2   car?

3   A.  Just Detective Howard.

4   Q.  And I'll show you Government Exhibit 2.  You heard

5   Detective Howard testify these were gloves that he saw.  To

6   the best of your recollection, were there any gloves sticking

7   out of the back seat of your --

8   A.  No, there wasn't.  No, there wasn't.

9   Q.  -- of the Buick you were driving?

10          THE COURT:  Is it your testimony that you had no

11   gloves like that in your car?

12          THE WITNESS:  No, I didn't.  He asked me, did I

13   see the gloves out of the car?  Out of the back seat,

14   sticking out.

15          THE COURT:  Right.

16          THE WITNESS:  And no, they wasn't sticking out.

17          THE COURT:  But did you have gloves like that in

18   your car?

19          THE WITNESS:  They -- yes, ma'am.

20          THE COURT:  All right.

21   BY MR. PEED:

22   Q.  Mr. Flowers, how long were you sitting on the curb before

23   you were put under arrest?

24   A.  About 35, 40 minutes.

25          THE COURT:  I want to ask you, to make sure I

1    understand this:  So you had the gloves in the car.  You

2    said they were not sticking out.  Were they in that rear

3    pocket?

4              THE WITNESS:  They possibly could have been.  Your

5    Honor, it -- it's not my car.  So, as -- I'm just using the

6    car.  So if the gloves been in the back seat, I wouldn't

7    know.  But I know that they wasn't sticking up because I

8    folded up the sweatshirt and had that on the back seat, so I

9    know the gloves weren't sticking out.

10   BY MR. PEED:

11   Q.  About 45 minutes, you said, before you're placed under

12   arrest?

13   A.  Right.  Yes.

14   Q.  Were you ever told that you may -- failed to make a right

15   turn?

16   A.  No.

17   Q.  Were you ever given a warning?

18   A.  Four months later when I got a discovery, I seen it and I

19   read it.  Reading discovery, I seen the ticket in it, that I

20   got a warning.  But the ticket had a the wrong date on it.

21   Wrong date.

22   Q.  Had you seen that warning ticket before you received your

23   discovery packet?

24   A.  No.

25              MR. PEED:  No further questions, Your Honor.

CROSS-EXAMINATION

BY MS. SOLTYS:

Q.  Mr. Flowers, you were convicted in this courtroom, in a
trial before Judge Hogan, charging you with felon in
possession, is that correct?

A.  Yes, ma'am.

Q.  And you received a sentence from Judge Hogan of about nine
years, is that correct?

A.  Yes, ma'am.

Q.  That's not the only conviction that you have, is it?

A.  No, ma'am.

Q.  Would you tell the Court the other convictions that you
have, as well?

A.  I have another possession of a handgun conviction.  I
have -- in D.C.  I have a conviction of robbery in the state
of Maryland, and I also have another conviction of armed
robbery in the state of Maryland.

Q.  And the armed robberies in the state of Maryland, you
actually got an 18-year sentence, is that correct?

A.  Yes, ma'am.

Q.  So as you sit here today, as you testify before this
Court, I just want to make it very clear, so you did not have
that sweatshirt that Detective Howard is talking about on the
front passenger seat, did you?

A.  No, ma'am.

1    Q.  You said it was in the back seat, right?

2    A.  Yes, ma'am.

3    Q.  And you said that you know that those gloves were not

4    visible behind the driver's side seat, right?

5    A.  Yes, ma'am.

6    Q.  And you're certain of that, right?

7    A.  Yes, ma'am.

8    Q.  Just like you're certain of the fact that you never

9    committed a traffic violation when you turned?

10   A.  Yes, ma'am.

11   Q.  And you never said the statement -- when he asked you

12   if -- he did ask you if he could search your car, right?

13   A.  Yes, ma'am.

14   Q.  But you never said, Well, if you do, you're going to lock

15   me up anyway?

16   A.  No, ma'am.

17   Q.  Never said anything like that?

18   A.  No, ma'am.

19   Q.  Now, you did see the police when you came out of your

20   house that morning, before you went to the dentist, right?

21   A.  Yes, ma'am.

22   Q.  In fact, you sent your wife a text message telling that

23   you saw the police, correct?

24   A.  Yes, ma'am.

25              MR. PEED:  Your Honor, I want to object.  Beyond

1     the scope.

2              THE COURT:  Overruled.

3              MR. PEED:  Secondary objection about marital

4     communications.

5              THE COURT:  Overruled.

6     BY MS. SOLTYS:

7     Q.  This is Government's Exhibit number 22.  That's your

8     jacket, right?

9     A.  Yes, ma'am.

10    Q.  That's the jacket that you claim was on the back seat of

11    the car, right?

12    A.  Yes, ma'am.

13    Q.  And you're certain that that was on the back seat of the

14    car?

15    A.  Yes, ma'am.

16    Q.  Now, do you think that it was positioned in such a way so

17    that no one could see the drawstrings?

18    A.  Yes, ma'am.

19    Q.  Because it would be -- because you know, after you sit

20    here today, after you've heard this motions hearing, that the

21    fact that those drawstrings were visible, that's important in

22    this case, isn't it?

