```
1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2

     - - - - - - - - - - - - - - - x
3    THE UNITED STATES OF AMERICA,
                                        Criminal Action No.
4                  Plaintiff,          1:15-cr-00023-BAH-1
                                        Friday, November 13, 2015
5    vs.                                2:08 p.m.

6    DAVID FLOWERS,

7                  Defendant.
     - - - - - - - - - - - - - - - x
8

9    _____

10                TRANSCRIPT OF MOTIONS HEARING
          HELD BEFORE THE HONORABLE BERYL A. HOWELL
11                 UNITED STATES DISTRICT JUDGE
     _____

12

13      APPEARANCES:

14      For the United States:       DARLENE MICHELE SOLTYS, ESQ.
                                      U.S. ATTORNEY'S OFFICE
15                                    555 Fourth Street, NW
                                      Room 4110
16                                    Washington, DC 20530
                                      (202) 252-7685
17                                    darlene.soltys@usdoj.gov

18      For the Defendant:           MATTHEW J. PEED, ESQ.
                                      CLINTON BROOK & PEED
19                                    1455 Pennsylvania Avenue, NW
                                      Suite 400
20                                    Washington, DC 20004
                                      (202) 621-1828
21                                    matt@clintonbrook.com

22      Court Reporter:              Lisa A. Moreira, RDR, CRR
                                      Official Court Reporter
23                                    U.S. Courthouse, Room 6718
                                      333 Constitution Avenue, NW
24                                    Washington, DC  20001
                                      202-354-3187

25      Proceedings recorded by mechanical stenography; transcript
        produced by computer-aided transcription
```

1                    P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Matter before the Court,

3    Criminal Case No. 15-23, *United States of America vs. David*

4    *Flowers*.  Counsel, please come forward and identify

5    yourselves for the record.

6              MS. SOLTYS:  Good afternoon, Your Honor.  I'm

7    Darlene Soltys on behalf of the United States, and with me

8    at counsel table is Brandon Coyne, my legal assistant.

9              THE COURT:  Good afternoon.

10             MR. PEED:  Good afternoon, Your Honor; Matthew

11   Peed on behalf of defendant, David Flowers.

12             THE COURT:  Okay.  Good afternoon.

13             Good afternoon, Mr. Flowers.

14             THE DEFENDANT:  Good afternoon.

15             THE COURT:  All right.  So we were going to meet

16   yesterday, but then I got the defense brief, and given the

17   other matters on my schedule I really didn't have time to

18   read that before 9:30 in the morning since I had a jury, so

19   we postponed it until this afternoon.  We still have pending

20   in front of the Court three motions:  the defendant's motion

21   to suppress, the government's motion to admit other crimes

22   evidence under 404(b), and the government's motion to admit

23   evidence under -- for impeachment under 609.  So I am going

24   to begin with the motion to suppress.

25             Mr. Peed, have you said everything you want to say

1    on your motion now?

2            MR. PEED:  Yes, Your Honor.  We'll rest on our

3    paperwork, and I just want to apologize to the Court for the

4    late filing.  I had the flu earlier in the week.

5            THE COURT:  I hope you're feeling better now.

6            MR. PEED:  Thank you.  I am.

7            THE COURT:  And does the government wish to

8    respond?

9            MS. SOLTYS:  Thank you, Your Honor, I do.  And I

10   do appreciate the opportunity to review the pleading because

11   I want to make the point that the defense's strongest

12   argument in his motion, which he did not make and that

13   speaks volumes, is the fact that he did not even reference

14   his client's own testimony in his 18-page pleading.  The

15   defendant testified before the Court last Friday that that

16   Champion jacket was in the back seat and that those gloves

17   were hidden in the pocket.  And if you believe him, if you

18   believe David Flowers, then Detective Howard must have

19   conducted a full-blown search of that car, and Detective

20   Howard must have pulled those gloves out so they were

21   visible, and he must have moved that jacket from the back

22   seat to the front seat thereby arranging all of that

23   incriminating evidence so it was in full view.  And then he

24   necessarily must have lied both on the witness stand as well

25   as in his affidavit.

1          So the question is whether or not the Court can

2     believe the defendant's testimony when he said that that

3     jacket was in the back seat and that those gloves were

4     absolutely hidden from view.  And I would tell the Court of

5     course not.  Even Mr. Peed abandoned any effort to argue his

6     client's credibility before the Court.

7          In evaluating the defendant's credibility, you

8     have to consider his attempt to disassociate himself from

9     those items.  I would submit to the Court that this

10    defendant disavowed knowledge, possession, ownership, use of

11    those items.  Clearly those items match the items of

12    clothing that were worn in the robbery videos.  Most

13    tellingly he could offer no explanation as to who the gloves

14    and who that black lava mask belonged to.  Why?  Because the

15    evidentiary value is overwhelming and his possession of it

16    is so incriminating of his guilt.

17         So if you don't believe the defendant when the

18    defendant testified to this Court that those gloves were

19    hidden from view and that that jacket was in the back seat,

20    then we're done here because that's the only scenario in

21    which the detective would have needed to rearrange the items

22    so that they would have been visible in plain view.

23         Now, I would submit to the Court that the Court

24    should make the following findings of fact based on that

25    long-term investigation.  Police officers clearly had

1    reasonable, articulable suspicion to suspect the defendant

2    of having committed the series of armed robberies.  The

3    Court should consider the description of those items of

4    clothing, that GPS device that was found five doors down

5    from the defendant's residence, the get-away car being

6    identified as a Buick LaCrosse, Mr. Flowers's physical

7    description as it matches the description --

8          THE COURT:  Ms. Soltys, can I just ask you

9    one question that I was a little bit curious about.  And

10   that is, this whole dentist appointment issue with the

11   document -- with the defendant's testimony that he was at

12   the dentist's office that morning, and he has this piece of

13   paper reportedly from the dentist's office, what is the

14   timing of the dentist's office vis-a-vis the attempted armed

15   robbery of the Popeye's?

16         MS. SOLTYS:  Your Honor, the text message that the

17   defendant sent to his wife, which I referenced in the

18   pleading, was at 11:15 in which he said he was at the

19   dentist, and the robbery had occurred at 8:55 that morning.

20   The dentist appointment would have been sometime between

21   11:00 and 12:00, and then the traffic stop is occurring at

22   12:00.  The time of the ticket is 12:00 noon, and then I

23   believe Agent Johannes testified that he arrived just a few

24   minutes after noon.  So I believe that the dental visit

25   occurs at 11:00 after the robbery.

1            THE COURT:  Okay.  Thank you.

2            MS. SOLTYS:  May I?

3            THE COURT:  You may continue.

4            MS. SOLTYS:  Okay.  In addition to the -- as part

5    of the reasonable, articulable suspicion, of course, is the

6    defendant's prior convictions that he has for the exact same

7    charges that exist here and the hard look that he gave to

8    Detective Howard when Detective Howard was standing at the

9    Popeye's looking out.

10           So Howard noticed the defendant in the same car

11   giving him this hard stare, and he said to -- testified he

12   tapped Investigator Tridico and said, "Come on.  Let's go."

13           And Jeff Johannes testified that he wasn't really

14   aware that the detective just left but the detective called

15   him saying, "I'm following the same guy, the same car."

16           Then a few minutes later the detective called him

17   back.  "I pulled him over."

18           Law enforcement is trained to look for any legal

19   alternative reason to stop someone.  Both Detective Howard

20   and Investigator Tridico said that the defendant turned

21   right onto 16th Street without using a signal.  Tridico

22   testified that he was excited when he saw that; that he told

23   Howard, "We should light him up right now."

24           They followed the defendant.  The defendant

25   stopped.

1        Detective Howard said he pulled in after him.

2    Detective Howard characterized it as a contact after a

3    traffic violation.

4        Investigator Tridico later wrote the defendant a

5    warning ticket.  Investigator Tridico said he engaged the

6    defendant.

7        Detective Howard asked for consent.  The defendant

8    made the statement that he now disavows on the witness

9    stand.  Howard said he walked around the car, he looked in,

10   and he saw these two items in plain view:  the hoodie with

11   the white drawstrings and the gloves in the back.  He told

12   Investigator Tridico.

13       Investigator Tridico said, "Detective Howard told

14   me," he said, "look there and look there."

15       Now, Investigator Tridico was not involved in the

16   investigation, and he understood from Detective Howard that

17   these were very important, that they were right there.

18   Howard had pointed out these two items -- the jacket with

19   the drawstring and the gloves -- and Tridico understood that

20   this was very significant.

21       Agent Johannes was notified, and he arrived

22   promptly.  He said Detective Howard pointed out those two

23   items to him, and he immediately realized the legal

24   significance.  He took those two photos.  The items were in

25   plain view.  He testified that, when he arrived, he saw the

1    gloves were sticking up; the jacket was where it was.

2          And then Tridico said that he went and he knocked

3    on Kevin Brown's door to talk to Kevin Brown.  Kevin Brown

4    said that's how he first became aware that something was

5    happening.  And what's important then is that it is

6    Investigator Tridico who said that after he talked to Kevin

7    Brown, the neighbor, he did the cursory sweep for weapons.

8          I would submit to the Court that people can

9    perceive the same event differently; that what to

10   Investigator Tridico was a cursory sweep for weapons, to

11   Kevin Brown may have been a search of the vehicle.

12         And then you heard testimony that the captain

13   arrived, the lieutenant arrived; that they talked about

14   whether Mr. Flowers should be arrested; that Detective

15   Howard said they walked down towards -- further away from

16   the block.  They were having a conversation.  And whether or

17   not they thought that they had probable cause to arrest or

18   not is irrelevant as to whether or not there was or not.

19         The defendant was arrested.  A search warrant

20   affidavit was then drafted.

21         It was late Friday night.  They had to rush.  They

22   had to call the mayor's command center to get a judge on a

23   Friday night at his residence.

24         Are there any innocent mistakes in the search

25   warrant affidavit?  Possibly.  But that certainly doesn't

1    rise to the level of a deliberate falsehood or reckless

2    disregard for the truth, and that's what Franks is concerned

3    with.

4              There was -- he says it was not a traffic stop.

5    The detective characterized it as a contact after a traffic

6    violation.

7              The detective characterized the vehicle in the

8    12/26/2014 traffic camera shot as consistent with a Buick

9    LaCrosse.  That's what they know the vehicle to be now.  On

10   12/26 Prince George's County thought that it was a small

11   SUV-type vehicle.  That's a distinction without a

12   difference.

13             And then finally, defense counsel tries to argue

14   that there is this one line in the affidavit, which if I

15   could have the Court's indulgence...

16             In Paragraph 16, the very last two sentences are:

17   "Flowers was wearing a black jacket, blue jeans and brown

18   boot.  Detective Howard immediately recognized these

19   clothing items as the same ones depicted in the video."

20             I would submit to the Court that you simply cannot

21   read the affidavit and stop right there and only focus on

22   those two sentences.  If the Court looks at the entire

23   affidavit, you would notice that, for example, Page -- for

24   example, Paragraph 4, "dark-colored hoodie with white

25   strings hanging from the neck, light-colored gloves";

1      Paragraph 5, "dark hooded sweatshirt with white

2   strings hanging from the neck, brownish-colored work boots";

3      Paragraph 6, "black hooded sweatshirt with the

4   hood up";

5      Paragraph 7, "dark-colored hoodie, blue jeans,

6   white gloves that were two-toned, black-colored palm, white

7   on the back of the hand, brown work boots";

8      Paragraph 8, "gray gloves, light blue jeans,

9   dark-blue hoodie, light-brown work boots";

10      Paragraph 10, "blue jeans, gray-and-black gloves";

11      Paragraph 12, "dark-colored hoodie with white

12   strings hanging from the neck, white-and-black gloves";

13      Paragraph 14, "dark-colored hoodie with white

14   strings hanging from the neck, two-toned colored gloves";

15      And then Paragraph 16.  And if you read Paragraph

16   16 in its entirety, you will see that the description is

17   that "Detective Howard saw in plain view in the front

18   passenger seat a hooded sweatshirt with white strings

19   hanging from the neck.  He also observed a black skull cap

20   and a dark-colored shirt also on the front passenger seat.

21   He also observed the tip of gloves in the storage pocket on

22   the rear of the driver's seat.  Detective Howard saw that

23   the gloves were two-toned in color.  The palms were black,

24   and the back of the hands were white.  Detective Howard is

25   the primary detective assigned to the robbery task force and

1  had viewed the video footage from each of the robberies.

2  Flowers was also wearing a black jacket, blue jeans and

3  brown boots.  Detective Howard immediately recognized these

4  items" -- "these clothing items as the same ones depicted in

5  the video."

6          And in the pleading, the defense counsel tries to

7  argue to the Court that we're only talking about the black

8  jacket, the blue jeans, and the brown boots where it's

9  clear, if you read the four corners of the affidavit, you'll

10  see that these clothing items, as the same ones depicted in

11  the video, are referencing all of the previous --

12          THE COURT:  I understand your argument.

13          MS. SOLTYS:  Thank you, Your Honor.

14          THE COURT:  Thank you.

15          MR. PEED:  May I give a brief response, Your

16  Honor?

17          THE COURT:  Brief response.  I'm bound and

18  determined to get through these motions today.

