**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.

DAVID FLOWERS,

                Defendant.

Criminal Action No. 15-23 (BAH)

Chief Judge Beryl A. Howell

**MEMORANDUM OPINION**

       The defendant, David Flowers, was sentenced to 120 months' incarceration on his guilty plea, pursuant to a plea agreement, to two counts of interference with interstate commerce by robbery, in violation of 18 U.S.C. § 1951; two counts of attempted interference with interstate commerce by robbery, in violation of 18 U.S.C. § 1951; one count of armed robbery, in violation of D.C. Code §§ 22-2801 and -4502; and one count of possession of a firearm during commission of a crime of violence, in violation of D.C. Code § 22-4504. *See* Judgment in a Criminal Case ("Judgment") at 1–2, ECF No. 72. The defendant also pleaded guilty and was sentenced to 120 months' incarceration, to run concurrently with the aforementioned sentence, on two counts of an information filed in the District of Maryland charging interference with interstate commerce by robbery and attempted interference with interstate commerce by robbery, in violation of 18 U.S.C. § 1951. *See* Judgment in a Criminal Case, *United States v. Flowers*, No. 16-cr-63 (BAH) (D.D.C. filed Jul. 18, 2016), ECF No. 20 ("Maryland Judgment"). Ten months after his sentencing, the defendant filed the pending *pro se* Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence ("Def.'s Mot."), ECF No. 79, claiming that he received ineffective assistance of counsel in multiple respects and requesting an evidentiary hearing. For the reasons below, the defendant's motion is denied.

# I.    BACKGROUND

Set out below are the facts underlying the defendant's conviction, as presented during an evidentiary hearing on defense counsel's motion to suppress, *see* Evidentiary Hr'g Tr. dated Nov. 6, 2015 ("Evid. Hr'g Tr."), ECF No. 31, and summarized in the Statement of Offense accompanying the Plea Agreement, which facts were admitted by the defendant at the time of his guilty plea, *see* Stmt. of Offense, ECF No. 57; Plea Agreement, ECF No. 56; Plea Hr'g Tr. dated April 14, 2016 ("Plea Hr'g Tr.") at 24–26, ECF No. 84, followed by a summary of the hearings held regarding the defendant's guilty plea and sentencing.

## A.    The Defendant's Criminal Conduct

From 2014 to 2015, shortly after being released from detention pending a trial in Maryland state court on a rape charge, *see* Gov't's Mot. Admit Other Crimes Evid. ("Gov't's Rule 404(b) Mot.") at 25 n.12, ECF No. 12, the defendant committed a string of robberies in Maryland and the District of Columbia, on an almost monthly basis.  He became known to the Federal Bureau of Investigation and the Metropolitan Police Department as the "Early Bird Bandit" given his modus operandi of walking into small, local chain stores, usually shortly before the stores were fully open and staffed, and intimidating the employees by brandishing a firearm.  *See* Evid. Hr'g Tr. at 24–25.  During these robberies, the suspect wore similar, distinctive items of clothing, including a black ski mask, hooded sweatshirts, and two-toned gloves, as evidenced on video surveillance of several robberies.  *Id.* at 26–29, 124–25.  Identical clothing items were later seized by law enforcement during lawful searches of his car and residence.  *Id.* at 96–99, 126.

The first armed robbery to which the defendant admitted took place on the morning of October 13, 2014, when the defendant, wearing two-toned gloves and a dark-gray hooded

sweatshirt with fluorescent green drawstrings, entered a Murry's Food store in Washington, D.C., brandished a silver and black firearm, or imitation thereof, at two employees and forced them to enter an office inside the store. Stmt. of Offense ¶ 2; Evid. Hr'g Tr. at 36–41. The defendant asked one of the employees to open the safe, removed approximately $900, and exited the store through the front door. Stmt. of Offense ¶ 2. An identical sweatshirt was later seized during the execution of a search warrant at the defendant's residence. Evid. Hr'g Tr. at 126.

On the morning of November 15, 2014, the defendant entered a different Murry's Food store in Washington, D.C., wearing a dark sweatshirt with light-colored drawstrings, a ski mask, and, again, two-toned gloves. Stmt. of Offense ¶ 3; Evid. Hr'g Tr. at 41, 127. The defendant again brandished a silver and black firearm, or imitation thereof, and ordered an employee to go inside an office near the front of the store. Stmt. of Offense ¶ 3. After the employee opened the safe, the defendant removed an undetermined amount of cash and exited the store. *Id.* Following this pattern, on the morning of December 10, 2014, the defendant entered a Rainbow clothing store in Washington, D.C., brandishing a black firearm or imitation thereof. *Id.* ¶ 4. The defendant escorted two employees to cash registers in the rear of the store, instructed them to open a safe, removed $1,706.95, and exited the store with the money. *Id.*

Then, on December 26, 2014, the defendant entered a CVS Pharmacy in Capitol Heights, Maryland, again wearing a gray hooded sweatshirt and a ski mask and brandishing a silver and black firearm, or imitation thereof. *Id.* ¶ 5; Evid. Hr'g Tr. at 57. He escorted an employee to an office inside the store, instructed him to open a safe, removed $9,000, and exited the store with the money. Stmt. of Offense ¶ 5. This time, however, a GPS device hidden in one of the bundles of cash that the defendant stole led the police to a cul-de-sac near the intersection of 57th Street and Foote Street. Evid. Hr'g Tr. at 58–59, 77–78, 130. The same GPS device also

showed that the driver stopped at the intersection of Southern Avenue and East Capitol Street SE, where a traffic camera captured a picture of a gold-colored four-door Buick LaCrosse. *Id.* at 80–85. The defendant's wife, Terri Holman, was, at the time, renting a gold Buick LaCrosse from Enterprise. *Id.* at 86.