23    A.  It's important because you said the drawstrings are the

24    case.

25    Q.  You know, you heard the detective testify that he saw the

1   drawstrings and he recognized the -- this particular jacket,

2   right?

3   A.  Yes, I did hear him say that.

4   Q.  So you know the existence, the visibility of these

5   drawstrings is important today, right?

6   A.  No, I don't know that, ma'am, because --

7   Q.  And that's why --

8   A.  Because I believe they probably made more than one of

9   those sweatshirts.  So for me to just think my sweatshirt is

10  the one that --

11  Q.  So your testimony here today is when that jacket was in

12  the back seat of the car, it was rolled up in such a way so

13  that the drawstrings were not visible?

14  A.  It was folded up.

15  Q.  Nobody could have seen those drawstrings, right?

16  A.  It was -- you may could, but it was folded up.  It was

17  neatly folded.

18  Q.  Well, you put it there.  You put -- you say you put it in

19  the back seat.  I just want to know whether or not --

20  A.  It's folded up, yes, ma'am.

21  Q.  -- whether or not the drawstrings were visible or not?

22  A.  I don't know.  I can't remember.

23  Q.  Now, you also said, when you put that in the back seat,

24  you had an opportunity to look in the back and see whether or

25  not those gloves were visible, right?

1    A.  Yes, ma'am.

2    Q.  You said, well, you didn't know whether the gloves were in

3    the car or not?

4    A.  Yes, ma'am.

5    Q.  But you knew that when you looked in the back, there were

6    no gloves that were visible, right?

7    A.  Yes, ma'am.

8    Q.  So you are denying the testimony of the police officer

9    when he says that those gloves were visible, right?

10   A.  Yes, ma'am.

11   Q.  Okay.  Now, this is another jacket that was found.  This

12   is Government's Exhibit 39.  You recognize this jacket, right?

13   A.  No, I don't.

14   Q.  You've never seen this jacket before?

15   A.  No, ma'am.

16   Q.  This jacket, you don't think this jacket was recovered

17   from the execution of the search warrant in your house?

18           MR. PEED:  Your Honor, beyond the scope.

19   Objection, Your Honor.  This was not even in the car.  Now

20   he's being asked about stuff that's not even in the car.

21   This is a limited hearing about what happened at the stop.

22           THE COURT:  I have to assess his credibility, now

23   that he has opted to take the stand.  So --

24           MR. PEED:  Yes, Your Honor.

25           THE COURT:  So in assessing his credibility, you

239 of 267

```
1    have to go beyond just what happened on the stop.  Do you

2    understand?

3              MR. PEED:  Of course, Your Honor.

4              THE COURT:  And to a certain extent --

5              MR. PEED:  It's about the defendant's right, need

6    to testify.

7              THE COURT:  I get it, but I also need to assess

8    his credibility.  So overruled.

9    BY MS. SOLTYS:

10   Q.  So you're denying this jacket was seized from your house

11   during the execution of the search warrant?

12   A.  I don't know.  I was incarcerated.  I don't know where.

13   Q.  This isn't your jacket?

14   A.  No, ma'am.

15   Q.  You've never seen this jacket before?

16   A.  No, ma'am.

17   Q.  What about this one, Government's Exhibit number 41.

18   That's your jacket, isn't it?

19   A.  No, ma'am.

20   Q.  Oh, you've never seen that jacket before?

21   A.  No, I never seen it before.

22   Q.  You're surprised to sit here today and see this jacket for

23   the very first time?

24   A.  Excuse me?

25   Q.  You must be surprised, as you sit here today, I show you
```

1      this photograph?

2      A.  Yes, ma'am.

3      Q.  You've never seen this jacket before?

4      A.  No, ma'am.

5      Q.  And you're certain of that, right?

6      A.  Yes, ma'am.

7      Q.  You're as certain as everything else that you've testified

8      here today, right?

9      A.  Yes, ma'am.

10     Q.  How about this exhibit, Government Exhibit 42, have you

11     ever seen that jacket before?

12     A.  No, ma'am.

13     Q.  And if I were to say this was seized from your house on

14     the evening of February the 6th, 2015, you would say, Couldn't

15     have been, right?

16     A.  I never seen it before.

17     Q.  Because it's not your jacket, right?

18     A.  That's right.

19     Q.  You've never seen it before?

20     A.  No.

21     Q.  I put this photo up, again you're surprised, right?

22     A.  Yes, ma'am.

23     Q.  What about this item, Government Exhibit number 32.  Yours?

24     A.  No, ma'am.  I seen it in the car though.

25     Q.  So surprise that this was in the car?

```
1    A.  Was I surprised?

2    Q.  Yeah.

3    A.  No.  Someone else driving that car.  It's not my car.

4    Q.  So it's a rental car, right?

5    A.  Yes.

6    Q.  And your wife Terri Holman leased the car from Enterprise

7    rental, right?

8    A.  Yes.

9    Q.  And you were the one that's operating the car on February

10   the 6th, right?

11   A.  Yes.

12   Q.  Well, whose was this?

13   A.  I don't know who was it.  I don't know, someone else might

14   have dove the car.

15   Q.  Who?

16   A.  I don't know, ma'am.

17   Q.  I'm really curious to know because -- was it her brother?

18   A.  I don't know.

19   Q.  Was it her sister?

20   A.  I can't answer that question, ma'am.

21   Q.  Was it your brother?

22   A.  I can't answer the question.

23   Q.  Well, let's just go through the realm of possibilities

24   then.  Who else could have been driving her car that left

25   their face mask in the car?
```