19          MR. PEED:  Understood, Your Honor.

20          For the record, there's not any disavowment of my

21  client's testimony by not including it in the pleading.  It

22  seemed more persuasive to me just to focus on the

23  government's evidence because I believe it's the

24  government's evidence that proves the defense's position.

25          For example, the government makes the argument

1      that Mr. Flowers is not credible because he has prior

2      convictions, because he gave the police a hard look,

3      but this just plays into our favor because, again, if

4      Mr. Flowers was aware in conducting a counter-surveillance,

5      then it makes it all the more incredible that he would leave

6      the key evidence in plain view as he drove by the police

7      with such a close eye shot.

8              I would like to point out, to the extent that

9      there are inconsistencies between the government's account

10     and the defense account, that where there is an ability to

11     test a third party, it goes to Mr. Flowers's favor.  I'm

12     thinking of the questions like:  Was there a search?  Was he

13     going to Mr. -- did he have prior arrangements to go to

14     Mr. Brown's house?  And then the only other dispute is was

15     this evidence in plain view?

16             THE COURT:  Does it really matter whether he was

17     going to Mr. Brown's house or not?

18             MR. PEED:  It matters, Your Honor, because it's a

19     disagreement between -- not in and of itself, but as a

20     contradiction between Mr. -- Detective Howard's testimony

21     and Officer Tridico's testimony and Mr. Flowers's.  There's

22     a question of credibility so I'm trying to find points of

23     disagreement between them.

24             THE COURT:  I don't even want to belabor this

25     point it's so beside the point.  Mr. Flowers told the police

1    officer.  The police officer said he was there to visit a

2    friend.  You know, Mr. Brown, for whatever reason, told the

3    police apparently, according to the police, he wasn't

4    expecting him.  He said on the stand he was.

5            Really, it's all totally beside the point.  Please

6    don't -- let's not waste any more time on that.

7            MR. PEED:  Okay, Your Honor.

8            To the government's long recitation of the rest

9    of the affidavit, why is Paragraph 16 so important?  What

10   Mr. Flowers was wearing that day was blue jeans, work

11   boots --

12           THE COURT:  I understand your point on that,

13   Mr. Peed.

14           MR. PEED:  So I'm not sure which point I --

15           THE COURT:  Well, you have made the point, in your

16   original brief and in your supplemental brief, about how you

17   think Paragraph 16 should be interpreted.  And you've

18   pointed out different --

19           MR. PEED:  Thank you, Your Honor.  I wasn't going

20   to go to how it should be interpreted, but just that what

21   was unique about it -- the reason it would go especially to

22   probable cause is because he was found on the same day, and

23   if those clothes matched a robbery on that same date, that's

24   highly probative.  If it matched other robberies in the

25   past, it would be probative if those clothes are unique.  If

1     those clothes are not unique -- they're common winter

2     clothes, jeans and work boots -- then it doesn't matter so

3     much that they matched other robberies from months earlier.

4     It matters that they matched the ones he was suspected of

5     committing that day.

6          So when Officer Howard said he was wearing clothes

7     that matched a video from that day, the defense's

8     interpretation, which was confirmed by Detective Howard,

9     that is why that became especially incriminating and also

10    was especially false.

11          THE COURT:  Okay.

12          MR. PEED:  Thank you, Your Honor.

13          THE COURT:  Thank you.

14          Okay.  I'm ready to rule on Mr. Flowers's motion

15    to suppress statements and physical evidence, which is

16    docketed at ECF No. 14.

17          Now, having had an opportunity to review the

18    defense supplemental 18-page brief filed yesterday morning,

19    this supplemental brief uses, to my mind, fairly

20    inflammatory language to describe the testimony of three law

21    enforcement officers who testified during the suppression

22    hearing.  This supplemental brief calls the testimony of

23    these officers a fictionalized account -- that's a quote --

24    of what occurred -- see the defendant's supplement at Page 8

25    docketed at ECF No. 28 -- and accuses the three law

1     enforcement officers of, quote, constructing a narrative to

2     obtain a search warrant in order to retroactively sanitize

3     the legally obtained evidence, the same page of the

4     supplement.

5                Despite the flowery inflammatory language used in

6     this supplement, I have to say that the Court's perspective

7     on the testimony elicited from the three law enforcement

8     officers is far different from the characterization given by

9     the defense memorandum.  The Court finds the officers'

10    testimony highly credible.  Where errors were made in the

11    affidavit used to support the two search warrants at issue,

12    the officers acknowledged those errors and provided clearly

13    understandable reasons for human error made in the drafting

14    of search warrants late on a Friday night after a very long

15    day.

16                After consideration of the evidence presented at

17    the extensive suppression hearing on Friday, November 6,

18    2015, where testimony was elicited from six witnesses,

19    including Mr. Flowers, upon review of all the exhibits and

20    the briefs filed in connection with this motion, I find that

21    the defense motion to suppress the evidence and statements

22    must be denied.

23                I'm going to give my explanation now.  I'll begin

24    by summarizing the evidence presented at the suppression

25    hearing from FBI Special Agent Johannes, MPD Detective

1    Howard, MPD Investigator Tridico, Mr. Kevin Brown,

2    Ms. Sherill Copeland, and the defendant, Mr. Flowers, that

3    are pertinent to resolving the defendant's motion to

4    suppress his statement and physical evidence seized from his

5    vehicle.  As I've already pointed out in questioning, I

6    think some of the evidence that was elicited and that I

7    heard about are just immaterial to resolution of this

8    motion.

9         To begin, on February 6, 2015, around 8:50 a.m., a

10   man walked into a Popeye's Restaurant at 2721 Naylor Road,

11   S.E., Washington, D.C.  The man, described as a black male,

12   light complexion, about six-foot-three tall in height,

13   wearing a dark-colored hoodie with white drawstrings with a

14   small "C" logo over the breast, dark pants, dark shoes, a

15   black face mask and two-toned gloves, brandished a silver-

16   colored gun and demanded money.  This perpetrator was

17   unsuccessful, however, and fled without obtaining any money.

18        FBI Agent Johannes confirmed, with an employee on

19   the scene, the description of the assailant and the method

20   of robbery or attempted robbery, and it matched the

21   description and method of a string of other armed robberies

22   in the area.

23        Investigation of the previous armed robberies had

24   already made the defendant the primary suspect.  Some of the

25   salient facts, not all, from the prior armed robberies

1     included that, one, a GPS device hidden in a cash pack

2     stolen during an armed robbery of a CVS in Maryland on

3     December 26, 2014, led the police to a cul-de-sac near the

4     intersection of 57th Street and Foote Street.  The same GPS

5     device showed that the perpetrator stopped at the

6     intersection of Southern Avenue and East Capitol Street,

7     S.E., where a traffic camera captured the picture of two

8     vehicles, one of which appeared to be a gold-colored four-

9     door sedan, and the cul-de-sac where the GPS device was

10    found smashed up was near the residence, about five houses

11    down, from the residence of the defendant.

12          Two, an armed robber matching the description of

13    the December 26, 2014, robbery as well as several other

14    robberies, armed robberies, attempted to rob a KFC in

15    Maryland on February 5, 2015.  Security footage of the

16    parking lot revealed that the armed robber fled the KFC in a

17    silver or gold newer model Buick LaCrosse.

18          Three, the night of the KFC armed robbery,

19    February 5, 2015, the police put together these two

20    important pieces of information and canvassed the area

21    around 57th Street and Foote Street, N.E., looking for a

22    silver or gold newer model Buick LaCrosse.  And guess what?

23    During this canvass the police found both a gold and a

24    silver 2015 Buick LaCrosse parked in front of the

25    defendant's residence, as I mentioned before, a mere five

1    houses away from where the GPS device was disabled following

2    the CVS robbery on December 26, 2014.

3         The very next day, on February 6, 2015, a Popeye's

4    on Naylor Road reported the attempted robbery.  FBI Agent

5    Johannes interviewed the employee and confirmed that the

6    perpetrator of the attempted robbery matched the description

7    of the previous armed robberies, including at the CVS and

8    the KFC.

9         MPD Detective Howard, responding to the attempted

10   robbery at Popeye's, an hour later observed the driver of a

11   gold Buick LaCrosse at a nearby traffic light looking

12   apparently at the police activity of Popeye's.  At this

13   point the detective knew that a gold Buick LaCrosse was

14   associated with the defendant and, from his experience,

15   perpetrators often return to the scene of the crime in order

16   to see what the police might know.  Based on this, Detective

17   Howard and his partner, Investigator Tridico, decided to

18   follow the gold Buick LaCrosse, which had the same license

19   number as the gold Buick LaCrosse the officers knew was

20   leased by the defendant's wife.

21        And you're going to hear this weird noise from the

22   roof.  Apparently when there's a wind outside, I sometimes

23   hear it, but the roof is not collapsing.  We are all safe.

24        At the intersection between Good Hope Road and

25   16th Street, S.E., the Buick made a right turn onto 16th

1     Street without using a turn signal.  Both officers,

2     Investigator Tridico and Detective Howard, observed this

3     failure to use a turn signal, although Detective Howard also

4     testified that he had earlier observed the defendant failing

5     to signal before changing lanes.  The officers followed the

6     Buick onto 16th Street, but before they were able to pull

7     the car over, the defendant pulled over of his own accord on

8     Ridge Place, S.E.  After the defendant voluntarily stopped,

9     the officers turned on their emergency signal briefly to let

10    the driver know that they were police.

11          Then, Investigator Tridico approached while the

12    defendant was getting out of the car -- or maybe he was

13    already out of the car; it's also immaterial -- and had a

14    brief conversation with him, patted him down, and asked him

15    to sit on the curb.  The limited conversation between

16    Officer Tridico and the defendant in this initial encounter

17    is not at issue since the government does not intend to

18    introduce any of those statements or any part of that

19    conversation in its case-in-chief.

20          The defendant disputes whether he committed a

21    traffic violation and testified that he could not have made

22    a right turn without a turn signal because he's always been

23    a careful driver.  The defendant also testified that he was

24    fully out of the car when first approached by Officer

25    Tridico.

1           Even if the Court found the defendant's testimony

2      credible, it would be irrelevant because both the police and

3      the defendant consistently testified that the defendant

4      stopped voluntarily, a point admitted by the defendant in

5      his supplemental brief.  Moreover, the defendant also

6      concedes that even absent any traffic violation the police

7      had reasonable suspicion to stop the defendant, citing the

8      defendant's supplemental memorandum at Page 14 stating,

9      "Here, Detective Howard had a reasonable, articulable

10     suspicion that Mr. Flowers was involved in several armed

11     robberies."

12           Detective Howard observed that the defendant

13     matched the physical description of the perpetrator from the

14     string of armed robberies, including a Popeye's that very

15     morning.  The detective walked around the Buick and

16     testified that he observed in plain view, first on the front

17     passenger seat, a dark hooded sweatshirt with white

18     drawstrings hanging from the neck similar to the sweatshirt

19     observed by the perpetrator in the previous armed robberies,

20     a black skull cap, and a dark-colored shirt.  He also

21     observed in the storage pocket in the rear of the driver's

22     seat the tip of what looked like black-and-white two-toned

23     gloves.  These distinctive two-toned gloves were worn by the

24     perpetrator in previous armed robberies.

25           The defendant does not dispute that these items

1   were in the car he was driving.  Instead, the defendant

2   testified that these items were not in plain view and were

3   only discovered after the MPD officers searched his car.  He

4   testified that the sweatshirt was folded on the back seat

5   with the white drawstrings carefully hidden and that the

6   gloves were fully concealed in the storage pocket in the

7   rear of the driver's seat because he hadn't seen them

8   before.  Thus, he does not accuse the police of planting

9   evidence, but of moving evidence.

10          Even if the sweatshirt had been on the back seat,

11   it would still have been in plain view.  Also, at the same

12   time the police were supposedly moving evidence, they failed

13   to move into plain view a very incriminating black face mask

14   that was used by the perpetrator of the robberies from the

15   front seat console to the seat.  This makes no sense.

16          The Court finds the veracity of the defendant's

17   testimony on this issue highly questionable in light of his

18   denial of ownership of the gloves in the rear pocket at the

19   same time he admits to using similar gloves found in his

20   residence.  Also, the Court has a hard time believing the

21   defendant carefully folded his sweatshirt in the back seat

22   with the drawstrings carefully hidden, particularly after

23   seeing pictures of the state of the defendant's residence in

24   Exhibit 37 which shows clothes and other items strewn all

25   over chairs.  I didn't see one item that was carefully

1    folded up.  In short, the Court does not credit the

2    defendant's testimony for these and other reasons.

3          After seeing these articles of clothing that

4    matched the clothing items used by the perpetrator in the

5    previous armed robberies, the detective asked the defendant

6    for consent to search the car.  The defendant responded, "If

7    you do, you're going to lock me up anyway," and refused

8    consent.

9          At this time, believing that the defendant may be

10   the perpetrator in a string of armed robberies, Detective

11   Howard asked Investigator Tridico to perform a security

12   sweep of the car to search for any firearms.