In addition to those successful armed robberies, the defendant also admitted, as part of his plea, to several attempted robberies in Maryland and the District of Columbia. Specifically, on January 18, 2015, the defendant entered a different CVS Pharmacy in Washington, D.C., wearing his two-toned gloves and a dark sweatshirt with light-colored drawstrings, and walked through the aisles before standing in aisle seven. Stmt. of Offense ¶ 6. When an employee approached him, the defendant brandished a silver and black firearm, or imitation thereof, before demanding that the employee open an office door. *Id.*; Evid. Hr'g Tr. at 50. When the employee refused and walked away, the defendant exited the store. Stmt. of Offense ¶ 6.

After months of searching for the "Early Bird Bandit," investigators reaped the fruits of their efforts in early February 2015. On the morning of February 5, 2015, the defendant, again wearing a ski mask and two-toned gloves, entered a KFC restaurant in Clinton, Maryland, through a back door near the drive-through window and encountered an employee in an office. *Id.* ¶ 7; Evid. Hr'g Tr. at 63–64. The defendant brandished a silver and black firearm, or imitation thereof, and demanded money, but when the employee informed him that the employee could not access the money at that location, the defendant fled out the back door on foot. Stmt. of Offense ¶ 7. Critically, security footage of the restaurant's parking lot revealed that the suspect fled in a gold or silver Buick LaCrosse, matching the vehicle that was captured on camera after the December 26, 2014, robbery and that was rented by the defendant's wife, Terri Holman. Evid. Hr'g Tr. at 82–86, 131–32. That night, the police canvassed the area around 57th

Street and Foote Street, the cul-de-sac indicated by the GPS tracking device. *Id.* at 85. The police found both a gold and a silver 2015 Buick LaCrosse parked in front of the defendant's residence, a mere five houses away from where the GPS device was disabled after the December 26, 2014, robbery. *Id.* at 85–87, 143.

The next day, on the morning of February 6, 2015, the defendant entered a Popeye's restaurant in Washington, D.C., wearing a dark sweatshirt with white drawstrings, a black ski mask, and two-toned gloves, again brandishing a silver and black firearm, or imitation thereof, and forced three employees to enter the kitchen area. Stmt. of Offense ¶ 8; Evid. Hr'g Tr. at 52– 53. The defendant asked one employee to open the safe, but when the employee said she did not have access to the safe, the defendant exited the restaurant. Stmt. of Offense ¶ 8. FBI Agent Jeff Johannes later interviewed the Popeye's employee, who confirmed that the perpetrator of this robbery matched the description of the perpetrator of the CVS and KFC robberies. Evid. Hr'g Tr. at 90. While he was responding to this attempted robbery, MPD Detective Chad Howard observed the driver of a gold Buick LaCrosse at a nearby traffic light, looking at the police activity at Popeye's. *Id.* at 95, 135–36. Howard and his partner, Investigator Joseph Tridico, followed the Buick, which they discovered had the same license plate as the gold Buick the officers knew was leased by the defendant's wife. *Id.* at 136–37.

While Howard and Tridico were following the Buick, the driver made a right turn without using a turn signal. *Id.* at 116, 136–39. During the ensuing stop of the car, the officers observed that the defendant matched the height, build, and complexion of the perpetrator of the robberies, including the attempted robbery at Popeye's that morning, *id.* at 132–33, and also observed, in plain view on the front passenger seat of the defendant's car, a dark hooded sweatshirt with white drawstrings similar to the sweatshirt observed on the perpetrator in the

previous armed robberies, and a black ski mask. *Id.* at 141–42. In the storage pocket on the rear

of the driver's seat, Howard observed the tip of what looked like two-toned gloves, similar to the

distinctive two-toned gloves worn by the perpetrator of the armed robberies. *Id.* at 142–43.

After obtaining search warrants for the defendant's car and residence, law enforcement

recovered, *inter alia*, a dark blue sweatshirt with white drawstrings, gloves with a black rubber

bottom and a gray top, a black ski mask, a gray hooded sweatshirt, and a dark sweatshirt with

fluorescent green drawstrings, which closely matched the clothing described by witnesses of the

armed robberies and depicted on surveillance videos. *Id.* at 96–99.

> **B.** **Procedural History**

On February 24, 2015, a federal grand jury returned a three-count indictment and, the

next day, with the aid of court-appointed counsel, the defendant pleaded not guilty to all counts.

*See* Indictment, ECF No. 1; Minute Entry (Feb. 25, 2015). On March 17, 2015, and April 30,

2015, two superseding indictments were returned by the same grand jury, charging eighteen

counts and twenty-two counts, respectively, arising from numerous robberies in 2014 and 2015.