1    A.  You have to ask Miss Holman.

2    Q.  You tell me.  Who has access to your wife's rental car?

3    A.  I don't know, ma'am.

4    Q.  And the gloves, they're not yours?

5    A.  No, ma'am.

6    Q.  None of them?

7    A.  No, ma'am.

8    Q.  Thirty-four, not your gloves?

9    A.  No, ma'am.

10   Q.  Never -- have you ever seen them before?

11   A.  Yes, ma'am.  I seen them in the car.

12   Q.  You saw them in the car, but they weren't yours?

13   A.  Yes, ma'am.

14   Q.  You never wore them?

15   A.  No, ma'am.

16   Q.  These gloves or any pair that is of this same brand had no

17   business ever being on your hands?

18   A.  No, ma'am.

19   Q.  These gloves have never been on your hands?

20   A.  Not those gloves in the car, ma'am.

21   Q.  Well, what about the ones in the console?

22   A.  No.  Ones in the house, sometimes, I mean, if I can fit

23   them, I may do home -- I may do yard work at home.

24   Q.  So there's a possibility that those gloves aren't even

25   going to fit you?

1    A.   It's a possibility, ma'am.  Big hands.

2    Q.   And the reason that you have never worn these gloves is

3    because these gloves were worn in a series of robberies that

4    occurred in the Washington, Prince George's County area

5    between February '14 and February 2015, right?

6              MR. PEED:  Objection, Your Honor.  Assumes facts

7    not in evidence.

8              THE COURT:  Overruled.

9    BY MS. SOLTYS:

10   Q.   That's why you want to tell this Court, as you sit here

11   today, under oath, that these gloves have never been on your

12   hands?

13   A.   Yes, ma'am.

14   Q.   Thirty-one, this hat, not your hat?

15   A.   That's my hat, ma'am.

16   Q.   This is your hat.  Okay.  So, some of the things that are

17   in the car you admit that -- you admit ownership?

18   A.   Yes, ma'am.

19   Q.   But it's the things that you -- you are going to deny

20   ownership of the items that Detective Johannes testified

21   about, about being worn by the robber, correct?  That's what

22   you're doing here, as you sit here today.  You are denying

23   ownership of the items of clothing that Detective Johannes

24   pointed out were worn by the serial robber, right?

25   A.   Detective said that the robber wore a hat like that, ma'am?

1   Q.  No.  The items that, as you sit here today, that you deny

2   ownership of are the items that Agent Johannes pointed out

3   that was worn by the serial robber?

4   A.  I don't know that, ma'am, because I don't know what the

5   robber wore.

6   Q.  Didn't you hear Agent Johannes testify --

7   A.  Ma'am, I don't believe that the gloves that was in my

8   wife's car are the gloves that the robber wore.

9   Q.  That's not my question.  Did you sit here this morning and

10  listen carefully to Agent Johannes' testimony?

11  A.  Yes, ma'am.

12  Q.  Did you hear Agent Johannes testify about the gloves that

13  were worn in at least five or six of these robberies?

14  A.  The gloves looked like different kinds of gloves, ma'am.

15  Q.  He pointed out the black palm, white or gray on the top

16  and the logo.  Did you hear that testimony?

17  A.  Yes, I did.

18  Q.  Do you agree that those gloves, the gloves in those

19  pictures --

20  A.  I can't agree those are the same gloves, not from the

21  videos I watched.

22  Q.  And what about the jacket?  You heard Agent Johannes

23  testify about the significance of this jacket.  This is your

24  jacket?

25  A.  Yes, ma'am.

1    Q.  This jacket you admit to ownership?

2    A.  Yes, ma'am.

3    Q.  But that one, number 41, not yours?

4    A.  Not mine.

5    Q.  Thirty-one, not yours?

6    A.  Not mine.

7    Q.  Thirty-two?

8    A.  Not mine.

9    Q.  Not yours.  Forty-two?

10   A.  Not mine.

11   Q.  Not yours.  And 34, not yours?

12   A.  Not mine.

13   Q.  Okay.  Now, as you sit here today -- let me ask you this

14   question:  Is it important -- in your mind, do you think it's

15   important for this Court to find that the law enforcement

16   officers illegally searched your vehicle?

17   A.  I don't understand the question.

18   Q.  In preparation for your testimony here today, do you

19   understand that if the Court finds that your car was illegally

20   searched, evidence could be suppressed?