13         The detective then called in additional officers

14   to the scene, including Special Agent Johannes.  The

15   detective, understanding the importance of the case and the

16   amount of law enforcement resources from multiple agencies

17   in this metropolitan region that had been committed for over

18   a year to conducting this investigation -- from the FBI, the

19   MPD, and PGPD police -- Detective Howard consulted with his

20   superiors at MPD before arresting the defendant.

21         The defendant's wife also arrived at the scene.

22   She drove the same car model as the defendant, a silver 2015

23   Buick LaCrosse instead of gold.  The defendant's wife

24   consented to a search of her car.

25         After the defendant was taken into custody,

1    Detective Howard, along with Investigator Tridico, Special

2    Agent Johannes, and a number of other officers who

3    participated in the task force investigating the serial

4    armed robberies, reviewed the cumulative facts in the

5    ongoing investigation while another officer drafted the

6    affidavit describing how the task force came to suspect the

7    defendant and the events leading up to the defendant's

8    arrest.  MPD officers then obtained search warrants for the

9    gold Buick LaCrosse as well as the defendant's home based on

10   the affidavit sworn to by Detective Howard.

11        As a result of the vehicle search, law enforcement

12   recovered, among other things, a dark-blue sweatshirt with a

13   white "Champion" logo and two white drawstrings hanging from

14   the front, white plastic bags, gloves with a black rubber

15   bottom and whitish/gray top with a Memphis Foam design on

16   top, and a black head cover mask from the vehicle search.

17        As a result of the search of the defendant's home,

18   law enforcement recovered additional clothing and shoes

19   consistent with those described by witnesses of the armed

20   robberies and depicted in surveillance videos, and this

21   included a black jacket with two zippers, a dark hooded gray

22   sweatshirt with fluorescent green drawstrings, a light gray

23   hooded sweatshirt, two-toned Memphis Foam gloves similar to

24   those found in the car in which the defendant was -- the

25   defendant was driving when he was arrested, plastic bags

1    matching those used in some of the robberies, and a black BB

2    pistol.

3            The defendant moved to suppress the one statement

4    he made to Detective Howard on the date of his arrest on

5    grounds that this statement was obtained pursuant to an

6    illegal *Terry* stop, and he's also moved to suppress physical

7    evidence seized from his car and residence contending that

8    the search warrants were based on materially false

9    statements, and that, after those false statements are

10   removed, probable cause is lacking.

11           The Fourth Amendment prohibits law enforcement

12   from conducting unreasonable searches and seizures, and this

13   protection extends to a brief investigatory stop of persons

14   or vehicles whether or not an arrest follows.  See *US v.*

15   *Bailey*, a D.C. Circuit case from 2010, *US v. Arvizu*, a

16   Supreme Court case from 2002, and *Terry v. Ohio*, a Supreme

17   Court case from 1968.

18           Generally searches must be supported by a warrant

19   obtainable upon a showing of probable cause.  See *US v.*

20   *Jackson*, a D.C. Circuit case from 2005.  Searches that are

21   conducted without prior approval by a judge are per se

22   unreasonable under the Fourth Amendment subject only to a

23   few specifically established and well-delineated exceptions.

24           To prevail on this suppression motion due to a

25   Fourth Amendment violation, the defendant must first

1    establish that the search or seizure was illegal, and in

2    this case, the defendant must demonstrate the illegality of

3    the officers' original *Terry* stop of the defendant and the

4    subsequent search of his vehicle and home pursuant to search

5    warrants.

6            I'll first address whether the officers conducted

7    a lawful stop at which -- pursuant to which the defendant

8    made the statement that he now seeks to suppress.

9            The testimony at the hearing established that two

10   officers witnessed the defendant committing a traffic

11   violation by making a right turn without a turn signal for

12   which a warning was written.  When evaluating the

13   reasonableness of a traffic stop, courts only examine

14   whether the stop was objectively reasonable.  The subjective

15   intent of the officer plays no role in the analysis.  See

16   the Supreme Court's case from 1996 in *Whren v. United*

17   *States*.  Thus, when officers observe a traffic violation,

18   stopping the vehicle is objectively reasonable and therefore

19   does not violate the Fourth Amendment.  See *US v. Mitchell*,

20   a D.C. Circuit case from 1991.  Even a traffic stop that was

21   a mere pretext for a search, if it was supported by

22   objectively reasonable circumstances, is reasonable.  See

23   *Mitchell*.

24           Thus, regardless of the officers' actual

25   motivations for the stop, a traffic stop is reasonable under

the Fourth Amendment so long as the police have probable

cause to believe that a traffic violation has occurred.

Once a motor vehicle has been lawfully detained

for a traffic violation, the police officers may order the

driver to get out of the vehicle without violating the

Fourth Amendment's proscription of unreasonable searches and

seizures.  See the Supreme Court case in *Pennsylvania v.*

*Mimms* from 1977.

The defendant disputes whether he committed a

traffic violation warranting a traffic stop not with a

specific memory of the day in question, but because

generally, he testified, he drives very cautiously and would

not make turns without turn signals.  While the Court finds

the defendant's testimony about whether he used his turning

signal to be unspecific and self-serving, there is no need

to resolve this dispute between his testimony and that of

the officers since he pulled his car over without being

stopped by the police.

The defendant's contact with the police did turn

into a *Terry* stop after he was patted down and asked to stop

and sit on the curb.  The law is clear that as an exception

to the Fourth Amendment's warrant requirements, officers may

conduct a brief investigative *Terry* stop so long as they

have reasonable, articulable suspicion of criminal conduct.

See *US v. Goddard*, a D.C. Circuit case from 2007, citing the

1     Supreme Court's case in *Illinois v. Wardlow*.

2            While *Terry* stops require only that the officers

3     have the minimum level of objective justification, the

4     prohibition against unreasonable seizures requires that all

5     seizures, even ones involving only a brief detention short

6     of traditional arrest, be found upon reasonable, objective

7     justification.  See *US v. Gross*, a D.C. Circuit case in

8     2015.

9            Here, Detective Howard has articulated with

10    specificity suspicion of criminal conduct.

11           First, Detective Howard testified he had seen the

12    defendant eyeing curiously or staring hard at the police

13    investigation of the attempted robbery of Popeye's earlier

14    on the same day when the defendant drove by in the Buick.

15           Second, Detective Howard and Special Agent

16    Johannes testified that the defendant's car, this gold Buick

17    LaCrosse, was associated with a string of armed robberies in

18    the nearby area, the result of a months-long investigation

19    following a key breakthrough after an armed robbery of the

20    CVS pharmacy in Maryland on December 26, 2014.

21           I've already described the circumstances leading

22    up to the discovery of the defendant as the primary suspect

23    in this string of armed robberies in the surrounding area.

24           Third, Detective Howard testified that in his

25    experience criminals often return to the scene of the crime

1    in order to glean information about the police's

2    investigation.

3          Fourth, Detective Howard and Investigator Tridico

4    saw the defendant commit a traffic violation by turning

5    without a proper right turn signal.

6          Putting all of these circumstances together, MPD

7    officers had sufficient reasonable suspicion to stop the

8    defendant after he pulled over and asked for consent to

9    search his car.  See *US v. Davis*, a D.C. Circuit case from

10   2000 finding reasonable suspicion to perform an

11   investigative stop when the defendant matched the

12   description of the primary suspect of a shooting.

13         See *US v. Brown*, a D.C. Circuit case from 2003

14   finding reasonable suspicion to support a *Terry* stop where

15   police officers in a high crime neighborhood stopped

16   defendants who were in a car close to where gunshots had

17   been fired, one of whom behaved peculiarly, including sizing

18   up the officers and doing -- engaging in other activity.

19         See also *US v. Abdus-Price*, a D.C. Circuit case

20   from 2008 where the Court found the police officers had

21   reasonable suspicion to stop the defendant whose car looked

22   similar to, though with some discrepancies, the car used in

23   an earlier armed robbery.

24         The defendant appears to argue that even though

25   the officers had sufficient reasonable suspicion for a *Terry*

1     stop of the defendant, the stop, which took about an hour,

2     took too long.  Certainly the Supreme Court instructed in

3     *Florida v. Royer* from 1983 that an investigative detention

4     must be temporary and last no longer than is necessary to

5     effectuate the purpose of the stop and that the

6     investigative methods employed should be the least inclusive

7     means reasonably available to verify or dispel the officers'

8     suspicion in a short period of time.

9            As the D.C. Circuit explained in *US v. Hutchinson*

10    in 2001, typically this means that the officer may ask the

11    detainee a moderate number of questions to determine his

12    identity and to try to obtain information confirming or

13    dispelling the officer's suspicions.  Unless the detainee's

14    answers provide the officer with probable cause to arrest

15    him, he must then be released.

16           In this case, the detention of the defendant was

17    only as long as necessary for Detective Howard to consult

18    with his supervisors about the nature of the evidence

19    supporting probable cause for the arrest and the

20    identification of the defendant as the perpetrator of the

21    string of armed robberies.  Once this consultation took

22    place, the defendant was arrested.

23           While the defendant seeks to suppress evidence as

24    a result of law enforcement's cautious and deliberate

25    approach to the defendant's arrest, the Court finds the

1    duration of the *Terry* stop was not excessive, but just long

2    enough for this consultation and deliberation to occur.

3    Therefore, I find that the investigative stop of the

4    defendant was supported by reasonable suspicion, and during

5    this investigative stop the defendant made a single

6    statement in response to a request to search his car that

7    the defendant seeks to suppress.

8         Now, the Supreme Court in *Miranda v. Arizona* from

9    1966 held that the prosecution may not use statements,

10   whether exculpatory or inculpatory, stemming from custodial

11   interrogation of the defendant unless it demonstrates the

12   use of procedural safeguards effective to secure the

13   privilege against self-incrimination.  The well-settled

14   procedural safeguards of *Miranda*, however, apply only when

15   there is custodial interrogation.  See the D.C. Circuit case

16   in *US v. Vinton* from 2010.  A custodial interrogation is

17   questioning initiated by law enforcement officers after a

18   person has been taken into custody or otherwise deprived of

19   his freedom of action in any way.

20        Volunteered statements of any kind are not barred

21   by the Fifth Amendment.  See *Miranda*.  Any statement given

22   freely or voluntarily without any compelling influences is,

23   of course, admissible in evidence without *Miranda* warnings.

24        In this case, the defendant contends his statement

25   to the MPD officers prior to his arrest should be suppressed

1    because he was illegally detained.  The Court disagrees.

2          First, the hearing demonstrated that Detective

3    Howard had reasonable suspicion to stop the defendant's car

4    not only because he committed a traffic violation when he

5    did not turn on his turn signal in making a right turn, but

6    also based upon the accumulation of evidence from the

7    ongoing investigation of multiple bank robberies.  Thus, the

8    *Terry* stop was lawful.

9          Furthermore, the defendant concedes that the MPD

10   officers had reasonable suspicion to perform a *Terry* stop

11   stating -- making that statement clear on Page 14 of the

12   supplemental brief.

13         The defendant states on Page 2 of the supplemental

14   brief that, quote, it makes no sense to invent a traffic

15   stop to explain the interrogation of a person for whom there

16   was ample justification for a *Terry* stop.  The Court agrees.

17   It would make no sense to invent an unnecessary traffic

18   violation, as the defendant suggests that Detective Howard

19   did, and further agrees that there was, indeed, ample

20   justification for a *Terry* stop.

21         Second, the fact that the defendant made the

22   statement at issue before he had been given any Miranda

23   warnings does not matter if he was not in custody; and here,

24   when the defendant made the statement, he was not

25   handcuffed.  He had not been arrested.  Only two police

1    officers were on the scene, and no guns were drawn.  The

2    defendant was not in custody requiring the giving of any

3    Miranda warnings.

4         Finally, the defendant volunteered the statement

5    he now seeks to suppress.  Defendant Howard only asked for

6    his consent to search the car, to which question the

7    defendant was free to respond yes or no.  Instead, the

8    defendant stated, "If you do, you are going to lock me up

9    anyway," before denying the consent.  The statement was

10   freely and voluntarily given, thus the Court finds no basis

11   to exclude this statement, and the defendant's motion to

12   suppress this statement is therefore denied.

13        Now I'm going to turn to the legality of the

14   search the defendant's vehicle and residence.

15        Detective Howard walked around the defendant's

16   voluntarily parked car and saw in plain view on the front

17   passenger seat the dark hooded sweatshirt with the white

18   drawstrings hanging from the neck and from the rear driver's

19   seat, the tips of distinctive two-toned gloves, as well as

20   other items.  These two items matched the clothes worn by

21   the perpetrator in a string of armed robberies.  After the

22   defendant declined to give consent to search the car more

23   thoroughly, the defendant was arrested.

24        The defendant argues for the first time on Page 17

25   of his supplemental brief that the investigatory stop turned

1    into a de facto arrest making evidence obtained from the

2    stop the fruit of an unlawful detention.  The defendant was,

3    in fact, arrested during the encounter with the police after

4    Detective Howard saw the items in plain view in front of the

5    car.  At this point the Court finds that there was probable

6    cause to arrest him.

7           In any event, the physical evidence in this case

8    was not seized pursuant to the arrest.  Instead, in a

9    commendable exercise of caution, the police only searched

10   the car driven by the defendant and also searched his

11   residence after obtaining two search warrants signed by a

12   judge of the Superior Court.