*See* First Superseding Indictment, ECF No. 5; Second Superseding Indictment, ECF No. 7. On

June 4, 2015, the defendant entered a not guilty plea to all counts of the Second Superseding

Indictment. At that hearing, defense counsel's motion to withdraw as counsel was granted based

on irreconcilable differences with the defendant. In response to the Court's query, the defendant

stated that "it's like we just got some differences that we just can't—we can't come to agreement

on," and that he did not trust the advice from counsel. Hr'g Tr. dated June 4, 2015 ("Hr'g Tr.

6/4") at 7, ECF No. 91. While granting the motion, the Court informed the defendant that the

right to appointed counsel "does not mean that you have the right to appointed counsel of your

preferred choice." *Id.* at 5. Alternative counsel was appointed for the defendant; it is the advice of this second counsel that the defendant now challenges.[1]

The defendant's new attorney filed two substantive motions, including a motion to suppress evidence found in the defendant's vehicle during his arrest and statements made to law enforcement, *see* Def.'s Mot. Suppress Evid. & Stmts., ECF No. 14, and a motion to sever the counts of the superseding indictment into separate trials, *see* Def.'s Mot. Sever Counts Indict., ECF No. 16. On November 6, 2015, this Court held a lengthy suppression hearing at which six witnesses testified, including the defendant and two additional defense witnesses, who were eyewitnesses to the defendant's arrest. Evid. Hr'g Tr. at 194–96, 204–07. At this hearing, the motions filed by defense counsel were resolved: the defendant's motion to sever counts of the indictment was denied, given the similarities between the various robberies underlying the indictment and the similar evidence for each incident, *id.* at 258–64; the defendant's motion to suppress statements made to law enforcement during his arrest was also denied, as well as his motion to suppress various physical evidence seized during the execution of the search warrants. Motions Hr'g Tr. dated Nov. 13, 2015 ("Mot. Hr'g Tr.") at 15, 20–22, 27–32, ECF No. 34.

The Court also granted in part and denied in part the government's motion to admit evidence of five other crimes under Federal Rule of Evidence 404(b), and, over strenuous objections from defense counsel, *id.* at 48–49, allowed evidence of the defendant's March 1, 2001, conviction for felony possession of a firearm; the December 26, 2014, armed robbery of a Maryland CVS; a January 14, 2015, armed robbery of a Maryland Murry's food store; and the February 5, 2015, attempted armed robbery of the Maryland KFC, *id.* at 52–58. Defense counsel persuasively argued to exclude evidence of the defendant's May 23, 1987, conviction for robbery

---

[1] Accordingly, all further references to "counsel" refer to the defendant's second court-appointed attorney.

with a dangerous weapon of a Maryland Lerner store. *Id.* at 58–61. Finally, the Court granted in part and denied in part the government's motion to admit impeachment evidence under Federal Rule of Evidence 609, and, again over defense counsel's vigorous objections, *id.* at 76–77, allowed evidence of the 2001 felon-in-possession conviction, *id.* at 80. Defense counsel succeeded in excluding three 1987 convictions for robbery, attempted robbery, and custody of a pistol without a license. *Id.* at 81–82.

Then, in February 2016, the defendant sent an *ex parte*, *pro se* letter to the Court seeking to obtain new counsel and suggesting other attorneys that could be appointed to this case. *See* Mot. Revoking Atty's Power of Att'y, ECF No. 37. At a status conference before this letter had been received by the Court, defense counsel brought this letter to the Court's attention and, in response to the Court's questions, the defendant stated that "When I go and sit there, we don't talk about winning the case. We just talk about a cop. And from the beginning I told them I wasn't guilty; but that don't mean nothing. It's just about pleading guilty." Hr'g Tr. dated Feb. 19, 2016 ("Hr'g Tr. 2/19") at 7, ECF No. 95. The defendant further complained that counsel had told his family he could not "beat the Government" and that, given the circumstances, he "kind of didn't hardly talk to [counsel] no more." Hr'g Tr. dated Feb. 25, 2016 ("Hr'g Tr. 2/25") at 8–9, ECF No. 94. In denying the defendant's motion for yet a third new attorney, the Court expressed concerns that "Mr. Flowers, who is well-versed in the criminal justice system, is indeed trying to manipulate this Court and the system in order to get what he is not entitled to, which is counsel of his preference, as opposed to competent counsel[,] appointed to him." *Id.* at 24. Moreover, "[t]he fact that Mr. Flowers has recommended certain attorneys in his letter . . . only corroborates part of [the] suspicion that he is trying to manipulate this Court in order to obtain a third lawyer on this case, after having two experienced[,] excellent[,] more than competent

criminal trial lawyers already assigned to this case." *Id.* at 24–25. Finally, the defendant's "voluntary decision to stop communicating" with counsel further suggested an attempt to "manipulate the system in order to show a breakdown in communications with his attorney in order to get his preferred counsel." *Id.* at 25.