21   A.  I'm -- can you say -- I'm sorry.  Can you say that again?

22   I'm --

23            THE COURT:  Do you understand why we're having the

24   hearing today?

25            THE WITNESS:  Yes.  Yes.

```
1                    THE COURT:  What's your understanding?

2                    THE WITNESS:  For the truth to come out about my

3        car being searched.

4        BY MS. SOLTYS:

5        Q.  What do you think will happen if the Court finds that your

6        car was illegally searched?

7        A.  I don't know.  My lawyer haven't -- he haven't really told

8        me everything that's going to go after today.

9        Q.  He hasn't?

10       A.  No.  I really don't know after today, ma'am.

11                   MS. SOLTYS:  Thank you.  I have nothing further.

12                   THE COURT:  Redirect?

13                          REDIRECT EXAMINATION

14       BY MR. PEED:

15       Q.  Mr. Flowers, you were asked whether you were denying

16       ownership of things that Special Agent Johannes said were in

17       some of the robberies, correct?

18       A.  Yes, she asked me that.

19       Q.  You did say that the blue Champion sweatshirt was

20       yours?

21       A.  Yes, I did.

22       Q.  So you're not denying --

23       A.  No, I'm not.

24       Q.  -- things that he said.

25                   How long have you -- did you live at -- on 57th
```

```
1    Street?

2    A.  I lived there a year or so ago, off and on.  I had

3    problems.

4    Q.  With the periods of separation with Miss Holman?

5    A.  Yes, it was.

6    Q.  Was there periods when you weren't in the house?

7    A.  Yes, it was.

8              MR. PEED:  No further questions.

9              THE COURT:  You're excused.  You may go back to

10   your seat.

11             MS. SOLTYS:  Could I have the Court's indulgence

12   for one moment?

13             THE COURT:  Yes.

14             (Pause.)

15             MS. SOLTYS:  Your Honor, if I could just have the

16   Court's indulgence.  Very briefly, I would like to call

17   Investigator Tridico for one point.  Very succinct.

18             THE COURT:  That's fine.  Good planning on your

19   part, to make sure all the agents stuck around.

20             MS. SOLTYS:  I've learned the hard way.

21             THE COURT:  Investigator Tridico, please come back

22   to take the witness stand.  And you remain under oath.

23             THE WITNESS:  Okay.  Thank you.

24             THE COURT:  Thank you for sticking around.

25             THE WITNESS:  No worries.
```

1        REBUTTAL DIRECT EXAMINATION

2     BY MS. SOLTYS:

3     Q.   Investigator, there came a point in time during this long

4     arrest period involving Mr. Flowers that a woman came to the

5     scene and identified herself as Terri Holman, is that correct?

6     A.   That's correct.

7     Q.   And this vehicle that is depicted in Government's Exhibit

8     number 26, this was the vehicle that she arrived in, is that

9     correct?

10    A.   That is correct.

11    Q.   And did you and other agents and other officers have an

12    opportunity to speak with her regarding this vehicle?

13    A.   I briefly spoke to her.  And my lieutenant, Lieutenant

14    Hebeebullah spoke to her.

15    Q.   Was she asked if law enforcement could search her vehicle?

16    A.   I believe Lieutenant Hebeebullah asked that.

17    Q.   Lieutenant --

18    A.   Hebeebullah.

19    Q.   Do you know how to spell that?

20    A.   It's H-A -- it's two Bs -- H-A-B-B-E something.  We'll

21    work on it.

22    Q.   And I'm not going to ask you to spell her first name, but

23    I am going to ask you if she is a woman?

24    A.   She is a woman, and I just call her Lieutenant.

25    Q.   Was she one of the individuals -- so, did there come a

1    point in time which Miss Holman said law enforcement could

2    search her vehicle?

3    A.   That's correct.

4    Q.   Was it searched on the scene during this period of time?

5    A.   Yes.

6    Q.   Government's Exhibit number 26 is Miss Holman's vehicle,

7    is that correct?

8    A.   That's correct.

9    Q.   Government's Exhibit number 27, do you recognize this as a

10   photograph of the interior of her vehicle?

11   A.   Yes.

12   Q.   And this is a photograph of Mr. Flowers' driver license

13   that was inside of the vehicle, is that correct?

14   A.   That's correct.

15   Q.   And if I could just show you one other photo real quick,

16   which I will make this Government's Exhibit number 46.  This

17   is -- do you recognize that this is the interior -- this is

18   her trunk?

19   A.   That's correct.

20   Q.   So photos were taken of her trunk while the search was

21   being conducted, is that correct?

22   A.   That is correct.

23   Q.   Do you recall who that was doing the search her car?

24   A.   It was Lieutenant Hebeebullah.  I assisted, but it was

25   Lieutenant Hebeebullah who looked around the car.

1    Q.  Okay.  We would call this a search?

2    A.  It was a search.  It was a -- yeah.  Yeah, it was a

3    search.

4    Q.  Not a protective sweep?

5    A.  Correct.  There was no protective sweeping.

6          MS. SOLTYS:  Thank you very much.  I have nothing

7    further.