13          The defendant does not argue that the search

14   warrants, based on Detective Howard's affidavit, failed to

15   show sufficient probable cause for the searches if the

16   contents are accepted as true.  Rather, he challenges the

17   veracity of the affidavit alleging it contained falsehoods

18   and material omissions as the basis for arguing the lack of

19   probable cause to search both the car and the residence.

20          The defendant challenges five statements in the

21   affidavit in support of the search warrant as material

22   falsehoods, and I'm just going to go through those five.

23          First, the defendant disputes Paragraph 16 of the

24   affidavit which stated that, quote, the Buick made a right

25   turn without using a turn signal, and Detective Howard

1    conducted a traffic stop.  The Court's already found that

2    Detective Howard's and Investigator Tridico's corroborating

3    testimony to be credible and that the defendant did commit a

4    traffic violation.  Additionally, the defendant, in his

5    supplement, admits that he had voluntarily parked his car

6    before he was approached by the police.  Therefore, whether

7    the defendant committed a traffic violation is immaterial,

8    and this challenge to the veracity of the affidavit is

9    therefore rejected.

10           Second, the defendant challenges the veracity of

11   another part of Paragraph 16 stating that -- the part of

12   Paragraph 16 that states, "Based on the foregoing, Detective

13   Howard placed Flowers under arrest."  And the "foregoing" is

14   Detective Howard's recognition of clothing items in the car.

15   The defendant argues in his supplemental brief that though

16   the sentence strongly implies that Detective Howard

17   immediately arrested Mr. Flowers upon viewing his

18   incriminating clothes through the car window without passage

19   of time, the defendant was actually arrested, quote, 45

20   minutes to an hour after he was initially stopped for

21   questioning.  The Court notes that Paragraph 16 of the

22   affidavit itself does not actually mention the timing of the

23   arrest and states merely the defendant was arrested when

24   officers recognized the clothing items in the defendant's

25   car as the same ones as those depicted in a number of

1    surveillance videos.

2         And Detective Howard also testified about the

3    amount of time it took for his lieutenant to come to the

4    scene.  He also called to have Agent Johannes come to the

5    scene, and he also called his district captain to come to

6    the scene so that he could confer with them to make sure

7    that he was doing everything by the book in such an

8    important investigation.  All of these phone calls -- all of

9    those confirmations took some time.  The Court finds that

10   Detective Howard's careful handling of the arrest not

11   suspicious, but rather, as I said before, commendable.

12         At the very least, whether Detective Howard

13   immediately arrested the defendant or arrested the defendant

14   after 45 minutes to an hour of conferring with his partners

15   and superiors is immaterial to whether he had probable cause

16   to search the defendant's car, and I don't find that this

17   particular challenge to the alleged -- you know, to the

18   veracity of Paragraph 16 to have any merit whatsoever.

19         The third challenge the defendant makes to the

20   veracity of the affidavit is to yet another part of

21   Paragraph 16 of the affidavit that states, "Detective Howard

22   saw in plain view on the front passenger seat a hooded

23   sweatshirt with white strings hanging from the neck, a black

24   skull cap, and a dark-colored shirt.  Detective Howard also

25   observed the tip of gloves in the storage pocket in the rear

1    of the driver's seat.  These gloves were two-toned in color,

2    the palms were black, and the back of the hands were white."

3    These items are significant because the hooded sweatshirt

4    and distinctive two-toned gloves matched those.

5             Again, the Court finds Detective Howard's

6    testimony credible that these items were in plain view.  It

7    was a sunny day.  The car windows were not tinted.

8    Detective Howard was able to see into the car to observe the

9    items inside, and he also walked all around the car to

10   observe it from all angles.  This testimony is corroborated

11   by Investigator Tridico, who was with him during the traffic

12   stop, and by the defendant himself, who testified that

13   Detective Howard, in the beginning of their interaction,

14   walked around the car and looked inside.

15            The defendant challenges Detective Howard's

16   testimony in this respect in two ways.  First, he testified

17   that rather than being located on the front passenger seat,

18   the Champion-branded hoodie was folded on the back seat in

19   such a particular way he was certain the incriminating white

20   drawstrings were not visible and that the distinctive and

21   incriminating gloves could not have peeked out from the rear

22   driver seat pocket, and therefore, they were not his.

23            As I already discussed, I don't find the

24   defendant's testimony on this issue credible or persuasive.

25   The defendant's cherry-picking of items he owned and did not

1    own, what he saw, what he did not see despite their presence

2    in the car he drove and the house he lived in raises

3    significant question about his credibility and his testimony

4    regarding the position of the dark Champion-

5    branded hooded sweatshirt and the gloves.

6            The defense also contends that -- challenges

7    whether or not these items were in plain view first

8    providing the necessary probable cause to search by

9    indicating that he had the testimony of two bystanders who

10   testified to the officers searching through the defendant's

11   car.  I don't find that the testimony of these two

12   bystanders to be inconsistent with the testimony of the

13   police officers since they may have been observing what was

14   totally appropriate, which was a security sweep of the car

15   conducted by Investigator Tridico.  Furthermore, it's not

16   entirely clear whether the bystanders saw the police

17   searching the defendant's car or the defendant's wife's car.

18   As already noted, when the defendant's wife arrived at the

19   scene, she consented to a search, and her car is the

20   identical make and model of the defendant's car except it's

21   silver in color whereas the defendant's car is gold.  In

22   fact, when asked directly, neither of the witnesses was able

23   to confirm the color of the car that they observed being

24   searched.

25            The defendant, in his supplemental brief, attempts

1   to dispel this apparent ambiguity in the witnesses'

2   testimony by arguing that defendant's wife drove to the

3   scene long after the defendant had already been arrested and

4   after witnesses had returned to their homes.  This is

5   directly contradicted by Mr. Brown's testimony.  Mr. Brown

6   testified during the hearing last Friday that he had seen

7   the defendant's wife on the scene.  When asked if he

8   recognized the photograph of defendant's wife's silver Buick

9   LaCrosse, Mr. Brown testified it was probably the car from

10  that morning and that it was probably the car that was

11  searched by the police, indicating that there is at least

12  some ambiguity as to which car the witnesses actually saw

13  being searched.

14          In any event, even if the MPD officers had

15  searched the defendant's vehicle on the scene, it would be

16  permissible because, by the time Detective Howard saw the

17  clothes, he already had probable cause to search the car and

18  seize the items.

19          Detective Howard did not, however, do that.

20  Instead, he wanted to be extra careful.  He waited until

21  later that night, when he was able to obtain the appropriate

22  search warrants from a D.C. superior judge, and he only

23  searched -- these locations were only searched then.  This

24  is a much more reasonable explanation than the defendant's

25  insinuation that everyone, all these three officers,

1    including a lieutenant and a captain and officers from

2    different law enforcement agencies, were involved in some

3    kind of massive cover-up.

4           The defendant argues that Detective Howard must

5    have also materially misspoken -- this is Material

6    Misstatement No. 4 in Paragraph 11 of the affidavit -- when

7    he stated that a review of traffic footage captured during

8    the GPS tracking of the robber's movement after the December

9    26, 2014, robbery, quote, revealed a vehicle that appeared

10   to be similar to a Buick LaCrosse because an FBI report

11   initially described the suspect vehicle as, quote, a small

12   SUV-type vehicle.

13          Special Agent Johannes and Detective Howard

14   presented credible testimony that the traffic footage

15   captured on December 26, 2014, while following the GPS

16   device that was hidden inside the stack of money stolen from

17   the CVS, showed one of two cars that could have been the

18   getaway car for the perpetrator of that armed robbery:  a

19   silver SUV and a metallic four-door sedan.  This testimony,

20   which is corroborated by Government Exhibit 11, showed the

21   photo of the two cars captured by the traffic shot of the

22   traffic camera.  Therefore, the Court does not find that

23   Detective Howard materially misspoke in the affidavit when

24   he stated that a review of those images, meaning the images

25   taken by the traffic camera, revealed a vehicle that

1     appeared to be similar to a Buick LaCrosse.

2             Finally, the defendant also claims that Detective

3     Howard materially misspoke in his affidavit in Paragraph 16

4     when he stated Flowers was also wearing a black jacket, blue

5     jeans and brown boots.  Detective Howard immediately

6     recognized these clothing items as the same ones depicted in

7     the video because the black jacket that the defendant was

8     arrested in, according -- the defendant says this was

9     misstated because the black jacket that the defendant was

10    arrested in was not worn by the perpetrator in any of the

11    armed robberies.

12            Detective Howard, corroborated by Investigator

13    Tridico, explained that the affidavit itself was actually

14    drafted by another officer on the task force, and it appears

15    to be an unintentional misstatement due to the confusion in

16    the room at the time the affidavit was drafted where many

17    officers were contributing many details from -- throughout

18    the lengthy investigation.  This is a reasonable explanation

19    of the human error rather than a sinister cover-up of an

20    illegal search.

21            The Court also finds that while a misstatement,

22    this was not a material misstatement because there was so

23    much other evidence discussed in the affidavit that provided

24    probable cause such as the model of the car, the Champion-

25    branded hoodie, and the distinctive two-toned Memphis Foam

1    gloves seen in the car at the time of the arrest.

2            For these reasons, the Court concludes that there

3    were no material falsehoods and material omissions in the

4    affidavit submitted by Detective Howard, and that the two

5    search warrants that led to the seizure of physical evidence

6    from the defendant's vehicle and evidence were fully

7    supported by probable cause.  And accordingly, the

8    defendant's motion is denied in its entirety.

9            All right.  Now, let's turn to the government's

10   motion to admit other crimes pursuant to 404(b).

11           MS. SOLTYS:  The Court is aware that the

12   government filed a notice.

13           THE COURT:  I am.  Let me ask you about that

14   actually because I was a little puzzled by the withdrawal of

15   the February 7, 2014, armed robbery of the Ashley Stewart

16   store because my understanding of the evidence connected

17   with that -- you've withdrawn that, right?

18           MS. SOLTYS:  No.

19           THE COURT:  The witness to the February --

20           MS. SOLTYS:  No.  I withdrew No. 4, which was the

21   robbery of the businessman.

22           THE COURT:  Hold on.  Let's see.

23           Oh, that's one of the charged crimes.  So in --

24   this is what you -- the April 15th robbery -- you withdrew

25   the evidence related to the April 15, 2014, robbery; is that

1    correct?

2            MS. SOLTYS:  Yes.

3            THE COURT:  And I guess this was my puzzle because

4    the Ashley Stewart store on February 7, 2014, has apparently

5    a witness that says that the perpetrator of that armed

6    robbery fled in a small red sport utility vehicle which was

7    rounded and which appeared to be a Nissan or Toyota.

8            That description sounded fairly similar to the

9    burgundy Nissan Murano used in the April 15, 2014, robbery

10   which occurred two months later, which is the one that

11   you're now withdrawing.  And so I was puzzled about why --

12   and that Nissan Murano was also registered to the

13   defendant's wife.

14           MS. SOLTYS:  I think I could make it very --

15           THE COURT:  Why you might not.

16           MS. SOLTYS:  Very succinctly, Your Honor, I do not

17   believe that the witness who reports the vehicle in the

18   February 7, 2014, robbery wishes to -- I believe that person

19   made himself anonymous and that person's identity cannot be

20   determined.

21           THE COURT:  I see.

22           MS. SOLTYS:  So the government would not be able

23   to put forth that testimony --

24           THE COURT:  I see.

25           MS. SOLTYS:  -- upon --

1          THE COURT:  Okay.

2          MS. SOLTYS:  -- upon drilling down.  And then it

3     became my ultimate conclusion that I thought that I should

4     make my best argument -- put my best arguments forward, and

5     I felt that the facts of that particular robbery, namely

6     that --

7          THE COURT:  Two assailants, one's person -- I

8     understand the differences, but the one probative issue was

9     the car.

10          Okay.  I understand.  Let me just say I'm

11     particularly concerned about the old convictions from 1987

12     because that dates them back almost 30 years.

13          MS. SOLTYS:  So that's one.  So now it's only one.

14     It's not two.

15          And when I looked at the two, it was very hard to

16     figure out what was my very best argument, and I think that

17     the government's best argument really is relying on the *Bell*

18     case from this circuit from 2015 in which that evidence of

19     that robbery was with a deadly weapon, which that '86

20     robbery was not a robbery with a gun, it was a snatch-and-

21     grab-and-run, but that the 1987 was an armed robbery, and

22     that armed robbery is being admitted to show familiarity

23     with and access to firearms.  And that is permitted under

24     the *Bell* decision, which, of course, the Court knows that

25     there were murders that were admitted as other crimes

1    evidence to demonstrate familiarity with and access to

2    firearms.

3           And so when I looked at the two, I realized that

4    my best argument really is the one that's the firearm

5    relying on the *Bell* case.