At a hearing to ensure protection of the defendant's rights under *Missouri v. Frye*, 566 U.S. 134 (2012), and *Lafler v. Cooper*, 566 U.S. 156 (2012), the government explained the penalties faced by the defendant under the Second Superseding Indictment and the two plea offers previously extended to the defendant that had lapsed without acceptance by the defendant. Specifically, given the defendant's extensive criminal history, the government stated that he faced the possibility of more than 142 years in prison due to mandatory consecutive sentences for the six violations of 18 U.S.C. § 924(c). *See* Hr'g Tr. 2/19 at 9–10; Hr'g Tr. dated March 3, 2016 ("Hr'g Tr. 3/3") at 4–5, ECF No. 96. Nevertheless, the defendant rejected both plea offers that had been extended in December 2015, which were identical but for an extra one-point reduction in offense level for acceptance of responsibility in the second offer. Hr'g Tr. 2/19 at 10; Hr'g Tr. 3/3 at 5. These offers would have required the defendant to plead guilty to four counts of interference with interstate commerce by robbery in Washington, D.C., four counts of the same in Maryland, and one count of brandishing a weapon under 18 U.S.C. § 924(c), in exchange for the government dropping the remaining charges (including several § 924(c) charges) and agreeing to a stipulated sentence, under Federal Rule of Criminal Procedure 11(c)(1)(C), of thirteen years. Hr'g Tr. 2/19 at 13; Hr'g Tr. 3/3 at 3–4.

On March 29, 2016, a new grand jury returned a third superseding indictment, the operative indictment in this case, charging twenty-two counts in total: eight counts of possession of a firearm during a crime of violence or dangerous offense under D.C. Code § 22-4504(b); four

counts of interference with interstate commerce by robbery under 18 U.S.C. § 1951; two counts

of attempted interference with interstate commerce by robbery under 18 U.S.C. § 1951; six

counts of armed robbery under D.C. Code. §§ 22-2801, -4502; and two counts of attempt to

commit robbery while armed under D.C. Code §§ 22-2801–02, -4502.  Third Superseding

Indictment at 1–9, ECF No. 47.

On April 14, 2016, the defendant was arraigned on all counts of the Third Superseding

Indictment and pleaded guilty to six counts: two counts of interference with interstate commerce

by robbery, in violation of 18 U.S.C. § 1951, at the two Murry's Food stores (Counts Six and

Nine); one count of armed robbery, in violation of D.C. Code §§ 22-2801 and -4502, at the

Rainbow clothing store (Count Twelve); one count of possession of a firearm during a crime of

violence or dangerous offense, in violation of D.C. Code § 22-4504(b), at the Rainbow clothing

store robbery (Count Thirteen); and two counts of attempted interference with interstate

commerce by robbery, in violation of 18 U.S.C. § 1951, at the CVS Pharmacy and the Popeye's

restaurant (Counts Seventeen and Twenty).  *Id.*  The defendant also pleaded guilty to two counts

of an information transferred from the District of Maryland charging interference with interstate

commerce by robbery and attempted interference with interstate commerce by robbery, in

violation of 18 U.S.C. § 1951.  Plea Agreement at 1; Maryland Judgment at 1–2.  The plea

agreement, which was entered pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C),

provided that the defendant would be sentenced to 120 months' incarceration, followed by five

years of supervised release, a sentence more lenient than the offer rejected by the defendant on

March 3, 2016.  Plea Agreement at 4.

The Court accepted the plea agreement on July 15, 2016, explaining that despite the

defendant's admission of involvement in over twenty armed robberies or attempted robberies

over the course of a single year, "no actual firearm was recovered presenting a limited proof problem; significant judicial and prosecutorial resources are saved by entry of the plea; the reluctant victims would not have to testify in Court and forced to relive their fear; and, lastly, the agreed sentence of 120 months is a substantial sentence." Stmt. of Reasons at 5, ECF No. 73. The defendant was sentenced accordingly and the remaining counts of the Third Superseding Indictment were dismissed. *See* Sentencing Hr'g Tr., dated July 15, 2016 at 26–32, ECF No. 85.

The defendant filed the instant *pro se* motion on May 22, 2017, after his request for postconviction appointment of counsel was denied, *see* Minute Order (Feb. 23, 2017). The government's motion for an order confirming the defendant's waiver of attorney-client privilege to allow the government to interview the defendant's prior attorney was subsequently granted. *See* Order, ECF No. 88; Notice of Waiver of Attorney-Client Privilege, ECF No. 89.

## II.    LEGAL STANDARD

### A.    28 U.S.C. § 2255

Pursuant to 28 U.S.C. § 2255(a), a prisoner in custody may file a motion to "vacate, set aside or correct" a sentence that was "imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). "After a sentence is imposed, the defendant may not withdraw his plea; rather, 'the plea may be set aside only on direct appeal or collateral attack.'" *In re Sealed Case*, 670 F.3d 1296, 1302 (D.C. Cir. 2011) (quoting FED. R. CRIM. P. 11(e)); *see also United States v. Farley*, 72 F.3d 158, 162 (D.C. Cir. 1995). If the court finds "a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).

A judgment challenged on collateral attack carries with it a "presumption of regularity," "even when the question is waiver of constitutional rights." *Daniels v. United States*, 532 U.S. 374, 381 (2001) (internal quotation marks omitted). The burden of proof rests on the petitioner to establish a denial of constitutional rights by a preponderance of evidence. *Johnson v. Zerbst*, 304 U.S. 458, 469 (1938); *see also United States v. Simpson*, 475 F.2d 934, 935 (D.C. Cir. 1973) (concluding that, in a § 2255 action to set aside plea of guilty, "the preponderance of evidence supports the judgment rejecting petitioner's claim"); *United States v. Wright*, 63 F. Supp. 3d 109, 115 (D.D.C. 2014).