8                    REBUTTAL CROSS-EXAMINATION

9    BY MR. PEED:

10   Q.  What -- was Mr. Flowers at the scene during the search?

11   A.  I don't know if he stayed the whole time, if he was there.

12   I know Miss Holman was there, but I'm not sure if the

13   defendant was there.  I can't remember that.

14   Q.  Do you see the defendant anywhere in this photo?

15   A.  No.  She's definitely parked up the street.  He would be

16   facing the other way.  He would be down the block.  He

17   wouldn't be that way, he would be behind us.

18   Q.  What's the distance between their vehicles?

19   A.  Six to eight car lengths, maybe less.

20   Q.  And this -- sky looks a little darker.  You don't recall

21   the time of day of the search?

22   A.  It was getting dusk.  It was right about that time.  We

23   were out there -- we were out there a while.

24   Q.  Okay.  So the search of Miss Holman's vehicle didn't occur

25   around noon?

1    A.   Excuse me, sir?

2    Q.   The search of Miss Holman's vehicle did not occur between

3    11:30 a.m. and noon p.m.?

4    A.   No.  She didn't even get there for a while afterwards.

5              MR. PEED:  Thank you.  No further questions.

6              MS. SOLTYS:  I have nothing further.

7              THE COURT:  All right.  You're excused for the

8    second time.

9              THE WITNESS:  Thank you, Your Honor.

10             THE COURT:  All right.  So we've now heard several

11   witnesses today, some we've heard a couple times.  And given

12   all of this information that has come in, do the parties

13   need any additional time to deal with any of the issues that

14   came up at the hearing today before I consider the evidence

15   and the briefing before me now?

16             MS. SOLTYS:  No, Your Honor.

17             THE COURT:  Okay.

18             MR. PEED:  No, Your Honor.

19             THE COURT:  Well, I want to look over the evidence

20   that's been collected and all the testimony that's been

21   presented today before I render a decision on the motion to

22   suppress.  But -- so, I'm going to ask you all to come back,

23   probably next Thursday, since I am in the middle of another

24   trial and the jury will be deliberating.  So I will be able

25   to fit in next Thursday --

1          MS. SOLTYS:  That's fine.

2          THE COURT:  -- my conclusion on the motion to

3     suppress.

4          But I would like to take care of, today, some of --

5     at least one or two of the other motions.

6          So let's turn now to the defendant's motion to

7     severe counts of the indictment, which is ECF number 16.  And

8     since it's your motion, Mr. Peed, do you want to come on up?

9          MR. PEED:  Thank you, Your Honor.  Government and

10    the defense agree on the central point, that this really

11    comes down to a question of what would be admitted in a

12    joint trial.

13         THE COURT:  Let me just ask you some questions

14    about that because -- do you concede, based on the arguments

15    that you made in your motion to severe, that if each of the

16    eight charged robberies would be admissible, even if a

17    separate trial was held on each of the individual counts,

18    that there would be no error in holding a joint trial here?

19         MR PEED:  There would be no prejudice for that

20    reason.  Sometimes defendants also have things they want to

21    testify to, about some counts versus others.  I think

22    today's hearing may require more thought about the scope of

23    Mr. Flowers' testimony.  But, we didn't raise that in our

24    motion, so the defense would agree that the prejudice

25    asserted in our motion is not one that would exist if, as

1     Your Honor stated, the evidence would come in anyway as

2     404(b) in separate trials.

3              THE COURT:  Well, with respect to Mr. Flowers'

4     testimony today, I mean, the government can't introduce it

5     in its case-in-chief, but if Mr. Flowers decided to testify

6     at the trial in this case, it would be perfectly appropriate

7     for the government to use his testimony for impeachment.

8     You understand that?

9              MR. PEED:  Yes.  Absolutely.

10             THE COURT:  But at the same time I also have to

11    evaluate the testimony for its credibility in order to

12    evaluate the weight to give his testimony in regard to the

13    motion to suppress.

14             MR. PEED:  Right.

15             THE COURT:  I just want to make sure that there

16    was no surprise about the scope of the cross-examination.

17             MR. PEED:  There's no surprise there.  The thing

18    that was interesting that I want to spend more time thinking

19    about before making a categorical answer, because there was

20    testimony that some items are Mr. Flowers and some aren't.

21    Obviously, certain things were worn to different robberies.

22    So you may have -- it's a further reason to sever the

23    counts, if there's different answers for different articles

24    of clothing.  The government is trying to lump all the

25    clothing together in one trial.  So that's why I wanted to

1    have that caveat.  But in general, we agree with the Court

2    and the government, that that's the test for that specific

3    form of prejudice.

4              THE COURT:  That's one thing, in your reply

5    papers, that you said.  And I want to make sure I understood

6    what you were trying to say, where you -- you make the

7    statement that trying the District robberies together would

8    introduce the prejudice of asymmetrical evidence.  But it

9    wasn't clear to me and you don't specify in your reply

10   papers, or in your opening brief, which of the eight charged

11   robberies you think are -- have stronger evidentiary cases

12   for the government and which ones are weaker, which would

13   suggest that there's asymmetrical evidence in the charges,

14   which means they shouldn't be tried together.  Could you

15   explain what you're talking about?