6           The other point that I wanted to make is that it

7    helps to prove identity for the -- recall the testimony of

8    Detective -- I'm sorry, Agent Johannes that said it was

9    unique that these were women's clothing stores that were

10   being robbed, and both Ashley Stewart and Rainbow fit that

11   description, as did that 1987, which was the robbery of a

12   Lerner's clothing store.

13          So the government has an argument to make about

14   the distinctness of the location that was robbed.  And why

15   are women's clothing stores, you know, preyed upon by this

16   defendant?  I think it's because they are women that are

17   working there and women that are more likely to just

18   surrender to the defendant, and he has realized that this is

19   a convenient and an easy place to commit a robbery.

20          Now, the fact that the 1987 one is armed is

21   significant, and that is because -- again because of what

22   the Circuit has said in the *Bell* case.

23          So that is really -- that is my argument.  I

24   understand that it would be offered for a very limited

25   purpose.

1          With respect to the age, I cited the cases from

2     the *Sitzmann* case, and I believe it was also the *Rodriguez*

3     case, which just talk about other crimes evidence just

4     doesn't die.  It doesn't terminate over age.  It doesn't age

5     out.  What you have in this case is the defendant -- it's 27

6     years ago; however, he received an 18-year sentence in the

7     Maryland case for which he must have been out by early 2000

8     when he was then arrested in the 2001 case that was charged

9     -- prosecuted before Judge Hogan.

10          THE COURT:  I've been trying to figure this

11     imprisonment period out, and it's not really clear from the

12     government's papers as I've been trying to piece it together

13     because we don't -- we have a conviction -- I guess it's the

14     conviction, a March 30, 1987, carrying-a-pistol-without-a-

15     license conviction -- or that's the date it occurred, and

16     the conviction was later?

17          Anyway, but it's not clear whether he was in jail

18     from March 30, 1987, until -- he was in jail on that until

19     August 15, 1997.  That's when he was granted parole.  It's

20     not clear whether his parole was revoked on that.

21          I really -- I've had difficulty piecing this

22     together.  In my mind, you know, I think 404(b) prior bad

23     act evidence, particularly conviction evidence that is old,

24     is, you know, considered -- may be considered, but the fact

25     that it's remote in time does affect the evaluation of its

1    probative and relevant value depending on how old it is.

2    Now, that factor can be mitigated, shall we say, if the

3    defendant was in jail for huge chunks of the time

4    intervening between the time of the prior conviction and the

5    charged offenses.

6         Based on the calculations that I've done out of

7    the 28 years since 1987, it appears he might have been in

8    jail about 19 and a half years out of the 28, but I don't

9    really trust my calculations because I don't really feel

10   like I have a clear understanding of when he was in and when

11   he was out.  It affects my consideration of the probative

12   value of the 1987 armed robbery for this, and it's also very

13   important for the 609 consideration.

14        MS. SOLTYS:  Yes, I understand.

15        THE COURT:  So --

16        MS. SOLTYS:  I can tell the Court what I've looked

17   at.  I had access to the presentence report for the 2001

18   conviction before Chief Judge Hogan here in Washington,

19   D.C., and that is what helped me figure out some of the

20   dates.  I would be happy to provide the Court with more

21   information regarding the sentence that was served in the

22   1987 case if the Court felt that it needed that.  I believe

23   I have a copy.

24        THE COURT:  Well, we could do that.  There's

25   one other way that I -- you know, either the government or

1    the -- you know, the agents on the case with access to NCIC

2    and records can try and figure out how long he was in jail.

3    Another way to do it is, you know, if a defendant is

4    concerned about criminal history, I can ask the probation

5    department to do a criminal history report because they are

6    the masters of doing criminal history and getting records.

7             But I do want to tell you that I'm a bit concerned

8    about the age and my inability, based on the information in

9    front of me, to, you know, really pin down, other than in a

10   very rough way, how much of the intervening time between

11   1987 and 2015 he remained incarcerated.

12            MS. SOLTYS:  Within a week I would be prepared to

13   provide the Court with what information I can discern from

14   looking at either NCIC records or his prior presentence

15   reports.

16            THE COURT:  Okay.  Well -- all right.  What I'm

17   going to do is I'm going to rule now, and then once you --

18   if you get additional information, I am going to leave open

19   the possibility for you to present more information to ask

20   me to revisit some of these issues.

21            Let me hear from Mr. Peed, if he wishes, on the --

22            MS. SOLTYS:  Does the Court have any further

23   questions about any of the other --

24            THE COURT:  No.

25            MR. PEED:  Thank you, Your Honor.

1          With regard to the old convictions, this is the

2     first time I'm hearing that part of the government's theory

3     is also having to do with women's clothing stores.  I

4     actually was searching for a reason in responding to the

5     404(b) notice, and I couldn't think of one other than the

6     fact that it was a robbery and putting robbery before the

7     jury would help the government.

8          Obviously, if their main focus is that it would --

9     they were -- they show the ability to use firearms, there's

10    a much more recent conviction, 2001, which could be

11    introduced in the form of a stipulation that he was

12    convicted of having access to a firearm illegally.  So in

13    the 403 weighing analysis, it seems much more -- much less

14    prejudicial getting the same point across to the jury

15    avoiding all of the -- I've reviewed some of Your Honor's

16    prior opinions.  Emphasizing the crimes that are the same

17    charge are especially prejudicial to hang in front of the

18    jury.  People are going to actually think if he did this

19    before, he did it this time.

20         So I don't think the probative nature of these

21    ancient convictions, if that's really what the government is

22    trying to use them for, is at all worth what their

23    prejudicial value would bring, even notwithstanding the age.

24              THE COURT:  Uh-huh.

25              MR. PEED:  And while Mr. Flowers was incarcerated

1   for a long period of those 30 years, it's also the case that

2   people grow up, and, you know, a conviction that happened

3   when you're 20 or 21, you're not the same person when you're

4   49.  I think that needs to be taken into account, too.

5            That's the only one the Court has addressed.  I

6   believe the other -- you know, a lot of these robberies from

7   Maryland were kind of subsumed -- it was the defense's

8   position they were more likely to be introduced under 404(b)

9   than the charged robberies in the District, were they to be

10   separated, and since the Court ruled on that motion, it kind

11   of sweeps in the ones from Maryland the Court has nullified.

12            But given that they likely will be coming in --

13   you know, this trial has to be -- the information presented

14   to the jury is getting extremely dense when you consider

15   eight District robberies, three Maryland robberies, and

16   certainly I think adding more convictions from 30 years ago

17   would not help the jury in that sense.  Thank you.

18            THE COURT:  Thank you, Mr. Peed.

19            Okay.  I'm prepared to rule on the government's

20   motion to introduce evidence under Federal Rule of Evidence

21   404(b).

22            The government seeks to introduce five separate

23   prior bad acts of the defendant in its case-in-chief through

24   stipulation, videos, the testimony of law enforcement

25   officers, and witnesses.  And three of these -- also, I

1    guess, where the defendant had not been convicted to use

2    prior transcripts and judgment and commitment orders.  Three

3    of the five prior bad acts that the government seeks to

4    introduce are prior bad acts from the last two years for

5    which the defendant has not been clearly identified as the

6    perpetrator, let alone convicted of those acts; and two are

7    the defendant's prior convictions for a gun offense and an

8    armed robbery dating back to 2001 and 1987 respectively.

9            Under Federal Rule of Evidence 404(b), evidence of

10   a crime, wrong, or other act is not admissible to prove a

11   person's character in order to show that on a particular

12   occasion the person acted in accordance with the character.

13   See Federal Rule of Evidence 404(b)(1).  However, such

14   evidence may be admissible for another purpose, such as

15   proving motive, opportunity, intent, preparation, plan,

16   knowledge, identity, absence of mistake, or lack of

17   accident.  See Federal Rule of Evidence 404(b)(2).

18           The D.C. Circuit has pointed out that, quote,

19   although the first sentence of Rule 404(b) is framed

20   restrictively, the rule itself is quite permissive,

21   prohibiting the admission of other crimes evidence in but

22   one circumstance for the purpose of proving that a person's

23   actions conformed to his character.  See *US v. Bowie*, a D.C.

24   Circuit case from 2000.  In short, Rule 404(b) is a rule of

25   inclusion rather than exclusion.

1          The government contends that it is seeking to

2     introduce evidence of these five other bad acts to show --

3     not to show propensity or bad character, but to show the

4     defendant's identity, motive, opportunity, intent,

5     preparation and common plan.  The Court is required to

6     conduct a two-part analysis even if the evidence at issue

7     may come in under Rule 404(b).  The Court must nonetheless

8     certify -- thereby certifying a proper and relevant purpose

9     under Rule 404(b).  The Court must then apply an analysis

10    under Rule 403 and weigh its probity and prejudice.  See

11    *United States v. Miller*, a D.C. Circuit case from 1990, and

12    *US v. Sitzmann*, a D.D.C. case from 2012.

13          In evaluating the admissibility of evidence under

14    Rule 403, the Court is cognizant that this rule does not bar

15    powerful or even prejudicial evidence, but focuses instead

16    on the danger of unfair prejudice and gives the Court

17    discretion to exclude evidence only if that danger

18    substantially outweighs the evidence's probative value.  See

19    *US v. Pettiford*, a D.C. Circuit case from 2008.

20          The D.C. Circuit recently noted that, quote, the

21    Rule's requirement that the danger of unfair prejudice

22    substantially outweigh probative value calls on us, in close

23    cases, to lean towards admitting evidence.  See *US v.*

24    *Straker*, 800 F.3d 570 and 589, a D.C. Circuit case from

25    2013.

1          Application of these legal standards in this case

2     demonstrates that the other criminal acts proffered by the

3     government generally are clearly relevant to proving a fact

4     in issue, namely whether the defendant is the person who

5     committed the charged offenses, and the government's proffer

6     strongly indicates the evidence is sufficient to support a

7     jury finding as to those prior acts.  In addition, at least

8     as to most of the proffered acts, the probative value is

9     substantially outweighed by the danger of unfair prejudice.

10          I'm going to begin by discussing the most recent

11     other crime evidence the government seeks to admit starting

12     with the 2014/2015 uncharged conduct.

13          The government proffers that the Other Crimes

14     Evidence No. 1, which is the December 26, 2014, armed

15     robbery of the Maryland CVS Pharmacy, and the Crime No. 2,

16     which is the January 14, 2015, armed robbery of the Maryland

17     Murry's food store, and No. 3, the February 5, 2015,

18     attempted armed robbery of the Maryland KFC are part of the

19     investigation that eventually led the police to arrest the

20     defendant.  Specifically, the GPS tracking device from Crime

21     No. 1 led the police to the defendant's neighborhood; the

22     clear surveillance picture captured during the commission of

23     Crime No. 2 depicted the exact type of sweatshirt and gloves

24     found in the defendant's car right before his arrest; and

25     the surveillance footage from Crime No. 3 pointed the police

1   to look for a gold or silver Buick LaCrosse, which led to

2   the discovery of both cars parked in front of the

3   defendant's residence five houses down from where the GPS

4   device was disabled.

5          The similarity of the incidents -- the proximity

6   of the robbery sites, the types of stores robbed, the

7   description of assailant's physical attributes, the

8   description of the assailant's clothes, and the use of a gun

9   and threat of violence to take money from similar types of

10  stores -- are all factors that are highly probative that the

11  same person committing these other crimes also committed the

12  charged offenses.

13         The defendant principally argues that the Court

14  should not admit evidence of Other Crimes No. 1, 2, and 3

15  because they are not intrinsic crimes, nor are they similar

16  enough to establish a modus operandi that is probative of

17  identity.

18         The Court agrees to a certain extent that these

19  crimes are not intrinsic evidence because they are separate

20  and independent events which are not acts that are part of

21  the charged offense or some uncharged acts performed

22  contemporaneously with the charged crime that facilitate the

23  commission of the charged crime.  See *US v. Bell*, a D.C.

24  Circuit case from 2015 quoting *US v. Bowie*, a D.C. Circuit

25  case from 2000.

1          The Court disagrees with the defense, however,

2     that these crimes are not probative under Rule 404(b).  The

3     perpetrator need not have a unique Hollywood-worthy modus

4     operandi in order for other similar crimes to be considered

5     probative of identity under Rule 404(b).  For example, in *US*

6     *v. Levi*, a D.C. Circuit case from 1995, the Circuit found

7     other crimes to be similar enough to be admissible under

8     Rule 404(b) where the perpetrator consistently used a gun or

9     similar clothing, robbed similar types of establishments,

10    and eyewitnesses offered similar descriptions of the

11    perpetrator.

12          Here, eyewitness descriptions of the perpetrator

13    are similar across all the crimes.  The perpetrator wore

14    similar clothing, used the same tactic -- threatening

15    violence with a gun if the employees did not turn over money

16    from a safe or the cash register -- and robbed similar

17    commercial establishments in the same general neighborhoods.

18    Even if the defense is right that these characteristics are

19    unremarkable, they are nonetheless sufficient to be

20    probative.

21          The defense will have an opportunity at trial to

22    question the uniqueness of the government's identity

23    evidence as the defense acknowledged in a footnote in its

24    opposition on Page 10 at ECF No. 21.

25          The salient facts associated with the Crimes Nos.

1     1, 2, and 3 are highly probative and make the determination

2     of the identity of the perpetrator more probable.  The Court

3     must still assess, under Rule 403, the prejudicial effect of

4     these three prior bad acts and whether any potential

5     prejudice to the defendant substantially outweighs the

6     probative value they provide.