**B.      Ineffective Assistance of Counsel**

The Sixth Amendment provides that "[d]uring plea negotiations defendants are entitled to the effective assistance of competent counsel." *Lafler*, 566 U.S. at 162 (internal quotation marks omitted); *Frye,* 566 U.S. at 138. "It is well-established that the validity of a guilty plea depends on 'whether the plea represents a voluntary and intelligent choice,' and that 'the voluntariness of the plea depends on whether counsel's advice' satisfies the Sixth Amendment guarantee of effective assistance." *In re Sealed Case*, 488 F.3d 1011, 1015 (D.C. Cir. 2007) (quoting *Hill v. Lockhart*, 474 U.S. 52, 56 (1985)); *see also In re Sealed Case*, 670 F.3d at 1303 (concluding that "[a] plea is not voluntary or intelligent, and therefore unconstitutional, if the advice given by defense counsel on which the defendant relied in entering the plea falls below the level of reasonable competence" required by the Sixth Amendment) (quoting *United States v. Loughery*, 908 F.2d 1014, 1018 (D.C. Cir. 1990)); *United States v. McCoy*, 215 F.3d 102, 107 (D.C. Cir. 2000) ("A plea of guilty is constitutionally valid if and only if it 'represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.") (quoting *Hill*, 474 U.S. at 56). Indeed, "'a defendant who pleads guilty upon the advice of counsel may only

attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel' was not 'within the range of competence demanded of attorneys in criminal cases.'"  *United States v. Rubio*, 677 F.3d 1257, 1261–62 (D.C. Cir. 2012) (quoting *Hill*, 474 U.S. at 56).

Under the two-factor *Strickland v. Washington*, 466 U.S. 668 (1984), analysis that applies to evaluate the merits of an ineffective assistance of counsel claim under the Sixth Amendment, the defendant must demonstrate: "that (1) his counsel's performance 'fell below an objective standard of reasonableness,' and (2) 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Payne v. Stansberry*, 760 F.3d 10, 13 (D.C. Cir. 2014) (quoting *Strickland*, 466 U.S. at 687–88, 694). Failure of either prong of the *Strickland* inquiry will preclude relief.  *See United States v. Solofa*, 745 F.3d 1226, 1230 (D.C. Cir. 2014) ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.") (quoting *Strickland*, 466 U.S. at 697).  The *Strickland* analysis applies to § 2255 proceedings. *See United States v. Toms*, 396 F.3d 427, 432 (D.C. Cir. 2005); *see also United States v. Streater*, 70 F.3d 1314, 1318 (D.C. Cir. 1995) ("*Strickland v. Washington* applies to a collateral attack on the voluntary and intelligent nature of a guilty plea on Sixth Amendment grounds.") (citation omitted) (citing *United States v. Horne*, 987 F.2d 833, 835 (D.C. Cir. 1993)). Consistent with the burden on the defendant to establish the right to relief under § 2255, "the burden to 'show that counsel's performance was deficient' rests squarely on the defendant." *Burt v. Titlow*, 134 S. Ct. 10, 17 (2013) (quoting *Strickland*, 466 U.S. at 687).

With respect to the first *Strickland* factor, the defendant "must show that counsel's actions were not supported by a reasonable strategy."  *Massaro v. United States*, 538 U.S. 500,

505 (2003); *United States v. Brisbane*, 729 F. Supp. 2d 99, 109 (D.D.C. 2010) (same). When

engaging in this analysis, the Supreme Court has instructed that "counsel should be 'strongly

presumed to have rendered adequate assistance and made all significant decisions in the exercise

of reasonable professional judgment.'" *Titlow*, 134 S. Ct. at 17 (quoting *Strickland*, 466 U.S. at

690); *Payne*, 760 F.3d at 13 ("[A] court must indulge a strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance.") (quoting *Strickland*,

466 U.S. at 689); *see also United States v. Mendez-Cruz*, 329 F.3d 885, 891 (D.C. Cir. 2003)

("Judicial scrutiny of counsel's performance must be highly deferential.") (quoting *Strickland*,

466 U.S. at 689).

    With respect to the second Strickland factor, "[i]n the context of pleas a defendant must

show" a reasonable probability that "the outcome of the plea process would have been different

with competent advice." *Lafler*, 566 U.S. at 163. "A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *United States v. Thompson*, 721 F.3d 711,

713 (D.C. Cir. 2013) (quoting *Strickland*, 466 U.S. at 694). Demonstrating a reasonable

probability in the context of a plea agreement requires a defendant to show "that there is a

reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded

guilty and would have insisted on going to trial." *Lafler*, 566 U.S. at 163 (alteration in original)

(quoting *Hill*, 474 U.S. at 59).

    With these standards in mind, the defendant's claims of ineffective assistance of counsel

are taken in turn.

## III.   DISCUSSION

    The defendant seeks to have his guilty plea and sentence set aside under 28 U.S.C.