16             MR. PEED:  Sure, Your Honor.  This came from a

17   case I cited in which there's more direct evidence tying the

18   defendant to one crime, and the others are just based on

19   modus operandi argument.  So here, for example, the blue

20   sweatshirt, the government will argue, was found in his car

21   right next to Mr. Flowers, whereas other jackets don't have

22   that direct connection to his physical person.

23             THE COURT:  Because they were found at his

24   residence?

25             MR. PEED:  Found at his residence, Your Honor.

1    Yes, that's right.  But a residence which he didn't live

2    full-time.  He had intermittent periods of living there.

3              THE COURT:  He was certainly seen there that day.

4              MR. PEED:  That's correct, Your Honor.  But these

5    would have been worn months prior.  And this is a span of

6    one year, the span between the first and the last crime.

7              Another example would be the Ashley Stewart

8    robbery.  The government has an exhibit of an Ashley Stewart

9    bag found at the defendant's residence; much more of a

10   specific tie to a store than the other robberies were, it's

11   just based on clothing.

12             THE COURT:  If you're able to argue at trial that

13   there's weaker evidence tying the defendant to some of the

14   bank robberies than others, doesn't that work in your favor,

15   as opposed to -- I mean, you're claiming that's giving --

16   prejudicing the defendant, but in some ways doesn't that

17   strengthen your case and raise a reasonable doubt about the

18   defendant's connection to any of the crimes?  So how -- I'm

19   not really following your prejudice argument there.

20             MR. PEED:  The Court makes a fair point.  It is a

21   little bit of a double-edged sword.  But the cases have

22   tended to hold where the evidence for one crime in a

23   multi-count case is very strong, the jury will just sweep

24   the others into a general conviction verdict and just check

25   yes on all of them, instead of taking the time to separate

1    the evidence for each individual one.  And that's what we're

2    concerned about.

3          THE COURT:  All right.  Is there anything else you

4    want to add to your papers you haven't already said?

5          MR. PEED:  I did make the point, I believe in the

6    reply, that the government had made misstatements about some

7    of their evidence, just to show how easy it is to confuse 8,

8    much less 12, much less 32 robberies.  And the government

9    corrected some of that today, but there --

10          THE COURT:  I don't think the government is

11    planning on introducing evidence about 32 robberies.  Are you?

12          MS. SOLTYS:  No.

13          MR. PEED:  They are.  But the ones they made

14    mistakes about are ones they do intend to introduce.

15          THE COURT:  The mistakes you're referring to are

16    what, precisely?

17          MR. PEED:  For example, the government's

18    opposition stated the same blue sweatshirt was used in one

19    Murry's robbery and another Murry's robbery, and that's how

20    we know it was the same person.  It wasn't.  One was an open

21    zipper sweatshirt and the other one was a sweatshirt with no

22    zipper, that was the Champion sweatshirt.

23          I point out if the government, in the calm of

24    preparing an opposition, can't even get straight which

25    sweatshirts were used when, I would question whether a jury,

1    in the heat of the deliberation, would be able to keep all

2    the evidence from all the robberies together and make

3    individual determinations that there's proof beyond a

4    reasonable doubt for each one individually.

5              THE COURT:  Thank you.  Does the government want

6    to respond?

7              MS. SOLTYS:  Your Honor, if I could respond very

8    briefly.  I would like to just make the following arguments:

9    It's really not very often that I get to stand in court and

10   say that the government should be able to do something

11   because the Chief Justice, John Roberts, says it's

12   permissible.  But this is one instance in which I am allowed

13   to do that.  And I make this argument based on the *Lawson*

14   case, which I cited in my papers repeatedly because I think

15   it's an incredibly important case for the issue of severance.

16             The issue here is is there evidence from each case

17   that I can use to contribute to the proof of the identity of

18   the perpetrator in each of the eight robberies, such that

19   each crime itself would be admissible in all of the other

20   offenses?  And the *Lawson* case I think was just right on

21   point for this argument, which is that in that case there

22   was a Maryland robbery, there was a D.C. robbery.

23             The Maryland video surveillance showed a short

24   robber who was wearing sweatpants with a stripe.  That pair

25   of sweatpants had been found in the defendant's vehicle when

1     it was searched.  The defendant was only on trial for the

2     D.C. bank robbery, but evidence of the Maryland bank robbery

3     was admissible.  And, you know, in writing his opinion --

4               THE COURT:  That's in the 404(b) issue?

5               MS. SOLTYS:  It was on the 404(b) issue, but that

6     analysis is the same.