7          Other Crime Evidence Nos. 1, 2, and 3 carry no

8     attached convictions, and consequently this reduces the risk

9     of prejudice from a prior finding by another jury of the

10    defendant's guilt.  Additionally, the evidence of these

11    three other crimes are not more serious than the instant

12    charges and do not involve any more inflammatory conduct,

13    further reducing the potential for unfair prejudice.

14         The defendant focuses on Other Crime Evidence No.

15    2 saying it's actually too similar to some of the charged

16    crimes, those involving Murry's food stores, but not similar

17    enough to the other charged crimes such that it would cut

18    against the government's other signature evidence.  In

19    addition, the defendant argues that admission of this 404(b)

20    evidence would surely create a substantial risk of unfair

21    prejudice, confusing the issues, misleading the jury, undue

22    delay, wasting time, or needlessly presenting cumulative

23    evidence.  See the defendant's opposition at Page 12.

24         The Court disagrees that the evidence which the

25    defendant believes would undercut another piece of the

1    government's evidence is prejudicial to the defendant.

2    Surely this would only benefit the defendant at trial,

3    especially where there are similar and there are sufficient

4    similarities between Other Crime Evidence No. 2 to all of

5    the other charged crimes so that it is still highly

6    probative.  Given the distinct facts and evidence associated

7    with each uncharged crime, this will help avoid confusion of

8    the jury.

9            In sum, the Court concludes that Other Crime

10   Evidence Nos. 1, 2, and 3 are highly probative of the

11   identity of the defendant in the charged crimes, and the

12   probative nature is not outweighed by the danger of unfair

13   prejudice.

14           Other Crime Evidence No. 5 -- I'm now going to

15   turn to the older crimes -- is a prior conviction on March

16   1, 2001, for felony possession of a gun.

17           The government argues that this conviction shows

18   the defendant had access to illegal firearms and familiarity

19   with illegal firearms like those used in the subject

20   offenses, citing *US v. Bell*, the D.C. Circuit case from 2015

21   where the D.C. Circuit approved the admission under Federal

22   Rule of Evidence 404(b) of evidence of an uncharged murder

23   because it shows use of and familiarity with firearms noting

24   that knowledge of firearms is a permissible purpose under

25   Federal Rule of Evidence 404(b).

1      Defendant argues this conviction would only be

2  probative of knowledge of firearms if the firearm he

3  possessed in 2001 had anything to do with the charged crimes

4  or was part of a plan to commit those crimes or that the

5  means by which he had access to that firearm had anything to

6  do with the charged crimes.  See the defendant's opposition

7  at Page 14.

8      The Court disagrees.  The perpetrator of the armed

9  robberies that are charged must be someone who knows how to

10  obtain a firearm and, based on the surveillance videos, is

11  familiar with firearms and knows how to use firearms.  Even

12  if the same firearm from the 2001 conviction is not the one

13  used in the charged offenses, the 2001 conviction is

14  probative of whether this defendant is familiar with how to

15  obtain, how to use, and how to handle firearms and, in

16  particular, to my mind, how to acquire firearms illegally.

17      In *Bell*, the D.C. Circuit affirmed the admission

18  of a prior murder, as I noted, to show access and

19  familiarity with firearms and found that the limiting

20  instructions used by the district court were sufficient to

21  mitigate the danger of undue prejudice or improper

22  inferences, and here the prejudice is not even so high since

23  it doesn't involve a murder.  It's certainly not more

24  violent than any of the charged offenses.  And so, as a

25  consequence, I do not find that its probative value is

1    substantially outweighed by any unfair prejudice; therefore,

2    I find that the other crime evidence is admissible under

3    404(b).

4            Oh, I should also note that the defendant also

5    relies on *US v. Linares* for saying that this 2001 gun

6    conviction is not needed to demonstrate the defendant's

7    familiarity with firearms because the defendant is not

8    challenging his knowledge of firearms, and under *Linares*

9    that fact is important to evaluating whether or not it's at

10   all probative.

11           The 2001 gun conviction, however, is not merely

12   probative of the knowledge-and-intent element for firearm

13   possession charges that the defendant now faces.  It's also

14   probative of whether the defendant has access to an

15   illegally obtained firearm, which goes to identity.  So

16   therefore the Court finds that this conviction is admissible

17   under 404(b).

18           Now I'm going to turn to the more troubling Other

19   Crime Evidence No. 6, which is the May 23, 1987, conviction

20   of robbery with a dangerous weapon of a Maryland Lerner

21   store.  This robbery conviction dates back about 28 years,

22   and in that case the defendant used a gun to rob a

23   commercial establishment -- a clothing store, women's

24   clothing store -- of cash, very similar to the charged

25   offenses.

1          The government contends that this prior conviction

2     "shows what the defendant's motive was in the charged

3     attempted offenses and demonstrates that he had the

4     opportunity, he prepared and planned to commit the charged

5     offenses."  The government further argues that these -- this

6     prior robbery conviction "stands as strong evidence of the

7     defendant's identity as the person who committed the charged

8     offense."

9          The prior conviction for armed robbery and robbery

10    was certainly -- of the defendant was certainly highly

11    relevant to the police in targeting the defendant as the

12    suspect in the string of armed robberies in the D.C. and

13    Maryland metropolitan area because the fact that the

14    defendant had done it before led to a very strong suspicion

15    on the law enforcement agents' part that he was doing it

16    again, and I certainly get that.  But, at the same time,

17    this is the danger that Rule 404(b) and Rule 403 are

18    designed to guard against; propensity evidence.

19          As the defendant forcefully argues, the government

20    has presented little evidence of how the ancient prior

21    conviction would be probative of the identity of the

22    perpetrator of the charged crimes other than to show that

23    this defendant had a propensity to engage in this type of

24    criminal conduct.

25          Courts are generally also reluctant to allow

1    introduction of evidence relating to convictions that are so

2    remote or old, although the facts and circumstances must

3    still be closely examined.

4         In this case, the government has offered the

5    detail that it has at hand, but it's not enough for the

6    Court to evaluate just how remote this conviction is in

7    terms of how long this defendant remained incarcerated in

8    the intervening period of 28 years.

9         Courts have found that where the defendant was

10   incarcerated for much of the time between the prior

11   convictions and the instant offense, the total number of

12   years separating the prior offense and the charged offense

13   would not significantly diminish the probativeness of the

14   evidence.  See *United States v. Halk*, an Eighth Circuit case

15   from 2011 at 634 F.3d 482, where the Court discussed this

16   fact.

17        The Court understands that the prior conviction,

18   the 1987 armed robbery, is at least to some extent probative

19   of intent, motive, and possibly plan and -- you know, but

20   the Court finds that even if this 1987 armed robbery were

21   deemed to pass muster under Rule 404(b), I am very concerned

22   about the risk of improper propensity use of this prior

23   conviction, and I have to be mindful of the D.C. Circuit's

24   scrutiny of prior conviction evidence that is so similar.

25   And, you know, the circuit has stated in some cases that

1    manifest prejudice can result when the jury is informed of a

2    prior conviction that is similar to the charged offense.

3    See *US v. Coleman*, a D.C. Circuit case from 2009, as well as

4    *United States v. Jones*, the D.C. Circuit case from 1995.

5            At this point, in light of the minimal information

6    provided and the closeness of the issue, the Court is

7    inclined to deny the government's motion to introduce Other

8    Crime Evidence No. 6.  If, however, during trial, more

9    context and development of the overall record comes to light

10   where the evaluation of the relative probative evidence and

11   prejudicial effect of this evidence is altered or additional

12   evidence comes into -- is presented to the Court about how

13   this Court should evaluate the remoteness of the conviction,

14   I am willing to revisit it.  But at this point, I'm going to

15   deny the government's motion with respect to the 1987 armed

16   robbery.

17           Finally, even though the Court has concluded that

18   evidence of the four other crimes, Nos. 1, 2, 3, and 5, are

19   probative and not unfairly prejudicial standing alone, the

20   Court must still assess the cumulative prejudicial effect

21   from admission of all of these other crimes together.  The

22   D.C. Circuit has cautioned district courts to exclude

23   evidence that is unfairly prejudicial where its effect is

24   merely cumulative, noting that it is difficult, if not

25   impossible, to draw a line at which such evidence, by virtue

1    of its shear volume, necessarily becomes unfairly

2    prejudicial.  See *US v. Long*, a D.C. Circuit case from 2003.

3          In making this cumulative evaluation, the circuit

4    has recognized that merely the number of Rule 404(b)

5    witnesses and the number of transcript pages their testimony

6    consumed in the government's case-in-chief is not the only

7    standard by which to determine the district court abused its

8    discretion under Rule 403.  See *US v. Brown*, a D.C. Circuit

9    case from 2010.

10         So there's no mechanical solution or bright line

11   rule that limits prior bad act evidence to two or three or

12   four prior incidents, but the Court has to be mindful of the

13   possibility, as the defense counsel has pointed out in his

14   briefing and orally, that a large number of prior bad acts

15   involving the defendant taken together might have an unfair

16   prejudicial effect unless each incident standing alone has

17   some particularly relevant purpose.

18         In considering each proffered incident of prior

19   bad acts, the Court concludes that each of the four other

20   crimes does serve a different and relevant probative

21   purpose; so they're not merely cumulative.  Other Crime

22   Evidence No. 1 is probative of identity because the GPS

23   device led the police to the location five houses away from

24   the defendant's residence; Other Crime Evidence No. 2 is

25   probative of identity because the security footage captured

1    a clear image of the perpetrator showing the logos on the

2    sweatshirt and the gloves worn; Other Crime Evidence No. 3

3    is probative of identity because the security footage

4    captured the model of the car used in the crime, which

5    matches the defendant's car; Other Crime Evidence No. 5 is

6    probative of identity to show the defendant was very

7    familiar with and knows how to get and use a gun.

8            So accordingly, the government's motion to

9    introduce prior bad act evidence is granted in part and

10   denied in part.  Specifically the government may introduce,

11   under Federal Rules of Evidence 404(b) and 403, evidence of

12   other Crime Evidence No. 1, the December 26, 2014, armed

13   robbery of the CVS pharmacy in Maryland; 2, the January 14,

14   2015, armed robbery of the Murry's food store in Maryland;

15   3, the February 5, 2015, armed robbery of the KFC located in

16   Maryland; and 4, the 2001 felon-in-possession conviction.

17           The government's motion is denied with respect to

18   the other crime evidence with the Court's permission to

19   renew the motion as to -- with respect to the 1987 armed

20   robbery conviction if additional evidence comes to light.

21           All right.  We have Federal Rule of Evidence 609.

22   I'm going to take a short break and give my court reporter a

23   break, as well as myself, and then we will return.

24           MS. SOLTYS:  Could I beg the Court's indulgence

25   for a moment?  Is the Court aware that the government did

1   file a motion asking for the Court to make the defendant

2   submit to a buccal swab?

3          THE COURT:  Yes, I did, and thank you.

4          MS. SOLTYS:  And if the Court were to grant that

5   today, I would be able to have an FBI evidence tech here

6   this afternoon to take the sample.

7          THE COURT:  Okay.  Do you have any position on

8   that?

9          MR. PEED:  I have not had a chance to confer with

10  Mr. Flowers.  I can do that during the five-minute recess.

11         THE COURT:  Okay.  Why don't we do that.

12         Okay.  Thank you.  We're going to take a ten-

13  minute recess.

14         And Mr. Peed, if he can sense -- (to Ms. Soltys)

15  do you have your agent here to do it right now?

16         MS. SOLTYS:  Yes.

17         THE COURT:  Okay.  Maybe I'll come out, and it's

18  done.

19         THE CLERK:  This Honorable Court stands in recess

20  for a period of ten minutes.

21         (Recess taken)

22         THE COURT:  Mr. Peed, what is the resolution of

23  the government's motion for buccal swab?

24         MR. PEED:  We don't want to consent to the motion,

25  Your Honor.  I have begun reviewing the law, and there are

1    some standard motions.  Obviously this issue comes up so

2    there are some standard motions from the defense bar on

3    this.  I can make a couple of points, if Your Honor wants to

4    hear them, or I could write them down and submit them.

5              THE COURT:  Why don't you make whatever points you

6    want to make now.  I'm ready to rule.

7              MR. PEED:  So I think the most important point for

8    the -- obviously I've reviewed *Maryland v. King* where the

9    Supreme Court very clearly stated that these are not --

10   these searches do not violate the Fourth Amendment.  They're

11   not unreasonable searches.  In that case, there was a

12   Maryland statute authorizing the government to take the DNA.

13             I'm not sure what the government's source of

14   authority is as to ask to do something.  In other words, if

15   they had done this while booking him, we wouldn't make a

16   Fourth Amendment challenge under *Maryland v. King*; however,

17   they didn't do it.  So they're asking to do something for

18   which they're not citing a statutory authority for them to

19   do this.

20             THE COURT:  Well, I'm not sure -- why are you so

21   sure that they didn't take a buccal swab when they booked

22   him?  Because it's my understanding that even if they take a

23   buccal swab from an arrestee, there are restrictions on the

24   use of that buccal swab.  It can be used -- it goes into a

25   database, but it can only be used for limited purposes.