§ 2255, asserting that his decision to plead guilty, while represented by two consecutive court-

appointed attorneys, was tainted by the "deficient advice," "deficient investigation," and "false information" of his second attorney. Def.'s Mot. at 13, 15. Specifically, the defendant alleges that his second court-appointed attorney rendered ineffective assistance by failing properly to advise on the plea, failing to investigate and utilize discovery, failing to investigate or call an alibi witness, and failing to object to a defective indictment. *Id.* at 4–8. The defendant requests an evidentiary hearing "to further investigate these issues." *Id.* at 19. As explained below, the defendant fails to demonstrate any instances of ineffective assistance of counsel, falling far short of meeting the *Strickland* standard, and is therefore not entitled to an evidentiary hearing.

### A. Counsel's Performance Was Objectively Reasonable

#### 1. *Counsel's Advice on the Plea Agreement Was Reasonable*

The defendant first claims ineffective assistance of counsel based on counsel's "deficient advice regarding the consequences of entering a guilty plea." Def.'s Mot. at 13. Although far from clear, the defendant appears to claim that counsel gave him "false information" that led him to believe "the state of Maryland had indicted him for other (unrelated robberies)." *Id.* According to the defendant, "[h]ad counsel adequately performed, there's more than a reasonable probability" the defendant would have chosen to go to trial. *Id.* at 14.

The defendant does not identify any specific statements by counsel that led him to believe he had been indicted in the State of Maryland. To the contrary, counsel repeatedly explained to the defendant he had not been indicted by the State of Maryland and that his plea agreement would not prevent state prosecutors from pursuing charges arising from any illegal conduct by the defendant in that state. For example, on April 9, 2016, counsel visited the defendant to discuss the government's plea offer and, upon his return, documented their discussion in a memorandum to the case file. *See* Gov't's Opp'n Def.'s Mot. ("Gov't's Opp'n), Ex. 1,

Memorandum re: Immediate Recollection of Visit with Mr. Flowers re: Plea Discussions, dated Apr. 9, 2016 ("Counsel's Memo") at 2, ECF No. 92-1. Counsel described his initial impression that the defendant "did not understand that his agreement was not binding on [Maryland state prosecutors] and would not prevent prosecution by [Prince George's] County." *Id.* Counsel then "explained the doctrine of dual sovereigns under the double jeopardy clause" and "discussed the implications of this at length," at which point the defendant "understood that nothing in the plea agreement would prevent [Prince George's] County from filing charges for the robberies that the USAO of Maryland was agreeing not to prosecute." *Id.*

The defendant may also have mistaken his guilty plea on two counts of an information filed in the District of Maryland for an indictment by the State of Maryland. To clarify this point, counsel and the Court explained to the defendant that by pleading guilty to the two charges in the information from the District of Maryland, he was waiving his right to have a federal grand jury consider those charges and his right to a federal jury trial on those charges. Plea Hr'g Tr. at 18–20. After a recess to allow the defendant time to review that information with his attorney, the defendant intimated that he understood these waivers. *Id.* at 14–15, 18–20. In addition, the defendant stated that he understood all of the charges against and that he had enough time to talk to his attorney about both the charges and the plea agreement. *Id.* at 15–17. He also stated at his sentencing hearing that he was satisfied with his attorney. Sentencing Tr. at 8. These representations "constitute a formidable barrier in any subsequent collateral proceeding," as "the defendant's 'declarations in open court carry a strong presumption of verity.'" *Farley*, 72 F.3d at 163 (quoting *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977)).

Moreover, throughout this case, the defendant has repeatedly asked clarifying questions of the Court and his attorney. *See, e.g.*, Hr'g Tr. 2/19 at 3, 14, 16; Plea Hr'g Tr. at 14, 22, 39.

Thus, if the defendant did have any misunderstanding about the charges brought against him or about the counts in his indictments, that misunderstanding "should have evaporated during the rule 11 colloquy."  *Farley*, 72 F.3d at 165; *see also United States v. Taylor*, 254 F. Supp. 3d 145, 157 (D.D.C. 2017) ("The defendant's own statements at the time of his plea about fully understanding the plea agreement and its consequences, as well as the findings of the sentencing judge, far outweigh the defendant's bare assertion now to the contrary.").  Further, in the absence of "even a hint of any defense, much less a suggestion that he could have succeeded had he gone to trial," *Farley*, 72 F.3d at 165, the defendant has not carried his burden of showing that his counsel's performance was deficient, *see Titlow*, 134 S. Ct. at 17, or that he would likely have succeeded at trial, *see Strickland*, 466 U.S. at 694.

Even if counsel had acted unreasonably, however, the defendant fails the second prong of the *Strickland* test because he has not shown that he suffered any prejudice from counsel's actions.  Had the defendant proceeded to trial, he faced a possible sentence in excess of 142 years due to stacking violations of 18 U.S.C. § 924(c).  Hr'g Tr. 2/19 at 14–20; Hr'g Tr. 3/3 at 4.  Given that his plea agreement stipulated a sentence of only ten years, and in light of the overwhelming evidence connecting him to the robberies at issue, the defendant has not shown a reasonable probability that "the outcome of the plea process would have been different with competent advice," *Lafler*, 566 U.S. at 163, and has not presented any evidence that "undermine[s] confidence in the outcome," *Thompson*, 721 F.3d at 713 (internal quotation marks omitted).