7               THE COURT:  You can rest on your papers.

8               MS. SOLTYS:  Okay.  Thank you.

9               THE COURT:  I'm ready to rule on the severance

10    motion.  This motion is going to be denied.  Federal Rule of

11    Criminal Procedure 8(a) permits joinder in the same

12    indictment of two or more offenses that are, quote, of the

13    same or similar character or are based on the same act or

14    transaction or are connected with or constitute parts of a

15    common scheme or plan, close quote.  See Federal Rule of

16    Criminal Procedure 8(a).  See also *U.S. v. Gooch*, 665 F.3d

17    1318, jump site 1325 through 1326, D.C. circuit case from

18    2012, noting that the issue of joinder of offenses was

19    proper is an issue that is analyzed under Rule 8(a).

20              The D.C. Circuit has repeatedly noted that Rule 8

21    has generally been construed liberally in favor of joinder.

22    *U.S. v. Gooch*, D.C. Circuit again, quoting *U.S. v. Richardson*,

23    161 F.3d 728, jump site 733, a D.C. Circuit case from 1998.

24    The policy reasons underscoring the benefits of joinder were

25    outlined by the Supreme Court in the *Zafiro v. United*

*States*, a 1993 case where the Supreme Court noted that joint trials, quote, play a vital role in the criminal justice system.  They promote, quote, efficiency and serve the interest of justice by avoiding the scandal and inequity of inconsistent verdicts, close quote.  See also U.S. v. Long, a D.C. Circuit case from 1990, noting that joinder promotes the judicial system's strong and legitimate interest in efficient and expeditious proceedings.  And *U.S. v. Robinson*, a D.C. Circuit case from 1970, stating that joinder, quote, expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once, close quote.

Nevertheless, Federal Rule of Criminal Procedure 14 permits a Court to order, quote, separate trials of counts if joinder of offenses or defendants in an indictment appears to prejudice a defendant or the government.  See Federal Rule of Criminal Procedure 14(a).

In considering whether counts should be severed under 14(a) to avoid undue prejudice to a defendant, the D.C. Circuit has counseled that joinder cannot be stretched to cover offenses which are discrete and dissimilar and which do not constitute parts of a common scheme or plan.

1    See *U.S. v. Gooch* again, the D.C. Circuit case from 2012.

2           The burden is on the defendant seeking severance

3    of charges to demonstrate prejudice resulting from a failure

4    to severe.  See *U.S. v. Carson*, a decision from the D.C.

5    Circuit in 2006.

6           The D.C. Circuit has identified related types of

7    prejudice that the court can consider in evaluating whether

8    or not relief under Rule 14 is warranted.  Those three types

9    of -- three types of prejudice the D.C. Circuit has noted

10   are that the jury may accumulate evidence of the separate

11   kinds, the jury may improperly infer a criminal disposition

12   and treat the inference as evidence of guilt, or the

13   defendant may become embarrassed or confounded in presenting

14   different defenses to the different charges.  See *Gooch*,

15   quoting *Blunt v. United States*, a D.C. Circuit case from

16   1968.

17          Set against these standards the defendant's motion

18   for severance of the counts in the indictment fails.

19          First, joinder of all eight bank robberies in the

20   same indictment fully satisfies the requirement in Federal

21   Rule of Criminal Procedure 8(a) allowing joinder of charges

22   against the same defendant that are of the same or similar

23   character.  The crimes charged occurred over a single,

24   fairly short period of under two years.  Close in time to

25   each other, generally in the same neighborhood with the same

general modus operandi of a single man robbing a commercial establishment with a gun.

To the extent that the defendant speculates that each of the eight charged robberies would not be admissible in the trial of each count individually under Federal Rule of Evidence 404(b), he is incorrect.  Given the closeness in time, the similarity in the charged crimes, and the overarching usefulness of all the robberies to be considered together, to piece together the identity of the perpetrator, these crimes would all be admissible under Federal Rule of Evidence 404(b).

Courts have frequently denied motions to severe counts where the charged crimes are similar and are probative of a common plan.  And certainly, in cases like this, this one, where the identity of the perpetrator is the primary issue.  See *U.S. v. Levy*, D.C. Circuit case from 1995 allowing joinder of nine bank robberies, *U.S. v. Carr*, D.C. Circuit case from 2004 allowing joinder of five bank robberies, *U.S. v. Pindell*, D.C. Circuit case from 2003 allowing joinder of 13 counts of armed robbery, and *U.S. v. Stubblefield*, a D.C. Circuit case from 2011 allowing joinder of seven bank robberies.

Moreover, the D.C. Circuit has repeatedly held that there is no prejudicial effect from joinder when the evidence of each crime is simple and distinct, even though

1    such evidence might not have been admissible in separate

2    trials.  See *Gooch*, quoting and the methodology, a seminal

3    case from this District -- from this Circuit, D.C. Circuit

4    case from 1964.

5           Here each of the charged offenses are relatively

6    simple.  Single perpetrator into the individual's commercial

7    establishment, demanded money by brandishing a gun, with

8    other similar operative methodologies used, in terms of

9    talking to the employees, grouping the employees, asking for

10   the safe to be opened and so on.  So each one is distinct,

11   with enormous numbers of similarities in the modus operandi.