1          MR. PEED:  Right.

2          THE COURT:  And it would be unusual for them not

3     to have taken a buccal swab from Mr. Flowers at the time of

4     his arrest, but even if they did, that doesn't mean that

5     they're allowed to use it for purposes of investigative

6     purposes in this case.

7          MR. PEED:  Right.  One of the reasons, as Your

8     Honor cited, was these privacy protections at booking and

9     how they get used.

10          THE COURT:  Uh-huh.

11          MR. PEED:  Those were factors in *Maryland v. King*

12     for why it did not violate the Fourth Amendment.  And so the

13     fact that those protections were important to the Court in

14     issuing this ruling means that at the very least those kind

15     of protections seem to be developed here, including any

16     order here where the government's asking for something sort

17     of without that sort of statutory protection.

18          I think --

19          THE COURT:  Well, have you talked to Ms. Soltys

20     whether or not she would limit the use of the results of any

21     buccal swab test to investigative purposes in this case?

22          MR. PEED:  We haven't had any conversation at all

23     about that.

24          THE COURT:  Would the government have any

25     objection to that?

1          MS. SOLTYS:  No, Your Honor.  The agents are

2     present.  They've obtained the evidence, and they intend to

3     take it down to Quantico.  The purpose of taking the buccal

4     swab today is to have a known sample from the defendant to

5     be compared to the evidence that was seized in this case,

6     which, of course, the Court knows he denied.

7          THE COURT:  I think what Mr. Peed is saying -- and

8     I just had this happen in another case where the defendants

9     basically agreed -- he may consent to allow the buccal swab

10    to be taken in connection with the investigation in this

11    case with the agreement of the government that it would be

12    used only as evidence for investigative purposes in this

13    case, not, I guess, posted on the Internet.

14         MS. SOLTYS:  Okay.  I understand.  If I could have

15    the Court's indulgence for a moment.

16         (Pause)

17         MS. SOLTYS:  That's fine, Your Honor.

18         THE COURT:  So with that, Mr. Peed?

19         MR. PEED:  With that, the only other issue I'd

20    raise for the Court would be my understanding from viewing

21    some of these sample motions, and I haven't had a chance to

22    go to the primary sources, but the treatises by experts

23    about how DNA sampling and comparison should proceed is

24    unknown sources should be developed first to prevent the

25    analyst from being biased towards a match.  Here --

1          THE COURT:  Well, then you're talking about a

2   procedure that really doesn't have much to do with obtaining

3   the buccal swab here.  You're making arguments down the

4   line, I would take it.

5          MR. PEED:  Well, what I'm suggesting is that the

6   Court should first identify that there is any DNA to compare

7   before asking for a sample from Mr. Flowers to compare it

8   to.

9          THE COURT:  Well, I think the government's notice

10  is that -- well, I'll talk to Ms. Soltys about that, okay?

11         MR. PEED:  Thank you.

12         THE COURT:  Okay.  Ms. Soltys, I understood from

13  the motion -- and I don't actually have it in front of me,

14  but my recollection is that you made assertions in your

15  motion that based on the materials obtained from the car and

16  the residence it's the government's understanding that DNA

17  evidence can be recovered from those materials in order to

18  compare it to a buccal swab, DNA in the buccal swab.

19         MS. SOLTYS:  That's absolutely correct, Your

20  Honor.  The Court obviously is aware that we have shown the

21  Court pictures of items that were recovered.  Of great

22  significance now is that black lava that would most likely

23  have DNA samples from the sweat areas of a person's face,

24  the gloves, the jackets as well, and, of course, Your Honor,

25  it is the practice, as far as I am aware, of every

1     laboratory that ever sets out to do a DNA analysis, they

2     must have a sample for which they wish to compare.

3          But then, of course, they have a protocol that is

4     set up so that they do not -- so that they analyze one and

5     then look at the other and keep them separate and distinct

6     and do their analysis on two separate days so that there's

7     no problem with commingling samples.  And that, of course,

8     would be something that the defense would be free to explore

9     on cross-examination.  To the extent that there is a DNA

10    hit, the DNA expert would testify, he would be subject to

11    cross-examination, and the defendant could then cross and

12    attempt to demonstrate that because the known sample was

13    present in the laboratory, that the expert was biased, and

14    the expert could then explain what the protocol is to

15    eliminate such concern.

16          THE COURT:  Thank you.

17          Mr. Peed, as I said, some of the issues you were

18    raising seemed to go to process rather than the obtaining of

19    the sample.

20          MR. PEED:  That's correct, Your Honor.  It is

21    process.  And I think, if the government could agree just to

22    ensure that there are samples to be tested that are unknown,

23    then we can probably consent at that point to the buccal

24    swab.  Here there's no reason to take a swab before there's

25    any knowledge that there is DNA to compare it to.

1          Obviously it's highly unlikely.  I mean, I'm not

2     trying to impugn the credibility of the government, but it's

3     impossible for them, for the reason of contamination, if

4     they take the unknown sample first, produce that evidence to

5     the defense, and just take the swab.  For both parties it

6     rules out -- and pending the Court's investigation, it would

7     rule out defense investigating there wasn't any

8     contamination because we already got the samples first

9     before having the swab.

10          So for all parties' purposes, I believe if we just

11     ensure there is testable DNA that can be compared first from

12     the samples -- I'm sorry, from the evidence, and then the

13     Court can decide to order a swab to compare it to those

14     samples, there would be absolutely zero risk of

15     contamination.

16          THE COURT:  Don't you think that's a bloody waste

17     of time?  Don't you think, if you have a DNA expert in a lab

18     that is very busy, that if they're going to do a test, they

19     want to do -- they want to get the DNA off the material,

20     they want to test it with respect to the swab as opposed to

21     getting DNA off the materials, waiting, waiting until

22     there's another court proceeding, and then going back to it?

23     I mean, really, what really is the point of that, Mr. Peed?

24          MR. PEED:  Again, if the government produces to me

25     an expert report saying there's a DNA match, I'm going to

1    have to determine the chain of custody from the swab that's

2    taken today through every officer, and did an officer have

3    access to the evidence being tested, what were the

4    procedures, ensuring that the swab that's being taken had no

5    contact with the evidence that's being tested.

6            THE COURT:  All right.  Well, the government is

7    forewarned.  Any other objections to getting -- to the

8    government's motion now?

9            MR. PEED:  I've stated, I believe, all the

10   objections on the record, Your Honor.

11           THE COURT:  All right.  I'm going to grant the

12   government's motion.  The Supreme Court has made it

13   absolutely clear that the intrusion of a cheek swab to

14   obtain a DNA sample is a minimal one.  It's quick.  It's

15   painless.  See *Maryland v. King* from the Supreme Court's

16   case from 2013.

17           Second, the government's proffered that the DNA

18   can be recovered from the objects obtained as a consequence

19   of the search warrant from the car that the defendant was

20   driving and from his residence.  While the reach of *Maryland*

21   *v. King* is unclear in this circuit, its approval of

22   obtaining buccal swab DNA samples for identification

23   purposes confirms that the government may obtain a buccal

24   swab DNA sample from an arrestee for any identification

25   purpose -- see *Maryland v. King*, 133 S. Court at 1972 in

1    1980 -- finding that DNA analysis is substantially the same

2    as fingerprint analysis and holding that obtaining a buccal

3    swab sample constitutes a reasonable search from a

4    defendant's arrest is supported by probable cause to hold

5    for a serious offense.

6          In this case, the defendant has been indicted so

7    clearly the probable cause requirement is met, and lastly,

8    the defendant, by his very own testimony in this court last

9    Friday, has put the ownership of the clothing items at

10   issue, and the government bears the burden of proving that

11   the defendant possessed and wore those clothes.  Therefore,

12   this is a perfectly appropriate request and motion, and the

13   Court will now sign the order.

14         Do you want to get that done now before I do the

15   609, or are you planning on doing it --

16         MS. SOLTYS:  We can do it right now.

17         THE COURT:  Because I see the agents are sitting

18   there.

19         MS. SOLTYS:  Yes, Your Honor.

20         THE COURT:  So we can get them in and out before

21   they have to listen to me issue yet another long ruling.

22         MS. SOLTYS:  Thank you, Your Honor.

23         (Pause while buccal swab is obtained)

24         THE COURT:  All right.  We have two other matters

25   on my agenda.  The first is to deal with the government's

1    motion to be able to impeach the defendant with prior

2    convictions under Federal Rule of Evidence 609 and, two, to

3    set a trial date in the case.

4          Now, let's turn to the government's motion

5    docketed at ECF No. 13.  Ms. Soltys, do you have anything

6    that you want to add to the papers you've already submitted?

7          MS. SOLTYS:  No, Your Honor.

8          THE COURT:  And let me just ask one question of

9    you, if you wouldn't mind.  By your notice you're

10   withdrawing Other Crime Evidence No. 7 from 404(b).  Are you

11   also withdrawing that under 609, or not?

12         MS. SOLTYS:  No.

13         THE COURT:  Okay.  So you're keeping all the

14   convictions under 609?

15         MS. SOLTYS:  Yes.

16         THE COURT:  Okay.  I just wanted to be clear about

17   that.

18         And let me -- I'm sorry, I have a couple more

19   questions.  I just want to be absolutely clear about this.

20   It goes back to trying to figure out the period of time that

21   the defendant has served on each of the older convictions.

22   I take it that certainly the government's well aware that

23   under 609 there's a more stringent balancing test of

24   probative value and prejudicial effect for convictions older

25   than ten years, so I just want to make sure that my

1      understanding is that the government is not disputing that

2      the March 30, 1987, conviction of carrying a pistol without

3      a license, the May 23, 1987, Lerner Store armed robbery, and

4      the July 17, 1987, Kmart robbery are outside the ten years.

5      Do I understand that correctly?

6                  MS. SOLTYS:  Yes.

7                  THE COURT:  Okay.

8                  MS. SOLTYS:  Yes, Your Honor.  I accept that.

9                  I have a certified copy of the conviction from

10     Prince George's County showing the imposition of sentence

11     that occurred on May the 12th, 1988, for which the defendant

12     received an 18-year sentence that ran concurrent with three

13     other -- with two other guilty pleas that he tendered that

14     same day before Judge Johnson, and as I stated earlier --

15                 THE COURT:  He was -- but it's been very

16     challenging to figure out when his violations were -- when

17     he was violated on parole and put back in jail.  I know in

18     this circuit the law is a little bit less clear than in

19     other circuits --

20                 MS. SOLTYS:  Yes.

21                 THE COURT:  -- that if you're violated on parole

22     for a conviction that counts under 609 to -- as part of the

23     term of incarceration, and -- so, you know, I don't -- I'm

24     going to accept your concession, but then it puts you under

25     the much more stringent balancing.

1          MS. SOLTYS:  Yes, I understand, Your Honor.  The

2     best I could tell -- and I obtained this information from

3     the presentence report that was completed in the case before

4     Judge Hogan, which was the 0112 case which was for the 1987

5     cases -- the defendant was granted parole in 1997.  So he

6     served ten years.  A parole warrant was issued.  I do not

7     know if he went back into custody at that point or not.

8          To the extent that the Court wishes to put the

9     government to the test to make a more -- a clear timeline as

10    to the defendant's history -- that is, when he was

11    incarcerated and when he was out of custody -- I will accept

12    that challenge, and I will provide the Court with more

13    documentation.

14          THE COURT:  Well, it depends on how much you want

15    to get the prior conviction evidence in under 609(b), and,

16    you know, to the extent that it has a bearing on the

17    probative value relevance weighing in 404(b), it's really up

18    to you.

19          MS. SOLTYS:  That's fine, Your Honor.  But there

20    is one more point which I wish to make, which is simply

21    having to look at the *Lipscomb* case carefully to see what

22    Judge Wald was concerned with.  And where she wrote about

23    the fact that the probativeness of his earlier robbery

24    conviction, it showed that the robbery was not merely an

25    isolated criminal episode from which he has since been

1    rehabilitated.  And that is clearly the position that this

2    defendant is in; that there has not been a period of law-

3    abidingness throughout his history.

4         And the Court has made now a finding that the

5    defendant did not provide credible testimony when this

6    defendant took the Court -- took the stand before this

7    Court.  A jury listening to the defendant -- should the

8    defendant choose to testify, and I have every indication to

9    think that he will -- should have the same opportunity to

10   evaluate his credibility, and, of course, prior criminal

11   records are significantly probative as to credibility, and

12   then -- that's my piece.

13        THE COURT:  I understand.  I find -- I'll be

14   honest.  I have found the 404(b) and the 609 weighing in

15   this case to be very troubling.

16        So Mr. Peed?

17        MR. PEED:  Your Honor, while convictions go to

18   credibility, obviously all convictions do, some convictions

19   are more for issues having to do with fraud, showing an

20   ability to deceive, of which violent crimes simply aren't,

21   which is why there is a ten-year window placed in 609(b).

22   You know, given that it's 30 years ago when Mr. Flowers was

23   21, I think that it's not probative enough of the ability to

24   deceive -- the likely ability to deceive to really overcome

25   the clear propensity nature that it's going to have when

1    attaching -- when lay jurors hear it either through cross-

2    examination or through 404(b).  It's just -- the prejudice

3    will be substantial, and how much it goes to showing that

4    he's lying about his current testimony is minimal compared

5    to that prejudice.  Thank you.