### 2.    *Counsel Acted Reasonably in Addressing Discovery*

The defendant next challenges counsel's "failure to investigate and utilize discoverable materials such as (D.N.A.) test performed on clothing items, that were alleged to have been worn

by the assailant who committed the crimes and also checks that were taken from the victim's business alleged to have been located at defendant's wife's residence." Def.'s Mot. at 15. He avers that counsel was deficient by "not verifying the (D.N.A.) found on the clothes alleged to have been worn by the assailant," *id.* at 16, and that counsel "misled him to believe false information" that "the stolen checks were discovered at the home of the defendant's wife," *id.* at 15. The defendant asserts that "[t]here's a reasonable probability had counsel utilized the discovery materials, the outcome of defendant's legal proceedings would have been different." *Id.* at 16.

"Where [a] case involves a failure to investigate, the 'particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *United States v. McDade*, 699 F.3d 499, 506 (D.C. Cir. 2012) (quoting *Strickland*, 466 U.S. at 691). To support a "failure to investigate" claim in a § 2255 motion based on ineffective assistance of counsel, a defendant must do more than simply assert a failure to investigate. He must instead make a "'comprehensive showing as to what information the investigation would have produced,' and how this information 'would have produced a different result.'" *United States v. Bertram*, 209 F. Supp. 3d 243, 256 (D.D.C. 2016) (alterations adopted) (quoting *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996)).

The defendant has not made that showing here, as to either the DNA evidence or the purported stolen checks, and in light of the overwhelming evidence against him, his claims of ineffective assistance must be denied. As for the DNA testing, the defendant ignores the fact that the items of clothing seized from his vehicle were observed in plain view through his car window during his arrest and matched numerous surveillance videos of the robberies, and that the

clothing was seized from his residence pursuant to a valid search warrant.  *See* Evid. Hr'g Tr. at 26–32, 124–25, 141–43.  Moreover, on April 1, 2016, the government notified counsel of its intent to call a Forensic Examiner in the DNA Casework Unit of the Federal Bureau of Investigation as an expert witness at trial.  Gov't's Opp'n, Ex. 2, Letter from Michael Marando to Counsel ("Expert Letter") at 1, ECF No. 92-2.  The witness prepared a laboratory report on biological material recovered from several items of clothing found in a search of the defendant's house and in a vehicle used by the defendant, that resembled clothing seen on surveillance camera footage of the robberies, including a ski mask, a blue hooded sweatshirt with white drawstrings, a gray hooded sweatshirt, a black jacket, and a blue hooded sweatshirt with yellow drawstrings.  Evid. Hr'g Tr. at 27–28, 36, 51; Expert Letter at 2.  Based on that report, the witness would testify that, "[t]o a reasonable degree of scientific certainty," the defendant was "the source of DNA" obtained from the ski mask and "the major contributor of DNA" obtained from the blue and white sweatshirt, the gray sweatshirt, the black jacket, and the blue and yellow jacket.  Expert Letter at 2.

Counsel's memorandum to the case file after his visit with the defendant indicates that he discussed this evidence with the defendant.  *See* Counsel's Memo at 3.  The defendant does not give any reason to doubt the veracity of the government's witness testimony, instead offering a blanket assertion that "had counsel verified the (D.N.A.) and uncovered that it 'did not' belong to the defendant, it could have been utilized as an [sic] negotiation tool."  Def.'s Mot. at 16.  In the face of the government's forthcoming expert testimony, however, counsel's decision not to verify independently the DNA evidence does not fall outside the "wide range of reasonable professional assistance."  *United States v. Shabban*, 782 F.3d 3, 8 (D.C. Cir. 2015) (quoting *Strickland*, 466 U.S. at 689).

Regarding the purported stolen checks, the defendant's claim again must be rejected because the record does not reflect that any such checks were found at his residence. In counsel's memorandum prepared after his visit with the defendant, counsel stated that he "reviewed the government's exhibit binder and current defense exhibits" with the defendant and "confirmed that the government apparently *did not find any Ashley Stewart checks*, since none are in the warrant photos and none are listed in the exhibit list." Counsel's Memo at 2 (emphasis added). The defendant offers no specific allegations regarding what false information counsel gave him or how that allegedly false information affected his decision to plead guilty. Moreover, the defendant stated at his plea colloquy that he was pleased with his counsel's services, and "the defendant's declarations in open court carry a strong presumption of verity." *Farley*, 72 F.3d at 163 (internal quotation marks omitted). The defendant has therefore fallen far short of establishing that his counsel was constitutionally deficient in this regard.

### 3. *Counsel Acted Reasonably in Addressing the Alibi Witness*

Next, the defendant alleges that counsel's failure to interview and call his wife, Terri Holman, as a witness "deprived him of exculpatory evidence in which a jury should of heard." Def.'s Mot. at 17. The defendant claims that the "investigation would have revealed petitioner was not in possession of the alleged vehicle on the days these crimes alleged to have occurred," because "[t]he defendant was drop off at [Ms. Holman's] house that morning to pick up the car to go to the dentist then meet her after work, so they could return the car to the rental center," *id.*, an alibi the defendant offered at the suppression hearing, *see* Evid. Hr'g Tr. at 225–29. Thus, the defendant alleges that counsel's failure to investigate or call Ms. Holman "detrimentally undermined defendant's rights to effective assistance of counsel, and potentially rendered his plea agreement inherently un-reliable." Def.'s Mot. at 17.