12          The defendant next counters that joinder of the

13   counts would result in prejudice due to asymmetrical

14   evidence arising from the joinder of a stronger evidentiary

15   case with a weaker one.  To the extent that the asymmetrical

16   evidence stems from whether the perpetrator wore a Champion

17   branded or another type of sweatshirt in one of more of the

18   charged robberies, the evidence is not so dramatically

19   disparate to cause prejudice.

20          This is especially the case since evidence of

21   other similarities will be presented, such as the use of the

22   distinctive two-toned gloves, white on the outside of the

23   hand, black on the inside of the hand, and other

24   similarities in the methodology used to execute the

25   different armed robberies.

1          Evidence of both the similarities and the

2     distinctions between the charged crimes is important to both

3     the defense and the government's case.  For example, lack of

4     consistency in clothing worn during the commission of the

5     charge crimes can only bolster the defendant's argument that

6     there is a lack of convincing identity evidence in front of

7     the jury.

8          Courts have routinely concluded that cumulation

9     will not necessarily occur just because many counts are

10     involved, the counts are related, and the underlying conduct

11     the same.  See *U.S. v. Singh*, D.D.C. case from 1997.

12          For example, in *Singh* the Court denied a motion to

13     sever counts where the defendants were charged with 16

14     counts of aiding and assisting in the preparation and

15     presentation of false federal income tax returns to the IRS.

16     Again, to the extent that there are differences between the

17     charged offenses, offense conduct, that may only bolster the

18     defendant's case.

19          Finally, the D.C. Circuit has recently held that

20     limiting instructions are sufficient to address prejudice.

21     For example, in *Gooch* the Court cited, approvingly, the

22     trial Court's limiting instructions at both the start and

23     the close of trial that explain to the jury that it was not

24     to infer guilt from the fact of the indictment, the number

25     of charges alleged, or the type of charges brought and that,

1     quote, its finding as to one offense should not control its

2     verdict as to any other offense charged, except as otherwise

3     instructed, and that it must not allow the character of any

4     charge itself to affect the jury's arrival at a verdict.

5     See *Gooch*, 665 F.3d at 1336.

6             These instructions, as well as words of caution to

7     the jury that each offense and the evidence pertaining to it

8     must be considered and decided separately and that the

9     indictment is not evidence, the Court, the D.C. Circuit

10    found were sufficient to combat any prejudice arising from

11    joinder.

12            Accordingly, the defendant's motion in ECF 16 to

13    severe counts is denied.

14            All right.  I think we can fit in one more motion

15    to resolve today.  Although maybe not.  I think we're going

16    to hold off on the remainder of the motions until Thursday.

17    My jury will probably come in at nine, so I will schedule

18    this for Thursday at 9:30, to hear any further argument and

19    to issue my rulings on the motion to suppress, the 404(b)

20    motion, and the Rule 609 motion.  And that will give me time

21    to digest all the evidence today.

22            So, everybody available for Thursday at 9:30?

23            MR. PEED:  (Nods head.)

24            MS. SOLTYS:  Yes, Your Honor.

25            MR. PEED:  Yes, Your Honor.

1          THE COURT:  Of course, I will have a jury out, so

2     we'll have to interrupt our proceedings, if there is a jury

3     note.

4          All right.  With that -- yes?

5          MS. SOLTYS:  Could I just say one thing, Your

6     Honor?  And that is that I did not cite this case in my

7     pleadings but to the extent that the Court has any questions

8     about the legality of the security sweep that was done on

9     the vehicle, I would point the court to *Michigan versus*

10    *Long*, which is 463 U.S. 1032, a 1983 case from the Supreme

11    Court which extended the concept of the *Terry* frisk to a

12    vehicle.

13         THE COURT:  Yes.  Okay.  Anything else?  From the

14    defense?

15         MR. PEED:  If there's time for it, would the Court

16    welcome filings related to the suppression hearing?

17         THE COURT:  You're welcome to do that.  That's why

18    I asked.  Because if you want to have -- if you want to

19    submit something else, I can give you additional time to do

20    so.  And we can --

21         MR. PEED:  I think that's enough time for the

22    defense.

23         THE COURT:  Fine.  If you file it late Wednesday

24    night, it may not be fully digested --

25         MR. PEED:  Understand.

1          THE COURT:  -- by the time I see you Thursday

2     morning.  I will do my best, but it might not be.

3          All right.  Anything further from the government?

4          MS. SOLTYS:  No, Your Honor.  The government does

5     not intend to file anything.

6          THE COURT:  I think that's fine.  All right.  I

7     will see you all Thursday morning at 9:30.  Have a good

8     weekend.

9                              *   *   *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4            I, JANICE DICKMAN, do hereby certify that the above

5       and foregoing constitutes a true and accurate transcript of

6       my stenograph notes and is a full, true and complete

7       transcript of the proceedings to the best of my ability.

8                       Dated this 22nd day of November, 2015.

9

10

11                        /s/_____

12                        Janice E. Dickman, CRR, RMR
                          Official Court Reporter
13                        Room 6523
                          333 Constitution Avenue NW
14                        Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25