6           THE COURT:  All right.  I'm prepared to rule on

7    the government's motion docketed at ECF No. 13 regarding the

8    use of the defendant's prior felony convictions to impeach

9    him should he elect to testify at trial.

10          Federal Rule of Evidence 609(a)(1)(B) states that

11   a defendant's prior felony conviction, quote, must, close

12   quote, be admitted for impeachment in a criminal case,

13   quote, if the probative value of the evidence outweighs its

14   prejudicial effect to that defendant.  This rule imposes an

15   important limitation by generally barring use of felony

16   convictions more than ten years old unless the Court finds

17   that the probative value of the evidence is supported by

18   specific facts and circumstances and substantially outweighs

19   its prejudicial effect.

20          The ten-year cut-off for the more stringent

21   probative value analysis is measured from the date of the

22   defendant's conviction or release from confinement for that

23   conviction, whichever is later.  Given the defendant's

24   multiple prior convictions and periods of incarceration,

25   including possibly on-parole violations, determining which

1    of the four prior convictions at issue are within or outside

2    the ten-year limitation is challenging.  In any event, the

3    government appears to concede that the defendant does not

4    dispute -- and the defendant doesn't appear to dispute --

5    that only the March 1, 2001, felon-in-possession-of-a-weapon

6    conviction is subject to analysis under Federal Rule of

7    Evidence 609(a) as falling within the ten-year period, and

8    the other three convictions are outside the ten-year

9    limitation.

10            I'm going to turn to the Federal Rule of Evidence

11    609(a) analysis first.

12            The Court must determine whether the probative

13    value of the prior conviction outweighs its prejudicial

14    effects to the defendant.  The weighing of the probative

15    value versus prejudicial effect under 609 is a different

16    calculus than under Federal Rule of Evidence 403, which

17    allows exclusion of relevant evidence if the danger of

18    unfair prejudice substantially outweighs its probative

19    value.

20            In other words, to keep out prior crimes evidence

21    for impeachment under Rule 609, the Court must determine

22    that the probative value is simply outweighed by the

23    prejudicial effect to the defendant while, under Federal

24    Rule of Evidence 403, the Court must determine the probative

25    value is substantially outweighed by the danger of unfair

1    prejudice.  Thus for criminal defendants, the balancing

2    under Federal Rule of Evidence 609 is somewhat more

3    protective of the defendant than under Rule 403, which is

4    the standard that applies to witnesses who are not criminal

5    defendants.  As one treatise explains, quote, a criminal

6    defendant's prior convictions may be excluded in situations

7    that would not justify exclusion for other witnesses.  See 4

8    Weinstein's Federal Evidence Section 609.05[3] at 609-37.

9        The prosecution bears the burden of persuasion and

10    must show that the probative value of a prior conviction

11    outweighs the prejudice to the defendant.  If it cannot do

12    so, the evidence is excluded.  See *US v. Lipscomb*, a D.C.

13    Circuit case from 1983.

14        Only the 2001 felon-in-possession conviction falls

15    within the ten-year window because the defendant was

16    released from prison for this conviction in 2009, well

17    within the ten-year mark.  Consequently, the question for

18    this 2001 conviction, which was also connected to a robbery,

19    is whether its probative value outweighs its prejudicial

20    effect such that it must be admitted to impeach the

21    defendant should he testify.  By contrast, the question with

22    respect to the other three prior convictions from 1987 and

23    1988 -- or maybe they're all from 1987 -- is whether their

24    probative value, supported by specific facts and

25    circumstances, substantially outweighs their prejudicial

1    effect.

2              The D.C. Circuit in *Lipscomb* made clear that all

3    felony convictions have some probative value on the issue of

4    credibility and, in particular, opined that even though

5    serious crimes, such as robbery and theft, that show

6    conscious disregard of others reflect more strongly on

7    credibility than, say, crimes of impulse or simple narcotics

8    or weapons possession.  The D.C. Circuit has further

9    instructed that courts should be reluctant to exclude

10   otherwise admissible evidence that would permit an accused

11   to appear before a jury as a person whose character entitles

12   him to complete credence when his criminal record stands as

13   direct testimony to the contrary.  See *US v. Lewis*, a D.C.

14   Circuit case from 1980.

15             With respect to the admission of the 2001

16   felon-in-possession conviction, under Rule 609(a)(1), the

17   Court must admit this prior conviction for impeachment if

18   the probative value of the conviction is greater than the

19   prejudicial effect, and I find that this conviction passes

20   the test for several reasons.

21             First, even though the felon-in-possession

22   conviction does not involve directly dishonest conduct or

23   false statements, it is a serious crime that shows conscious

24   disregard for the rights of others.  The felon-in-possession

25   conviction is not simply a possession conviction but

possession after the defendant has already been previously convicted of a felony, so this conviction shows complete disregard of the laws that clearly forbid such possession.

The defendant's commission of a felony gun violation after a prior felony and knowing that possession of a gun was illegal due to his status is a relevant consideration for a jury assessing the defendant's credibility and willingness to fulfill and respect his oath under the law to tell the truth while testifying.

Second, the probative nature of this prior conviction is particularly salient where defendant's credibility will likely be central to the trial because the main defense appears to be the defendant is not the one who committed any of the charged offenses.

Third, the prejudicial effect is not high because his prior conviction is not more serious or sensational than the charged crimes at issue here and because this prior conviction is already admissible under Rule 404(b) per my prior ruling.  Therefore, the Court finds that the probative nature of the 2001 felon-in-possession conviction does not outweigh its potential prejudice, and the government may use this conviction to impeach the defendant should he take the stand.

Now, turning to the July 1987 robbery conviction, the May 23, 1987, armed robbery conviction, and the 1987

1   custody-of-a-pistol-without-a-license conviction, these all

2   fall outside the ten-year limitation under Rule 609, and the

3   Court is not convinced that these convictions are -- even

4   though the Court is not convinced that they're definitively

5   outside the ten-year time frame, but given the lack of

6   clarity about when this defendant had his parole revoked and

7   how much time he served on any such revocation, I am not

8   going to -- certainly I'm not in a position to bicker with

9   the government's concession.  But relying solely on the

10  government's concession, these prior convictions face a

11  significant hurdle to admission under 609.

12          For these convictions as I stated to be

13  admissible, their probative value must be supported by

14  specific facts and circumstances and must substantially

15  outweigh the prejudicial effect.  The advisory notes to Rule

16  609(b) have emphasized that it is intended that convictions

17  over ten years old will be admitted very rarely and only in

18  exceptional circumstances.

19          With these principles in mind, the Court finds

20  that the government has not proven that the probative value

21  of these stale convictions substantially outweighs their

22  prejudicial effect.  To support the admission of these old

23  convictions, the government has cited the *Lipscomb* Court's

24  finding that, quote, all felony convictions are probative of

25  credibility to some degree, and even in oral argument today

1    has cited the fact that the *Lipscomb* Court allowed admission

2    of prior armed robbery convictions.

3         I do find that although custody of a pistol

4    without a license conviction may be probative of credibility

5    to some degree, that probative value is diminished in light

6    of the fact that it doesn't add to any determination of the

7    defendant's credibility beyond what is already added by the

8    admission of the 2001 felon-in-possession conviction.

9         The 1987 robbery convictions may hold more

10   probative value because they are serious crimes that also

11   show conscious disregard of the rights of others, but they

12   do not involve any false statement or dishonest conduct and,

13   therefore, the Court is not persuaded that their probative

14   value of the defendant's credibility, because that's what's

15   at issue for impeachment, substantially outweighs the

16   prejudicial effect.

17        Courts have consistently kept out stale

18   convictions, especially where they are not any more

19   probative of the defendant's credibility than already other

20   admissible evidence of fresher convictions, which in this

21   case would be the defendant's 2001 conviction.  See *US v.*

22   *Morrow*, a D.D.C. case from 2001 where the Court kept out

23   prior convictions older than ten years where they do not

24   involve dishonest conduct and the witness may already be

25   impeached based on other convictions, and *US v. Pettiford*

1    where the Court kept out stale convictions where the

2    underlying crime was not indicative of truthfulness and was

3    not able to show that the convictions were relevant to

4    credibility.

5          So therefore, the Court is going to keep out for

6    the impeachment value the three 1987 crimes.  I'm also

7    concerned that in the balancing with the prejudicial effect

8    of those, that it will also, as discussed in connection with

9    the 404(b), only have the effect of persuading the jury that

10   this defendant has a propensity to robbery, and particularly

11   armed robbery.

12         All right.  So with that, the government's motion

13   to impeach the defendant with prior conviction evidence --

14   prior convictions under Rule 609 is granted in part and

15   denied in part.

16         All right.  Now, let's turn to setting a trial

17   date in this case.

18         MS. SOLTYS:  Can I consult with defense counsel

19   for a minute?

20         THE COURT:  Yes.

21         MS. SOLTYS:  Thank you, Your Honor.

22         I was just consulting with defense counsel.  The

23   defendant would like an April or May trial date.  That would

24   be fine for the government.  I expect that there will be a

25   waiver of Speedy Trial rights as well.

1          THE COURT:  Okay.  Let's look at April or May.

2          MS. SOLTYS:  Does anyone know, when is Easter?

3          THE COURT:  April 27th?

4          MR. PEED:  March 27th.

5          MS. SOLTYS:  March 27th.

6          THE COURT:  Okay.  So I'm looking at an April 18th

7   date, which is a Monday.

8          MS. SOLTYS:  I think that would be fine.

9          THE COURT:  Does that date work for the

10  government?

11         MS. SOLTYS:  Yes, Your Honor.

12         THE COURT:  And does that date work for you,

13  Mr. Peed?

14         MR. PEED:  Yes, Your Honor.

15         THE COURT:  And have you consulted with

16  Mr. Flowers about exclusion of time under the Speedy Trial

17  Act?

18         MR. PEED:  I just had a chance to consult about an

19  April date, and he said that he was fine with an April date

20  or even a later date, but I didn't do a specific Speedy

21  Trial consultation.

22         THE COURT:  Would you do that now, please.

23         MR. PEED:  Sure.

24         (Pause)

25         MR. PEED:  Your Honor, I explained that

1    Mr. Flowers has a right to a speedy trial.  The government

2    would have to try him within 70 days of today essentially

3    because all motions have been decided, and he agreed to

4    waive that right and set a date in April.

5            THE COURT:  All right.  In addition to setting

6    the date -- okay.  All right.  Based on that representation,

7    and after consultation with -- counsel's consultation with

8    Mr. Flowers, I will exclude time between today and April

9    18th under the Speedy Trial Act and find that it is in the

10   interests of justice to do so.

11           I would also like to set a pretrial conference

12   date for April 1st.  Would you all check -- at 9:30 in the

13   morning.

14           MS. SOLTYS:  You know what, Your Honor?  I may be

15   out of town.  I don't have any firm plans yet, but I now --

16           THE COURT:  Is that spring break time?

17           MR. PEED:  Same here.

18           THE COURT:  Okay.  Well then, how about April 8th?

19           MS. SOLTYS:  That would be fine.

20           THE COURT:  Mr. Peed?

21           MR. PEED:  Yes.

22           THE COURT:  And just so you all know, under my

23   standing order, all motions in limine have to be ripe by the

24   time of the pretrial conference so I can resolve all motions

25   in limine at the pretrial conference, and your pretrial

1    statement is due at least ten days, I believe, prior to the

2    pretrial conference.  So if you're concerned about spring

3    break plans with family, just keep that in mind for the date

4    of the pretrial conference.  You'd have to get it done

5    before your spring break.

6              MR. PEED:  Based on those concerns of Your Honor

7    and my family struggles, I would rather have the current

8    trial date be the pretrial conference instead of the trial

9    date.

10             THE COURT:  Okay.  I usually do pretrial

11   conferences on Fridays.

12             MR. PEED:  It would be the 15th for the

13   conference.

14             THE COURT:  Okay.  We can do pretrial conference

15   on the 15th, and then set the trial date for May 2nd.  Does

16   that work for you, Mr. Peed?

17             MR. PEED:  Yes.

18             MS. SOLTYS:  Thank you, Your Honor.

19             THE COURT:  Okay.

20             All right.  Is there anything further to take up

21   today?

22             MS. SOLTYS:  Not from the government, Your Honor.

23             THE COURT:  Mr. Peed?

24             MR. PEED:  Not from the defense.

25             THE COURT:  All right.  You're all excused and

1   enjoy your weekend.

2                         (Whereupon the hearing was

3                      concluded at 4:32 p.m.)

4

5              **CERTIFICATE OF OFFICIAL COURT REPORTER**

6

7              I, LISA A. MOREIRA, RDR, CRR, do hereby

8    certify that the above and foregoing constitutes a true and

9    accurate transcript of my stenographic notes and is a full,

10   true and complete transcript of the proceedings to the best

11   of my ability.

12       Dated this 2nd day of February, 2016.

13

14                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
15                              United States Courthouse
                                Room 6718
16                              333 Constitution Avenue, NW
                                Washington, DC 20001
17

18

19

20

21

22

23

24

25