The defendant's argument ignores the fact that, even if he is correct that this alibi witness could testify as to the defendant's activity on the day of his arrest, no proffer has been made that the witness could provide an alibi for the many other robberies in this yearlong, one-man crime spree. Even so, evidence submitted by the government substantially undermines the defendant's claims and shows that counsel acted reasonably in addressing this potential witness. According to emails between counsel and counsel's investigator, the investigator made several attempts to speak to Ms. Holman, both in person and over the phone. *See* Gov't's Opp'n, Ex. 3, Emails between Counsel and Investigator ("Investigator Emails") at 1–3, ECF No. 92-3. The investigator stated that he had visited Ms. Holman's house "a number of times without getting any response." *Id.* at 1. When the investigator eventually reached Ms. Holman by phone, Ms. Holman intimated that she was unable to talk because she was at work and that she would call back later, but she did not return the call before the defendant's plea colloquy. *Id.* at 2–3. Counsel relayed these difficulties to the defendant in his visit on April 9, 2016, as reflected in counsel's detailed memorandum to the case file. *See* Counsel's Memo at 3. Counsel acknowledged the defendant's request to "try to contact Ms. Holman to see what she would say on his behalf," even though the defendant was "aware that Ms. Holman appears to not want to talk to the defense, since she has not responded to messages left at her door by [the] investigator." *Id.* The defendant has not offered an affidavit from Ms. Holman detailing what her testimony would have been, nor has he provided any indication that she is even willing to testify—falling far short of the required "comprehensive showing as to what the investigation would have produced." *Askew*, 88 F.3d at 1073 (internal quotation marks omitted).

Moreover, the defendant ignores the vigorous defense his counsel put on during the lengthy suppression hearing in this case. Counsel filed substantive motions in advance of this

all-day hearing and put on three witnesses, including two bystanders who had observed the search of the defendant's car on the day he was arrested. Evid. Hr'g Tr. at 194–96, 204–07. Counsel thoroughly questioned these witnesses and cross-examined the government's witnesses at this hearing, putting to rest any concerns about a failure to investigate possible leads. In light of counsel's vigorous defense, at this suppression hearing and throughout this case, the defendant's failure-to-investigate claim falls flat.

### 4. *Counsel Acted Reasonably by Not Objecting to the Indictment*

Finally, the defendant avers that "counsel's deficient performance and influence mislead [sic] him into pleading guilty to a defective indictment." Def.'s Mot. at 18. Specifically, the defendant claims that because the Third Superseding Indictment dropped charges under 18 U.S.C. §§ 922(g) and 924(c) while adding charges under the D.C. Criminal Code, the Court "los[t] subject matter jurisdiction." *Id.* The defendant also alleges that counsel was ineffective by failing to argue that "the grand jury session time had expired." *Id.* at 18–19.

The defendant is mistaken on both counts. First, this Court has jurisdiction over "[a]ny offense under any law applicable exclusively to the District of Columbia which offense is joined in the same information or indictment with any Federal offense." Court Reform Act, Pub. L. No. 91-358, title I, § 111, 84 Stat. 473, 477–78 (codified at D.C. Code § 11-502(3)). Thus, this Court may exercise jurisdiction over local D.C. Code criminal offenses "in a manner similar to pendent jurisdiction." *United States v. Brown*, 58 F. Supp. 3d 115, 121 (D.D.C. 2014). In this case, the D.C. Code offenses in the Third Superseding Indictment were properly joined to federal offenses of 18 U.S.C. § 1951 in the same indictment, and accordingly, this Court maintained subject-matter jurisdiction at all times.

As to the duration of the grand jury, the Third Superseding Indictment was returned on March 29, 2016, by a grand jury that was sworn in on May 5, 2015, *see* Third Superseding Indictment at 1, a time period well within the eighteen-month period provided in Federal Rule of Criminal Procedure 6(g). Given these facts, counsel's decision not to object to the indictment fell well within the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

### B.     The Defendant Is Not Entitled to an Evidentiary Hearing

A hearing on a § 2255 motion is not necessary when "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *United States v. Gooch*, 842 F.3d 1274, 1280 n.3 (D.C. Cir. 2016); *United States v. Simmons*, 951 F. Supp. 2d 137, 141 (D.D.C. 2013). A hearing is similarly unwarranted where the motion "fail[s] to allege sufficient facts or circumstances 'upon which the elements of constitutionally deficient performance might properly be found' . . . [or] where the defendant has failed to present any affidavits or other evidentiary support for the naked assertions contained in his motion." *United States v. Taylor*, 139 F.3d 924, 933 (D.C. Cir. 1998) (quoting *United States v. Pinkney*, 543 F.2d 908, 916 (D.C. Cir. 1976)).

As already discussed, the defendant's motion, the government's opposition, and the transcripts of the proceedings held before this Court conclusively show that the prisoner is not entitled to relief. Moreover, the defendant has provided no affidavits or evidentiary support for the broad, conclusory statements offered in his motion, and his motion is bereft of any specific factual allegations pertaining to his claims. Consequently, the defendant's request for an evidentiary hearing is denied.

## IV.    CONCLUSION

Accordingly, because the defendant has not proven under *Strickland* that his counsel's performance was objectively unreasonable, the defendant's motion to vacate his sentence is denied.  An appropriate Order accompanies this Memorandum Opinion.

Date: January 11, 2018

_____
BERYL A. HOWELL
Chief Judge